1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

CONFEDERATED TRIBES OF THE CHEHALIS
RESERVATION

TULALIP TRIBES

HOULTON BAND OF MALISEET INDIANS

AKIAK NATIVE COMMUNITY

ASA'CARSARMIUT TRIBE

ALEUT COMMUNITY OF ST. PAUL ISLAND

            Plaintiffs,

    v.

STEVEN MNUCHIN, SECRETARY, UNITED
STATES DEPARTMENT OF THE TREASURY

            Defendant.

Case No.: 01:20-cv-01002-APM

MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
AND MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF MOTION

## MOTION

Pursuant to Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1, Plaintiffs

hereby move for a temporary restraining order (TRO) and preliminary injunction immediately

directing Defendant Steven Mnuchin, Secretary of the U.S. Department of the Treasury, to:  1)

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 1

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

exclude Alaska Native regional corporations and Alaska Native village corporations (collectively, "ANCs") from the allocation or distribution of Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") Title V funds, and 2) to allocate and disburse to federally recognized Tribal governments all $8,000,000,000 reserved by Congress for Tribal governments, according to a reasonable formula consistent with the CARES Act, no later than April 26, 2020, the statutory deadline established in the Act.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiffs the Confederated Tribes of the Chehalis Reservation ("Chehalis"), the Tulalip Tribes ("Tulalip"), the Houlton Band of Maliseet Indians ("Houlton Band"), the Akiak Native Community ("Akiak"), the Asa'carsarmiut Tribe ("ATC"), and the Aleut Community of St. Paul Island ("Aleut") (collectively, "Plaintiffs" or "the Tribes") bring this suit against the Secretary of the Treasury (the "Secretary") to block his impending, unlawful diversion of federal COVID-19 relief funding—intended by Congress to provide Tribal governments with critical budgetary help at this time of great crisis—to private, state-chartered Alaska Native corporations.  In Title V of the CARES Act, Congress provided that the Secretary must distribute $8,000,000,000 in funding to Tribal governments by the end of this week in order to lessen the severe strain that combatting the COVID-19 pandemic has placed on their budgets and the delivery of services to their members.  The Secretary's determination to allocate Title V monies to non-governmental Alaska corporations will necessarily reduce the funds available for allocation to Plaintiffs and other Tribal governments, at a time when they desperately need the funding to provide essential governmental services and to safeguard the public health and welfare in their communities.

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 2

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

Plaintiffs accordingly move for a temporary restraining order and preliminary injunction directing the Secretary to allocate the full $8,000,000,000 in Title V funding to Tribal governments as Congress intended.  Immediate relief is essential and Plaintiffs request that the Court hear this motion on an expedited basis.  Because Congress specified that the Secretary must distribute all $8,000,000,000 in tribal relief funding on or before April 26, 2020, payments will issue in short order.  Once those payments are made, it will likely be impossible for the Tribes to recover any of the diverted funds and to use them, as Congress plainly directed, to meet the critical needs of their communities which have been besieged by the coronavirus pandemic.  Plaintiffs only learned of the Secretary's intention to divert governmental funding to private corporations less than a week ago, and filed this suit almost immediately.  The criteria for injunctive relief are amply satisfied here and Plaintiffs respectfully respect that this Court issue an order requiring the Secretary to follow the law.

## II.    BACKGROUND

### A.    The COVID-19 Pandemic and Its Devastating Effects on Plaintiffs.

In December 2019, a new coronavirus known as SARS-CoV-2 was detected in the People's Republic of China, causing outbreaks of the novel coronavirus disease COVID-19 there and around the world.  On March 11, 2020, the World Health Organization formally declared that the COVID-19 outbreak is a pandemic, and expressed deep concern over its alarming spread and severity and the worrying levels of inaction as infection rates and deaths soared.[1]  On March 13, 2020, President Trump issued a proclamation declaring a national emergency concerning

---

[1] Tedros Adhanom Ghebreyesus, *WHO Director-General's opening remarks at the media briefing on COVID-19*, World Health Org. (Mar. 11, 2020),

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 3

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

COVID-19, recognizing the preventative and proactive measures being taken by all levels of government to slow the spread of the virus and treat those affected.[2]

According to the Centers for Disease Control and Prevention ("CDC"), as of April 19, 2020, the United States has experienced 720,630 confirmed cases of COVID-19 and suffered 37,202 deaths.[3]  Tribes and tribal members have not been spared—COVID-19 is instead causing devastating harm throughout all of Indian country.  As of April 17, 2020, the Navajo Nation alone has reported 1,127 cases and 44 deaths related to COVID-19.[4]

Plaintiffs comprise a diverse group of sovereign Tribal governments, but they are united in the tremendous disruption they have suffered as a result of the COVID-19 pandemic.  Tulalip, Chehalis, and the Houlton Band are located in the lower 48 states—though on opposite coasts, in Washington and Maine.  Each of these federally recognized Tribes has declared a State of Emergency, issued Stay at Home orders, or both.  Gobin Decl. ¶ 30 (Tulalip); Declaration of Harry Pickernell, Sr. ("Pickernell Decl.") ¶ 20 (Chehalis); Declaration of Clarissa Sabattis ("Sabattis Decl.") ¶ 5 (Houlton Band).  As a result of the COVID-19 pandemic, each government has been forced to take extraordinary emergency actions to stem the spread of the virus, maintain

---

https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[2]  Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, The White House (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[3]  Centers for Disease Control and Prevention, *Cases of Coronavirus Disease (COVID-19) in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Apr. 19, 2020).

[4]  Press Release, Navajo Dep't of Health, *Navajo Nation Health Command Operations Center Confirmed 85 New Cases As Second 57-Hour Curfew Takes Effect on Navajo Nation* (Apr. 17, 2020), https://tinyurl.com/y8sl4bvm.

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 4

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

existing essential government services, develop and deploy COVID-19 response measures, and help their citizens avoid financial ruin.  *Infra* at 12-13, 30-33.  Nearly all of their government resources—financial and otherwise—have been redirected toward COVID-19 efforts, and they desperately need funds to continue those efforts.  *Infra* at 12, 29-34.

These profound impacts of the pandemic have struck Tribal governments in Alaska with equal force.  Akiak, ATC, and ACSPI are federally recognized Indian tribes located in remote areas of Alaska.  Like their lower 48 counterparts, these Tribal governments have also declared States of Emergency, issued Stay at Home orders, or both.  Declaration of James C. Landlord ("Landlord Decl.") ¶ 6 (ATC); Declaration of Amos Philemonoff ("Philemonoff Decl.") ¶ 6 (ACSPI); Declaration of Mike Williams ("Williams Decl.") ¶ 2 (Akiak).  Each of these Tribal governments has also seen their financial resources vanish as they have taken the emergency steps necessary to provide critical services to protect tribal members' health and financial well-being.  *Infra* at 30-34.  Like other Tribal governments they too have "attributed almost every resource of the Tribal Government to responding to the pandemic threat."  Philemonoff Decl. ¶ 5.  They are in grave need of financial relief to continue their efforts.  *Infra* at 30-34.

**B.**      **The CARES Act and the Title V Coronavirus Relief Fund.**

Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020), which President Trump signed into law on March 27, 2020, to respond to the devastating impacts of the COVID-19 pandemic.  Its provisions direct relief tailored to specific sectors of American society, including economic aid to small businesses and employment retention programs for workers (Title I); unemployment insurance and other financial support systems for workers and families (Title II); pandemic

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 5

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

response and healthcare funding (Title III); support for economically struggling businesses regardless of size (Title IV); relief funding for State, Tribal, and local governments (Title V); and federal agencies and programs (Title VI).

To help meet the challenges and cover the increased expenditures by Plaintiffs and other federally recognized Tribal governments necessitated by the pandemic, Title V of the CARES Act, Section 5001, is targeted to State, local, and Tribal governments.  It is these same governments with whom the federal government is coordinating the fight against COVID-19—as the CDC reports, "[t]he federal government is working closely with state, local, tribal, and territorial partners as well as public health partners, to respond to this situation."[5]

Title V amends the Social Security Act, 42 U.S.C. §§ 301-1397, to create the Coronavirus Relief Fund ("Section 601") and appropriates $150,000,000,000 for fiscal year 2020 to make "payments to States, Tribal governments, and units of local government . . . ."  Section 601(a)(1).  The Act requires that the Secretary of the United States Department of the Treasury ("Secretary") "shall reserve . . . $8,000,000,000 of such amount for making payments to Tribal governments."  Section 601(a)(2)(B).  The Secretary is required to disburse these stabilization funds to Tribal governments "not later than 30 days after the date of enactment of this section," Section 601(b)(1), that is by April 26, 2020.  The funds are "to cover only those costs of the State, Tribal government, or unit of local government that – (1) are necessary expenditures incurred due to the public health emergency with respect to the Coronavirus Disease 2019 (COVID-19); (2) were not accounted for in the budget most recently approved as of the date of

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 6

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

enactment of this section for the State or government; and (3) were incurred during the period that begins on March 1, 2020, and ends on December 30, 2020." Section 601(d). "Tribal government" is defined as "the recognized governing body of an Indian tribe." Section 601(g)(5).

### C.   The Secretary's Imminent and Unlawful Diversion of Coronavirus Relief Funds to For-Profit, State-Chartered Alaska Native Corporations.

In a time of enormous need, the Secretary threatens to defy Congress's mandate by diverting Title V relief funds away from the 574 federally recognized Indian Tribal governments in the lower-48 states and Alaska that maintain a government-to-government relationship with the United States.  The Secretary has designated and determined to treat more than 230 Alaska Native regional *corporations* and village *corporations* ("ANCs") as "Tribal governments" for purposes of these payments.  As the Supreme Court explained in *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520, 534 (1998), ANCs are "state-chartered and state-regulated private business corporations,"[6] with shareholders that include non-Indians.  *See* 43 U.S.C. § 1606(h)(2), (h)(3)(D).  Receipt of funds by these ANCs will leave federally recognized Tribal governments with a fraction of the aid Congress intended for them.

Because Congress directed the Secretary to distribute Title V relief funds by April 26, 2020, he has acted with deliberate haste.  In order to determine the amounts that would be paid to each Tribal government, and as a precondition to receive funding, the Secretary requested certain

---

[5]  Centers for Disease Control and Prevention, *Situation Summary*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html (last updated Apr. 19, 2020).

[6] ANCs were created pursuant to the Alaska Native Claims Settlement Act ("ANCSA").  *See* 43 U.S.C. § 1602(g), (j) (defining Alaska Native regional corporations and village corporations).

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 7

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

data from Tribal governments on or about Monday, April 13, 2020, publishing a Certification for Requested Tribal Data ("Certification") form on the Treasury website.[7]

The Certification form makes it clear that the Secretary has determined to treat ANCs as Tribal governments for purposes of allocating and disbursing Title V Funds.  The Certification asks each funding applicant to state its "**Population:** Total number of *Indian Tribe Citizens/Members/Shareholders*, as of January 1, 2020" (italics added) and includes a note defining "Indian Tribe" as "any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act (85 Stat. 688, 43 U.S.C. 1601 et seq.), which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." *Id.*

The Certification also asks for "**Land Base:** Total number of land acres held by the Indian Tribe and any tribally-owned entity (to include entities in which the Indian Tribe maintains at least 51% ownership) as of January 1, 2020 (to include lands held in trust by the United States, owned in restricted fee status, owned in fee, or selected pursuant to the Alaska Native Claims Settlement Act)." *Id.*  Lands "selected pursuant to the Alaska Native Claims Settlement Act" [ANCSA] are ANC-owned lands.  *See Native Village of Venetie*, 522 U.S. at 524, 532-33 (explaining that through ANCSA "Congress authorized the transfer of . . . approximately 44 million acres of Alaska land to state-chartered private business corporations . . . without any restraints on alienation or significant use restrictions, and with the goal of

---

[7] U.S. Dep't of the Treasury, *Submission Required for Receipt of Coronavirus Relief Fund Payments* (Apr. 13, 2020), https://forms.treasury.gov/caresact/stateandlocal.

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 8

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

avoiding 'any permanent racially defined institutions, rights, privileges, or obligations'" (citations omitted)).[8]

The Treasury website provides that "Governments eligible for payments must provide payment information and required supporting documentation through the electronic [Certification] form accessible below.  To ensure payments are made within the 30 day period specified by the CARES Act, governments must submit completed payment materials not later than 11:59 p.m. EDT on April 17, 2020.  Eligible local and Tribal governments that do not provide required information—and in the case of a local government, the required certification— by 11:59 p.m. EDT on April 17, 2020, may not receive any payment from the Fund."[9] According to the website of the U.S. Department of the Interior, Indian Affairs, payments will be made no later than April 24, 2020, once the recipient has registered through the web portal.[10]

Each of the Plaintiff Tribes submitted to Treasury its Certification form with all required information prior to the deadline.  Pickernell Decl. ¶ 32 (Chehalis); Gobin Decl. ¶ 61 (Tulalip); Sabattis Decl. ¶ 13 (Houlton Band); Williams Decl. ¶ 6 (Akiak); Landlord Decl. ¶ 19 (ATC); Philemonoff Decl. ¶ 7 (ACSPI).  It is Plaintiffs' understanding that numerous ANCs, including

---

[8]  *See also* ANCSA Reg'l Ass'n, *Overview of Entities Operating in the Twelve Regions*, https://ancsaregional.com/overview-of-entities/ (last visited Apr. 15, 2020) ("Through ANCSA, Alaska Native corporations hold title to roughly 44 million acres of land held in private corporate ownership.").

[9]  U.S. Dep't of the Treasury, *The CARES Act Provides Assistance for State and Local Governments*, https://home.treasury.gov/policy-issues/cares/state-and-local-governments (last visited Apr. 16, 2020).

[10]  Indian Affairs, U.S. Dep't of the Interior, *Indian Affairs to Assist Tribes Eligible to Receive Funding from Treasury Under the Coronavirus Relief Fund* (Apr. 14, 2020), https://www.bia.gov/as-ia/opa/online-press-release/indian-affairs-assist-tribes-eligible-receive-funding-treasury-under.

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 9

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

all 12 for-profit regional corporations, submitted Certification forms to Treasury prior to the

April 17, 2020 deadline, which submissions Treasury accepted.[11]

There are more than 230 separate ANCs, including 12 regional corporations and

approximately 225 village corporations.[12]  The 12 regional corporations alone have over 138,000

shareholders.[13]  They are similar to other multinational corporations and own scores of corporate

subsidiaries, operating in all 50 states and countries across the globe.[14]  They are managed by

their corporate boards of directors.  *See* 43 U.S.C. § 1606(f).  Their business holdings include

everything from construction to pipeline maintenance to real estate management to

telecommunications to government and military contracting to environmental remediation to

facilities maintenance to catering and camp services to venture capital and financial management

to aerospace engineering.[15]  The 12 regional ANCs alone generated more than $10.5 billion in

revenues in 2018, and are consistently ranked as some of the largest corporations in Alaska based

---

[11]  Acee Agoyo & Todd York, *Alaska Native Corporations Outpace Tribes in Race for $8 Billion in Coronavirus Relief* (Apr. 17, 2020), https://www.indianz.com/News/2020/04/17/alaska-native-corporations-outpace-indian-country.asp.

[12]  Res. Dev. Council, *Alaska Native Corporations*, https://www.akrdc.org/alaska-native-corporations (last visited Apr. 15, 2020).  A 13th Regional Corporation was also formed for non-resident Alaska Natives, but the current status of the 13th Regional Corporation is unclear.  *See, e.g.*, ANCSA Reg'l Ass'n, *About the Alaska Native Claims Settlement Act*, https://ancsaregional.com/about-ancsa/ (last visited Apr. 15, 2020) (noting that the 13th Regional Corporation was involuntarily dissolved by the State of Alaska in 2013).

[13]  ANCSA Reg'l Ass'n, *Economic Impacts*, https://ancsaregional.com/economic-impacts/ (last visited Apr. 15, 2020).

[14]  Res. Dev. Council, *Alaska Native Corporations*, https://www.akrdc.org/alaska-native-corporations (last visited Apr. 15, 2020); NANA Reg'l Corp., Inc., *Overview* (May 17, 2017), https://www.nana.com/regional/Shareholder-relations/Shareholder-Preference/files/2017_NRC_One_Sheet_OVR_0256_1024_Part1.pdf.

[15]  *See* Res. Dev. Council, *Alaska Native Corporations*, https://www.akrdc.org/alaska-native-corporations (last visited Apr. 15, 2020); Alaska Bus., *The 2019 Top 49ers*, https://digital.akbizmag.com/issue/october-2019/the-2019-top-49ers/ (last visited Apr. 15, 2020).

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 10

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

on gross revenue.[16]  Like other corporations, an ANC's mission is "[t]o maximize dividends and opportunities for [its] shareholders."[17]

## III.   STANDING

Plaintiffs have standing to request that this Court enjoin the Secretary's unlawful actions. To establish standing, "a plaintiff must, generally speaking, demonstrate that he has suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision."  *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-561 (1992)).

The Secretary's action threatens Plaintiffs with concrete, imminent injury.  *Id*. at 167. Plaintiffs are Tribal governments that provide essential governmental services to their citizens. Like other governments, Plaintiffs have had to take myriad emergency steps to provide critical services for the protection of their citizens and non-citizens alike in their communities.  At the same time that these Tribal governments are expending vast unbudgeted resources on emergency COVID-19 response, they must continue to provide existing essential government services, even as they have seen their tax base and other revenues with which they pay for such services vanish literally overnight.

---

[16]  Res. Dev. Council, *Alaska Native Corporations*, https://www.akrdc.org/alaska-native-corporations (last visited Apr. 15, 2020).  In 2019, approximately half of the top 49 Alaska-owned corporations, based on gross revenue, were ANCs with the top three spots all belonging to regional corporations. Alaska Bus., *The 2019 Top 49ers*, https://digital.akbizmag.com/issue/october-2019/the-2019-top-49ers/ (last visited Apr. 15, 2020).
[17]  Aleut Corporation, *Mission Statement*, https://www.aleutcorp.com/shareholders/who-we-are/mission-statement/ (last visited Apr. 15, 2020); *see also* ANCSA Reg'l Ass'n, *The Twelve Regions*, https://ancsaregional.com/the-twelve-regions/ (last visited Apr. 15, 2020).

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 11

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

For example, Chehalis has shuttered all of its business enterprises except gas stations in response to COVID-19, effectively eliminating its entire stream of revenues to support its governmental operations. Pickernell Decl. ¶¶ 10, 12, 21, 23-24, 29. At the same time, Chehalis continues to provide essential services such as policing and garbage and sanitation service, while ramping up COVID-19 response efforts such as daily operation of its Incident Operation Center, COVID-19 clinical work, and meal delivery to elders and school-age children. *Id.* ¶ 22. Likewise, ATC has shut down its gaming enterprise and cannot engage in normal fundraising activities due to social distancing measures, again cutting off its sources of revenue for its government. Landlord Decl. ¶ 15. At the same time, ATC continues to provide essential services like law enforcement and a food bank to its citizens, while adding COVID-19 response activities, including the hiring of a third police officer in order to address the uptick in crime (especially domestic violence) since the stay-at-home order, as well as the purchase of gas and oil for tribal members to be able to gather firewood and hunt moose to bring back to elders and low-income families. *Id.* ¶¶ 7-8, 12.

Each of the other Plaintiff Tribal governments—Tulalip, the Houlton Band, Akiak, and ACSPI—has also submitted a declaration describing the many actions it has already taken to address the COVID-19 pandemic, as well as the extraordinary financial strain the pandemic has placed on it. Gobin Decl. ¶¶ 18-26, 28-42, 44-59 (Tulalip); Sabattis Decl. ¶¶ 4-11 (Houlton Band); Williams Decl. ¶¶ 2, 4-5 (Akiak); Philemonoff Decl. ¶¶ 3, 5 (ACSPI); *see also infra* at 30-34. Each of these declarations details the Tribes' struggles to expand essential government resources to protect against the virulent coronavirus at the same time as revenue has stopped flowing, similar to Chehalis and ATC. *See* Gobin Decl. ¶¶ 22, 26, 28-30, 32-40, 44-59 (Tulalip);

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 12

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

Sabattis Decl. ¶¶ 4-11 (Houlton Band); Williams Decl. ¶¶ 2, 4-5 (Akiak); Philemonoff Decl. ¶¶ 3, 5 (ACSPI).

The acute, immediate needs confronting the Plaintiff Tribes and other tribal governments constituted the very reason that Congress set aside the $8,000,000,000 in Title V funding for such governments. *Infra* at 30-34. Each of the Plaintiff Tribal governments has timely submitted its certification form through the Treasury web portal to receive its fair share of the $8,000,000,000 set aside. Pickernell Decl. ¶ 32 (Chehalis); Gobin Decl. ¶ 61 (Tulalip); Sabattis Decl. ¶ 13 (Houlton Band); Williams Decl. ¶ 6 (Akiak); Landlord Decl. ¶ 19 (ATC); Philemonoff Decl. ¶ 7 (ACSPI). The Secretary, however, unlawfully invited not just Tribal governments but also ANCs to submit certification forms. *Supra* at 7-9. And as noted above, it is Plaintiffs' understanding that ANCs have indeed submitted Certification forms to Treasury prior to the April 17, 2020 deadline, which submissions Treasury has accepted. Under the CARES Act, the Secretary must distribute all $8,000,000,000 in Title V funds by April 26, 2020, and the Department of the Interior has indicated that the Secretary of Treasury intends to make all payments by Friday, April 24, 2020. *Supra* at 9. Plaintiffs are under imminent threat of losing desperately needed funds to ANCs, which Congress did not intend to benefit from the Act. *See Bennett*, 520 U.S. at 168 ("Given petitioners' allegation that the amount of available water will be reduced and that they will be adversely affected thereby, it is easy to presume specific facts under which petitioners will be injured—for example, the Bureau's distribution of the reduction pro rata among its customers.").

Plaintiffs' injury is fairly traceable to the Secretary's actions. *Id.* at 167 (requiring "a causal connection between the injury and the conduct complained of—the injury must be fairly

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 13

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"). The Secretary has unlawfully designated and treated ANCs as Tribal governments for purposes of distributing Title V relief funds, which are a limited and finite pool of resources. Once the Secretary completes those distributions, inclusive of ANCs, Plaintiffs will lose the ability to receive any portion of those funds paid to ANCs, which Plaintiffs need to provide essential government services to their citizens. *See infra* at 29-30. This concrete injury stemming from the Secretary's illegal appropriations to ANCs is fairly traceable to the Secretary's actions.

Plaintiffs' injuries will be redressed by a favorable decision from this Court. *Id.* at 167 (requiring "that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision"). This Court can redress the injuries by enjoining the Secretary not to designate or otherwise treat ANCs as Tribal governments, and to allocate and disburse all $8,000,000,000 in Coronavirus Relief Funds reserved by Congress to federally recognized Tribal governments, exclusive of ANCs, according to a reasonable formula consistent with the CARES Act.[18]

---

[18] Any suggestion that Plaintiffs' claim is not ripe or that the Secretary's decision is not final would be a transparent attempt to shield the Secretary's unlawful appropriation of Coronavirus Relief funds to ANCs from judicial review. The Secretary has designated ANCs as Tribal governments, and has accepted the submission of Certification forms by ANCs purporting to be Tribal governments. As discussed below, he has done so in clear violation of Congress's statutory mandate. Once the Secretary issues payments, which must occur before April 26, 2020, to ANCs those funds will be unrecoverable and Plaintiffs will lose the ability to share in them as Congress intended. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 14

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

## IV.   ARGUMENT

To obtain injunctive relief, Plaintiffs must show:  1) they are "likely to succeed on the merits," 2) they are "likely to suffer irreparable harm in the absence of preliminary relief," 3) "that the balance of equities tips in his favor," and 4) "that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "In this jurisdiction, courts evaluate the four preliminary injunction factors on a 'sliding scale'—if a 'movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor.'"  *Dallas Safari Club v. Bernhardt*, No. 19-CV-03696 (APM), 2020 WL 1809181, at *3 (D.D.C. Apr. 9, 2020) (Mehta, J.) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009)).  "The same standards apply for both temporary restraining orders and preliminary injunctions." *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003) (citing *Wash. Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)).  Here, all four factors strongly favor the issuance of injunctive relief.

### A.   Plaintiffs Have a Strong Likelihood of Success on the Merits.

The Administrative Procedure Act ("APA") authorizes judicial review of federal agency actions.  5 U.S.C. § 702.  It directs that "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5. U.S.C. § 706.  "It is emphatically the province and duty of the judicial department to say what the law is."  *Marbury v. Madison*, 5 U.S. 137, 177 (1803).  Based on its determination of the law, the reviewing court shall hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 15

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

with law," 5 U.S.C. § 706(2)(A), and agency action found to be "in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C).

"In statutory construction, we begin 'with the language of the statute.' *Barnhart v.*

*Sigmon Coal Co.*, 534 U.S. 438, 450 (2002).  If the statutory language is unambiguous and 'the

statutory scheme is coherent and consistent' . . . '[t]he inquiry ceases.' *Id.*"  *Kingdomware*

*Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016).  Here, the plain language of the

CARES Act is clear and conclusive, and it is dispositive of the merits of this dispute.

ANCs are not "Indian Tribes" because they are not "*recognized* as eligible for the special

programs and services provided by the United States to Indians because of their status as

Indians." (emphasis added).  Nor are ANCs "Tribal governments" because they do not have

"*recognized* governing bodies." (emphasis added).  As explained below, *recognition* is a legal

term of art in federal Indian law: Indian tribes are *recognized*, while corporations are not.

### 1.    ANCs Are Not Indian Tribes and Thus Are Not Tribal Governments.

Title V mandates that the Secretary of the Treasury pay Coronavirus Relief funds only to

"Tribal governments."  Section 601(a)(2)(B).  Section 601(g)(5) defines the term "Tribal

government" as "the recognized governing body of an Indian Tribe."  Title V further provides

that "[t]he term 'Indian Tribe' has the meaning given that term in section 4(e) of the Indian Self-

Determination and Education Assistance Act (25 U.S.C. 5304(e))."  Section 601(g)(1).  That

provision of the Indian Self-Determination and Education Assistance Act ("ISDEAA") defines

"Indian tribe" as "any Indian tribe, band, nation, or other organized group or community,

including any Alaska Native village or regional or village corporation as defined in or

established pursuant to the Alaska Native Claims Settlement Act (85 Stat. 688) [43 U.S.C. 1601

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 16

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

et seq.], which *is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians*." 25 U.S.C. § 5304(e) (emphasis added).  By its plain terms, then, this definition includes "any Alaska Native village or regional or village corporation" as a tribe *only if* it satisfies a precisely delineated condition – it must be "recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians."[19] *Id.*

In the Federally Recognized Indian Tribe List Act of 1994, Pub. L. No. 103-454, 108 Stat. 4791-92 ("List Act"), Congress required the Secretary of the United States Department of the Interior to prepare a list of precisely such entities:  "The Secretary [of the Interior] shall publish in the Federal Register a list of all Indian tribes which the Secretary *recognizes to be eligible for the special programs and services provided by the United States to Indians because of their status as Indians*." 25 U.S.C. § 5131(a) (emphasis added).  Only if ANCs are included by the Secretary of the Interior on the statutorily-mandated List of Recognized Tribes, then, do they satisfy the clear textual definition of an "Indian tribe" under the ISDEAA and hence the CARES Act.

As it does each year, on January 30, 2020, acting pursuant to the List Act, Interior published its list of 574 "Indian Entities Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs."  85 Fed. Reg. 5462 (Jan. 30, 2020) ("This notice is

---

[19] Any suggestion that the modifier "which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians" *applies only* to "any Indian tribe, band, nation, or other organized group or community" and *does not apply* to Alaska Native villages and ANCs would defy the plain language of the statute and the rule of logic, which expressly defines the latter category of entities as "includ[ed]" within (that is, a subset of) the former category.

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 17

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

published pursuant to Section 104 of the Act of November 2, 1994 (Pub. L. 103-454; 108 Stat. 4791, 4792) . . . .")) ("List of Recognized Tribes").  These recognized entities include "Indian Tribal Entities Within The Contiguous 48 States Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs" as well as "Native Entities Within the State of Alaska Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs."  *Id.* at 5462, 5466 (noting "[w]e have continued the practice of listing the Alaska Native entities separately for the purpose of facilitating identification of them.").

While the list of 574 federally recognized Indian tribes contains 229 Alaska Native villages – including Plaintiffs Akiak, ATC, and ACSP, who, like Chehalis, Tulalip, and the Houlton Band, maintain a government-to-government relationship with the United States—*it does not include* Alaska Native regional or village *corporations*.  Because ANCs are not "recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians," 25 U.S.C. § 5304(e), ANCs are not "Indian Tribes" for purposes of Title V.  And because ANCs are not "Indian Tribes," they cannot receive relief fund payments as "Tribal governments."  Section 601(g)(5) (defining "Tribal governments" as "the recognized governing body of an Indian Tribe").

The absence of state-chartered corporations, which may have non-Indian shareholders, from the Secretary's list of tribes that are "recognized" as "eligible for the special programs and services provided by the United States to Indians because of their status as Indians" is not surprising.  As the Secretary of the Interior explained in publishing the List of Recognized Tribes, recognition denotes those American Indian or Alaska Native tribal entities that the Secretary has formally recognized as having "the immunities and privileges available to federally

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 18

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

recognized Indian Tribes by virtue of their *government-to-government relationship* with the United States as well as the responsibilities, powers, limitations, and obligations of such Tribes." 85 Fed Reg. at 5462 (emphasis added).  The very purpose of the List Act was to ensure that the Interior Department properly memorializes those tribes with which the United States enjoys such a relationship:

> "Recognized" is more than a simple adjective; it is a legal term of art. It means that the government acknowledges as a matter of law that a particular Native American group is a tribe by conferring a specific legal status on that group, thus bringing it within Congress' legislative powers. This federal recognition is no minor step. A formal political act, it permanently establishes a government-to-government relationship between the United States and the recognized tribe as a "domestic dependent nation," and imposes on the government a fiduciary trust relationship to the tribe and its members. Concomitantly, it institutionalizes the tribe's quasi-sovereign status, along with all the powers accompanying that status such as the power to tax, and to establish a separate judiciary. Finally, it imposes upon the Secretary of the Interior specific obligations to provide a panoply of benefits and services to the tribe and its members.

H.R. Rep. No. 103-781, at 2-3 (1994) (stating also that appearing on the BIA's list "is a functional precondition" to receipt of services and that, "[i]n addition to the BIA, other federal agencies which provide services to the tribes use the list to determine eligibility."); *see also*, *e.g.*, *Frank's Landing Indian Cmty. v. Nat'l Indian Gaming Comm'n*, 918 F.3d 610, 616 (9th Cir. 2019) ("On its face, this phrase ['recognized as eligible by the Secretary' in the Indian Gaming Regulatory Act] means that the Secretary must recognize an Indian tribe as eligible for special programs and services.  And . . . the significance of Secretarial recognition . . . means that a tribe is federally recognized and that it appears on the Secretary's annual list.").  By contrast, the List Act does not speak to memorializing any federal relationship with state-chartered corporations.

The Secretary's designation and treatment of ANCs as Tribal governments would require this Court to conclude that Congress intended the same 23 words that appear in the ISDEAA and

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 19

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

the List Act (both defining the relationship between Indian tribes and the United States) to have

entirely different meanings.  This argument is not credible.  It defies "the most rudimentary rule

of statutory construction . . . that courts do not interpret statutes in isolation, but in the context of

the *corpus juris* of which they are a part, including later-enacted statutes:

> 'The correct rule of interpretation is, that if divers statutes relate to the same thing,
> they ought all to be taken into consideration in construing any one of them.... If a
> thing contained in a subsequent statute, be within the reason of a former statute, it
> shall be taken to be within the meaning of that statute ...; and if it can be gathered
> from a subsequent statute *in pari materia*, what meaning the legislature attached
> to the words of a former statute, they will amount to a legislative declaration of its
> meaning, and will govern the construction of the first statute.'"

*Branch v. Smith*, 538 U.S. 254, 280-81 (2003) (Scalia, J.) (quoting *United States v. Freeman*, 3

How. 556, 564-65 (1845)).

The Secretary may seek to defend his action by pointing to a 1987 Ninth Circuit decision

deferring to the BIA's determination that Cook Inlet Native Association, an ANC, was an

"Indian tribe" for purposes of the ISDEAA.  *Cook Inlet Native Ass'n v. Bowen*, 810 F.2d 1471

(9th Cir. 1987).  Any such argument would miss the mark.  In *Bowen*, the Ninth Circuit observed

that "the plain language of the [ISDEAA] *allows* business corporations created under the

[ANCSA] to be recognized as tribes."[20]  810 F.2d at 1476 (emphasis added).  This much is true,

and the Ninth Circuit accordingly concluded that "the legislative history does not indicate that

Congress intended to *preclude* the agency interpretation.  The court must, therefore, *defer* to that

interpretation."  *Id.* (emphasis added).  But the problem for the Secretary is that *Bowen* predates

the 1994 List Act.  When the Ninth Circuit decided the case, there was no congressionally

---

[20]  The definition of "Indian tribe" now appears at 25 U.S.C. § 5304(e), rather than 25 U.S.C. §
450b(b).

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 20

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

mandated list defining those entities "recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians."  In the absence of legislative prescription, deference was appropriate.  The List Act changed all of that, eliminating any ambiguity surrounding the ISDEAA definition of "Indian tribe" by compelling the Secretary of the Interior to publish an annual list that identifies those entities falling within its ambit.  The Secretary has done so, and ANCs are not on it.

### 2. ANCs Are Not Tribal Governments Because They Do Not Have Recognized Governing Bodies.

The CARES Act definition of "Tribal government" also echoes the ISDEAA.  The ISDEAA authorizes "tribal organizations" to enter into self-determination or "638" contracts (the ISDEAA is Pub. L. No. 93-638) with the Bureau of Indian Affairs and the Indian Health Service ("IHS").  A 638 contract is "a contract (or grant or cooperative agreement utilized under [25 U.S.C. § 5308]) entered into . . . between a *tribal organization* and the appropriate Secretary for the planning, conduct and administration of programs or services which are otherwise provided to Indian tribes and their members . . . ."  25 U.S.C. § 5304(j) (emphasis added).  The ISDEAA defines two types of "tribal organizations."  The first is "*the recognized governing body of any Indian tribe*," 25 U.S.C. § 5304(l) (emphasis added) – this definition tracks the CARES Act definition of "Tribal government."  The second is "*any legally established organization of Indians which is controlled, sanctioned, or chartered by such governing body* or which is democratically elected by the adult members of the Indian community to be served by such organization and which includes the maximum participation of Indians in all phases of its activities . . . ."  *Id.* (emphasis added).

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 21

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

The universe of tribal organizations eligible for 638 contracting thus extends beyond Indian tribes' governing bodies. But a tribal organization that is not itself an Indian tribe may apply for and enter into 638 contracts *only where requested to do so by an Indian tribe*, which authorization must be provided by resolution of the tribe's recognized governing body. 25 U.S.C. § 5321(a)(1) ("The Secretary is directed, upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract or contracts with a tribal organization to plan, conduct, and administer programs or portions thereof, including construction programs . . . ."); 25 U.S.C. § 5304(l) (providing in definition of "tribal organization" "[t]hat in any case where a contract is let or grant made to an organization to perform services benefiting more than one Indian tribe, the approval of each such Indian tribe shall be a prerequisite to the letting or making of such contract or grant . . . ."); 25 C.F.R. § 900.8(b)-(d) ("If the tribal organization is not an Indian tribe, the proposal must also include: (1) A copy of the tribal organization's organizational documents (e.g., *charter, articles of incorporation, bylaws*, etc.) [and] (2) The full name(s) of the Indian tribe(s) with which the tribal organization is affiliated[,]" as well as, *inter alia*, "[t]he full name(s) of the Indian tribe(s) proposed to be served" and "[a] copy of the authorizing resolution from the Indian tribe(s) to be served.") (emphasis added). In the CARES Act, Congress did not choose the broader ISDEAA category of "tribal organization" in specifying the entities eligible for Title V funding, but instead chose the narrower category of "Indian tribe" which is predicated on federal governmental recognition.

In 1981, IHS adopted guidelines regarding the authorization of tribal organizations in Alaska to enter into 638 contracts. *See* Alaska Area Guidelines for Tribal Clearances for Indian Self-Determination Contracts, 46 Fed. Reg. 27,178-02, 27,179 (May 18, 1981) ("Alaska

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 22

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

Guidelines"). The Alaska Guidelines explained that "[v]illages, as the smallest tribal units under the ANCSA must approve [ISDEAA] contracts which will benefit their members." *Id.* at 27,178. IHS thus recognized the relevant Alaska Native village council as the "governing body" for purposes of 638 contracting, and provided that it is this governing body that must issue the authorizing resolution to a tribal organization. *Id.* at 27,178-27,180.[21] *Only if there is no village council at all* would IHS treat an ANC (a village corporation or a regional corporation) as a "village governing body" for 638-contracting purposes. *Id.* at 27,178.[22]

In 2013, the U.S. Department of Health and Human Services ("DHHS") reiterated how the ISDEAA operates as to ANCs in *Ukpeagvik Inupiat Corporation v. U.S. Department of Health & Human Services*, No. 3:13-cv-00073-TMB, 2013 WL 12119576 (D. Alaska May 20, 2013) ("*UIC v. DHHS*"). In *UIC v. DHHS*, the plaintiff ANC moved for a preliminary injunction

---

[21] The scope of a village's authorizing resolution may be narrow, it may be broad, or it may even delegate the village's 638-contracting approval authority to a tribal organization entirely. *Id.* at 27,179. "For example, all the villages in a region may authorize the regional health corporation to act on their behalf in requesting or approving contracts for any health care program run on a statewide basis such as a renal dialysis, burn care unit, or other specialized medical care." *Id.* But such resolutions, however broad, do not transform the corporations into Indian tribes with recognized governing bodies.
Similarly, while Title V of the ISDEAA (Tribal Self-Governance – Indian Health Service) provides that a "tribal organization" may be treated as an "Indian tribe" for purpose of that particular subchapter, such treatment is necessarily limited to the scope of the particular authorization provided by the Indian tribe. 25 U.S.C. § 5381(b) ("In any case in which an Indian tribe has authorized another Indian tribe, an inter-tribal consortium, or a tribal organization to plan for or carry out programs, services, functions, or activities (or portions thereof) on its behalf under this subchapter, the authorized Indian tribe, inter-tribal consortium, or tribal organization shall have the rights and responsibilities of the authorizing Indian tribe (except as otherwise provided in the authorizing resolution or in this subchapter). In such event, the term 'Indian tribe' as used in this subchapter shall include such other authorized Indian tribe, inter-tribal consortium, or tribal organization.").
[22] To Plaintiffs' knowledge, virtually all if not all of the 229 villages currently listed on the Secretary of the Interior's List of Recognized Tribes have governing bodies.

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 23

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

following the passage of resolutions by six federally recognized Alaska Native villages authorizing the transfer of 638-contract funding away from plaintiff to a different entity. *Id.* at *1-2.  The district court explained that pursuant to the Alaska Guidelines, "DHHS defers to resolutions of a village's governing body, rather than resolutions of village corporations," *id.* at *2, and denied plaintiff's motion on a number of grounds.  Without deciding the question, the court noted UIC's contention that it was itself a "tribe" for purposes of the ISDEAA.  The United States did not agree.  In its brief in opposition, the United States did not dispute "that UIC is one of the entities *eligible* to enter into a self determination contract with the IHS."  United States' Resp. in Opp'n to Mot. for Prelim. Inj. at 18, *UIC v. DHHS*, Dkt. 22 (emphasis added).  It made clear, however, "that UIC is not, nor ever has been, a federally recognized tribe such as the Native Village of Barrow Inupiat Traditional Government,"[23] citing the Secretary of the Interior's List of Recognized Tribes.  *Id.*  The United States further explained that "because UIC wants to provide services to the members of other Alaska Native tribal villages, *UIC must have authorizing resolutions from all these tribal villages* that are within the geographic area that the SSMH serves," citing the Alaska Guidelines.  *Id.* (emphasis added).  In other words, for purposes of the ISDEAA definition of "tribal organization," UIC was not "the recognized governing body of any Indian tribe" on the List of Recognized Tribes but was instead a "legally established organization of Indians which is controlled, sanctioned, or chartered by such governing body," 25 U.S.C. § 5304(l).

---

[23]  The Native Village of Barrow Inupiat Traditional Government, the village associated with UIC, was one of the village governing bodies that had authorized the transfer of the funding away from UIC.  *UIC v. DHHS* at *1 n.8.

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 24

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

1

2

### 3. The Case Law Confirms that ANCs Are Not Indian Tribes and Do Not Have Recognized Governing Bodies.

3

4

Consistent with the distinction in the ISDEAA between, on the one hand, Indian tribes

5

("recognized as eligible for the special programs and services provided by the United States to

6

Indians because of their status as Indians") and Tribal governments ("the recognized governing

7

body of any Indian tribe"), and on the other hand, other types of "tribal organizations," the

8

federal courts have long held that ANCs, in contrast to federally recognized Alaska Native

9

villages, are not sovereign governments and do not have "recognized governing bodies."  For

10

example, even prior to the List Act, the Ninth Circuit held that the Alaska Native villages of

11

Venetie and Fort Yukon were authorized to invoke federal court jurisdiction under 28 U.S.C. §

12

1362, which provides that "district courts shall have original jurisdiction of all civil actions,

13

brought by any Indian tribe or band with a *governing body duly recognized* by the Secretary of

14

the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of

15

the United States" (emphasis added), because they were "the duly organized and elected

16

governing bodies of the native villages."  *Native Vill. of Venetie I.R.A. Council v. Alaska*, 944

17

F.2d 548, 550-52 (9th Cir. 1991).

18

But when an ANC sought to pierce the sovereign immunity of the State of Alaska, the

19

Ninth Circuit concluded that because the ANC was "*not a governing body*, it does not meet one

20

of the basic criteria of an Indian tribe."  *Seldovia Native Ass'n v. Lujan*, 904 F.2d 1335, 1350

21

(9th Cir. 1990) (emphasis added).  The Court explained that the ANC, in contrast to federally

22

recognized Alaskan Native villages, was "not a governmental unit with a local governing board

23

organized under the Indian Reorganization Act . . . ."  *Id.*  Rather it was a "Village Corporation

24

organized under the laws of the State of Alaska . . . ."  *Id.* (quotation marks omitted).  Similarly,

25

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 25

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

in *Pearson v. Chugach Government Services Inc*., 669 F. Supp. 2d 467, 469 n.4 (D. Del. 2009), the district court rejected an ANC's claim that it was exempt from federal antidiscrimination statutes and possessed tribal sovereign immunity, explaining that "ANCs are not federally recognized as a 'tribe' when they play no role in tribal governance . . . . *[T]he Court can find no evidence to suggest, that they are governing bodies*." (emphasis added).  *See also, e.g., Aleman v. Chugach Support Servs., Inc*., 485 F.3d 206, 213 (4th Cir. 2007) (comparing ANCs to Indian tribes and concluding that "Alaska Native Corporations and their subsidiaries are not comparable sovereign entities").

Indeed, ANCs openly admit that they do not have recognized governing bodies and are not tribal governments.  The 12 regional ANCs comprising the ANCSA Regional Association represent in public-facing materials that they "do not possess a government-to-government relationship with the federal government" and are not federally recognized tribes, and that only such tribes "are eligible to receive certain federal benefits, services, and protections, such as funding and services from the Bureau of Indian Affairs."  ANCSA Reg'l Ass'n, *Overview of Entities Operating in the Twelve Regions*, https://ancsaregional.com/overview-of-entities/ (last visited Apr. 1, 2020).  Like other corporations, ANCs have corporate boards of directors and are owned by private shareholders, including non-Indians.  *See* 43 U.S.C. § 1606(f), (h)(2), (h)(3)(d). As another example, the Arctic Slope Regional Corporation, a regional ANC, submitted comments on a proposed revenue procedure to the Department of the Treasury stating:

> Section 4.01 of the Proposed Revenue Procedure defines an "Indian tribal government" as . . . "the governing body of any tribe, band, community, village or group of Indians, or (if applicable) Alaska Natives" that is determined by the federal government to exercise governmental functions.  The tribal entities on the North Slope, not ASRC, are the entities recognized by the Department of Interior as having government functions.  See 78 Fed. Reg. 26384-89 (May 6, 2013).  *In*

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 26

Kanji & Katzen, P.L.L.C.
811 1ˢᵗ Ave., Suite 630
Seattle, WA 98104
206-344-8100

*other words, a governing body of Alaska Natives would constitute an Indian tribal government, but an Alaska Native Corporation would not because it does not exercise governmental functions.*

Arctic Slope Regional Corporation, "Comments to Notice 2012-75: Proposed Revenue Procedure to Address the Application of the General Welfare Exclusion to Indian Tribal Government Programs Providing Benefits to Tribal Members," Notice 2012-75 DYSON, 2013 WL 3096205, at *2 (emphasis added).  These statements well reflect legal reality.

\*   \*   \*

In sum, the Secretary may not pay Coronavirus Relief Fund payments to ANCs because they are neither "Tribal governments" nor "Indian tribes."  "In construing statutes, 'we must, of course, start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used.'" *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 482 (1992) (quoting *Richards v. United States*, 369 U.S. 1, 9 (1962)).  The statutory language here is unambiguous, and the Secretary must carry out the intent of Congress by disbursing relief funds to federally recognized Tribal governments exclusive of ANCs.

### 4.     The Context Surrounding Title V Confirms the Plain Language.

The Secretary's diversion of Title V relief funds to ANCs conflicts with the structure of Title V and the CARES Act as a whole.  Whereas other titles of the Act provide relief tailored to businesses, *see supra* at 5-6, Title V specifically targets and establishes a relief fund for "States, Tribal governments, and units of local government."  Section 601.  State, local and tribal governments are the entities in our constitutional system that bear responsibility for safeguarding the public health and welfare and providing essential governmental services to their citizens during a worldwide pandemic.  They fit seamlessly into one another's company.  Private, state-

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 27

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

chartered corporations do not.  "That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."  *Beecham v. United States*, 511 U.S. 368, 371 (1994); *see also United States v. Williams*, 553 U.S. 285, 294 (2008) ("[T]he commonsense canon of *noscitur a sociis* . . . counsels that a word is given more precise content by the neighboring words with which it is associated.").

The legislative history of Title V confirms the plain language of the statute—that Congress intended the Secretary to pay the $8,000,000,000 Coronavirus Relief funds to federally recognized Tribal governments only.  A few examples are illustrative:

- "One of the last provisions added to this bill was Title [V], which establishes a Coronavirus Relief Fund that provides $150 billion for the Secretary of Treasury to disseminate to States, Tribal Governments, and units of local government in fiscal year 2020.  These funds are to alleviate severe financial pressure these governments are under during this public health emergency."  166 Cong. Rec. E346-05, 2020 WL 1539824 (Mar. 27, 2020) (Colloquy) (Statement of Congressman Gallego).

- "I was pleased to see and support an additional $8 billion for payments to Tribal governments through the Coronavirus Relief Fund in this bill.  Because of the Federal Government's unique government-to-government relationship with Indian Tribes, providing these funds to Tribes directly—rather than through the States—is the right approach."  166 Cong. Rec. E341-02, 2020 WL 1539805 (Mar. 27, 2020) (Colloquy) (Statement of Congressman Joyce).

To Plaintiffs' knowledge, nowhere does the legislative history of Title V even hint that Congress intended to provide Title V relief funds to ANCs.  *See Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835 (1990) ("The starting point for interpretation of a statute 'is the language of the statute itself.  Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.'") (quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108 (1980)).

*    *    *

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 28

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

Plaintiffs have a strong likelihood of success on the merits because the Secretary's designation of ANCs as Tribal governments for purposes of allocating and distributing Title V Coronavirus Relief Funds runs directly counter to the plain statutory text and hence violates the APA, as it is not in accordance with law.

## B.      Absent Immediate Injunctive Relief, Plaintiffs Will Suffer Irreparable Harm.

Plaintiff Tribal governments are hemorrhaging funds to protect their citizens and communities from the devastating health and economic consequences of the COVID-19 crisis, even as their own economies have crumbled overnight.  If the Secretary is not immediately enjoined from diverting critically needed relief funds from Tribal governments to ANCs, Plaintiffs will be irreparably harmed.  To demonstrate such harm, Plaintiffs must show: 1) that the harm will be "certain and great," "actual and not theoretical," and so "imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm"; and 2) that the harm is "beyond remediation."  *League of Women Voters of United States v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) (citing *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).  Plaintiffs readily meet this test.

First, the harm facing Plaintiffs is irreparable as a matter of law.  "It is a well-settled matter of constitutional law that when an appropriation has lapsed or has been fully obligated, federal courts cannot order the expenditure of funds that were covered by that appropriation." *City of Houston, Tex. v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1424 (D.C. Cir. 1994).  *See also id*. at 1426 (stating that "once the relevant funds have been obligated, a court cannot reach them in order to award relief").  Thus, an injunction is the only means by which Plaintiffs can secure their right to the disputed funds.  *Id*. at 1427 ("[T]o avoid having its case mooted, a

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 29

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

plaintiff must both file its suit before the relevant appropriation lapses *and* seek a preliminary

injunction preventing the agency from disbursing those funds."). *See also*, *Ambach v. Bell*, 686

F.2d 974, 986 (D.C. Cir. 1982) ("Once the chapter 1 funds are distributed to the States and

obligated, they cannot be recouped.  It will be impossible in the absence of a preliminary

injunction to award the plaintiffs the relief they request if they should eventually prevail on the

merits."). *Cf. Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008) ("[W]here, as here,

the plaintiff in question cannot recover damages from the defendant due to the defendant's

sovereign immunity, any loss of income suffered by a plaintiff is irreparable *per se*." (internal

citations omitted)).

Second, Plaintiffs desperately need CARES Act relief funds to continue to provide and

expand vital governmental services to their citizens and community members during this

unparalleled public health and economic crisis.  The dramatic reduction in CARES Act funds

available to Tribal governments—including Plaintiffs—that would result from the Secretary's

unlawful diversion of funds to ineligible state-chartered ANCs would hobble Plaintiffs' efforts to

respond to the pandemic.  Because Plaintiffs must address grave challenges in real time in order

to mitigate the devastating impacts already being felt within their communities, "there is a clear

and present need for equitable relief to prevent irreparable harm." *League of Women Voters*, 838

F.3d at 7–8 (internal citations and quotation marks omitted).

The immediate consequences of the COVID-19 pandemic are staggering, and Plaintiffs

face an unprecedented and overwhelming need for governmental funds to fight it.  ACSPI, for

example, has "attributed almost every resource of the Tribal Government to responding to the

pandemic threat."  Philemonoff Decl. ¶ 5 (ACSPI).  Tribal governments, including Plaintiffs,

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 30

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

must still provide the essential government services that they always have, such as public safety

and policing, health care, garbage and sanitation services, and food assistance.  *E.g.*, Pickernell

Decl. ¶¶ 16, 22 (Chehalis); Landlord Decl. ¶ 7 (ATC); Sabattis Decl. ¶ 8 (Houlton Band).  But

the COVID-19 pandemic has forced Tribal governments to reorient or expand many of these

existing services and create others from whole cloth.  For example, the COVID-19 emergency

has required Plaintiffs to transform health facilities into acute health care centers to treat

COVID-19 cases, Sabattis Decl. ¶ 8 (Houlton Band), Gobin Decl. ¶ 38 (Tulalip); procure

unanticipated medical equipment and supplies, including an ambulance and personal protective

equipment (PPE), Gobin Decl. ¶ 39 (Tulalip), Pickernell Decl. ¶ 28 (Chehalis), Sabattis Decl. ¶ 9

(Houlton Band); provide emergency relief funds to tribal members, Sabattis Decl. ¶ 6 (Houlton

Band), Gobin Decl. ¶ 22 (Tulalip); deliver meals to elders and school children and open or

expand food banks, Pickernell Decl. ¶ 28 (Chehalis), Williams Decl. ¶ 4 (Akiak), Sabattis Decl. ¶

9 (Houlton Band); purchase gas and oil to aid efforts to acquire firewood and moose for elders

and low income families, Landlord Decl. ¶ 8 (ATC); reconnect disconnected water and sewer

service, Williams Decl. ¶ 4 (Akiak); provide additional cleaning and sanitation supplies and

service, Pickernell Decl. ¶ 28 (Chehalis), Williams Decl. ¶ 4 (Akiak), Gobin Decl. ¶ 28 (Tulalip);

and hire additional staff, including emergency response and police, Landlord Decl. ¶¶ 8, 12

(ATC).

At the same time, Plaintiffs' revenue sources have evaporated.  Plaintiffs and other Tribal

governments (who have limited tax bases) have been forced to abruptly close the businesses they

rely on as source of governmental revenues in order to stem the spread of the virus.  For

example, the Tulalip Tribes, which funds 92% of its governmental services from tribal business

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 31

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

revenues, was forced to close all non-essential tribal businesses, including its casinos (Tulalip's main revenue source). Gobin Decl. ¶¶ 10, 26, 44. While necessary to protect the public health, this decision "has financially devastated Tulalip's economy." *Id*. ¶ 54. The same is true for the other Plaintiffs. Chehalis closed all of its business enterprises except its gas stations. Pickernell Decl. ¶ 21. Akiak closed its gaming operations, its only source of funding. Williams Decl. ¶¶ 2, 5. The Houlton Band, which does not have any gaming enterprises or large businesses, was forced to close or partially close its small businesses. Sabattis Decl. ¶¶ 4, 7. And ATC closed its gaming office and cannot conduct its normal fundraising activities due to social distancing. Landlord Decl. ¶ 15. These financial impacts are not limited to governmental revenues—ATC "faces the serious threat of the loss of income for many tribal members due to the possible cancellation of commercial fishing." *Id*. ¶ 8.

Plaintiffs have sought to mitigate the financial consequences to their employees as much as possible, making decisions to provide paid leave to furloughed employees, Gobin Decl. ¶¶ 26, 29 (Tulalip), Sabattis Decl. ¶ 7 (Houlton Band), Pickernell Decl. ¶ 24 (Chehalis); provide health care premiums and additional assistance to furloughed employees, Gobin Decl. ¶ 29 (Tulalip); provide overtime pay to essential employees and emergency workers, *id*. ¶ 56 (Tulalip), Sabattis Decl. ¶ 5 (Houlton Band). In addition, they will be making unanticipated payments into state unemployment insurance systems, Pickernell Decl. ¶ 25 (Chehalis), Gobin Decl. ¶ 57 (Tulalip).

The financial toll that this crisis has taken on Plaintiffs is in no way theoretical. In just the first three weeks since the closure of its government offices and enterprises, Tulalip spent $9,178,300 on paid leave and overtime pay. Gobin Decl. ¶ 56. The cost for medical benefits for furloughed employees through May 2020 will be $3,957,786. *Id*. Payments to employees

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 32

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

exercising their option to cash out annual leave thus far has been $1,400,000.  *Id.* ¶ 58.  The

anticipated payment to Washington State's unemployment insurance program for the next twelve

weeks is $6,536,000.  *Id.* ¶ 57.   Even the cost to deep-clean its government and enterprise

facilities after the closure orders—an unanticipated but critical step in responding to the present

crisis—was $126,000 for outside contractors.  *Id.* ¶ 28.

Despite all of their efforts to date, Plaintiffs know that they need to do so much more to

protect and guide their citizens through this crisis.  But they require funds to do that.  Chehalis

Chairman Harry Pickernell, Sr. summarizes the situation well.

> The COVID-19 epidemic has strained and jeopardized every aspect of Tribal
> government . . . as well as every aspect of the Tribe's enterprises. . . .  Without
> CARES Act monies to stop the hemorrhage, the Tribe anticipates that it will need
> to severely diminish or entirely shut down essential government services to tribal
> members, such as programs that feed elders, provide nutritional support for other
> tribal members, treat common illnesses in the tribal community like diabetes,
> keep tribal members' homes warm in winter and their electricity on, and keep
> tribal members off the State's welfare rolls.

Pickernell Decl. ¶¶ 27, 30.  Chief Williams of the Akiak Native Community similarly attests that

"[w]ithout income from any source we will be unable to provide any more services . . . ."

Williams Decl. ¶ 4 (Akiak).

The other Plaintiffs confront similar imperatives.  For instance, ATC is experiencing a

critical need for PPE, housing, quarantine facilities, and sanitation supplies to respond to the

instant crisis.  Landlord Decl. ¶¶ 11, 13, 17.  Without charter planes, ACSPI members will have

no means of travelling the 800 miles to mainland Alaska for healthcare.  Philemonoff Decl. ¶ 5.

And without additional funding, the Houlton Band will continue to struggle to secure PPE, hand

sanitizer and cleaning supplies, to provide food services and rent assistance to struggling tribal

members, and to secure computers and internet access for students to participate in remote

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 33

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

education programs.  The Houlton Band's duly-elected Chief Clarissa Sabattis is currently also serving as the Band's Emergency Operations Manager because funding does not exist to hire anyone else to fill the position.  Sabattis Decl. ¶¶ 9-11.

If Plaintiffs' shares of CARES Act Title V relief funds are diminished because the Secretary unlawfully diverts those funds to ANCs, Plaintiffs' ability to meet the great and growing needs of their communities will be reduced.  For example, if the Secretary allocates the $8,000,000,000 equally among all 574 federally recognized Tribal governments, each Tribal government would receive just under $14,000,000.  If the Secretary includes the 237 ANCs, however, an equal allocation among all 811 entities would reduce that amount to less than $10,000,000, a difference of more than $4,000,000 for each of the 574 federally recognized Tribal governments.  Plaintiffs would thus lose approximately 30% of their properly allocated share of Title V funds through the illegal appropriation of those funds to ANCs.

In the alternative, if the Secretary considers the population, land base, employees, and expenditures of each Tribal government, as the data requested by the Certification form suggests, then ANCs will have a vastly outsized impact.  Together, the ANCs own approximately 44 million acres of land.[24]  These landholdings are equivalent to the total trust land base of *all federally recognized Tribal governments* in the lower-48 states combined.[25]  The 12 regional

---

[24]  Res. Dev. Council, *Alaska Native Corporations*, https://www.akrdc.org/alaska-native-corporations (last visited Apr. 15, 2020).

[25]  Office of the Special Tr. for American Indians, U.S. Dep't of the Interior, *OST Statistics and Facts*, https://www.doi.gov/ost/about_us/Statistics-and-Facts (last visited Apr. 15, 2020) ("The Indian trust consists of 55 million surface acres and 57 million acres of subsurface minerals estates held in trust by the United States for American Indians, Indian tribes and Alaska Natives. Over 11 million acres belong to individual Indians and nearly 44 million acres are held in trust for Indian tribes.").

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 34

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

ANCs alone have over 138,000 shareholders, employ more than 43,000 people worldwide, and generated more than $10.5 billion in revenues in 2018.[26]  Under any formula that considers ANCs' corporate shareholders, land base, employees, and expenditures, the relief funds available to federally recognized Tribal governments, including Chehalis, Tulalip, the Houlton Band, Akiak, ATC and ACSPI will be greatly reduced, given their more modest population, land base, and economic size.[27]

It cannot be gainsaid that Plaintiffs and other Tribal governments are in dire need of the financial relief that Congress acted to provide them.  During this time of unprecedented crisis, the consequences of interrupting the vital governmental services that Plaintiffs are providing to their communities would be devastating and unquestionably irreparable.

## C.     The Balance of Equities Tips in Plaintiffs' Favor and an Injunction Is in the Public Interest.

While "[t]he first two factors of the traditional standard are the most critical," *Nken v. Holder*, 556 U.S. 418, 434 (2009), Plaintiffs easily satisfy the remaining factors.  Where the Federal government is the opposing party, the remaining two factors of the injunctive relief test—balance of equities and public interest—merge.  *Id.* at 435; *Pursuing Am.'s Greatness v.*

---

[26]  *See* Res. Dev. Council, *Alaska Native Corporations*, https://www.akrdc.org/alaska-native-corporations (last visited Apr. 15, 2020).

[27]  At the same time, the shareholders of ANCs, including both village and regional corporations, that are closely affiliated with particular Alaska Native villages will effectively "double dip" or "triple dip," taking multiple slices of the same limited pie through payments to both the ANCs and the villages.  On the other hand, if the Secretary properly allocates and distributes Title V funds directly to federally recognized Tribal governments only, Alaska Native villages may use their funds in partnership with ANCs if they determine that is the most effective to meet the needs of their communities, as they do with respect to 638 contracts under the ISDEAA.  *See supra* at 21-24.  Nothing in Title V prevents Tribal governments from using their relief funds to

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 35

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

*Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).  "The balance of the equities weighs the harm to [the Secretary] if there is no injunction against the harm to the [Plaintiffs] if there is." *Pursuing Am's Greatness*, 831 F.3d at 511 (citing *Winter*, 555 U.S. at 25-26).  "And in this case, the [Secretary's] harm and the public interest are one and the same, because the government's interest *is* the public interest." *Id.* (citing *Nken*, 556 U.S. at 435).  "There is generally no public interest in the perpetuation of unlawful agency action.  To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters*, 838 F.3d at 12 (internal citations omitted).  While district courts ordinarily enjoy broad discretion to balance the equities and weigh the public interest, this discretion accordingly "is bounded" when the activity in question contravenes a statutory directive.  *Gordon v. Holder*, 721 F.3d 638, 652 (D.C. Cir. 2013).

An injunction preventing the unlawful disbursement of CARES Act funds to ANCs is in the public's interest—and therefore in the Secretary's interest— as it will ensure that Congress's public policy choices are properly enforced.  In responding to the havoc wrought by COVID-19 on every facet of American life, Congress made policy judgments regarding the most appropriate way to allocate the limited relief funding available.  Allowing the Secretary to disburse relief funds to unauthorized entities contravenes Congress's plan by reducing the amount of funding available to Tribal governments to respond to the severe health, safety, and financial crises currently afflicting their communities.  "Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is . . . for the courts to enforce them when

pay third parties for coronavirus related services.  *See* Section 601(d) (specifying those costs for which Title V funds may be used).

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 36

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

enforcement is sought.  Courts of equity cannot, in their discretion, reject the balance that

Congress has struck in a statute." *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S.

483, 497 (2001) (quoting *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 194-95 (1978)

(internal quotes omitted)).  Because Congress has not authorized the Secretary to disburse Title

V funds to ANCs, the public's interest in requiring federal agencies to abide by the will of

Congress and its statutory directives counsels heavily in favor of the issuance of injunctive relief.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion

for a temporary restraining order and preliminary injunction.

ORAL ARGUMENT REQUESTED.

Dated this 20th day of April, 2020.

Respectfully submitted,

By:

KANJI & KATZEN, P.L.L.C.

/s/ Riyaz A. Kanji
Riyaz A. Kanji, D.C. Bar # 455165
303 Detroit Street, Suite 400
Ann Arbor, MI 48104
Telephone:  734-769-5400
Email:  rkanji@kanjikatzen.com

/s/ Cory J. Albright
Cory J. Albright, D.C. Bar Application Pending
WSBA # 31493
811 1st Avenue, Suite 630
Seattle, WA  98104
Telephone:  206-344-8100
Email:  calbright@kanjikatzen.com

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 37

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

*Co-Counsel for the Confederated Tribes of the*
*Chehalis Reservation and the Tulalip Tribes*

*Counsel for the Houlton Band of Maliseet Indians,*
*Akiak Native Community, Asa'carsarmiut Tribe*
*and Aleut Community of St. Paul Island*

CONFEDERATED TRIBES OF THE CHEHALIS
RESERVATION

/s/ Harold Chesnin
Harold Chesnin, WSBA # 398
Lead Counsel for the Tribe
420 Howanut Road
Oakville, WA  98568
Telephone:  360-529-7465
Email:  hchesnin@chehalistribe.org

TULALIP TRIBES

/s/ Lisa Koop Gunn
Lisa Koop Gunn, WSBA # 37115
Tulalip Tribes, Office of the Reservation Attorney
6406 Marine Drive
Tulalip, WA  98271
Telephone:  360-716-4550
Email:  lkoop@tulaliptribes-nsn.gov

MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION
– Page 38

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

# CERTIFICATE OF SERVICE

The undersigned counsel certifies that on the 20th day of April, 2020, he caused one copy

each of the foregoing plaintiffs' MOTION FOR TEMPORARY RESTRAINING ORDER AND

PRELIMINARY INJUNCTION, including memorandum in support and attachments, to be

served by certified mail and [UPS] overnight mail on the following:

Steven Mnuchin, Secretary
U.S. Department of the Treasury
1500 Pennsylvania Ave., N.W.
Washington, D.C.  20220
(202) 622-2000

and by electronic mail and [UPS] overnight mail on the following:

Alex Haas, Director
Federal Programs Branch
Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
(202) 514-1259
alex.haas@usdoj.gov

April 20th, 2020                              Respectfully submitted,

                                             By:

                                             /s/ Riyaz A. Kanji
                                             Riyaz A. Kanji, D.C. Bar # 455165
                                             303 Detroit Street, Suite 400
                                             Ann Arbor, MI 48104
                                             Telephone:  734-769-5400
                                             Email:  rkanji@kanjikatzen.com

                                             /s/ Cory J. Albright
                                             Cory J. Albright, D.C. Bar Application Pending
                                             WSBA # 31493
                                             811 1st Avenue, Suite 630

CERTIFICATE OF SERVICE
– Page 1

Seattle, WA  98104
Telephone:  206-344-8100
Email:  calbright@kanjikatzen.com

*Co-Counsel for the Confederated Tribes of the*
*Chehalis Reservation and the Tulalip Tribes*

*Counsel for the Houlton Band of Maliseet Indians,*
*Akiak Native Community, Asa'carsarmiut Tribe*
*and Aleut Community of St. Paul Island*

CONFEDERATED TRIBES OF THE CHEHALIS
RESERVATION

/s/ Harold Chesnin
Harold Chesnin, WSBA # 398
Lead Counsel for the Tribe
420 Howanut Road
Oakville, WA  98568
Telephone:  360-529-7465
Email:  hchesnin@chehalistribe.org

TULALIP TRIBES

/s/ Lisa Koop Gunn
Lisa Koop Gunn, WSBA # 37115
Tulalip Tribes, Office of the Reservation Attorney
6406 Marine Drive
Tulalip, WA  98271
Telephone:  360-716-4550
Email:  lkoop@tulaliptribes-nsn.gov

CERTIFICATE OF SERVICE
– Page 2

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100