**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CONFEDERATED TRIBES OF THE CHEHALIS ) <br> RESERVATION, ET. AL. ) <br> *Plaintiffs*, ) <br> ) <br> v. ) <br> ) <br> STEVEN MNUCHIN, SECRETARY, UNITED ) <br> STATES DEPARTMENT OF THE TREASURY ) <br> *Defendant*. ) | No. 1:20-cv-01002-APM |

**BRIEF OF *AMICI CURIAE,* NATIONAL CONGRESS OF AMERICAN INDIANS, AFFILIATED TRIBES OF NORTHWEST INDIANS, ALL PUEBLO COUNCIL OF GOVERNORS, CALIFORNIA TRIBAL CHAIRPERSON'S ASSOCIATION, GREAT PLAINS TRIBAL CHAIRMEN'S ASSOCIATION, INTER TRIBAL ASSOCIATION OF ARIZONA, INTER-TRIBAL COUNCIL OF THE FIVE CIVILIZED TRIBES, MIDWEST ALLIANCE OF SOVEREIGN TRIBES, UNITED SOUTH AND EASTERN TRIBES SOVEREIGNTY PROTECTION FUND, NATIONAL INDIAN GAMING ASSOCIATION, ARIZONA INDIAN GAMING ASSOCIATION, AND CALIFORNIA NATIONS INDIAN GAMING ASSOCIATION IN SUPPORT OF THE PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## INTRODUCTION

*Amici Curiae* are national and regional organizations of federally recognized Indian tribes ("*Amici Curiae*"). They submit this brief in support of the *Motion for Temporary Restraining Order and Preliminary Injunction* of the Plaintiffs, Confederated Tribes of the Chehalis Reservation; Tulalip Tribes; Houlton Band of Maliseet Indians; Akiak Native Community; Asa'Carsarmiut Tribe; Aleut Community of St. Paul Island; the Navajo Nation; Quinault Indian Nation; Pueblo of Picuris; Elk Valley Rancheria, California; and San Carlos Apache Tribe (collectively the "Plaintiffs"). By their Motion, the Plaintiffs seek to prevent Steven Mnuchin, the Secretary of the United States Department of the Treasury (the "Secretary") from unlawfully distributing up to $8,000,000,000 of "Tribal government" relief funds appropriated in the

Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") to non-government, privately owned, Alaska Native regional corporations and Alaska Native village corporations (collectively, "ANCs") chartered under state law.  Title V of the CARES Act establishes a coronavirus relief fund ("CRF") for state, local and Tribal governments, intended to stabilize all such "governments," and cover unexpected public health and emergency costs "with respect to the Coronavirus Disease 2019 (COVID-19)."[1]  The Plaintiffs' motion should be granted to ensure that these urgently needed funds for Tribal governments are properly allocated to federally recognized Indian tribes, including Alaska Native villages, as intended by Congress, and not redirected to instead benefit for-profit ANCs.

The goals of the *Amici Curiae* in this brief are to describe to the Court the nature and characteristics of federally recognized Indian tribes and their unique government-to-government relationship with the United States, to help the Court understand the breadth of essential governmental services tribes provide, to describe the on-the-ground challenges tribes face in providing such services in response to the COVID-19 pandemic, and to explain why any disbursement of the CRF to the ANCs will completely undermine Congress's intent to support the needs of Indian tribal governments during this crisis.

## ARGUMENT

### I.   THE NATURE OF INDIAN TRIBES AND THEIR RELATIONSHIP TO THE UNITED STATES

Indian tribes are governments "that exercise inherent sovereign authority over their members and territories."  *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of*

---

[1] Section 601(g)(5), Title V, Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020), amending the Social Security Act, 42 U.S.C. 301 *et seq*.  The *Amici Curiae* adopt the same citation forms to the CARES Act as the Plaintiffs in their Motion.

*Oklahoma,* 498 U.S. 505, 509 (1991) (citing *Cherokee Nation v. Georgia,* 5 Pet. 1, 17 (1831));

*accord Michigan v. Bay Mills Indian Cmty.,* 572 U.S. 782, 788 (2014).  *See generally* COHEN'S

HANDBOOK OF FEDERAL INDIAN LAW §§ 1.06-1.07, at 2, § 4.01, at 206-08 (N. Newton & R.

Anderson eds., 2012) ("COHEN").  The sovereign authority that Indian tribes possess is "retained"

and "inherent;" it is not granted by the federal government.  *United States v. Wheeler*, 435 U.S.

313, 322-23 (1978) (stating that "The powers of Indian tribes are, in general, 'inherent powers of

a limited sovereignty which has never been extinguished,'" citing COHEN at 122); *Talton v. Mayes,*

163 U.S. 376, 384, (1896)).  Rather, as the Supreme Court has explained, Tribes are "separate

sovereigns pre-existing the Constitution." *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 56 (1978).

Tribes retain all attributes of their sovereignty that Congress has not divested.  *See, e.g.*, *Bay Mills*,

572 U.S. at 789; *Kiowa Tribe of Okla. v. Mfg. Tech., Inc*., 523 U.S. 751, 755–56 (1998); *Wheeler*,

435 U.S. at 323.

### A.  The Sovereign Powers of Indian Tribes

The Supreme Court has regularly confirmed the sovereign powers that Indian tribes retain,

including the inherent power "to make their own laws and be ruled by them."  *Williams v. Lee*,

358 U.S. 217, 220 (1959).  As such, tribes retain the power to determine who is or is not a citizen

of the tribe, *Santa Clara Pueblo,* 436 U.S. at 55-56; to institute tribal employment preferences that

favor their own citizens under tribal law, *see E.E.O.C. v. Peabody Western Coal, Co.*, 610 F.3d

1070 (9th Cir. 2010); to regulate domestic relations, including marital rights, child custody matters,

inheritance, and tort and contract disputes between tribal citizens, *Santa Clara Pueblo,* 436 U.S.

at 56 (citing cases); to establish courts to adjudicate civil disputes and criminal prosecutions, *see*

American Law Institute ("ALI"), RESTATEMENT OF THE LAW OF AMERICAN INDIANS, § 31 at 79

(Tentative Draft No. 2, March 13, 2018); and to exercise inherent sovereign authority over non-

citizens within their territories in certain circumstances. *See, e.g., id.* § 34 at 79-80; The Violence Against Women Act of 2013, Pub. L. 113-4, Title IX, sec. 904 (codified at 25 U.S.C. § 1304). Like other governments, tribes also enjoy sovereign immunity, which the Court describes as "a necessary corollary to Indian sovereignty and self-governance," *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g,* 476 U.S. 877, 890 (1986), and which helps protect and preserve their governance from frivolous suits.   Indian tribes also have the inherent power to engage in, and regulate, economic activity within their jurisdictions to "raise revenues to pay for the costs of government."  *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 144 (1982); *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 335-36 (1983).   In much the same way that states generate governmental revenues through a variety of enterprises, including liquor stores and lotteries, Indian tribes exercise their sovereign authority to generate such revenues by operating myriad enterprises, including tourism, timber harvesting, and gaming *see, e.g. id.* at 327 ("resort complex" for recreational hunting and fishing); *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 139 (1980) ("tribal enterprise that manages, harvests, processes, and sells timber"); *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 219 (1986) (gaming enterprise). Congress broadly encourages the enterprises of Indian tribes to flourish.  *See, e.g.*, 25 U.S.C. § 1521 (provisions of Indian Financing Act of 1974 establishing Indian business-development grant programs); 25 U.S.C. §§ 4103(22), 4111, 4131 (provisions of the Native American Housing Assistance and Self-Determination Act authorizing funding for tribally designated housing authorities).  It does so comprehensively for gaming pursuant to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721 (2006).

Given the breadth and scope of Indian tribes' sovereign powers, the Supreme Court consistently admonishes that it "denigrates Indian sovereignty" to treat them as mere "private,

voluntary organizations." *Merrion,* 455 U.S. at 140-46 (quotations omitted) (citing *United States v. Mazurie,* 419 U.S. 544, 557 (1975)); *accord Bryan v. Itasca Cty., Minnesota,* 426 U.S. 373, 388 (1976).

### B.  The Federal Trust Responsibility Owed To Indian Tribes

From the founding of our Nation, the Supreme Court has recognized that the federal government has a unique trust obligation to protect tribal sovereignty and the power of self-governance.  This trust responsibility has its origins in the constitutional responsibility for Indian affairs lodged in Congress, *see* U.S. CONST., art. I, § 8, cl. 3 (the "Indian Commerce Clause"), and in Chief Justice Marshall's foundational Indian law decisions interpreting that responsibility.  *See Worcester v. State of Ga.,* 31 U.S. 515,  551-52, 555 (1832) (United States' trust to Indian nations involves "a nation claiming and receiving the protection of one more powerful:  not that of individuals abandoning their national character, and submitting as subjects to the laws of a master"); *see also Oneida County v. Oneida Indian Nation,* 470 U.S. 226, 247 (1985) (discussing trust doctrine).  While the Supreme Court has interpreted the Indian Commerce Clause to give Congress powers over Indian affairs, the political branches also have an obligation to protect Indian tribes as governments.  As such, the Executive Branch has historically recognized the United States' "unique trust relationship with Indian tribal governments" and the need to "[s]upport tribal sovereignty and self-determination." Exec. Order No. 13175, § 2 (a)-(b), 65 Fed. Reg. 67, 249 (Nov. 9, 2000).

This trust responsibility pervades the field to this day.  Congress confirms that "[t]he United States has a trust responsibility to each tribal government," respecting "the sovereignty of each tribal government," and "through statutes, treaties, and the exercise of administrative authorities, [Congress] has recognized the self-determination, self-reliance, and inherent sovereignty of Indian

tribes." 25 U.S.C. § 2601(2)-(3) (2001).  The trust responsibility is mentioned in almost every federal statute and executive order addressing Indian affairs.  *See, e.g.,* Indian Child Welfare Act, 25 U.S.C. § 1901 *et seq.,* § 1901(2) (1978), and it undergirds a statute that is central to this case, the Federally Recognized Indian Tribe List Act, Law 103-454, Nov. 2, 1994, 108 Stat. 479, originally codified at 25 U.S.C. §§ 479a, 479a-1 ("the List Act"), now codified at 25 U.S.C.A. § 5131 where Congress announced:  "the United States has a trust responsibility to recognized Indian tribes, maintains a government-to-government relationship with those tribes, and recognizes the sovereignty of those tribes."  P.L. 103-454 § 103(2), 25 U.S.C. § 479a Note.

### C. Federal Recognition of Indian Tribes

Federal "recognition" (or "acknowledgement") is of utmost importance to the government-to-government relationship between Indian tribes and the United States and to their identity as sovereigns.  As explained in Plaintiffs' Motion, "*recognition* is a legal term of art in federal Indian law: Indian tribes [and their "governing bodies"] are *recognized*, while corporations [and their boards] are not."  Plaintiff's Motion (ECF No. 3) at 16 (emphasis in original).

The Administrative process for federal acknowledgement states that its purpose as "to determine whether a petitioner is an Indian tribe eligible for the special programs and services provided by the United States to Indians because of their status as Indians," 25 C.F.R. § 83.2, and describes federal recognition as:

(a)  . . . a prerequisite to the protection, services and benefits of the Federal Governments available to those that qualify as Indian tribes and possess a government-to-government relationship with the United States

(b)  [meaning] the tribe is entitled to the immunities and privileges available to other federally recognized Indian tribes;

(c)  [meaning] the tribe has the responsibilities, powers, limitations, and obligations of other federally recognized Indian tribes; and

(d)  [subjecting] the Indian tribes to the same authority of Congress and the United States as other federally recognized Indian tribes.

United States Department of the Interior, *Procedures for Federal Acknowledgement of Indian Tribes*, 25 C.F.R. § 83 *et seq.,* § 83.2 (2015).  The statutory lynchpin for an Indian tribe "to exist" is 25 U.S.C. § 5130, formerly codified at 29 U.S.C. § 479a(2).  Section 5130 provides that "[f]or the purposes of this title [Title 25 of the United States Code, 'Indians'], . . .[t]he term 'Indian tribe' means any Indian or Alaska Native tribe, band, nation, pueblo, village or community that the Secretary of the Interior *acknowledges to exist* as an Indian tribe."   25 U.S.C.A. § 5130(2) (emphasis added).  Finally, in 1994, Congress enacted the List Act, which confirms the Interior Secretary's authority to recognize Indian tribes as described in the Federal Acknowledgement regulations at 25 C.F.R. Part 83.  Periodically, the Interior Department publishes a list of federally recognized Indian tribes in the Federal Register.

The List Act is, therefore, the means by which the federal government announces its recognition of Indian tribes.  The List Act provides: "The Secretary shall publish in the Federal Register a list of all Indian tribes which the Secretary recognizes to be eligible for the special programs and services provided by the United States to Indians because of their status as Indians." 25 U.S.C.A. § 5131(a).

The ALI's distillation of federal Indian law fully buttresses the nature of federal "recognition" (or "acknowledgement") unique to Indian tribes (and having nothing to do with private corporations):   the *very definition* of an Indian tribe turns on such recognition or acknowledgment:

§ 2. Indian Tribe
(a) An "Indian tribe" is any Indian or Alaska Native tribe, band, nation, pueblo, village, or community that either:

(1)      the Secretary of the Interior; or

(2)      Congress pursuant to its plenary authority

has acknowledged to exist as an Indian tribe.  25 U.S.C. § 479a(2) [recodified at 25 U.S.C. §5130].

ALI, RESTATEMENT OF THE LAW OF AMERICAN INDIANS, § 2 (Tentative Draft No. 1, April 22, 2015). *See also id.* § 2, Comment a, p. 32 (explaining the history of federal recognition, starting with treaty-making and evolving to the current process ending in the listing of Indian tribes pursuant to the List Act).

The significance of "federal recognition" cannot be overstated since it is federal acknowledgement that establishes a unique government-to-government relationship between the recognized governing body of the Indian tribe and the United States, *see Worcester v. State of Ga.,* 31 U.S. at 557; *Cherokee Nation v. State of Ga.,* 30 U.S. 1, 16–17 (1831) (Indian tribes are "domestic dependent nations"), and (at least in that regard) brings the Indian tribes under the Indian Commerce Clause of the Constitution as co-equal sovereigns with states and foreign nations. *See, e.g., State of R.I. v. Narragansett Indian Tribe,* 19 F.3d 685, 694 (1st Cir. 1994) (stating "Federal recognition is just that: recognition of a previously existing status[,] . . . that certain American Indian tribes exist" with "retained sovereignty . . . predat[ing] the birth of the Republic.") (citing *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 56 (1978)).

### D.  Alaska Native Corporations Are Not Tribal Governments or Indian Tribes

As the Plaintiffs have pointed out in their motion, ANCs are not on the Interior Department's List.  Nor do they possess any of the regulatory, adjudicatory or other sovereign powers of Indian tribes described above, including (for example) sovereign immunity from suit, *see Aleman v. Chugach Support Services*, 485 F.3d 206, 213 (4th Cir. 2007), or the right to exercise government regulatory authority over tribal lands and citizens.  Nor do they enjoy a "recognized" government-to-government relationship with the United States as described above, or anything that could possibly invoke the federal trust responsibility owed Indian tribes.  For these reasons, it

denigrates the dignity of Indian tribes, as sovereign governing entities, to suggest that ANCs are Indian tribes or Tribal governments in any manner.

## II.   EVEN IN ORDINARY TIMES, INDIAN TRIBES STRUGGLE TO GENERATE GOVERNMENTAL REVENUES TO PROVIDE GOVERNMENTAL SERVICES TO THEIR CITIZENS.

As governments with citizenries under their jurisdiction, federally recognized Indian tribes within the United States routinely provide the whole range of governmental services to their citizens, including, but not limited to, health and wellness programming, police and public safety, courts, water and sewer infrastructure, fire protection, schools, sanitation and trash collection, road maintenance, the creation and enforcement of building codes, zoning and land use planning, the regulation of air and water quality, and wildlife management.   But even before the current pandemic, Indian tribes struggled to generate governmental revenues to provide these services since states and localities already tax economic activity on tribal lands,[2] all but ensuring an additional tribal tax would cause double taxation and "discourage economic growth."  *Bay Mills*, 572 U.S. at 811 (Sotomayor, J., concurring); *see id.* at 807 ("Tribes face a number of barriers to raising revenue in traditional ways").  Despite this, Tribal governments are responsible for funding the same essential government services that United States citizens enjoy from the federal government, and their respective state, and local governments.

---

[2] *See, e.g.*, Montana Budget & Policy Center, *Policy Basics: Taxes in Indian Country, Part 2*, at 4 (Nov. 2017); *Dep't of Taxation & Fin. of N.Y. v.Milhelm Attea & Bros., Inc.*, 512 U.S. 61, 78 (1994) (approving state authority to tax cigarettes sold on the Seneca reservation); *Okla. State Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 507 (1991) (authorizing state tax on sales of goods to nonmembers of Indian Tribes on land held in trust for the Tribe); *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 151-63 (1980) (approving state cigarette and sales taxes on certain on-reservation purchases made by nonmembers of Indian Tribes); *Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 477 (2d Cir. 2013) (authorizing town's imposition of personal-property tax on gaming devices in tribal casino).

In addition, as the 2003 report of the U.S. Commission on Civil Rights, *Quiet Crisis: Federal Funding and Unmet Needs in Indian Country,* documented, the federal government has historically failed "to carry out its promises and trust obligations." U.S. Civil Rights Commission, *A Quiet Crisis: Federal Funding and Unmet Needs in Indian Country*, July 2003). "These failures included longstanding and continuing disregard for tribes' infrastructure, self-governance, housing, education, health, and economic development." *Id*. Updating that report in December 2018, the Commission concluded:

> Federal funding for Native American programs across the government remains grossly inadequate to meet the most basic needs the federal government is obligated to provide. Native American program budgets generally remain a barely perceptible and decreasing percentage of agency budgets. Since 2003, funding for Native American programs has mostly remained flat, and in the few cases where there have been increases, they have barely kept up with inflation or have actually resulted in decreased spending power.

U.S. Civil Rights Commission, *Broken Promises: Continuing Federal Funding Shortfall for Native Americans*, December 2018 at 4, 6 (citing U.S. Civil Rights Commission, *A Quiet Crisis: Federal Funding and Unmet Needs in Indian Country*, July 2003).

For these reasons, all federally recognized Indian tribes rely heavily on the earnings of their tribal government-owned enterprises to fund the services to meet their citizens' needs. Thus, as of 2019, *before the current crisis*, Indian tribes' gaming enterprises alone provided more than $12,590,000,000 annually to support tribal governmental programs.[3] However, "[n]early half of federally recognized Tribes in the United States do not operate gaming facilities at all," *Bay Mills*, 572 U.S. at 809 (citing A. Meister, Casino City's Indian Gaming Industry Report 28 (2009–2010 ed.) (noting that "only . . . 42 percent, of . . . federally recognized Native American tribes in the U.S. operate gaming")), and of that percentage, many are small and in remote areas. Thus, this

---

[3] Dupris Consulting Group, "Economic Impact Summary: The Nationwide Impacts of Indian Gaming," National Indian Gaming Association, 2019.

figure only tells half the story since it does not account for those governmental needs of federally recognized Indian tribes supported through revenues generated by non-gaming enterprises.  And as explained below, COVID-19 has shuttered virtually all tribal enterprises, gaming and non-gaming, and the $8 billion at issue here, while critical to help sustain tribal governments through this crisis, hardly represents an adequate amount of revenue to meet basic existing governmental needs.

### III.   THE COVID-19 PANDEMIC HAS DEVASTATED THE ABILITY OF TRIBES TO GENERATE GOVERNMENTAL REVENUES, AND THE $8,000,000,000 RELIEF FUND CONGRESS HAS ALLOCATED TO INDIAN TRIBES IS INSUFFICIENT TO MEET THEIR MOUNTING NEEDS.

The devastation besetting the Plaintiffs, as set forth in their Motion, ECF No. 3 at 12-13 and 31-33, is a story that is playing out across Indian Country.  *See* Declaration of Maria Dadgar, Executive Director of the Inter Tribal Association of Arizona, Inc., attached hereto as Exhibit A ("Dadgar Decl") ¶ 7; Declaration of Chuck Hoskin, Jr., Principal Chief of the Cherokee Nation and President of the Inter-Tribal Council of the Five Civilized Tribes, attached hereto as Exhibit B ("Hoskin Decl") ¶ 6; Declaration of Michael Chavarria, Chairman of the All Pueblo Council of Governors, attached hereto as Exhibit C ("Chavarria Decl") ¶ 6; Declaration of Bo Mazzetti, Chairman of the California Tribal Chairpersons' Association, attached hereto as Exhibit D ("Mazzetti Decl") ¶ 6; and Declaration of Leonard Forsman, President of the Affiliated Tribes of Northwest Indians, attached hereto as Exhibit E ("Forsman Decl") ¶ 6.

For example, all 21 federally recognized Tribes, who are members of amicus curiae Inter Tribal Association of Arizona[4], with lands in Arizona, as well as California, New Mexico, Nevada,

---

[4] The member tribes of the Inter Tribal Association of Arizona include:  the Ak-Chin Indian Community, the Cocopah Tribe, the Colorado River Indian Tribes, the Fort McDowell Yavapai Nation, the Fort Mojave Indian Tribe, the Gila River Indian Community, the Havasupai Tribe, the Hopi Tribe, the Hualapai Indian Tribe, the Kaibab Band of Paiute Indians, the Pascua Yaqui Tribe,

and Utah, have exercised governmental authority to protect tribal citizens from the impacts of COVID-19 by "promptly and voluntarily issu[ing] emergency orders on their reservations." Dadgar Decl. ¶ 4. These orders have "radically limited or shut down their tourism, gaming, and other business enterprises," the principal source of governmental revenues for these Tribes.  *Id.* This loss of revenue cripples the ability of these Indian tribes to "provide ongoing governmental services to their community members, including but not limit to, public safety and policing, health care, child care, elder assistance, food assistance, garbage and sanitation services, and many others services." *Id.* ¶ 5.  In addition, and similar to the Plaintiffs, these 21 Indian tribes "have done their best to mitigate the economic hardships they and their tribal members are experiencing, by (where possible) providing paid leave and ongoing medical benefits to furloughed employees and overtime pay to essential employees and emergency workers for as long as possible." *Id.* ¶ 6.  This is the situation for Indian tribes everywhere, only by way of example:  for some of the largest tribes, in Oklahoma, *see* Hoskin Decl. ¶¶ 3-5, for the Pueblos of the Southwest, *see* Chavarria Decl. ¶¶ 3-5; for the California Rancherias, *see* Mazzetti Decl. ¶¶ 3-5, and for the tribes of the Pacific Northwest, *see* Forsman Decl. ¶¶ 3-5.

American Indian and Alaska Native communities are among the poorest populations in the United States, over 25 percent live in poverty with overcrowded housing conditions (sixteen times worse than the national average) and high rates of diabetes, cancer, heart disease, and asthma.[5]

---

the Quechan Tribe, the Salt River Pima-Maricopa Indian Community, the San Carlos Apache Tribe, the San Juan Southern Paiute Tribe, the Tohono O'odham Nation, the Tonto Apache Tribe, the White Mountain Apache Tribe, the Yavapai-Apache Nation, the Yavapai-Prescott Indian Tribe, and the Zuni Tribe.

[5] U.S. Civil Rights Commission, *Broken Promises:  Continuing Federal Funding Shortfall for Native Americans*, December 2018 at 156 – 157; Dana Hedgpeth, Darryl Fears and Gregory Scruggs, *Indian Country, where residents suffer disproportionately from disease, is bracing for coronavirus*, Washington Post, April 4, 2020, https://www.washingtonpost.com/climate-environment/2020/04/04/native-american-coronavirus/

Daily life for a majority of American Indians on reservations means "living without adequate access to clean water, plumbing, electricity, internet, cellular service, roads, public transportation, housing, hospitals, and schools."[6]  Due to the geography of some reservations, tribal members must travel great distances for work and basic necessities such as food and clothing.  For example, a majority of American Indians who live on the Pine Ridge Reservation in South Dakota commute more than 50 miles to work and travel two hours to the nearest grocery store.[7]  On the Navajo Reservation, which is home to 300,000 people where one in every five adults has diabetes, the average resident has to drive three hours to buy food at the grocery store.[8]  Thus, the COVID-19 pandemic only exacerbates the dire conditions of reservation life, a tinderbox for spread of the infection.  Tribal governments face a looming disaster that requires a rapid response, and the funding that Congress intended for recognized tribal governments.

A survey conducted by amicus curiae National Congress of American Indians ("NCAI"), the largest, oldest, and most representative organization comprised of American Indian and Alaska Native Tribal governments and their citizens, identified numerous health, education, and welfare challenges due to the pandemic.  *See* Declaration of Yvette Roubideaux, attached hereto as Exhibit F ("Roubideaux Decl.") ¶ 10-39.  As Tribal economies continue to collapse and government services and enterprises shut down in response to COVID-19, the financial needs of the Tribes increase and these critical health and safety challenges go unmet.  *Id.* at ¶ 15-16, 28-29, 31.

---

[6] U.S. Civil Rights Commission at 1.
[7] *Id.* at 1; Priya King, *How Native Americans Are Fighting a Food Crisis,* New York Times, April 13, 2020,  https://www.nytimes.com/2020/04/13/dining/native-americans-coronavirus.html
[8] Matilda Kreider, *13 grocery stores: The Navajo Nation is a food desert*, George Washington University, Dec. 10, 2019,   https://www.planetforward.org/idea/13-grocery-stores-the-navajo-nation-is-a-food-desert

A significant challenge to public health identified by Tribal governments, including Alaska Native villages, is a lack of COVID-19 point of care testing, treatment facilities and an inability to provide protective medical equipment to health care workers.  *Id.* at ¶ 11, 13, 34.  For example, the Navajo Reservation covers 27,000 square miles of Arizona, New Mexico, and Utah, and only has 12 health care facilities.[9]  In Alaska Native villages, some citizens infected with COVID-19 need to be flown 100 miles to the nearest healthcare facility for treatment or are unable to receive in-person medical care.  Roubideaux Decl. at ¶ 13.  The medical supply needs include, "N95 medical masks and COVID-19 testing kits, hand sanitizer, infrared non-contact thermometers, toilet paper, disinfecting wipes, anti-viral surgical masks, gloves, booties, caps, face shields, [goggles], hospital grade disinfectants, antibacterial soaps, and pharmaceuticals."  *Id.* at ¶ 34. Tribal governments also state that additional funding is needed to address increased costs in providing personal protective equipment for first responder personnel and deep cleaning expenses for ambulance services after patient transport.  *Id* at ¶ 29, 36-37.  Food scarcity now threatens the health of elders and children due to a reduction in food shipments by plane and ferry, funding caps on federal food programs, and the closure of schools that provided daily lunch programs and grocery stores.  *Id.* at ¶ 13, 18, 21-22, 35. On the Pine Ridge Reservation, "shelves of the few groceries empty out, shipments of food boxes are delayed because of supply chain disruptions, and hunting and gathering are restricted by government regulations and environmental conditions."[10]

---

[9] Kenzi Abou-Sabe, Cynthia McFadden, Christine Romo and Jaime Longoria, *Coronavirus batters the Navajo Nation, and it's about to get worse*, April 20, 2020, https://www.nbcnews.com/health/health-news/coronavirus-batters-navajo-nation-it-s-about-get-worse-n1187501.

[10] Priya King, *How Native Americans Are Fighting a Food Crisis,* New York Times, April 13, 2020,  https://www.nytimes.com/2020/04/13/dining/native-americans-coronavirus.html.

Community infrastructure challenges include inadequacy (or complete absence) of broadband Internet and capital equipment for telework, telehealth services, and for students to conduct online learning while schools are closed. *Id.* at ¶ 17, 20, 23-24, 30, 33. Other community infrastructure challenges include shortages of temporary housing for multi-generation households, problems implementing proper sanitation methods in dwellings that lack running water, deficient medical supplies needed for families to self-quarantine and shelter-in-place, increases in energy costs from shelter-in-place orders, and a lack of community quarantine facilities. *Id.* at ¶ 21-28, 38-39.

American Indian and Alaska Native communities already suffer from the highest rates of poverty, unemployment and economic distress. The survey results described above demonstrate that federally recognized Tribal governments face unprecedented challenges with significant financial needs. As the COVID-19 disease continues to spread throughout Indian Country, these needs and challenges will continue to adversely affect Tribal governments and their citizenry.

\* \* \*

As discussed above, less than one-half of the over 570 federally recognized tribal governments have gaming operations and for that percentage, gaming revenues directly support Tribal government services to the tune of nearly $13,000,000,000.[11] Today, the doors of all of those businesses are closed, while tribes undertake a massive expansion of essential governmental services to protect and meet the basic needs of their citizens.

---

[11] *List of Casinos State-by-State*, 500Nations.com, https://www.500nations.com/Indian_Casinos_List.asp (last visited April 19, 2020) reports 245 tribes as having gaming operations as of mid-2018.

It is, therefore, clear that the $8,000,000,000 relief fund at issue will not be sufficient to meet the governmental needs of Indian tribes as a result of the COVID-19 pandemic.  Tribal governments will, in no time, be in dire straits if not already there.

**IV.** **ALLOCATION OF COVID-19 RELIEF FUNDS TO ALASKA NATIVE CORPORATIONS WILL DEPRIVE INDIAN TRIBES OF CRITICALLY NEEDED FUNDS FOR THE PROVISION OF GOVERNMENTAL SERVICES TO THEIR CITIZENS.**

**A.  The Alaska Native Claims Settlement Act**

In 1971, Congress passed the Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C. §§ 1601 *et seq.*, and resolved claims made by Alaska Natives to their lands in exchange for title to over 40 million acres of land and almost one billion dollars. 43 U.S.C. §§ 1603, 1611, 1613; *see* Martha Hirschfield, *The Alaska Native Claims Settlement Act: Tribal Sovereignty and the Corporate Form*, 101 Yale L.J. 1331 (1992).

ANCSA created two-tiers of corporations to hold title to settlement lands and to pay out financial compensation in the form of dividends to Alaska Native shareholders. 43 U.S.C. § 1606-1607.  "These assets of the Natives would be administered through twelve regional corporations and a village corporation in each Village." H. Rep. 92-523, 1971 U.S.C.C.A. 2192, 2192 (1971).[12]

While ANCSA provided for the establishment of these corporate entities to receive significant resources, it left intact the 229 federally recognized Indian tribes at the village level, which retain and exercise inherent sovereignty, provide governmental services to their citizens, and have a government-to-government relationship with the United States as discussed above. *See Indian Entities Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs,* 85 FR 5462-01 (Jan. 2020)*; see also* Bureau of Indian Affairs, Office of Indian

---

[12] The Regional Corporations and Village Corporations are collectively be referred to herein as "Alaska Native Corporations" or "ANCs."

Services, Tribal Leaders Directory, https://www.bia.gov/bia/ois/tribal-leaders-directory/ (last visited April 21, 2020).

### B. Corporate Structure under ANCSA and the ANCs Operations

ANCSA divided Alaska "into twelve geographic regions", each to be administered by separate private, for-profit corporations, known as "regional corporations."   43 U.S.C. 1606(a), (d).  The regional corporations were required to "incorporate under the laws of Alaska . . . to conduct business for profit."  *Id*. at 6206(d).  Apart from the twelve regional corporations, in order to receive settlement benefits, ANCSA required the creation of village corporations to develop natural resources at local levels, and, like the regional corporations, these corporate entities had to be organized as "corporation[s] under the laws of the State."  *Id*. at § 6207(a).

As with any state incorporated business entity, ANCs are controlled by boards of directors that are elected by shareholders, *see* 43 U.S.C. § 1606(f), and ANCs "do not possess a government-to-government relationship with the federal government."   NCSA Reg'l Ass'n, *Overview of Entitles Operating in the Twelve Regions*, available at https://ancsaregional.com/overview-of-entities/#village-corporations (last visited April 19, 2020).

Today, there are more than 200 ANCs, including regional and village corporations. The twelve regional corporations include: Aleut Corporation; Arctic Slope Regional Corporation ("ASRC"); Bering Straits Native Corporation; Bristol Bay Native Corporation ("BBNC"); Calista Corporation; Chugach Alaska Corporation ("Chugach"); Cook Inlet Region, Inc. ("CIRI"); Doyon, Ltd.; Koniag, Inc.; NANA Regional Corporation; and Sealaska Corporation. *See* ANCSA Reg'l Ass'n, *The Twelve Regions*, https://ancsaregional.com/the-twelve-regions/ (last visited April 19, 2020).

ANCs and their subsidiaries deliver shareholder profits through involvement in a number of industries, including construction, environmental services, government contracting, natural resource development, technology services, and many others. ANCSA Reg'l Ass'n, *Economic Impacts*, available at https://ancsaregional.com/economic-impacts/ (last visited April 19, 2020).  It is within this for-profit corporate world that ANCs generate prolific levels of corporate revenue for the benefit of their shareholders.  However, they have no statutory obligation to provide any benefit directly to Alaska Native Tribal governments.

Over the past two years, revenues for regional corporations have ranged from approximately $250 million into the billions of dollars, with Arctic Slope Regional Corporation, one of the top 200 largest private companies in the United States, reporting $3.4 billion of revenue in 2019 alone. *Id.;* Forbes, *Arctic Slope Reg'n Corp.*, available at https://www.forbes.com/companies/arctic-slope-regional-corporation/#175fc5e2982c (last visited April 19, 2020).  Annual revenues at the village corporation level can average above $50 million. *See* Alaska Native Village Corp. Ass'n, *ANVCA Members*, available at https://anvca.biz/anvca-members (last visited April 19, 2020).  Corporate giants of this magnitude ordinarily maintain significant payrolls and ANCs are no different.  The largest ANCs, including ASRC and NANA Regional Corporation, each employ between 13,000-16,000 individuals around the world and largely outside of Alaska. Res. Dev. Council, *Alaska Native Corporations*, available at https://www.akrdc.org/alaska-native-corporations (last visited April 19, 2020).

### C.  Completion of the Certification by ANCs

As set forth in the Plaintiffs' Motion, the "Certification for Requested Tribal Data" ("Certification") that the Department of Treasury ("Treasury") required Indian tribes to complete to tap the $8,000,000,000 funds for Tribal governments invited ANCs to submit applications for

those funds.  This means not only that these giant private corporations are poised to siphon off funds that can only begin to ameliorate the needs of Tribal governments in this time of crisis, but will also create funding inequities that will compound the current problems faced by federally recognized Tribal governments, the true intended beneficiaries of the CFR.

The Certification requires that a requesting entity provide the following information:

1. "Name of Indian Tribe", "Population: Total number of Indian Tribe Citizens/Members/Shareholders",
2. "Land Base: Total number of land acres held by the Indian Tribe and any tribally-owned entity (to include entities in which the Indian Tribe maintains at least 51% ownership) as of January 1, 2020 (to include lands held in trust by the United States, owned in restricted fee status, owned in fee, or selected pursuant to the Alaska Native Claims Settlement Act),
3. "Employees: Total number of persons employed by the Indian Tribe and any tribally-owned entity (to include entities in which the Indian Tribe maintains at least 51% ownership), and
4. "Expenditures: Total expenditures for the most recently completed fiscal year." Dept. of Treasury.

*Certification for Requested Tribal Data*, OMB Approved No. 1505-0264, Exp. 10/31/2020

https://forms.treasury.gov/caresact/stateandlocal (last visited April 19, 2020).

Notably, federally recognized Indian tribes have citizens (or "members") who make up their populations, not "shareholders." And, most (but not all) Indian tribes prohibit tribal citizen enrollment in more than one tribe.  *See e.g.* Muscogee (Creek) Nation Cons. art III, sec. 2 ("an enrolled member of another Indian tribe, nation, band, or pueblo shall not be eligible for citizenship"); Tulalip Tribes Code Ch. 5.10.010 (prohibiting dual enrollment); Seminole Nation of Oklahoma Code Title 22, sec. 101(c) (containing a dual enrollment prohibition).  The Certification form invites ANCs to register for these relief funds as if they were federally recognized Indian tribes, and thereby allows for multiple payments to the same constituents, since a single Alaska Native may be both a citizen of one of Alaska's 229 federally recognized Indian tribes and a "shareholder" of a regional corporation or a village corporation.  *See* Cook Inlet Region, Inc.,

*Shareholder 101*, available at   https://www.ciri.com/shareholder-101-3/ (last visited Apr. 21, 2020) (stating that ANCSA Alaska Natives may own stock in at least one regional corporation and at least one village corporation); *see also* Cook Inlet Region, Inc., *CIRI Shareholder Handbook*, available at   https://www.ciri.com/wp-content/uploads/2016/09/SH-Handbook-2016.pdf   (last visited Apr. 21, 2020) ("[a]n individual who is enrolled in a tribe may []be enrolled as a shareholder of an ANCSA regional or village corporation").

Alaska Natives can also inherit stock, meaning that it is possible for a single individual, who is a shareholder of stock in a regional corporation and a village corporation, to also become a shareholder of stock in additional regional corporations and their associated village corporations through inheritance. *See* 43 U.S.C. § 1606(g) (recognizing the ability of Alaska Natives to receive ANC stock by gift or inheritance; *see also* Sealaska *Life Estate Enrollment*, available at https://mysealaska.com/Services/Enrollment (last visited Apr. 21, 2020) (recognizing gifts or inheritance as permissible justifications for a shareholder to own stock in another regional corporation), Doyon, Limited, *Class C (Children) Stock Application,* available at https://www.doyon.com/wp-content/uploads/2018/06/Class-C-Fillable.pdf (last visited Apr. 21, 2020) (asking applicants to check "all" regional corporations in which their parents are shareholders), and Bristol Bay Native Corporation, *BBNC Gift of Stock*, available at https://www.bbnc.net/wp-content/uploads/2016/04/BBNC-Gift-of-Stock-2020.pdf (last visited Apr. 21, 2020) (providing a form for shareholders to complete if they wish to gift regional corporation stock to another individual).

The bottom line is this:  the Certification allows a single Alaska Native to be counted towards the "population" of three or more entities:  as a "shareholder" of one or more regional corporations and one or more village corporations, and as a "citizen" or "member" of an Alaska

Native Tribal government.  This scenario, with a single individual counted multiple times for these relief funds, would contribute toward an inequitable distribution of precious resources away from the Tribal governments for which they were intended.  Such methodology would result in the inequitable disbursement of relief funds to large for-profit corporations that are not recognized tribal governing bodies, and thereby shortchange the federally recognized Tribal governments responsible for preparing for, and combatting COVID-19 in tribal communities.

This is a complete anathema to the federal government's relationship to Indian tribes. Indeed, in Title III of List Act (the Tlingit and Haida Status Clarification Act), Congress made clear that citizens of Indian tribes should not be counted multiple for federal funding purposes. Addressing federal funding allocations to a consortium of Alaska Native villages, Congress announced, "In no event shall dually enrolled members result in duplication of Federal service funding."  List Act, § 205, codified at 25 U.S.C. § 1215.

In addition, while the Treasury's allocation formula for these relief funds is still unknown, if it allocates according to a formula weighted on "land base" or "employees," the ANCs stand to take the lion's share of these already meager funds targeted for Indian tribes.

     *i.*    *Land base*

ANCs are massive landholders in the State of Alaska, collectively owning nearly 40 million acres.  *See generally* ANCSA Reg'l Ass'n, *The Twelve Regions*, https://ancsaregional.com/the-twelve-regions/ (last visited April 19, 2020).  ANCSA permitted village corporations to select a total of twenty-two million acres of land, to be based on the Native population of each recognized village.  43 U.S.C. § 1611(c). The regional corporations were also allowed to select an additional sixteen million acres, based solely on the size of the region and without regard to Alaska Native population. *Id.; see* Hirschfield, *supra* at 1336.

ASRC holds title to more than 5 million acres, Calista Corporation holds title to more than 6.5 million acres, and Doyon Limited owns 12.5 million acres. Res. Dev. Council, *Alaska Native Corporations*, available at https://www.akrdc.org/alaska-native-corporations (last visited April 19, 2020).  The landholdings of these three ANCs "dwarf nearly every federally recognized Indian nation in the lower 48."[13] Acee Agoyo, Indianz.Com, *Alaska Native corporations in line for billions in coronavirus relief promised to tribes*, Apr. 14, 2020, available at https://www.indianz.com/News/2020/04/14/alaska-native-corporations-in-line-for-b.asp (last visited April 19, 2020). In stark contrast to large-landholding ANCs, a significant number of federally recognized Indian tribes have extremely small or diminished reservations or no land base at all. *See* National Congress of American Indians, Resolution #MKE-17-059 (2017) (recognizing that "most [tribal] reservations [or land holdings] are insufficient as a viable land base").

Further, unlike the tribal lands held in trust for the Metlakatla Indian Community and Indian tribes in the Lower 48 states, "[ANCs] can immediately convey former reservation lands to non-Natives, and such corporations are not restricted to using those lands for Indian purposes." *Alaska v. Native Vill. of Venetie Tribal Gov't,* 522 522 U.S. 520, 533 (1998).  In fact, the Supreme Court in *Venetie* held that ANCSA lands are held in fee simpler and are therefore not Indian land and left it for Congress to determine otherwise.  *Id.* at 534.

This fact alone makes it unreasonable to consider such lands in any formula for relief fund distribution intended for Indian tribes and associated with addressing the COVID-19 pandemic in Indian country, as that term is defined under federal law.  *See* 18 U.S.C. § 1151.

---

[13] The one Indian tribe with a land base larger than any of the ANCs is the Navajo Nation, which had 1,321 cases positive COVID cases and had experienced 43 deaths as of April 20, 2020. *See* i*d.*; *see* Navajo Times, *COVID-19 Across the Navajo Nation*, available at https://navajotimes.com/coronavirus-updates/covid-19-across-the-navajo-nation/ (last visited Apr. 21, 2020).

ii.    *Employees*

In a similar vein, regional corporations employ such large numbers of employees globally that their inclusion in the CRF formula would disproportionally tilt this factor in favor of ANCs and away from Tribal governments. ASRC alone employs approximately 15,000 individuals in its operations around the world, with only 23% of those employees located in Alaska. Res. Dev. Council, *Alaska Native Corporations*, available at https://www.akrdc.org/alaska-native-corporations (last visited April 19, 2020).  In addition, NANA Regional Corporation employs 13,000 people (32% in Alaska), Chugach employs 6,000 people (18% in Alaska), and several other ANCs employ 1,000 or more people, largely outside of Alaska. *Id*. These employment figures are more consistent with the multinational companies with whom regional corporations compete with than they are with Indian tribes, many of whom employ predominantly reservation residents alongside a small percentage of non-Indians living near the reservation.

**D.   ALLOCATION OF THE RELIEF FUNDS TO THE SOVEREIGN ALASKA NATIVE TRIBAL GOVERNMENTS, NOT TO PRIVATE ALASKA NATIVE CORPORATIONS, PROPERLY ALLOWS THESE TRIBAL GOVERNMENTS, LIKE ALL OTHERS, TO FAIRLY SEEK FEDERAL FUNDS IN THE INTERESTS OF THEIR CITIZENS.**

The 229 federally recognized Indian tribes in Alaska – the Alaska Native villages – are the governments that will fashion policy decisions on behalf of their citizens to respond to the coronavirus pandemic.  That is the exercise of inherent sovereignty and the pursuit of self-determination.

These Tribal governments presumably have submitted the Certifications and provided sensitive data to Treasury to set out their government needs.  In doing so, they had the option to account for their budgetary expenditures and needs.  The rules around Tribal government use of CARES Act relief funds is flexible enough to account for the budgetary impacts felt by any of the 229 Alaska Native Tribal governments.  As suggested in a letter by United States Senator Lisa

Murkowski, the unique relationships between Alaska Native Tribal governments and ANCs requires that the "Tribes [be] afforded the ability to designate award of their portion of the Relief Funds to their respective regional organization." Letter from Lisa Murkowski, United States Senator, to Steven T. Mnuchin, Secretary of Treasury, U.S. Dept. of Treasury, and David Bernhardt, Secretary of Interior, Dep't of Interior at 4 (Apr. 14, 2020).  According to Senator Murkowski, "Alaska's Tribes must be able to use their resources in a way that provides relief to their communities in the way that works for" the Tribes.  *Id.*  In Alaska, that means allowing relief funds to flow directly only to Tribal governments that, as federally recognized sovereigns, bear responsibility to serve citizens at risk of coronavirus.

Congress intended the delivery of funds from the $8 billion CARES Act tribal set-aside fund to "Tribal governments", not what the Supreme Court describes as "state-chartered and state-regulated private business corporations," *Alaska v. Native Village Tribal Gov't,* 522 U.S. 520, 534 (1998), with shareholders that include non-Indians, 43 U.S.C. §§ 1606(h)(2), (h)(3)(D), 1607(c). ANCs are not controlled by a governing body, like a sovereign government, and they "do[] not meet [even] one of the basic criteria of an Indian tribe."  *Seldovia Native Ass'n v. Lujan,* 904 F.2d 1335, 1350 (9th Cir. 1990).  Indeed, as set out above, they are not "recognized by" the federal government, they have no government-to-government relationship with it, and they do not possess or exercise inherent sovereign powers.  To be fair, the shareholders of ANCs may be (but are not required to be) Alaska Natives and those shareholders may be elected leaders of federally recognized Indian tribes in Alaska, but that correlation does not imbue ANCs with the unique dignitary status of the sovereign Indian tribes responsible for dealing with a pandemic crisis in a manner that protects and preserves the best interests of their citizenries.

## CONCLUSION

For all of the above reasons, the Court should grant the Plaintiffs' *Motion for Temporary Restraining Order and Preliminary Injunction.*

Dated:  April 23, 2020                    Respectfully submitted,

*/s/  Kaighn Smith, Jr.*
Kaighn Smith, Jr. (D.C. Bar No. MI0027)
Michael Corey Francis Hinton
Erick J. Giles
DRUMMOND WOODSUM
84 Marginal Way, Suite 600
Portland, ME 04101
(207) 772-1941
ksmith@dwmlaw.com

*Co-Counsel for National Congress of American Indians*

*Counsel for Affiliated Tribes of Northwest Indians; All Pueblo Council of Governors; California Tribal Chairperson's Association; Great Plains Tribal Chairmen's Association, Inc.; Inter Tribal Association of Arizona, Inc.; Inter-Tribal Council of the Five Civilized Tribes; Midwest Alliance of Sovereign Tribes; United South and Eastern Tribes Sovereignty Protection Fund; National Indian Gaming Association; Arizona Indian Gaming Association; and California Nations Indian Gaming Association*

NATIONAL CONGRESS OF AMERICAN INDIANS

*/s/  Derrick Beetso*
Derrick Beetso
National Congress of American Indians
Embassy of Tribal Nations
1516 P Street NW,
Washington, DC 20005
(202) 466-7767
dbeetso@NCAI.org

**CERTIFICATE OF SERVICE**

I hereby certify that on April 23, 2020, I electronically filed the foregoing brief, together with Exhibits A through F, with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Kaighn Smith Jr.*
Kaighn Smith Jr.

Drummond Woodsum
84 Marginal Way, Suite 600
Portland, Maine 04101
Tel: (207) 772-1941
Fax: (207) 772-3627
ksmith@dwmlaw.com