# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CONFEDERATED TRIBES OF THE
CHEHALIS RESERVATION et al.,

                    Plaintiffs,

          v.                                    Case No. 1:20-cv-1002-APM

STEVEN MNUCHIN, in his official capacity
as Secretary of the Treasury,

                    Defendant.

## DEFENDANT'S CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Defendant Steven Mnuchin, in his official capacity as Secretary of the Treasury, hereby files this memorandum in opposition to the Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 3) ("*Chehalis* Motion" or "*Chehalis Chehalis Mot.*") filed by Plaintiffs Confederated Tribes of the Chehalis Reservatoin, Tulalip Tribes, Houlton Band of Maliseet Indians, Akiak Native Community, Asa'carsarmiut Tribe, and Aleut Community of St. Paul Island.

This memorandum also opposes a Motion for Temporary Restraining Order and Preliminary Injunction in the consolidated case, *Cheyene River Sioux v. Mnuchin*, Case No. 1:20-cv-01059, ECF No. 4 ("*CRS* Motion" or "*CRS Mot.*").[1]

To the extent it is ambiguous where employed below, the term "Plaintiffs" refers to the *Chehalis* Plaintiffs. Citations to the "Complaint" refer to the *Chehalis* complaint.

---

[1] Because Defendant only received the *CRS* Motion 24 hours before this opposition had to be filed, Defendant regrets any oversight in this memorandum of a point or argument in the *CRS* Motion, and asks the Court not to construe any such omission as a waiver. Any such points or arguments can be addressed at the motion hearing.

## TABLE OF CONTENTS

**INTRODUCTION**....................................................................................................... 1

**BACKGROUND** ........................................................................................................ 2

**ARGUMENT** ............................................................................................................. 5

I.   STANDARD OF REVIEW ..........................................................................................6

II.  PLAINTIFFS HAVE FAILED TO MEET THE HIGH BURDEN FOR A TEMPORARY RESTRAINING
     ORDER OR PRELIMINARY INJUNCTION. .....................................................................7

   A.   Plaintiffs Have Not Shown a Likelihood of Success on the Merits. ............................... 7

       1.   The amounts and manner of payments from the Coronavirus Relief Fund are
            committed to Defendant's discretion by law and are thus unreviewable. .......................... 7

       2.   Alaska Native Corporations qualify as Tribal governments, eligible for payments
            under Title V of the CARES Act. ....................................................................... 8

   B.   Plaintiffs Have Not Demonstrated Irreparable Harm..................................................... 19

       1.   Plaintiffs have not alleged or argued that their economic injury is irreparable.......... 19

       2.   Plaintiffs' declarations do not make up for that critical shortcoming. ....................... 20

   C.   The Balance of Interests Does Not Favor an Injunction. ............................................... 22

**CONCLUSION** ........................................................................................................... 23

## INTRODUCTION

Up against a 30-day deadline to obligate $8 billion dollars among hundreds of Tribal governments, Defendant has reasonably interpreted the term "Indian tribe," as it is defined in the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, to include Alaska Native Corporations ("ANCs").[2] The CARES Act incorporates by reference the meaning given "Indian tribe" by another statute, the Indian Self-Determination and Education Assistance Act ("ISDEAA"), which expressly includes ANCs. *See* 25 U.S.C. § 5304(e) ("Indian tribe" . . . includ[es] any Alaska Native village *or regional or village corporation* as defined in or established pursuant to [ANCSA].") (emphasis added). Agencies and courts have read ISDEAA to include ANCs as "Indian tribes" for more than thirty years. In light of Congress's grant of discretion to the agency to decide this question in the CARES Act, Plaintiffs have not demonstrated a likelihood of success, and their Motion can be denied on this basis alone.

If the Court were to look beyond the merits, Plaintiffs have also failed to demonstrate the irreparable harm that would be necessary to justify preliminary injunctive relief. While Plaintiffs are no doubt in need of funding as a result of the COVID-19 epidemic, they have not shown that the diminution of funding they stand to receive under Defendant's determination, as compared to the amount that they would receive under their preferred interpretation of the CARES Act, will cause them irreparable harm.

Finally, the balance of equities favors denying this motion. Congress expressly chose to include ANCs in the CARES Act by incorporating IDSEAA's definition, but those ANCs stand to receive *no* funding if Plaintiffs prevail. By contrast, Plaintiffs stand merely to receive *less* funding—30%, by their estimation (although the true amount presently remains unclear)—than they would under their interpretation of the CARES Act. Congress has specified the recipients of and conditions for funding in the CARES Act, and an injunction interfering with that intent would

---

[2] Alaska native corporations are defined in the Alaska Native Claims Settlement Act (ANCSA), § 1602. The term "ANCs" refers collectively to Regional Corporations (*id.* § 1602(g)) and Village Corporations (*id.* § 1602(j)).

therefore be detrimental to the interest that Congress sought to achieve by providing such funding.

**BACKGROUND**

## I.   THE CARES ACT

On March 27, 2020, the President signed the CARES Act into law. H.R. 748, 116th Cong. (2020). Title V of the CARES Act appropriates $150 billion through a "Coronavirus Relief Fund," codified as Subchapter VI to the Social Security Act at 42 U.S.C. § 801,[3] to States, Tribal governments, and units of local government.[4]

The Coronavirus Relief Fund specifically reserved $8 billion for "Tribal governments." 42 U.S.C. § 801(a)(2)(B). Under Section 801, "the Secretary [of the Treasury][5] shall determine, in consultation with the Secretary of the Interior and Indian Tribes," the amount to pay each Tribal government. *Id.* § 801(c)(7). That amount shall be "based on increased expenditures of each such Tribal government (or a tribally-owned entity of such Tribal government) relative to aggregate expenditures in fiscal year 2019 by the Tribal government (or tribally-owned entity)." *Id.* But so long as he distributes all of the appropriated funds, the "manner" in which to determine the amount paid to each Tribal government is "as the Secretary determines appropriate." *Id.*

To receive the amount to which they are entitled, the Tribal governments must certify that they will only use funds paid through Section 801 to cover costs that (1) are necessary expenditures incurred due to the public health emergency with respect to COVID-19; (2) were not accounted for in the budget most recently approved as of the date of enactment of this section for the Tribal government; and (3) were incurred between March 1, 2020, and December 30, 2020. *Id.* §§ 801(d), (e). The Treasury Department Inspector General is to monitor and oversee the receipt, disbursement, and use of funds appropriated through Section 801, and directed specifically to

---

[3] The CARES Act refers to "Title" VI of the Social Security Act, and to "Sec. 601" of Title 42. But in fact, the provisions have been codified as *Subchapter* VI and at 42 U.S.C. § *801*.

[4] This case does not concern payments to State or local governments, which are proceeding separately from those to Tribal governments.

[5] Where Section 801 uses the term "Secretary," that refers to the Secretary of the Treasury. 42 U.S.C. § 801(g)(3).

2

recoup any funds used for impermissible purposes. *Id.* § 801(f).

As noted above, funds appropriated through Section 801 are paid to "Tribal governments." *Id.* § 801(a)(2)(B). That term is defined as "the recognized governing body of an Indian Tribe." *Id.* § 801(g)(5). An "Indian Tribe" is, in turn, given the same meaning as in ISDEAA. *Id.* § 801(g)(1) (citing 25 U.S.C. § 5304(e)).

## II.    HISTORICAL INTERPRETATIONS OF "INDIAN TRIBE" UNDER ISDEAA

For reasons set forth below, the history of ISDEAA is critically important to resolving this case. As originally proposed, ISDEAA section 450b(b) defined "Indian tribe" as "an  Indian tribe, band, nation, or Alaska Native community for which the federal government provides special programs and services because of its Indian identity." H.R. 6372, 93d Cong., 1st Sess. (1973). It did not include ANCs. The original bill instead defined "Indian tribe" as "any Indian tribe, band, nation, or other organized group or community, including any Alaska Native community as defined in the Alaska Native Claims Settlement Act, which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." S. 1017, 93d Cong., 2d Sess. (1974), 120 Cong. Rec. 2813-19. Again, it did not include ANCs.

The House Committee on Interior and Insular Affairs, to whom S. 1017 was referred, "amended the definition of 'Indian tribe' to include regional and village corporations established by the Alaska Native Claims Settlement Act." H.R. Rep. 93-1600; 120 Cong. Rec. 40252 (Dec. 16, 1974). Thus, the law as passed contained the following definition:

> "Indian tribe" means any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village *or regional or village corporation* as defined in or established pursuant to the Alaska Native Claims Settlement Act (85 Stat. 688) [43 U.S.C. 1801 et seq.], which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians[.]

Pub. L. 93-638 § 4(b), 88 Stat. 2203, 2204 (1975) (emphasis added). That definition remains the same today. *See* 25 U.S.C. § 5304(e).

Soon after the 1975 statute was passed, the government realized that the amended

3

definition contained an apparent internal inconsistency: ANCs were expressly *included* in the definition of "Indian tribe," only to risk being *excluded* by the ensuing "which is recognized" clause—as they are not federally recognized. Beginning in May 1976, therefore, the Bureau of Indian Affairs began interpreting the "which is recognized" clause only to modify the phrase "any Indian tribe, band nation, or other organized group or community," in light of the legislative history of the definitional provision. In other words, ANCs were not subject to the "which is recognized" clause.

That interpretation was upheld by the Ninth Circuit in *Cook Inlet Native Association v. Bowen*, 810 F.2d 1471 (9th Cir. 1987). The court recounted the legislative history above, noted that government agencies—the Bureau of Indian Affairs and the Indian Health Service—had stood consistently by their interpretation, and ultimately held that "the secretaries reasonably interpreted the eligibility clause to modify only the first entities listed in the definition." *Id.* at 1474-75 & nn.4-5. Thus, from 1987 onward, it has been settled by the government and the courts that ANCs are "Indian tribes" under ISDEAA. ANCs continue to receive funding under ISDEAA today.

Against that backdrop, Congress passed the Federally Recognized Indian Tribe List Act of 1994, Pub. L. 103-454 (the "List Act"). The List Act formalized and standardized the process by which the United States recognized Indian tribes as eligible for special programs and services, by directing the Secretary of the Interior to publish annually a list of such tribes in the Federal Register. *Id.* § 104, *codified at* 25 U.S.C. § 5131. The List Act's definition of "Indian tribe" does not include an ANC.  25 U.S.C. § 5130(2).

### III.   PROCEDURAL HISTORY

On April 13, 2020, in preparation to determine the amount payable to Tribal governments, Defendant uploaded a certification form for Tribal governments to fill out. *See* U.S. Dep't of Treasury, *Submission Required for Receipt of Coronavirus Relief Fund  (Payments*, *available at* https://forms.treasury.gov/caresact/stateandlocal. Tribal governments were directed to upload their certifications by Friday, April 17, 2020.

On April 17, 2020, Plaintiffs filed their Complaint, ECF No. 1, seeking declaratory and injunctive relief against Defendant Mnuchin, in his official capacity as Secretary of the Treasury. Plaintiffs allege, at bottom, that ANCs are not "Tribal governments" and are thus ineligible for payments from the Coronavirus Relief Fund. Am. Compl. ¶¶ 120-22. The sole count in Plaintiffs' Complaint alleges a violation of section 706(2) of the Administrative Procedure Act. *See Am. Compl.* ¶ 119.

On April 20, 2020, Plaintiffs filed the instant Motion. Plaintiffs ask this Court to order Defendant to exclude ANCs from the payments under the Coronavirus Relief Fund and to disburse those payments "according to a reasonable formula consistent with the CARES Act," by April 26, 2020. *Chehalis* Mot. at 1-2.

On April 23, Defendant determined that ANCs would be eligible for payments from the Coronavirus Relief Fund.[6] That determination reads, in pertinent part: "After consultation with the Department of the Interior, Treasury has concluded that Alaska Native regional and village corporations as defined in or established pursuant to the Alaska Native Claims Settlement Act[7] are eligible to receive payments from the Fund in the amounts to be determined by the Secretary of the Treasury. In determining the appropriate allocatiosn of payments to Tribal governments, Treasury intends to take steps to account for overlaps between Alaskan Native village membership and Alaska Native corporation shareholders or other beneficiaries."

## ARGUMENT

For the following reasons, Plaintiffs have not met their burden to obtain the extraordinary relief of a temporary restraining order of preliminary injunction. They cannot succeed on the merits, because it has been well understood for more than thirty years that "Indian tribe" under ISDEAA, and therefore under the CARES Act, has included ANCs. Plaintiffs cannot establish the prospect of irreparable harm from whatever diminution of funds they would receive under

---

[6] *Available at* https://home.treasury.gov/policy-issues/cares/state-and-local-governments.

[7] 43 U.S.C. § 1601 *et seq.*

Defendant's, vice their, interpretation of the CARES Act. And the balance of equities tips against proscribing payments to expressly intended recipients of the Coronavirus Relief Fund. Their Motion should therefore be denied.

## I.     STANDARD OF REVIEW

"Injunctive relief, of the kind requested here, is an 'extraordinary and drastic remedy' that is 'never awarded as [a matter] of right.'" *Alphapointe v. U.S. Dep't of Veterans Affairs*, 416 F. Supp. 3d 1, 7 (D.D.C. 2019) (Mehta, J.) (quoting *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)) (citations and internal quotation marks omitted). A court may only grant such "extraordinary remedy . . . upon a clear showing that the plaintiff is entitled to such relief." *Id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). Specifically, a plaintiff must show that: (1) it "is likely to succeed on the merits"; (2) it "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) "an injunction is in the public interest." *Id.* (quoting Winter, 555 U.S. at 20 (citations omitted).

Courts in this Circuit traditionally have evaluated these four factors on a "sliding scale"—if a "movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Alphapointe*, 416 F. Supp. 3d at 8 (quoting *Davis v. Pension Benefit Guar. Corp*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009)). *Winter*, however, called that approach into doubt and sparked disagreement over whether the "sliding scale" framework continues to apply, or whether a movant must make a positive showing on all four factors without discounting the importance of a factor simply because one or more other factors have been convincingly established. *Id.* This question remains undecided by the D.C. Circuit. *See Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018).

Finally, where a movant seeks mandatory injunctive relief, *i.e.*, an injunction that "would alter, rather than preserve, the status quo by commanding some positive act—the moving party

must meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction." *Elec. Info. Privacy Ctr. v. U.S. Dep't of Justice*, 15 F. Supp. 3d 32, 39 (D.D.C. 2014) (citations omitted); *see also Nat'l Conf. on Ministry to the Armed Forces v. James*, 278 F. Supp. 2d 37, 43 (D.D.C. 2003) ("A district court should not issue a mandatory preliminary injunction unless the facts and law clearly favor the moving party." (quotation omitted)).

## II. PLAINTIFFS HAVE FAILED TO MEET THE HIGH BURDEN FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION.

### A. Plaintiffs Have Not Shown a Likelihood of Success on the Merits.

The "most important factor" is "whether [Plaintiffs] have established a likelihood of success on the merits." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). The essence of Plaintiffs' sole count is that, under Title V of the CARES Act, ANCs do not qualify as "Tribal governments" and thus are not eligible for payments under the Coronavirus Relief Fund. Am. Compl. ¶ 120. Under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), Defendant's determination warrants deference to the extent it has the "power to persuade." *Id.* (quoting *Gonzales v. Oregon*, 546 U.S. 243, 256 (2006) (quoting *Skidmore*, 323 U.S. at 140)).

### 1. The amounts and manner of payments from the Coronavirus Relief Fund are committed to Defendant's discretion by law and are thus unreviewable.

The Executive's ongoing decisions about how to implement an emergency relief fund in the wake of "this unparalleled public health and economic crisis," is not properly subject to judicial oversight. In essence, Plaintiffs are asking this Court to second-guess the Executive Branch's time-pressed determination about which Indian tribes qualify for payments intended to address a public-health emergency. Given that the CARES Act places commits that decision with the Executive (*see* 42 U.S.C. § 801(c)(7) ("[T]he Secretary shall determine" the amount of the payments, which are to be made "in a manner as the Secretary determines appropriate"), this Court should not review the Executive's emergency determinations. *See Curran v. Laird*, 420 F.2d 122, 132 (D.C. Cir. 1969) (en banc) ("In time of stress and emergency our officials need freedom to act. Congress gave

the Executive such freedom in relation to the [program at issue].”); *see also Bd. of Trade v. Commodity Futures Trading Comm'n*, 605 F.2d 1016, 1023 (7th Cir. 1979) (“The fact that the Commission is authorized by Congress to take emergency action is, in itself, a suggestion of Congressional intent to commit such actions to the Commission's discretion.”).

While the CARES Act provides no private cause of action to challenge Defendant's determination of payment amounts or the manner of payment, it does specifically charge the Treasury Department Inspector General with “oversight authority” and “recoupment” responsibilities. 42 U.S.C. § 801(f). The fact that Congress specified a means for enforcement of the statutory provisions—means which are Executive, not Judicial, in nature—is evidence that Congress did not intend judicial oversight of the manner in which the funds are distributed. *Curran*, 420 F.2d 122; *Bd. of Trade*, 605 F.2d 1016.

Thus, this APA claim is precluded because the Executive's decisions about how best to implement § 1342 are “committed to agency discretion by law.” 5 U.S.C. § 701(a)(2).

### 2. Alaska Native Corporations qualify as Tribal governments, eligible for payments under Title V of the CARES Act.

Even if this Court were to conclude that it has the ability to review Defendant's decision, after consultation with the Department of the Interior, about the proper manner in which to distribute the funds, Congress's deferential grant of decision-making authority to those agencies with the expertise on the issues at hand warrants deference from this Court.  Indeed, in light of the longstanding history interpreting the ISDEAA definitional provision, no other interpretation of the CARES Act could be warranted.

### a) ANCs are properly recognized as “Indian tribes” under the CARES Act.

Payments from the Coronavirus Relief Fund are made to Tribal governments. But because a “Tribal government” is defined as “the recognized governing body of an Indian tribe,” *id.* § 801(g)(5), the primary question is whether an ANC is an “Indian tribe” under the CARES Act. As plaintiffs correctly note, “[i]n construing statutes, ‘we must, of course, start with the assumption

that the legislative purpose is expressed by the ordinary meaning of the words used.'" *Chehalis* Mot. at 27 (citing *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 482 (1992); *Richards v. United States*, 369 U.S. 1, 9 (1962)).

"Indian tribe" under the CARES Act "has the meaning given that term in section 4(e) of [ISDEAA]." 42 U.S.C. § 801(g)(1). As noted in the Background section above, ISDEAA's definition of "Indian tribe" has a particular and storied meaning. *Bowen*, 810 F.2d at 1474-75 & nn.4-5. The statute defines "tribe" as any tribe, band, nation, or other organized group or community, including any Alaska native village or ANC established under ANCSA," but then adds "which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." 25 U.S.C. § 5304(e).[8]

Absent the "which" clause of the above definition, no one could dispute that ISDEAA's definition of "Indian tribe" expressly includes ANCs. However, Plaintiffs argue that for an ANC to qualify as an Indian Tribe, it must satisfy the "which" clause—*i.e.*, be "recognized as eligible for the special programs and services provided by the United States." *Chehalis* Mot. at 16-17 (citing 25 U.S.C. § 5304(e)). But immediately after this definition was passed in 1975 as part of the ISDEAA, the Bureau of Indian Affairs ("BIA") interpreted the "which" clause *not* to apply to ANCs—*i.e.*, that they need not satisfy the recognition clause. Again, that was due to the legislative history and how the native corporations were later added to the definition of "Indian tribe." *Bowen*, 810 F.2d at 1474-75 & nn.4-5.

That interpretation was challenged and litigated in federal court. But the Ninth Circuit upheld that interpretation as reasonable, *id.*, and it has stood ever since. *See, e.g.*, *Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d 986, 988 (9th Cir. 1999); *Central Council of Tlingit and Haida Indian Tribes v. Chief Branch of. Justice Svs., Bureau of Indian Affairs,* 26 IBIA 159, 163 (1994).[9]   In

---

[8] Calling ANCs "state-chartered corporations" is thus misleading. *Chehalis* Mot. at 19. ANCs are specifically referenced in the *federal* definition of an "Indian tribe." 25 U.S.C. § 5304(e).

[9] *See also Ukpeagvik Inupiat Corp. v. HHS*, No. 3:13-CV-00073-TMB, 2013 WL 12119576, at *2 & n.21 (D. Ala. May 20, 2013).

fact, ANCs to this day are eligible for, and continue to receive, funding under ISDEAA.

Neither the government's interpretation nor *Bowen*'s holding was disturbed when the List Act was passed seven years later. *Contra Chehalis* Mot. at 20-21 ("The List Act changed all of that[.]"). Under that Act, the Secretary of the Interior is to "publish in the Federal Register a list of all Indian tribes which the Secretary recognizes to be eligible for the special programs and services provided by the United States to Indians because of their status as Indians." 25 U.S.C. § 5131(a). But because the List Act did not amend ISDEAA's definition of "Indian tribe," it did not change the express inclusion of ANCs within the definition. Indeed, the List Act simply adopted an altogether separate definition of "Indian tribe" for the Secretary to use when publishing the annual list of tribes "eligible for the special programs and services provided by the United States to Indians because of their status as Indians."  Because ANCs are "Indian tribes" under ISDEEA without regard to whether they are eligible for such services, the List Act's definition changed nothing. Accordingly, the Ninth Circuit continued to recognize ANCs as Indian tribes under ISDEAA, citing *Bowen*, even after the List Act was passed. *Cook Inlet Treaty Tribes*, 166 F.3d at 988.

Plaintiffs' argument that the most recent list of 574 Indian tribes "*does not include* any Alaskan Native regional or village *corporations*" is likewise beside the point. *Chehalis* Mot. at 18-19. This was not a policy determination by Interior; ANCs were never subject to the recognition clause or to the List Act to begin with. And that different treatment makes sense in light of the differing purposes of the statutes.  The List Act is meant to standardize which tribes are "eligible for the special programs and services provided by the United States to Indians because of their status as Indians." 25 U.S.C. § 5131. Those programs and services are codified in Title 25 of the U.S. Code. The CARES Act, of course, is codified as Subchapter VI of the Social Security Act in Title 42. Because Social Security is not a program or service provided to Indians *because of their status as Indians*, it would be implausible to think that the List Act must be construed to limit the universe of tribes that can be recognized for those benefits.

While Plaintiffs suggest that Defendant's interpretation makes a surplusage of the recognition clause—a suggestion that is contradicted by the Ninth Circuit's conclusion in *Bowen*—

Plaintiffs' interpretation would make a surplusage of everything else. That is, they read ISDEAA's definition as follows: "'Indian tribe' means any[one] . . . recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians[.]" *Compare* 25 U.S.C. § 5304(e). The intervening words would be meaningless, in Plaintiffs' view. As the *Bowen* court did, this Court must recognize and give effect to each word in the statute. In this case, that requires interpreting the recognition clause as only applicable to then non-ANC tribes.

There would have been far easier means for Congress to have achieved the goal that Plainitffs suggest. Instead of incorporating ISDEAA's definition of "Indian tribe" in the CARES Act, Congress would have simply incorporated the List Act's definition, which excludes ANCs. Or Congress could have referred directly to Interior's most recent list, which was published in January. Or Congress could have just said "federally recognized," as Plaintiffs do throughout their motion. But Congress did none of those. The only plausible reason to incorporate ISDEAA's broader definition of "Indian tribe," instead of the narrower definitional list prescribed by Interior under the List Act, is that Congress intended the recipients of the Coronavirus Relief Fund to be broader than those 574 tribes.

> (1) **"The context surrounding Title V" does not support Plaintiffs' reading of the statute and cannot, in any event, surmount the plain text.**

The Court need go no further, as the plain language of the CARES Act, by incorporating the plain language of ISDEAA, defines "Indian tribe" to include ANCs. *Accord Chehalis* Mot. at 16 ("In statutory construction, we begin 'with the language of the statute.'") (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002)). While contextual arguments cannot overcome a statute's plain meaning, those arguments fail on their own terms.

Plaintiffs argue that ANCs do not "fit seamlessly" into Title V because "other titles of the Act provide relief tailored to businesses." *Chehalis* Mot. at 27. But even assuming that Congress could not have reasonably provided two avenues of relief for an entity in the CARES Act,

11

Plaintiffs' argument assumes incorrectly that there is a clean dividing line between government and business operations. Indeed, Plaintiffs Tulalip Tribes itself claims to fund 92% of its governmental services "from tribal business revenues." *Chehalis* Mot. at 31-32. Yet it claims entitlement to Title V funds. Conversely, the GAO found in a 2012 study that Regional Corporations provide a host of "nonmonetary benefits" to native communities, including employment opportunities; cultural preservation; land management; economic development; and advocacy on behalf of Alaska Natives and their communities. GAO, *Regional Alaska Native Corporations: Status 40 Years after Establishment, and Future Considerations* (2012). And, as discussed previously, ANCs are not precluded from seeking funding under ISDEAA simply because they are incorporated as a business entity. Clearly, then, Title V eligibility cannot turn on whether the recipient is engaged in profitable businesses.[10]

Plaintiffs also include two floor statements from the three-hour debate held by the House of Representatives on March 27, 2020, before the passage of the CARES Act. *See Chehalis* Mot. at 28. "[F]loor statements by individual legislators rank among the least illuminating forms of legislative history," and the statements relied on by plaintiffs demonstrate why. *Trump v. Hawaii*, 138 S. Ct. 2392, 2413 (2018) (quoting *NLRB v. SW General, Inc.*, 137 S. Ct. 929, 943 (2017)). Mr. Gellego's statement sheds no light on the question before the court, as he merely uses the same term ("governments") as the CARES Act itself. And although Mr. Joyce noted in passing "the Federal Government's unique government-to-government relationship with Indian Tribes," *Chehalis* Mot. at 28, that statement was made in the entirely  separate context of whether to fund tribes directly or through the States. Tribes that have a government-to-government relationship with the United States are of course included in the government's interpretation, so the statement does nothing to suggest (contrary to the statute's plain language) that ANCs are to be excluded

---

[10] For the same reason, Plaintiffs gain little by touting the billions in revenues generated by ANCs, or describing them as "some of the largest corporations in Alaska." *Chehalis* Mot. at 10. States that are even larger will still receive payments from the same fund.

from the available funding.[11]

### (2)   Plaintiffs offer no case for their contra-textual position that ANCs are not "Indian tribes" under ISDEAA.

Plaintiffs offer no caselaw for the proposition that ANCs are not "Indian tribes" as defined by ISDEAA. They cite *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520, 534 (1998), but that case did not opine on the qualification of ANCs as "Indian tribes." Instead, it held that land transferred to ANCs under ANCSA was not "Indian country" as defined in another statute, 18 U.S.C. § 1151(b). *Village of Venetie*, 522 U.S. at 532-34.

Plaintiffs cite a legal brief filed by the government in *Ukpeagvik Inupiat Corporation v. U.S. Department of Health & Human Services*, No. 3:13-cv-00073-TMB, 2013 WL 12119576 (D. Ala. May 20, 2013). *See Chehalis* Mot. at 24. But even if the government took the position that the plaintiff ANC in that case was "eligible to enter into a self-determination contract with the HIS," though it had never been "a federally recognized tribe," *id.*, that is consistent with Defendant's position here. For that reason, Defendant does not deny that the ANC in *Ukpeagvik Inupiat Corporation* would have needed an authorizing resolution from a tribal village. *See Chehalis* Mot. at 24. That is perfectly consonant with ISDEAA's definitional provision and Defendant's position in this case.

The balance of Plaintiffs' cases are even less relevant. *See, e.g.*, *Chehalis* Mot. at 25 (citing *Native Vill. of Venetie I.R.A. Council v. Alaska*, 944 F.2d 548, 550-52 (9th Cir. 1991)). The question in that case was whether a native village could invoke federal jurisdiction under 28 U.S.C. § 1362, which allows "any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior" to sue. Plaintiffs emphasize the wrong words in the statute. *See Chehalis*

---

[11] Plaintiffs' argue that "nowhere does the legislative history of Title V even hint that Congress intended to provide Title V relief funds to ANCs." *Chehalis* Mot. at 28. That is both misleading, since there is no written legislative history, and irrelevant, since, "The starting point for interpretation of a statute is the language of the statute itself." *Chehalis* Mot. at 28 (quoting *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835 (1990); *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980)). In this case, the relevant statute expressly *includes* ANCs.

Mot. at 25 ("any Indian tribe or band with a *governing body duly recognized* by the Secretary of the Interior"). The key phrase is instead ". . . *by the Secretary of the Interior*." That qualifier is notably absent from the CARES Act definition, which does not require the "governing body" to be "recognized" by any particular authority. Thus, even if ANCs cannot invoke Section 1362, that does not make them ineligible for the Coronavirus Relief Fund.

Plaintiffs similarly overstate *Seldovia Native Ass'n v. Lujan*, 904 F.2d 1335, 1350 (9th Cir. 1990). The Ninth Circuit there observed "that eleventh amendment immunity does not apply to suits brought by Native Alaskans against the State of Alaska," but held that the ANC in that case was, unlike a native village, "not a non-foreign governmental unit." 904 F.2d at 1350. But Title V of the CARES Act does not prescribe payments to non-foreign governmental units; it provides payments for recognized governing bodies of Indian tribes. As with federal jurisdiction under 28 U.S.C. § 1362, the fact that ANCs may be barred by the 11th Amendment from suing States does not mean that are not "Indian tribes" as defined by ISDEAA, which specifically includes them.

In *Pearson v. Chugach Government Services Inc.*, 669 F. Supp. 2d 467, 469 n.4 (D. Del. 2009) and *Aleman v. Chugach Support Servs., Inc.*, 485 F.3d 206, 213 (4th Cir. 2007), *see Chehalis* Mot. at 26, the question was whether ANCs qualified under Title VII's exemption of "Native American tribes" from the term "employer." *Pearson*, 669 F. Sup. 2d at 470. "The purpose of the tribal exemption is tribal self-governance and economic development," and the Supreme Court had already declared it a "narrow context." *Id.* at 471. That is not the purpose of the CARES Act, however, so disqualification from the one hardly spells disqualification from the latter.

Ultimately, these cases all come from irrelevant contexts—whether federal jurisdiction statutes, the 11th Amendment, or Title VII. None of them bears on the question whether ANCs are "Indian tribes" as that term is defined by ISDEAA, let alone what the meaning of that definition is when incorporated into the CARES Act.[12] And while there is little reason to think that the rationales for the foregoing contexts can be transplanted into ISDEAA or the CARES Act, there

---

[12] As noted above, the government's legal brief in *Ukpeagvik Inupiat Corporation*, not adopted or addressed in that opinion, is entirely consistent with its position here.

is no need to delve into underlying rationales because the statute expressly includes ANCs. *See* 25 U.S.C. § 5304(e). ISDEAA has been the law for more than forty years; that Plaintiffs cannot find a single case holding that ANCs are not "Indian tribes" under ISDEAA is telling, at the least.

### (3)    None of Plaintiffs' policy arguments is availing.

Unable to explain why ANCs should be excluded from a definition that expressly includes them, and unable to muster apposite caselaw, Plaintiffs turn to policy arguments, which cannot overcome the plaint language of the CARES Act.  None of Plaintiffs' policy arguments suffices.

First, Plaintiffs suggest repeatedly that, because ANCs are "for-profit," they cannot be "Tribal governments" eligible for payments under the act. Am. Compl. ¶¶ 2, 96, 112. But that argument overlooks that Village Corporations can, under ANCSA, be "for profit or nonprofit." 43 U.S.C. § 1602(j). Nothing in ISDEAA's definition of "Indian tribe" distinguishes between for-profit and nonprofit ANCs—they are both included. Nor is there reason to think that the CARES Act, which appropriates tens of billions of dollars to for-profit business around the country, was intended to fund nonprofits only.

Second, Plaintiffs warn that Defendant's interpretation of the CARES Act might allow Alaska tribes to "double dip" or "triple dip," because some ANCs are "closely affiliated" with native villages. *Chehalis* Mot. at 35 n.27.  That argument assumes that Defendant would not account for these affiliations in its allocation. But the $8 billion is not to be divvied up on a flat, per-tribe basis. 42 U.S.C. § 801(c)(7). And of course, any payments must be used to cover costs necessitated by COVID-19, unaccounted for by the governing body's most recent budget, and incurred between March 1, 2020, and December 30, 2020. 42 U.S.C. § 801(d). There is little fear, therefore, that the Coronavirus Relief Fund would become an all-purpose subsidy. Recognizing concerns about "double-dipping," however, Defendant has said in its final decision: "In determining the appropriate allocation of payments to Tribal governments, Treasury intends to take steps to account for overlaps between Alaskan Native village membership and Alaska Native corporation shareholders or other beneficiaries."

Third, Plaintiffs suggest that, because ANC shareholders may include non-Indians, the CARES Act should be read to exclude ANCs. *Chehalis* Mot. at 7, 26 (citing 43 U.S.C. §§ 1606(f), (h)(2), and (h)(3)(d)). But they greatly exaggerate the ANCSA provisions they cite. Section 1606(f) merely says that Regional ANCs shall be managed by a board of directors. And while Section 1606(h) contemplates the possibility of "a person not a Native" owning stock in a Regional ANC, the cited subsections provide that Regional ANCs have the statutory right to *buy back* those shares at fair market value, *id.* § 1606(h)(2)(B); the fact that stock inherited by non-Natives does *not* carry voting rights, *id.*; that Regional ANCs may *deny voting rights* to any holder of Replacement Common Stock who is not a Native or a descendent of a Native, *id.* § 1606(h)(3)(D)(i); and that Regional ANCs may give "the first right of purchase" to a shareholder's immediate family members *who are Natives*, *id.* § 1606(h)(3)(D)(ii). While Plaintiffs paint a picture of ANCs as non-Indian-controlled conglomerates, the truth is that there remains a significant overlap between the members of a village and an affiliated corporation. Given the abiding feature of Native control of the ANCs, it is hardly unreasonable for Defendant to think that they would qualify under the CARES Act set-aside for Indian tribes.

Despite Plaintiffs' textual, contextual, jurisprudential, and policy arguments to the contrary, there is little doubt that ANCs qualify as "Indian tribes" under ISDEAA and the CARES Act. Plaintiffs are unlikely to succeed in proving otherwise.

### b)    ANCs have "Tribal governments" under the CARES Act.

Plaintiffs argue that, even if an ANC is an "Indian tribe" under the CARES Act, it does not have a "Tribal government" eligible for payments under the Coronavirus Relief Fund. *Chehalis* Mot. at 21-24; *see* 42 U.S.C. § 801(g)(5) (defining "Tribal government" as "the recognized governing body of an Indian Tribe").

As an initial matter, these should not be read as two independent requirements. That is, a beneficiary of the Fund need not demonstrate both that it is an "Indian tribe" and also that it has a recognized governing body. After all, the phrase "Tribal government" is defined in the CARES

16

Act to be "the recognized governing body of an Indian Tribe," and the definition of "Indian Tribe" then incorporates the ISDEAA definition.   42 U.S.C. § 801(g).   So the meaning of Tribal government still relies on the ISDEAA definition.

The only additional interpretive importance of the phrase "Tribal government" is therefore to specify the entity to whom payments would be made. To leave it at "Indian tribe" would doubtless have invited litigation, as parties often dispute just *who* or *what* is "the tribe" for the purposes of government benefits.[13]

This reading also best explains the sole reference to "Indian tribes" in Title V of the CARES Act. *See* 42 U.S.C. § 801(c)(7). By directing Treasury to consult with Interior and "Indian tribes," *id.*, instead of "Tribal governments," Congress freed up the Tribes to consult through whatever delegates or representatives they saw fit, and ensured that these "consultation[s]," were not delayed for unavailability of the recognized governing bodies. It also allowed tribes to consult jointly through a third party—*e.g.*, an inter-tribal consortium—that could not have called itself "the recognized governing body" of each represented tribe.

Plaintiffs' argument to the contrary is largely tautological. They posit that, because ANCs "do not govern" and "do not provide government services," they do not have "recognized governing bodies." Am. Compl. ¶ 98. But Plaintiffs offer no authority for this argument.

They argue that the CARES Act definition of Tribal government "echoes [the definition of that phrase in] ISDEAA," *Chehalis* Mot. at 21, and make several arguments accordingly. But that is a faulty premise, as Congress imported to the CARES Act ISDEAA's definition of "Indian tribe" but *not* its definition of "Tribal government." 42 U.S.C. § 801(g)(5). Indeed, the definitional subsection of the phrase in the CARES Act references no other statute, and instead simply provides

---

[13] *See, e.g.*, *Cayuga Nation v. Bernhardt*, 374 F. Supp. 3d 1, 5 (D.D.C. 2019); *Cal. Valley Miwok Tribe v. Jewell*, 5 F. Supp. 3d 86 (D.D.C. 2013) (noting that the Department suspended the tribe's ISDEAA contract in light of an unresolved leadership dispute); *Alturas Indian Rancheria and Wendy Del Rosa v. Pac. Reg' Dir., Bureau of Indian Affairs*, 64 IBIA 236 (2017); *Picayune Rancheria of the Chukchansi Indians v. Pac. Reg'l Dir., Bureau of Indian Affairs*, 62 IBIA 103 (2016) (dismissing challenges to a decision by Pacific Regional Director to recognize on an interim basis the last undisputed tribal council).

the phrase in its plain language. *See id.* Indeed, Plaintiffs acknowledge that ANCs *can*, at least in some circumstances, serve as a "village governing body." *Chehalis* Mot. at 23.

Plaintiffs also point out that an Alaska Regional Corporation is managed by a board of directors, *id.* (citing 43 U.S.C. § 1606(f)), but offer no reason why a board of directors cannot be a "recognized governing bod[y]" under the CARES Act. Boards of directors have been deemed "recognized governing bodies" in other contexts. *See Vill. of Hotvela Traditional Elders v. Indian Health Servs.*, 1 F. Supp. 2d 1022, 1029 (D. Ariz.), *aff'd*, 141 F.3d 1182 (9th Cir. 1998). After finding that the Hopi tribe was immune from suit, the court concluded that a Hopi village's board of directors were immune from suit because they were "a recognized governing body within the Hopi Nation." *Id.* In another context, the Indian Health Care Improvement Act, Pub. L. 94-437 (1976), Congress defines "urban Indian organization" as "a nonprofit corporate body situated in an urban center, governed by an urban Indian controlled board of directors, and providing for the maximum participation of all interested Indian groups and individuals." 25 U.S.C. § 1603(29). Thus, the board of directors would be a "recognized governing body" of an "urban Indian organization." *Cf. id.*

Plaintiffs' argument about "recognition" assumes that the term connotes *federal* recognition. *Chehalis* Mot. at 19 (citing H.R. Rep. No. 103-781, at 2-3 (1994), part of the legislative history of the List Act). But Congress chose not to identify any particular recognizing authority of any tribe's governing body. That choice sensibly leaves room for Defendant to make payments to Tribal governments that are recognized by their tribes, as was the board of directors in *Village of Hotvella*, 1 F. Supp. 2d at 1029, or to "governing bodies" that might not have met the definition of that term in ISDEAA or the List Act.

If the Court agrees that ANCs are "Indian tribes" under Title V of the CARES Act, it should also hold that the ANCs have "recognized governing bod[ies]" and are, therefore, "Tribal governments" eligible for payments from the Coronavirus Relief Fund. 42 U.S.C. § 801(g). To hold otherwise, this Court would have to find that, although the definition of Indian tribe in the CARES Act expressly incorporates ANCs, Congress nonetheless impliedly intended to exclude

them because of how the phrase "Tribal government" is used in separate contexts. That interpretation would thus impliedly read out terms that had been expressly included by Congress, and thereby do violence to the plain language of the statutory scheme. This Court should not countenance such a result.

### B.    Plaintiffs Have Not Demonstrated Irreparable Harm.

"[T]he basis of injunctive relief in the federal courts has always been irreparable harm." *CityFed Fin. Corp.*, 58 F.3d at 747 (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974), internal quotation marks omitted).  The D.C. Circuit "has set a high standard for irreparable injury." *In re Navy Chaplaincy*, 534 F.3d 756, 766 (D.C. Cir. 2008) (internal quotation marks and citation omitted).  The party seeking injunctive relief must show that its injury is "both certain and great," and that it is "actual and not theoretical."  *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).  "The key word in this consideration is *irreparable*. . . . The possibility that adequate . . . corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm."  *Id.* (quoting *Va. Petroleum Jobbers Ass'n*, 259 F.2d at 925).

### 1.    Plaintiffs have not alleged or argued that their economic injury is irreparable.[14]

---

[14] As an initial matter, Plaintiffs' alleged injury is not "irreparable as a matter of law." *Chehalis* Mot. at 29. The *City of Houston* doctrine does not support Plaintiffs' claim to irreparable harm. *Contra Chehalis* Mot. at 29-30 (citing, e.g., *City of Houston, Tex. v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1424 (D.C. Cir. 1994)). That case and its progeny recognize a narrow exception to appropriations law, such that a Plaintiffs who files suit *before* an appropriation has lapsed may still obtain, by means of an injunction, the appropriated funds even *after* they have lapsed. *Houston*, 24 F.3d at 1426 (citing Nat'l Ass'n of Regional Councils v. Costle, 564 F.2d 583 (D.C. Cir. 1977)). Even then, the court's equitable power only lasts until the relevant funds have been obligated. *Id.* (citing *W. Va. Health Ctrs. v. Heckler*, 734 F.2d 1570, (D.C. Cir. 1984)). But that does not mean that every plaintiff who files suit on the eve of an appropriation lapse has, "as a matter of law," *Chehalis* Mot. at 29, stated an irreparable harm. *City of Houston* itself does not address the notion of irreparable harm, but rather whether the plaintiff's claim in that case was moot. 24 F.3d at 1426.

It is true that *Ambach v. Bell*, 686 F.2d 974 (D.C. Cir. 1982) affirmed per curiam—in a three-sentence paragraph citing no authority—the district court's reasoning that the impossibility of recovering obligated funds "favor[ed] the grant of interim relief." *See id.* at 986. The Court did not hold that inability to recover funds after they are obligated constitutes irreparable harm "as a matter

The harm alleged by Plaintiffs is economic in nature. They claim to be "hemorrhaging funds" and that their "economies have crumbled overnight." *Chehalis* Mot. at 29. Under the irreparable-harm standard, however, "economic harm alone is generally not sufficient to warrant this [c]ourt's granting of a motion for a preliminary injunction." *Dallas Safari Club v. Bernhardt*, -- F. Supp. 3d. --, No. 19-CV-03696-APM, 2020 WL 1809181, at *7 (D.D.C. Apr. 9, 2020) (quoting *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 120 (D.D.C. 2012)). Even "significant economic loss" will not do. *Id.* (quoting *Safari Club*, 852 F. Supp. 2d at 120).

Defendant does not deny that Plaintiffs face a dire situation. *Chehalis* Mot. at 30-33 (citing declarations). But that is true of most individuals, families, businesses, governments, and tribes during this "unprecedented crisis." *Id.* at 35. Hence the CARES Act. The legal question presented by this motion is not whether Plaintiffs face irreparable harm from COVID-19, or whether they would be marginally better off if ANCs were excluded from the Relief Fund. The question is whether the delta between the payment amounts they stand to receive under Defendant's determination, and the amounts they would receive if ANCs were excluded, would make the difference between irreparable harm or not.

Plaintiffs have not met that bar, as their proffered "scenarios" bear out. *See* Am. Compl. ¶ 113; *Chehalis* Mot. at 34. In the first scenario, Plaintiffs would receive $10 million instead of $14 million. *Chehalis* Mot. at 34. That amount of economic loss, even if significant, does not arise to irreparable harm. In other words, Plaintiffs cannot show that they will be irreparably harmed if they only receive $10 million, but could stave off that harm if they received $14 million. Nor have they attempted to do so.

### 2.     Plaintiffs' declarations do not make up for that critical shortcoming.

Plaintiffs' pleading and motion are insufficient on their face to grant preliminary injunctive relief, and the evidence they offer does not get them over that hurdle.

---

of law." If the D.C. Circuit had announced that proposition nearly 40 years ago in *Ambach*, one must think that an intervening opinion would have said so more directly.

Mr. Williams declares on behalf of Plaintiff Akiak Native Community, for example, that they derive funding from a "small gaming enterprise," which has been closed, and that "[w]ithout receiving the financial relief under the CARES Act Title V," the community "is at risk of not being able to provide essential government services." Williams Decl. (ECF No. 3-1) ¶¶ 1, 5, 7. But he does not distinguish between the amount his tribe would receive if ANCs are included, and the amount he would receive if they were excluded—let alone aver that the "risk" facing his community *only* exists if he gets the lesser of the two amounts.

Mr. Philemonoff declares on behalf of Plaintiff Aleut Community of St. Paul Island ("ACSPI") that his community will need "tens of millions" of dollars to charter planes, establish quarantine facilities, and otherwise "deal with the sudden and severe economic dislocations created from this pandemic." Philemonoff Decl. (ECF No. 3-2) ¶ 5. But even accepting that as true, it is all the more apparent that ACSPI will not get the funding it needs *regardless* of how this case is resolved. *Cf.* Compl. ¶ Thus, ACSPI cannot claim that the delta between the amount determined by Defendant and the amount ACSPI would receive through a favorable order form this Court is the cause of any irreparable harm threatening ACSPI.[15]

Mr. Landlord declares on behalf of the Asa'carsarmiut Tribe that it does not have the funding necessary to meet its needs, which have been exacerbated by COVID-19. Landlord Decl. (ECF No. 3-3) ¶ 15. But as with Messrs. Williams and Philemonofff, he does not explain how the delta in funding that his tribe would receive, if successful in this lawsuit, would make the difference in being able to open its gaming office, or buy sanitary and cleaning products. *Id.* ¶ 15. Again, Defendant does not deny that "[w]ithout receiving some relief, Asa'carsarmiut is at risk of not being able to provide essential government services to its members and community." The question is how *much* relief and, more precisely, the impact of the difference between what Defendant has

---

[15] Mr. Philemonoff also cites harms that are, while tragic, irrelevant to the instant motion. He attributes much of ACSPI's misfortune to losing its only passenger airline to bankruptcy, leaving ACSPI "without any means of reaching the distant mainland." Philemonoff Decl. ¶ 4. That injury was not caused by the Secretary's determination to include ANCs as payees from the Coronavirus Relief Fund, nor would that injury be remedied by a contrary determination.

determined and what Plaintiffs want. Neither Mr. Landlord nor any other declarant describes how *that figure* poses a risk of irreparable harm.

Mr. Frazier similarly declares, on behalf of the Cheyenne River Sioux, that "[w]ithout additional funding, we will not be able to continue to offer the protection and support currently in place for [their] people."[16] Frazier Decl. (*CRS* ECF No. 4-2) ¶ 15. But no effort is made to distinguish between the amount that all agree his tribe will receive, even under Defendant's interpretation, from the amount that his tribe would receive under its interpretation. Plaintiffs must show that *that difference*—the effect of Defendant's action—will cause irreparable harm.

These are representative of the other declarations offered by Plaintiffs. None of them demonstrates how the difference between the amount they stand to receive, and the amount that they would receive if they prevailed in this lawsuit, will make the difference between suffering irreparable harm or not. These particulars are required in order to substantiate a claim of irreparable economic injury. *See, e.g.*, *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 51-52 (D.D.C. 2011) (finding that plaintiff failed to demonstrate irreparable harm where declarant mentioned his company's lost revenues and predicted that he "will be out of business within [eighteen] months" because the declaration failed to "offer a projection of anticipated future losses, tie that to an accounting of the company's current assets, or explain with any specificity how he arrived at the conclusion that he would be forced out of business in eighteen months").

For the foregoing reasons, Plaintiffs have not demonstrated the threat of irreparable harm.

## C.    The Balance of Interests Does Not Favor an Injunction.

The final two factors—the balance of equities and the public interest—merge when, as here, "the Government is the opposing party." *Trump v. Comm. on Oversight & Reform of U.S. House of Representatives*, 380 F. Supp. 3d 76, 105 (D.D.C.) (quoting *Nken v. Holder*, 556 U.S.

---

[16] As Mr. Philemonoff does, Mr. Frazier cites harms in support of the *CRS* Motion that are irrelevant here. Frazier Decl. ¶¶ 7-13 (citing increased health risks posed to the Indian community; the remoteness of the nearest healthcare facilities; the proximity to a COVID-19 "hotspot"; and a lack of food supplies).

418, 435 (2009)).

The first relevant interest is that of the public, expressed by Congress when it chose to include ANCs within the definition of "Indian tribe" in ISDEAA, and thus in the CARES Act. That interpretation has been unquestioned for 30 years, and this Court should hesitate before contravening a policy interest expressed by Congress in this area. Congress expressed the public interest in providing funding as it deems appropriate in the CARES Act, and in so doing it included ANCs in that determination. Ruling for Plaintiffs would frustrate Congress' purposes and thus harm the public interest.

The second relevant interest is that of the ANCs, whom Plaintiffs would exclude from the Coronavirus Relief Fund altogether, in the interests of getting marginally more for themselves. Given that ANCs are "Indian tribes" under ISDEAA, and given that the same "revenue sources" that "have evaporated" for Plaintiffs have also evaporated for the ANCs, *Chehalis* Mot. at 31, that interest merits protection. And as noted above, these ANCs provide benefits to their associated native communities. Thus, those communities have subsidiary interests that would be harmed. *See generally* ANC Amicus Br. (ECF No. 18-1) at 15-16.

The interests of Plaintiffs must also be accounted for, of course. But as noted above, while the ANCs stand to see their payments reduced to $0, Plaintiffs stand only to see a reduction in their payment amounts. And as further noted above, the CARES Act directs payments to be made based on increased expenditures. Defendant has stated publicly that it will take steps to account for any overlap between Alaskan Native village membership and ANC shareholders or other beneficiaries, to safeguard Plaintiffs' interests from being harmed by "double-dipping."

Ultimately, the balance of interests favors denying Plaintiffs' motion.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be denied.

Dated: April 23, 2020

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ERIC WOMACK
Assistant Branch Director

*/s/ Jason C. Lynch*
Jason C. Lynch (D.C. Bar No. 1016319)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Rm. 11214
Washington, DC 20005
Tel: (202) 514-1359
Email: Jason.Lynch@usdoj.gov

*Attorneys for Defendants*