**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

CONFEDERATED TRIBES OF THE
CHEHALIS RESERVATION *et al*.,

               Plaintiffs,

v.

STEVEN MNUCHIN, SECRETARY,
UNITED STATES DEPARTMENT OF
THE TREASURY,

               Defendant.

Civil Action No:  1:20-cv-01002-APM

**BRIEF OF *AMICUS CURIAE* AHTNA, INC**.

Michael J. O'Leary, DC Bar No. 1014610
HOLLAND & HART LLP
901 K Street NW, Suite 850
Washington, D.C., 20001
(202) 654-6922
mjoleary@hollandhart.com

Jonathan Katchen (*pro hac vice* admission pending)
HOLLAND & HART LLP
1029 W.3rd Avenue, Suite 550
Anchorage, AK 99501
(907) 865-2606
jwkatchen@hollandhart.com

Dated:  April 22, 2020

*Counsel for Amicus Curiae*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... ii

CORPORATE DISCLOSURE STATEMENT .......................................................................... v

INTEREST OF AMICUS CURIAE ......................................................................................... 1

INTRODUCTION ...................................................................................................................... 2

I.      Background ......................................................................................................................... 2

II.     Congress' Decision to Authorize Relief Funds to ANCSA Corporations in Title V of
        the CARES Act ................................................................................................................... 4

ARGUMENT .............................................................................................................................. 7

I.      Congress Intended for ANCSA Corporations to Play a Unique and Critical Role in
        Supporting Alaska Native Communities During This Global Pandemic ........................... 7

        A.      Overview of Alaska Native History Prior to Statehood.......................................... 8

        B.      ANCSA Formally Defined the Relationship Between Alaska Natives
                and the Federal Government ................................................................................. 10

        C.      ANCSA Corporations Serve a Similar Role to their Native
                Communities as Other Tribal Governments ......................................................... 11

II.     Plaintiffs' Statutory Argument is Flawed and Seeks to Contravene Congress' Intent
        in Enacting the CARES Act ............................................................................................. 17

CONCLUSION ......................................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

## <u>CASES</u>

*Alaska Pacific Fisheries v. United States,*
  248 U.S. 78 (1918) ...........................................................................................................9

*Alaska v. Babbitt,*
  72 F.3d 698 (9th Cir. 1995) ...........................................................................................14

*Cook Inlet Native Ass'n v. Bowen,*
  810 F.2d 1471 (9th Cir. 1987) ..........................................................................5, 19, 20, 21

*Cook Inlet Treaty Tribes v. Shalala,*
  166 F.3d 986 (9th Cir. 1999) ....................................................................................5, 20

*Metlakatla Indian Community v. Egan,*
  369 U.S. 45 (1962) ...........................................................................................................9

*Ninilchik Traditional Council v. United States,*
  227 F.3d 1186 (9th Cir. 2000) ........................................................................................14

*Sturgeon v. Frost,*
  136 S. Ct. 1061 (2016) (*Sturgeon I*) ...........................................................................2, 8, 9

*Sturgeon v. Frost,*
  139 S. Ct. 1066 (2019) (*Sturgeon II*) ..................................................................................2

*Tlingit and Haida Indians of Alaska v. United States,*
  177 F. Supp. 452 (Fed. Ct. Cl. 1959) ...............................................................................9

*United States v. Alaska,*
  422 U.S. 184 (1975) ..........................................................................................................8

*United States v. Kagama,*
  118 U.S. 375 (1886) ..........................................................................................................9

*United States v. Libby, McNeil & Libby,*
  107 107 F.Supp.2d 697 (D. Alaska 9th Cir. 1952) ...........................................................9

## <u>STATUTES</u>

25 U.S.C. § 5130(2) .......................................................................................................6, 18

25 U.S.C. § 5131 ...............................................................................................................21

25 U.S.C. § 5301 .........................................................................................................4, 7, 8

25 U.S.C. § 5304(e) ...............................................................................................4, 18

43 U.S.C. § 1601(b) ...........................................................................................13, 16

43 U.S.C. § 1601(c) .................................................................................................16

43 U.S.C. § 1602(b) .................................................................................................13

43 U.S.C. § 1604 ......................................................................................................11

43 U.S.C. § 1606 ....................................................................................11, 13, 20

43 U.S.C. §1606(i) ...................................................................................................13

43 U.S.C. § 1606(b)(1) ............................................................................................13

43 U.S.C. § 1606(d) .................................................................................................10

43 U.S.C. § 1606(g) .................................................................................................11

43 U.S.C. § 1606(h) .................................................................................................14

43 U.S.C. § 1607 ......................................................................................................11

43 U.S.C. § 1607(a) .................................................................................................10

43 U.S.C. § 1607(c) .................................................................................................11

43 U.S.C. § 1613 ......................................................................................................10

Alaska National Interest Lands Conservation Act Title VIII, 16 U.S.C. § 3111-
    3125...................................................................................................................14

Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C. § 1601-1629.................1, 2, 10, 18

Alaska Organic Act, § 8, 23 Stat. 24, 26 (1884) .......................................................10

Coronavirus Aid, Relief, and Economic Security ("CARES") Act, H.R. 748,
    Section 601(a)(2)(B) & (b)(1)..................................................................... passim

Treaty of March 30, 1867, 15 Stat. 539 .....................................................................8

## <u>OTHER AUTHORITIES</u>

Aaron Schutt, *ANCSA Section 7(I): $ 40 Million Per Word and Counting*, 33
    Alaska L. Rev. 229, 230 (2016)..........................................................................13

Aboriginal Fishing Rights in Alaska, 57 Interior Dec. 461, 474 (Feb. 13, 1942) ...........................9

B.A. Potter, *Exploratory Models of Intersite Variability in Mid and Late Holocene Central Alaska,* Arctic Vol. 61, No. 4, 407-425 (2008)............................................................2

David S. Case & David A.Voluck*, Alaska Natives and American Laws* 296-301 (University of Alaska Press, 3d ed. 2012) ...............................................................14

Ernest Gruening, *The State of Alaska* 355 (1968)............................................................9

Felix S. Cohen, Handbook of Federal Indian Law 28–29, 74–92, 121–125 (1982 ed.) ...............................................................................................................................9

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Rule 7(o)(5) of this Court and Rules 26.1 and 29(a)(4)(A) of the Federal Rules of Appellate Procedure incorporated therein, *amicus curiae* Ahtna, Incorporated ("Ahtna"), is an Alaska Native Regional Corporation created pursuant to the Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C. §§ 1601-1629.  Ahtna is owned by its more than 2,000 Alaska Native shareholders.  It owns and controls the lands and property of the Ahtna people in east central Alaska.  Ahtna has no parent company, and no publicly held company holds more than a ten percent interest in Ahtna.

/s/ *Michael J. O'Leary*
Michael J. O'Leary, DC Bar No. 1014610
HOLLAND & HART LLP
901 K Street NW, Suite 850
Washington, D.C., 20001
(202) 654-6922
mjoleary@hollandhart.com

## INTEREST OF AMICUS CURIAE[1]

Ahtna, Incorporated ("Ahtna"), is an Alaska Native Regional Corporation ("ANC" or "ANCSA corporation") created pursuant to the Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C. §§ 1601-1629.  Ahtna's mission is the "[w]ise stewardship of Ahtna lands and responsible economic growth, for future generations of Ahtna people."[2]  To this end, Ahtna represents the interests of its more than 2,000 Alaska Native shareholders and owns lands and resources located in eastern Alaska.  Ahtna is charged with advancing the interests of its Alaska Native shareholders, many of whom have limited incomes and live in remote locations in rural Alaska.  Ahtna, like other Alaska Native communities, has faced significant hardships during the current COVID-19 global pandemic as outlined below.  Ahtna stands ready to assist the Ahtna people in this crisis.

Plaintiffs in this action, eleven Indian tribes from Alaska, Arizona, California New Mexico, Maine, and Washington state, claim that ANCSA corporations, like Ahtna, are ineligible to receive a portion of the $8,000,000,000 in federal funds appropriated for payments to "Tribal governments" under Title V of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act.  H.R. 748, Section 601(a)(2)(B) & (b)(1).  Plaintiffs' position contravenes Congress' intent as expressed in the statute.  And Ahtna is well positioned to assist the Court by: (1) outlining the critical and unique role that ANCSA corporations play in supporting Alaska Native communities; and (2) relevant information that may inform the Court's analysis of Congress' intent in enacting the relevant provisions of the CARES Act.

---

[1] This brief was not written in whole or in part by counsel for a party, and no one other than the amicus curiae and its counsel contributed money intended to fund the preparation of the brief.  Counsel for the parties have stated that they consent to the filing of this brief.

[2]   Ahtna website, "Mission, Vision, and Values," available at https://www.ahtna.com/mission-vision-and-values/

## INTRODUCTION

### I.    Background

Specific Congressional acts enacted for Alaska Natives are *sui generis;* as the Supreme Court recently observed "Alaska is often the exception, not the rule." *Sturgeon v. Frost*, 136 S. Ct. 1061, 1071 (2016) (*Sturgeon I*); *Sturgeon v. Frost,* 139 S. Ct. 1066, 1072 (2019) (*Sturgeon II*) ("Alaska is different from the rest of the country").

Statutes touching on Alaska and Alaska Natives cannot be read in a vacuum.  Ahtna, like all other ANCSA corporations, was created under such a *sui generis* statute, ANCSA, 43 U.S.C. §§ 1601-1629.  Notably, the Ahtna people did not choose to organize themselves into a corporation—Congress made that choice for them.  Alaska Natives did not seek a corporate form of organization.  That was a byproduct of legislative negotiations.  What Alaska Natives sought was self-determination of their own future.

And despite its legal form, Ahtna is much more than just a corporation.  Ahtna represents and advances the interests of over 2,000 Alaska Native shareholders, administers land and resources in eastern Alaska on their behalf, and provides a litany of social, educational, and health-related services.  For example, Ahtna spends significant funds putting tribal members to work in its impoverished villages.  *See* Declaration of Ken Johns at ¶¶ 5-6, attached as Exhibit 2.  Ahtna has also expended significant resources defending the hunting and fishing rights of the Ahtna people.  *Id*. at ¶¶ 3-4.  The Ahtna people have occupied east-central Alaska for more than 5,000 years. B.A. Potter, *Exploratory Models of Intersite Variability in Mid and Late Holocene Central Alaska,* Arctic Vol. 61, No. 4, 407-425 (2008).  Since its creation under the ANCSA, Ahtna has served a critical role in assisting its Alaska Native shareholders in maintaining their way of life and physical and economic health. *Id*. at ¶¶ 1-10.  But Ahtna, like other Native communities, now

face a new and devastating challenge to their way of life as a result of the COVID-19 pandemic.

Food security is a paramount issue for the Ahtna people during this pandemic. The Ahtna region is located in rural Alaska.  While their villages are on the road system, they are supported by only one small grocery store in Glennallen, Alaska.  For one of the Ahtna villages, this means traveling over 100 miles to get limited access to groceries.  Compounding the issue, this grocery store, like many others in Alaska, has very limited stock due to panic buying.  This means that some of Ahtna shareholders have gone without staples, such as meat and produce for over a month.  Ahtna is mobilizing to address these issues and stands ready to further assist the Ahtna people in this crisis.

Plaintiffs in this action present ANCSA corporations as simply for-profit corporations established under state law and, thus, very different from other Indian tribes.  But that is an inaccurate caricature.  ANCSA was a negotiation among the United States, Alaska Natives and the State of Alaska.  It is the functional equivalent of a modern-day Indian treaty and fulfills very similar purposes as Indian treaties.  Like Indian treaties, it was a final agreement with the United State on aboriginal land rights and resolved Alaska Natives aboriginal claims to the entire 300 million acres of what is now the State of Alaska.  ANCSA, like other agreements between the United States and Native peoples, also set the terms and conditions of land ownership by establishing a governance structure for that Alaska Native land ownership in for-profit corporations, in which each Alaska Native was entitled to 100 shares of ANCSA stock as a birthright.

Three additional purposes are identical between reservations and ANCSA lands: (i) they are an embodiment of the culture of Native people; (ii) utilized for aboriginal hunting and fishing; and (iii) they are the embodiment of economic sovereignty.  Indeed, the dependence of Alaska

Native on subsistence hunting and fishing is likely far more prevalent among Alaska Natives than anywhere else in the Unites States.

Although it is true that ANCSA corporations are treated differently than other Tribal governments in some contexts, Congress, in the exercise of its plenary power over Indian affairs, has also mandated that ANCSA corporations be treated the same in other critical contexts. For example, since 2004, federal law has required that "[t]he Director of the Office of Management and Budget and all Federal agencies . . . consult with Alaska Native corporations on the same basis as Indian tribes under Executive Order No. 13175" which outlines the United States Government's "Consultation and Coordination with Indian Tribal Governments." 25 U.S.C. § 5301, Note, Pub. L. 108-199, Div. H. Sec. 161, 118 Stat. 3, 452 (2004), as amended Pub. L. 108-447, Div. H., Title V. Sec. 518, 118 Stat. 2809, 3267 (2004).

## II. Congress' Decision to Authorize Relief Funds to ANCSA Corporations in Title V of the CARES Act

It is with this history and the specific provisions of the ANCSA in mind, that Congress in 1975 specifically added ANCSA corporations to the definition of "Indian tribe" in section 4(e) of the Indian Self-Determination and Education Assistance Act ("ISDEAA"), which in turn defines "Indian tribe" to mean:

> "any Indian tribe, band, nation, or other organized group or community, **including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act (85 Stat. 688) [43 U.S.C. § 1601 et seq.]**, which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians[.]"

25 U.S.C. § 5304(e) (emphasis added).

This definition explicitly includes ANCSA corporations. The term "Tribal government," in turn, is broadly defined in the CARES Act as "the recognized governing body of an Indian Tribe" without further limitation or statutory cross-reference. H.R. 748, Section 601(g)(5). Thus,

the governing body of any Indian tribe under the Act, including an ANCSA corporation, is eligible for relief funds appropriated to "Tribal governments."

Nevertheless, Plaintiffs now seek to contravene Congress' intent in selecting a definition of "Indian tribes" that explicitly included ANSCA corporations by reference to separate statutory provisions, regulations, and an agency list—none of which are referenced in the CARES Act or even the ISDEAA definition it cross-references.  Plaintiffs' argument is largely premised on the final clause of the ISDEAA definition, which they claim excludes *all* ANCSA corporations despite the specific enumeration of ANCs in the statute.  The Ninth Circuit previously rejected a substantially similar argument concluding that the clause at issue did not modify or limit the inclusion of ANCSA corporations.  *Cook Inlet Native Ass'n v. Bowen*, 810 F.2d 1471, 1475 (9th Cir. 1987) ("*CINA*") (because "[s]pecific reference to Alaska village and regional corporations was added by amendment" the court held it was reasonable for the Bureau of Indian Affairs to conclude that the "eligibility clause" modified only the terms "any Indian tribe, band, nation, or other organized group or community," and not the specifically enumerated ANCSA corporations which were added later) (citing 120 Cong. Rec. 40242); *Cook Inlet Treaty Tribes v. Shalala,* 166 F.3d 986, 988-90 (9th Cir. 1999) (observing that ANCSA corporations qualify as tribes under the ISDEAA).

The Ninth Circuit's reasoning remains sound in this context.  Here, it is similarly reasonable for a different agency—this time the Department of the Treasury—to conclude that by choosing a definition that specifically includes ANCSA corporations, Congress in fact, intended to include ANCSA corporations.  Although it is true that not every definition of "Indian tribe" in the United States Code includes ANCSA corporations[3], the ISDEAA definition *does*, and that is

---

[3] *See*, *e.g.*, 25 U.S.C. § 5130(2) (defining "Indian tribe" to mean "any Indian or Alaska native tribe, band, nation,

the definition that Congress chose to use in the CARES Act by explicitly cross-referencing the ISDEAA definition.  And in light of the critical and unique role that ANCSA corporations play in supporting Alaska Natives and challenges faced by those communities during the current pandemic, that choice makes perfect sense.  It is also worth noting also that the statute from which Congress chose the definition, the Indian Self-Determination and Education Assistance Act, was a statute explicitly intended to provide benefits by the U.S. Government to Indians and Alaska Natives based on their status as Indians—and Congress exercised its plenary authority to include ANSCA corporations in the definition of "Indian tribe" within that Act.

In sum, Congress wanted to ensure an effective response to this pandemic for Alaska Natives,  and it understood that the best way to address their needs is by providing additional resources to ANCSA corporations, who play a critical role in providing services and support to their communities.  Alaska is larger than 177 nations.  If it were a country, it would be in the top 20 by landmass.  There are more than 200 remote, predominantly Native, communities across the state but no roads connect them.  The size, remoteness, and diversity bring immense challenges unique to Alaska.  Many tribes in Alaska simply do not have the capacity or resources to meet the needs of tribal members on their own.  ANCSA corporations fill that role.  It is also important to highlight the fundamental characteristics of the Title V CARES Relief program at issue in this case—it is designed to get critical relief to Native communities throughout the United States including Alaska.  Like other Native American communities across the United States, ANCSA corporations need that relief to support critical expenditures and alleviate suffering by Alaska Natives resulting from the pandemic.  There is little risk here that ANCSA corporations would be receiving some type of "windfall" through eligibility in the program—there are specific

---

pueblo, village or community that the Secretary of the Treasury acknowledges to exist as an Indian tribe).

restrictions and controls in the Act to ensure that the funds are only expended in direct response to the current crisis to meet demonstrated needs.[4]

These are challenging times for all Native communities and all Americans.  Although Plaintiffs understandably are trying to maximize the funds available to their communities, the solution is not to seek to deny critical funding to other Alaska Native communities who also need those funds and whom Congress specifically chose to include as eligible recipients under the Act. This is a time for all Native communities to stand together rather than attempting to exclude relief to others.

## ARGUMENT[5]

**I.      Congress Intended for ANSCA Corporations to Play a Unique and Critical Role in Supporting Alaska Native Communities During This Global Pandemic**

As outlined below, Plaintiffs' challenge to the eligible of ANCSA corporations is premised on a deeply flawed statutory analysis and contravention of Congressional intent.  But it is animated by the parallel claim that Congress should have excluded ANSCA corporations from receiving Title V CARES Act relief funds because ANSCA corporations are "treated differently" by the federal government than other Tribal Governments.  While that may be true in some contexts, it is similarly true that in other contexts, the United States Government treats ANSCA corporations the same as other Indian tribes.  *See, e.g.*, 25 U.S.C. § 5301, Note, Pub. L. 108-199, Div. H. Sec. 161,

---

[4]      Section 601(d) of the Act restricts the use of the funds by Tribal governments to cover "necessary expenditures" caused by Covid-19 that were: (1) not accounted for in the budget most recently approved by the Tribal government: and (2) were incurred between March 1, 2020 and December 30, 2020.   It also empowers the Inspector General of the Department of the Treasury to conduct "monitoring and oversight of the receipt, disbursement, and use of funds made available" to State, local, and tribal governments.  Section 601(d)(1).  Indeed, if the Treasury Inspector General later determines that relief funds are not expended in accordance with the restrictions in the act, he or she has the right to seek recoupment of the funds.  Section 601(d)(2).

[5]      Plaintiffs' challenge to ANSCA corporation's receipt of funds from Title V of CARES Act likely should also be denied for numerous procedural and jurisdictional reasons under the Administrative Procedures Act and the standards for injunctive relief.  Because Ahtna assumes those issues will be adequately addressed by the parties, Ahtna only addresses the merits of Plaintiffs' challenge.

118 Stat. 3, 452 (2004), *as amended* Pub. L. 108-447, Div. H., Title V. Sec. 518, 118 Stat. 2809, 3267 (2004) (requiring equal consultation with ANCSA corporations and federally recognized Indian tribes).

To understand this dynamic and why it was entirely reasonable and appropriate for Congress to choose to include ANSCA corporations in Title V of the CARES Act, it is helpful to understand the distinct differences in the history and experiences of the Native peoples of Alaska when compared to the rest of the United States.  The caricature of ANSCA corporations presented by Plaintiffs is belied by what it took to achieve this seminal legislative land claims settlement. That history and the critical role that ANSCA corporations currently play for Alaska Natives helps explain why Congress would choose to provide relief funds to ANCs on the same terms as other Tribal governments during the current crisis— ANSCA corporations, like other Tribal governments, advance the social, cultural, physical, and economic health of their communities.

## A.    Overview of Alaska Native History Prior to Statehood

Alaska Native history is very different than the history of aboriginal peoples in the lower-48 states.  When the United States purchased Alaska from Russia on March 30, 1867, the Treaty of Cession[6] did little to create a functioning government and provided scant guidance on what rights Alaska Natives retained; the Treaty merely provides that "[t]he uncivilized tribes will be subject to such laws and regulations as the United States may, from time to time, adopt in regard to the aboriginal tribes of that country." Treaty of March 30, 1867, 15 Stat. 539; *see also Sturgeon I,* 136 S.Ct. at 1073.

After acquiring Alaska, the federal government exhibited little interest in the new territory.

---

[6]    *United States v. Alaska*, 422 U.S. 184, 192 n.13 (1975) ("By the Treaty of Cession in 1867 Russia ceded to the United States 'all the territory and dominion now possessed (by Russia) on the continent of America and in the adjacent islands.' The cession was effectively a quitclaim. It is undisputed that the United States thereby acquired whatever dominion Russia had possessed immediately prior to cession.").

*Sturgeon II,* 136 S. Ct. at 1073 (citing Ernest Gruening, *The State of Alaska* 355 (1968)); *see also*

*Tlingit and Haida Indians of Alaska v. United States,* 177 F. Supp. 452, 456-59, 464-67 (Fed. Ct.

Cl. 1959).  For the most part, federal legislation during Alaska's first 100 years dodged the issue

of Alaska Native land rights through a series of statutory disclaimers that continued until ANCSA.

During this same period, most American Indians in the contiguous United States had been

displaced from their aboriginal lands by war or treaty and confined to federally established

territories or reservations.  Because their means of subsistence had fallen prey to westward

expansion, these communities were almost entirely dependent upon the federal government for

food, clothing, and protection, and were often "dead [ly] enemies" of the States. *United States v.*

*Kagama*, 118 U.S. 375, 383–384 (1886); *see generally* Felix S. Cohen, Handbook of Federal

Indian Law 28–29, 74–92, 121–125 (1982 ed.).

But in Alaska there is no history of Indian wars or treaties, and from purchase to Statehood

"the federal government was involved only minimally with Alaska Natives." Cohen, supra, at 739.

That said, the federal government did attempt to protect Native hunting and fishing rights and

allowed for the acquisition of property.[7]  Efforts were also occasionally undertaken to provide

Alaska Natives with civil rights.[8]  In short, Alaska's federal Indian laws have evolved in a very

---

[7]     To cite a few examples: In 1906, Congress enacted the Alaska Native Allotment Act, which was intended to
significantly increase Native land ownership.  In 1908, Congress amended Alaska's first game law, 35 Stat. 102,
allowing for Natives to take game animals.  And in 1942, the Department of the Interior issued an opinion concluding
that Natives have broad aboriginal fishing rights, which have "been construed to include the occupancy of water and
land under water as well as land above water." Aboriginal Fishing Rights in Alaska, 57 Interior Dec. 461, 474 (Feb.
13, 1942). *See generally Alaska Pacific Fisheries v. United States,* 248 U.S. 78 (1918) (the United States filed suit to
enjoin a commercial fishing operation from operating in a reservation established to protect Natives' fishing rights);
*United States v. Libby, McNeil & Libby*, 107 107 F.Supp.2d 697 (D. Alaska 9th Cir. 1952) (discussing the federal
efforts to reserve fishing rights for natives).

[8]     For example, in 1915, the Territorial legislature granted some Alaska Natives the right to become citizens
and, in 1924, Congress passed legislation, 43 Stat. 253, extending citizenship to all Natives.  Gruening at 363.  Shortly
thereafter, the Alaska Territorial Legislature amended its laws to permit Native villages to organize municipal
governments, and several did so. Over the years, moreover, numerous Native leaders have gained "prominent public
office in the state government," *Metlakatla Indian Community v. Egan,* 369 U.S. 45, 51 (1962), as well as in the prior
Territorial Legislature, and, given the State's unique demographics, Alaska Natives to this day wield genuine political

different ecosystem than in the continental United States because, unlike in much of the lower-48 states, Alaska Natives were not categorically displaced from their land and, to varying degrees, were able to participate in the economy and civil governance.

## B.   ANCSA Formally Defined the Relationship Between Alaska Natives and the Federal Government

In 1884, section 8 of the Alaska Organic Act extended the Mining Law of 1872 to Alaska with the proviso that Alaska Natives "shall not be disturbed in the possession of any lands actually in their use or occupation . . . but the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress." Alaska Organic Act, § 8, 23 Stat. 24, 26 (1884).  Little clarity developed with respect to aboriginal rights over lands and resources for the better part of a hundred years.  Finally in 1971, Congress exercised the decision-making authority that Congress reserved to itself by enacting the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. §§ 1601 et seq., to settle, through grants of a combination of land and money, all "claims by Natives of Alaska."

ANCSA is "Indian legislation enacted by Congress pursuant to its plenary authority under the Constitution of the United States to regulate Indian affairs is Indian legislation."  Section 2(9) of the 1987 Amendments to ANCSA, Pub. L. No. 100-241, 101 Stat. 1788.  But ANCSA is unique. Unlike other Indian legislation, sections 7(d) and 8(a) of ANCSA[9] *required* Alaska Natives to organize corporations "under the laws of the State [of Alaska]" in order to obtain settlement benefits. And rather than conveying land in trust, section 14 of ANCSA[10] required the Secretary of the Interior to issue the corporations patents that conveyed title to land in fee simple.

---

influence.  Thus, many Alaska Natives have enjoyed a long history of participation and influence in state and local government.

[9]      43 U.S.C. §§ 1606(d), 1607(a).

[10]      *Id*. at § 1613.

ANCSA thus established a governance structure for Alaska Native land ownership in for-profit corporations, in which each Alaska Native was entitled to shares of ANCSA stock as a birthright. 43 U.S.C. §§ 1604, 1606(g), 1607(c).  To this end, ANCSA created twelve Regional and 220 Village Corporations to represent Natives in geographic areas and to manage the property and funds received from the federal government. *Id.* at §§ 1604, 1606, 1607.

In short, the contention that ANSCA corporations are simply for-profit corporations established under state law is a gross mischaracterization.  What is missed by Plaintiffs is that Alaska Natives fought for the right to manage their land and resources, to build an economy, and to preserve traditional and cultural practices.  Alaska Natives faced the critical question of how to resolve ownership issues relating to Native lands.  The creation of ANCSA corporations was Congress' answer.

## C.     ANCSA Corporations Serve a Similar Role to their Native Communities as Other Tribal Governments

Plaintiffs derisively refer to ANCSA corporations as "for profit corporations" "similar to other multinational corporations" and allege that the corporate nature of ANCs should disqualify the ANCs from receiving monies.  Mtn. at 10, 26.  But that characterization ignores the history cited above and the role of ANCSA corporations in resolving land ownership issues unique to Alaska Native communities.   Because the rights of Alaska Natives were bifurcated by the federal government such that tribes are sovereign, while ANCSA corporations actually own Native lands, it is practically impossible to provide meaningful economic, cultural, and social assistance to Native communities without involving ANCSA corporations.   For example, Alaskan tribes receiving funding for critical resources such as health clinics do not control lands to build such a clinic—the ANCSA corporations do.  ANCSA corporations have a legal mandate to support their Alaska Native shareholders and the resources and expertise to effectively utilize relief funds to

support their Native communities. Congress understands this role, which is why they chose to specifically include ANCs in the CARES Act by incorporating a definition that explicitly identified them—and not a definition that excluded them or left the point ambiguous.

The fact that ANCSA corporations utilize a corporate form, and control business enterprises, does not fundamentally distinguish them from other Indian tribes. Many lower 48 tribes operate enterprises that net many times the annual revenue of ANCs, and Plaintiffs do not dispute such tribes are eligible for relief funds under the CARES Act. In sum, there is no valid reason to contravene Congress' clear intent and bar ANCs while many other tribes with substantial business operations remain eligible.

In making this argument, Plaintiffs reside in "glass houses." Indian gaming is a major business for many lower-48 tribes. In 2018, Indian gaming generated over $33.7 billion in revenue for the lower-48 tribes.[11] Tribes in the Pacific Northwest generated over $3.6 billion in revenue in 2018,[12] which may explain why Plaintiff Chehalis Tribe could spend approximately $40 million expanding a casino[13] or Plaintiff Tulalip Tribes could spend $100 million.[14]

But, perhaps more importantly, Plaintiffs' argument is a red herring because they have overlooked key mandates that make ANCs like Ahtna far from typical for-profit corporations— and very much like other Tribal governments. There are several important characteristics of ANCSA corporations that have been presented to the Court and which buttress Congress' determination to include them in Title V of the CARES Act.

*First*, ANCSA corporations have a specific mandate to support their Alaska Native

---

[11]  https://www.nigc.gov/news/detail/2018-indian-gaming-revenues-of-33.7-billion-show-a-4.1-increase

[12]  https://www.nigc.gov/images/uploads/2018GGRGamingRevenuesbyRegionFINAL_Charts_3.pdf

[13]     https://www.indianz.com/IndianGaming/2015/01/23/chehalis-tribe-to-start-work-o.asp

[14]     https://www.bizjournals.com/seattle/news/2017/09/15/tulalip-tribes-plan-new-100-million-casino.html

shareholders like any other Tribal government.   Specifically, Congress created ANCSA corporations not to simply enrich shareholders, but to addresses "the real economic and social needs of Natives, without litigation, *with maximum participation by Natives in decisions affecting their rights and property*…". 43 U.S.C. § 1601(b) (emphasis added).   To take one example of the unique nature of ANCs, ANCSA requires an Alaska Native Regional Corporation like Ahtna to share 70 percent of the net revenue from timber and mineral resources developed on their lands with other Alaska Native Regional Corporations.  43 U.S.C. §1606(i).[15]   The amount of revenue that has been shared between Alaska Native corporations since ANCSA was enacted is simply staggering -- well over $2 billion since 1971.  Aaron Schutt, *ANCSA Section 7(I): $ 40 Million Per Word and Counting*, 33 Alaska L. Rev. 229, 230 (2016).   Much of this section 7(i) revenue is distributed directly to ANCSA shareholders.

*Second,* ANCSA restricted original shareholders to *Alaska Natives*, which is defined to mean: "a citizen of the United States who is a person of one-fourth degree or more Alaska Indian (including Tsimshian Indians not enrolled in the Metlakatla Indian Community) Eskimo, or Aleut blood, or combination thereof." 43 U.S.C. § 1602(b).   In this sense, this is very similar to restrictions placed by other Tribal governments on their membership.

*Third,* ANCSA also imposed restrictions on alienation of common shares that prevented their transfer to non-Natives except in limited circumstances.  *See* 43 U.S.C. § 1606(b)(1).  But ANCSA also mandates that *only* Alaska Natives shareholders have voting rights in the annual election of directors.  Section 1606 of ANCSA provides that "any stock transferred to a person not a Native or a descendant of a Native shall not carry voting rights."  43 U.S.C. § 1606(h).  More

---

[15]   ANCSA also requires revenues from natural resource wealth to be shared with Alaska Native village corporations. Section 7(j) directs Alaska Native regional corporations to disperse 50 percent of the Section 7(i) revenues they receive to Alaska Native village corporations within the region.

importantly, Alaska Natives are not authorized to simply transfer shares to non-Native third parties outside of those limited circumstances prescribed in ANCSA.  And as a practical matter, only a very small portion of the outstanding shares of Ahtna—like others ANCS corporations—are held by non-Native family members of original shareholders.

*Fourth,* the federal government continues to have extensive oversight over ANCSA corporations.  In fact, ANCSA has been amended hundreds of times over the last 49 years. Congress has also enacted new legislation affected ANCSA lands, in particular, Title VIII of the Alaska National Interest Lands Conservation Act, 16 U.S.C. § 3111-3125, to remedy some of ANCSA's shortcomings.  *See Alaska v. Babbitt,* 72 F.3d 698, 709 (9th Cir. 1995); *Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1189 (9th Cir. 2000) ("Congress' aim in passing ANILCA was to ensure a way of life 'essential to Native physical, economic, traditional, and cultural existence….') (quoting ANICLA Section 801(1)); *see generally* David S. Case & David A.Voluck*, Alaska Natives and American Laws* 296-301 (University of Alaska Press, 3d ed. 2012) (providing a comprehensive overview of ANILCA and discussing how it "is intended to carry out the subsistence-related policies and fulfill the purposes of ANCSA").

To effectuate these objectives set out in ANILCA and ANCSA, Ahtna has spent millions protecting the cultural and traditional ways of the Ahtna people. *See* Declaration of Ken Johns at ¶ 1 (Exhibit 2).  Ahtna is the steward of the its people's traditional hunting and fishing lands.  *Id.* at ¶ 2.  These activities provide food security for the Ahtna people.  Though its Land and Resource Department, the corporation is mandated to manage its lands in accordance with cultural and traditional uses and values. *Id.* at ¶ 3.  This includes providing trespass enforcement, wildlife monitoring and enhancement programs, wildfire prevention, and access to hunting and fishing. Ahtna also builds and maintains trails for access to traditional hunting and fishing grounds. *Id.* at

¶¶ 3-4.  For example, in 2019 Ahtna employed a work crew from the Native Village of Kluti-Kaah to construct a trail to access a traditional hunting area near the village. *Id*. at ¶ 4. As another example, the Ahtna Land and Resource Department coordinates with its each of the Ahtna tribes to identify traditional fishwheel users by family and provides on-going assistance to develop and maintain access to their traditional fishwheel sites.  *Id.* at ¶ 5.

In addition to the lands, Ahtna provides other crucial support for the economic and social well-being of the Ahtna people. *Id*.  Ahtna gives significant financial and organizational support to many of its regional non-profits who are responsible for feeding elders, providing health and dental care, preserving native language and dance, and providing housing and job-related services. Ahtna also has its own programs for providing jobs and job readiness. *Id*.   In 2019 Ahtna committed over $1,000,000 to pay wages for tribal members for shovel-ready projects within its villages. *Id.* at ¶ 6.  Ahtna has also spent significant resources helping the Ahtna people break through the common barriers to get access to jobs in impoverished communities.  *Id.* at ¶ 7. Through its Employment and Enrichment Program, Ahtna pays for vocational education, apprenticeships, union dues, childcare, transportation, work clothing, housing and food for its shareholders seeking employment.  *Id*.

Further, Ahtna has a highly integrated relationship with its federally recognized tribes in a common effort to protect its cultural and traditional wildlife management rights.  *Id.* at ¶ 9.  Ahtna has expended significant resources furthering these efforts.  Ahtna also sits in a quasi-government role, consulting with the United States Department of the Interior and the State of Alaska on hunting and fishing matters for the benefit of all Ahtna people, including the tribes. *Id.* at ¶ 10.

*Finally*, many Alaska Native goals are captured in the congressional findings in ANCSA and its amendments.  They have a direct bearing on the question of Congress' recognition of

ANCSA corporations as 'Indian tribes' in the Coronavirus Relief Act.   The explicit statement of

self-determination was stated in Section 1601(b) of the findings that:

> "[T]he settlement should be accomplished rapidly, with certainty, in conformity with the real economic and social needs of Natives, without litigation, *with maximum participation by Natives in decisions affecting their rights and property . . . ."*

43 U.S.C. § 1601(b)(emphasis added).

ANCSA was not meant to diminish the obligations of the United States toward Indian

people.   ANCSA was explicitly not a termination of federal trust responsibilities, but a

reaffirmation of federal responsibilities.   Section 1601(c) provides that:

> "[N]o provision of this chapter shall replace or diminish any right, privilege, or obligation of Natives as citizens of the United States or of Alaska, *or relieve, replace, or diminish any obligation of the United States or of the State of Alaska to protect and promote the rights or welfare of Natives as citizens of the United States or of Alaska . . . ."*

43 U.S.C. § 1601(c)(emphasis added). ANCSA ensures that Alaska Natives would still be qualified

to participate in federal programs meant for Indians and Alaska Natives.   This was necessary

because in the 1960s, some parties wanted to terminate Alaska Native rights to such participation

as part of a land claims settlement.

ANCSA also provides that ANCSA lands will be treated as 'Indian reservations' for the

purposes of qualifying for these programs:

> "no provision of this chapter shall be construed to terminate or otherwise curtail the activities of the Economic Development Administration or other Federal agencies conducting loan or loan and grant programs in Alaska . . . . and the terms 'Indian reservation" and "trust or restricted Indian-owned land areas" . . . *shall be interpreted to include lands granted to Natives under this chapter as long as such lands remain in the ownership of the Native villages or the Regional Corporations*."

43 U.S.C. § 1601(c)(emphasis added)

This original ANCSA congressional finding is the template to define ANCSA corporations

and ANCSA lands as an 'Indian tribe' and as an 'Indian reservation' in the Indian Self-

Determination and Educational Assistance Act of 1975 and the Indian Financing Act of 1974. These two major federal Indian laws of general applicability codified the congressional findings of ANCSA.  Congress has plenary authority to recognize an entity as an Indian tribe for a specific purpose or in a specific statute.  And Congress has chosen to recognize ANCSA corporations as "Indian tribes" in the context of the ISDEAA and now in the context of Title V of the CARES Act.

There is no question that the ISDEAA definition that includes ANCSA corporations as an 'Indian tribe' is neither an accident nor an aberration.  It fulfills congressional intent to assure the participation of ANCSA corporations in federal Indian legislation.  And there is structural continuity of congressional policy in the inclusion of ANCSA corporations in Title V of the CARES Act.  In short, ANCSA corporations are not simply standard for-profit corporations. Federal laws impose a legal mandate on ANCSA corporations to support Alaska Native shareholders economically, culturally, and socially which has been repeatedly recognized by the United States government.  These laws not only explain how and why Congress created ANCSA corporations, but they also provide essential context to understand why Congress *wanted* ANCSA corporations to play a central role in using their resources, often in partnership with Alaska Native tribes, to protect and advance Alaska Natives rights, health, security, and interests in this pandemic.

## II.    Plaintiffs' Statutory Argument is Flawed and Seeks to Contravene Congress' Intent in Enacting the CARES Act

As outlined above, Plaintiffs seek to exclude the ANCSA corporations from the CARES Relief fund by using a convoluted statutory interpretation that relies on a variety of separate statutes, regulations, and an agency list—none of which are referenced in or incorporated into the CARES ACT.  Plaintiffs' argument is not, however, supported by the text of the statute and should be rejected for all of the following reasons.

*First*, Congress chose to define "Indian tribes" as that term is defined in the ISDEAA and

that definition specifically includes "any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act (85 Stat. 688) [43 U.S.C. 1601 et seq.]."  25 U.S.C. § 5304(e).  There are other definitions of "Indian tribe" throughout the U.S. Code that do not specifically enumerate ANCSA corporations.  *See*, *e.g.*, 25 U.S.C. § 5130(2) ("The term 'Indian tribe' means any Indian or Alaska Native tribe, band, nation, pueblo, village or community that the Secretary of the Interior acknowledges to exist as an Indian tribe.").  Thus, by choosing the definition in the ISDEAA (and not some other definition like the one appearing in 25 U.S.C. § 5130(2) for instance) there is a strong argument that Congress intended to include ANCSA corporations.

Plaintiffs, nonetheless, argue that the Federal Tribal List published by the Secretary of the Interior in the Federal Register is dispositive of which entities meet the definition of Indian Tribe in the ISDEAA.  But they similarly highlight that the list of federally recognized tribes "*does not include any* Alaska Native regional or village corporations ("ANCs")."  Compl. at ¶ 47 (emphasis in original).  In other words, they argue that all ANCSA corporations are constructively stricken from the definition that Congress specifically selected in the CARES Act.  That argument does not make sense and effectively nullifies specifically enumerated terms in a definition drafted by Congress.  Thus, in the context of Title V of the CARES Act, Congress has exercised its plenary power and chosen to recognize ANCSA corporations as Indian tribes for the limited purpose of receiving funding to address a pandemic.

Plaintiffs' argument, frankly, defies common sense.  Why Congress would use the ISDEAA definition, which specifically lists ANCSA corporations, if it did not intend to include them as eligible recipients?  Congress could have readily selected a "cleaner" definition that simply did not reference ANCs at all.  Or it could have simply made reference to the Federal Tribal list

itself.  Put simply, if Congress wanted to exclude ANCSA corporations it could have done so and in a much less convoluted way.

*Second,* the U.S. District Court for Alaska and the Ninth Circuit expressly endorsed the proposition that ANCSA corporations were included in the ISDEAA's definition of Indian tribe.  *See Cook Inlet Native Ass'n v. Bowen*, 810 F.2d 1471, 1474 (9th Cir. 1987) ("*CINA*").   In *CINA,* the plaintiff, like the Plaintiff Tribes here, argued that Alaska Native Regional Corporations are excluded from the definition of Indian Tribe because, to be a tribe under the ISDEAA's definition, ANCSA corporations must "be recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." *Id.* The Ninth Circuit, in affirming the District Court, held that such a construction of the statute would (i) render the provision including ANCs in the definition of tribes as inoperative and (ii) defy common sense to construe a statute to render a provision meaningless.  *Id.*

In reaching this conclusion, the Ninth Circuit expressly rejected CINA's argument, which is virtually identical to the argument that the Plaintiffs are raising here "that recognition of CIRI as a tribe subverts the policies and purposes underlying the Self-Determination Act." *Id*. at 1476. The court explained that "classifying a business corporation as an Indian tribe does not clearly contravene the policies and purposes of the [ISDEAA]. The [ISDEAA] was promulgated to insure maximum Indian participation in and control over the programs and services for Indians." *Id.* Even more helpful for our purposes, the Court observed that

> the record does not indicate whether non-profit or profit corporations are more suited to achieve this goal. ***It is instructive, however, that the corporations formed pursuant to the Settlement Act also were established to provide maximum participation by Natives in decisions affecting their rights and property***. See Congressional Findings and Declaration of Policy, 43 U.S.C. § 1601. To achieve this goal, the Act required many specific features to be included in the corporations. See 43 U.S.C. § 1606."

*Id.* (emphasis added).   In short, two federal courts have expressly rejected the argument raised by the Plaintiffs in their complaint and TRO Motion.

In their TRO Motion, Plaintiffs attempt to distinguish the *CINA* decision holding that ANCSA corporations are Indian Tribes under the ISDEAA by suggesting that the Ninth Circuit simply deferred to the agency's interpretation. TRO Motion at 20.   Plaintiffs contend that while ANCs were "eligible" to be considered as Indian Tribes under ISDEAA when the case was decided in 1987, the Federal Tribal List Act of 1994 fundamentally changes that analysis.   *Id*. at 20-21. According to Plaintiffs, because Congress has now mandated the creation of a list defining those entities "recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians," only entities on the tribal list still qualify.

But this analysis is flawed.   The *CINA* decision was not premised solely on deference to the then-existing agency interpretation by the Bureau of Indian Affairs.   The Court also analyzed the legislative history and conducted a careful statutory analysis, noting that the "administrative interpretation is supported by the legislative history" because the "proposed [ISDEAA] definition of Indian tribe and the definition in the original bill included the eligibility clause but did not mention the Alaska regional corporations." *CINA*, 810 F.2d at 1474-75.   Because "[s]pecific reference to Alaska village and regional corporations was added by amendment" the Court held it was reasonable to conclude that the "eligibility clause" modified only the terms "any Indian tribe, band, nation, or other organized group or community," and not the specifically enumerated ANCs which were added later.   *Id*. (citing 120 Cong. Rec. 40242).   That reasoning remains sound in this context. The Ninth Circuit has also continued to recognize that ANCSA corporations are tribes under ISDEAA, even after the Federal Tribe List Act became law. *See Cook Inlet Treaty Tribes v. Shalala,* 166 F.3d 986, 988-90 (9th Cir. 1999) (observing that ANCSA corporations qualify as

tribes under the ISDEAA).

Once again, the question before the Court will likely be whether Treasury's decision to include ANCSA corporations is reasonable.  And the inclusion of ANCSA corporations in Title V of the CARES would be more than reasonable—it is dictated by the plain language of the statute.

*Third,* the *CINA* decision buttresses the argument that Congress intentionally used the ISDEAA definition including ANCSA corporations.   Congress is presumed to know the status of federal decisions when it enacts legislation.   Moreover, if Congress had intended to exclude the ANCSA corporations, they would have specifically done so instead of relying on a statutory provision that has been interpreted by federal courts to include ANCSA Corporations.

*Fourth,* to the extent the eligibility clause in ISDEAA does restrict the class of ANSCA corporations that qualify under the definition, the ISDEAA does not tie that qualifier to the publication of the list by the Secretary of the Interior mandated under 25 U.S.C. § 5131 as noted above.  If Plaintiffs' interpretation were correct, then a portion of the ISDEAA definition enacted by Congress was effectively nullified by a separate statute passed almost 20 years later.  That is not a reasonable proposition.  And to the extent there is any factual support for the proposition, ANCSA corporations should have an opportunity to demonstrate to Treasury that ANCs—despite not being on the Federal Tribal List—do satisfy the definition in ISDEAA because they enjoy some special benefits from the federal government based on their identity as Native Corporations.

*Finally*, the Plaintiff Tribes' claim that ANCSA corporations do not meet the definition of "Tribal governments" under the CARES Act because they are not "recognized" governing bodies. This argument is also unavailing.   In support, Plaintiffs once again rely on other statutes, 638 contracting rules and regulations, and irrelevant case law concluding ANCSA corporations are not separate sovereigns with a "government-to-government" relationship with the United States.  But

there is absolutely nothing in the CARES Act to suggest that Congress intended to limit the definition of Tribal government based on any of those statutes, rules, regulations, or legal decisions or require entities to receiving relief funds to have a sovereign government.  Once again, Congress chose not to cross-reference or incorporate any of those provisions in the Act.  Instead, they simply chose a specific statutory provision to define entities that qualified as "Indian tribes," (which included ANCs) and defined Tribal governments as the governing body of those entities.  More importantly, Plaintiff ignore that with respect to the ISDEAA definition (which is the only definition used in the CARES Act), Congress has exercised its plenary authority to recognize ANCSA corporations as Indian tribes.

## CONCLUSION

For all the foregoing reasons, ANCSA corporations are "Tribal governments" within the meaning of Title V of the CARES Act and eligible for relief payments.

Dated: April 22, 2020                                     Respectfully submitted,


                                                          /s/ *Michael J. O'Leary*
                                                          Michael J. O'Leary, DC Bar No. 1014610
                                                          HOLLAND & HART LLP
                                                          901 K Street NW, Suite 850
                                                          Washington, D.C., 20001
                                                          (202) 654-6922
                                                          mjoleary@hollandhart.com

                                                          Jonathan Katchen (*pro hac vice* admission
                                                          pending)
                                                          HOLLAND & HART LLP
                                                          1029 W.3rd Avenue, Suite 550
                                                          Anchorage, AK 99501
                                                          (907) 865-2606
                                                          jwkatchen@hollandhart.com