Christine V. Williams
J. Harrison Powell, II
Outlook Law, LLC
Attorneys for *Amici Curiae*
1016 West 6th Avenue, Suite 306
Anchorage, Alaska 99501
(907) 258-2200
christinewilliams@outlooklaw.com
harrisonpowell@outlooklaw.com

**UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA**

CONFEDERATED TRIBES OF THE
CHEHALIS RESERVATION, et al.,

          PLAINTIFFS,

    v.

STEVEN MNUCHIN, SECRETARY, UNITED
STATES DEPARTMENT OF THE
TREASURY,

          DEFENDANT.

Case No. 1:20-cv-1002 (APM)

**BRIEF OF *AMICI CURIAE***

The Alaska Native Village Corporation Association ("ANVCA") and ANCSA Regional Association ("ARA"), collectively *Amici Curiae*, by and through counsel, Outlook Law, LLC, hereby submits its Brief.

**I.      Introduction of the Parties**

ANVCA is a non-profit corporation formed in 2010 that has no parent corporation and issues no stock.  Its mission is to promote the success of Alaska Native village corporations and protection of Alaska Native lands.  ANVCA represents the 177 Alaska Native village

corporations that were formed under the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. § 1601 *et seq*.

ARA is a non-profit association formed in 1998 that has no parent corporation and issues no stock. Their mission is to promote and foster continued growth and economic strength of the Alaska Native regional corporations for the benefit of their Alaska Native shareholders and communities.  The associated corporations are owned by over 130,000 Alaska Native people and were formed under the ANCSA, 43 U.S.C. § 1601 *et seq*.[1]

## II.    Summary of the Argument

The essence of the plaintiffs' arguments are that (1) Congress wrote an ambiguous and disjointed statute concerning the Coronavirus Relief Fund, therefore this Court should narrowly interpret the statute to include only Federally-recognized Indian Tribes intended to benefit from desperately needed COVID-19 relief funds; (2) that ANCSA corporations, whose incorporation Congress specified to be under Alaska state law, 42 U.S.C. §1606(d), do not participate in programs or services offered to other Indian Tribes; and (3) therefore this Court must ignore the rules of statutory construction that apply to this statute, and instead substitute in the narrow construction argued for by the plaintiffs and ignore the clear statutory intent of Congress to include ANCSA corporations charged with the unique Federal public policy that exists for Alaska Natives and ANCSA corporations.

These arguments fail for obvious reasons, including the following: (1) Congress wrote and passed, the CARES Act , Pub.L. 116-136, signed into law, nearly a month ago with specific definitions of both "Indian Tribe" and "Tribal Government."  No convoluted statutory analysis is

---

[1] Disclosure per Fed. R. App. P. 29(a)(4)(E), no party or person other than the *Amici* authored this brief. This brief has been written in a *pro bono* capacity.

needed to ascertain the clear intent of Congress which includes Alaska Native Corporations ("ANCs") as CARES Act beneficiaries - (2) Congress passed this law with clear direction to the U.S. Department of Interior and U.S. Treasury Department to include ANCs that have long been held to be recognized as Indian tribes in this and other statutes;[2] (3) the Federal Indian policy for Alaska Native land and Alaska Native people through ANCSA specifies that ANCs are subject to Alaska corporation law for regulatory purposes, while Congress retained its Constitutional responsibility of oversight of ANCs under the Indian Commerce Clause. U.S. Constitution, Article I, §8,(3), as it does with other Indian Tribes; and (4) the clear unambiguous language of the statute dictates that success on the merits is exceptionally unlikely and the extraordinary remedy of injunctive relief must be denied.  Finally, and perhaps fatally, the plaintiffs wholly ignore the appropriate standard of review for this case, *i.e.* "rational review," and the steep climb that is required to overcome an economic law passed by Congress and signed into law.  That is, a statute such as this comes to this Court bearing a strong presumption of validity and plaintiffs must overcome their assigned burden to ***negate*** every conceivable basis which might support it. For these reasons alone, the relief sought must be denied.

**III.    The Clear Language of the CARES Act Governs**

**A.    Title V of the Cares Act is Unambiguous**

Pursuant to Section 601(g) of Title V, of the CARES Act, the term 'Indian Tribe' has the meaning given that term in section 4(e) of the Indian Self-Determination and Education

---

[2]  There are approximately 200 other statutes that contain similar definitions or are used in the same way.  As a point of fact, some Alaska Native people belong to no tribes, some Alaska Native people are not shareholders of ANCs.  The concept of double dipping (albeit catchy for publicity-is not supported by facts) or that the services provided may not be fundamentally distinct is a rudimentary misunderstanding of how Alaska Native tribes and ANCs work, as demonstrated in the tribal consultations and ANCSA history, *infra*.

Assistance Act (25 U.S.C. 5304(e)) ("ISDEAA).  In turn, 25 U.S.C. § 5304(e), the ISDEEA as used in the CARES Act, defines any Indian Tribe as "any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village or regional village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act (85 Stat. 688) [43 U.S.C. §§ 1601 et seq.] which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." Likewise, ANCSA states that "***Notwithstanding any other provision of law***, ***Alaska Natives shall remain eligible for all Federal Indian programs on the same basis as other Native Americans***."[3]  This language in the CARES Act, as well as the clear language in ANCSA, makes it plainly apparent that ANCs are included as Indian Tribes for the purposes of the CARES Act.

The definition of "Tribal government" is set forth in the CARES Act and reads as follows:  "'Tribal government' means the recognized governing body of an Indian Tribe.'"  That is, the term "Tribal government" is defined plainly and unambiguously in the CARES Act as the "recognized governing body of an Indian Tribe."  The governing body directing the affairs of an ANC is generally an elected Alaska Native Board of Directors, with a duly elected Chair, who has empowered a President and/or Chief Executive Officer to act on its behalf.[4]  This could, by analogy, be likened to many tribal councils with a Chair, Chief, or President.  Indeed, some Indian Reorganization Act ("IRA") tribes have set up as 17(c) corporations, reinforcing that structure prior to the passage of ANCSA.  Simply put, ANC Boards, which are required under

---

[3]  43 U.S.C. 1626(d) (emphasis added).

[4]  This did not exclude ANCs nor specify or require that the statute only included local tribal governments, large tribal governments, small tribal governments, government to government relationship, tribes with or without land, or any other strained definition.

ANCSA to be composed of solely Alaska Native shareholders, are elected to the governing body of an Indian Tribe.

This reading comports with the most basic application of statutory construction and interpretation in that the statute must be read as a whole.  This does not beget a reading where ANCs would be included in some way in the consultations and then left off of the disbursements. That is, the term "Tribal government" ***does not*** contain any such restriction against the Alaska Native people nor does it in any way refer to the list of Federally Recognized Tribes.  Had Congress wanted to say that it was limited to certain tribes and exclude others not on the list, it could have certainly done so.  ***It did not***.

The plaintiffs argue that the Federal Tribal List published by the Secretary of the Interior determines which entities meet the definition of Indian Tribe in the ISDEAA. But they similarly highlight that the list of federally recognized tribes "does not include any Alaska Native regional or village corporations ("ANCs")."  Compl. at ¶ 47 (emphasis in original). In other words, they argue that all ANCs are essentially stricken from the definition that Congress specifically selected to use in the CARES Act. That argument does not make sense and effectively nullifies specifically enumerated terms in a definition drafted by Congress. Moreover, the Federal Tribe List Act actually uses an entirely different definition of Indian Tribe -- the one found in Section 5130(2) which does not include ANCs -- than the ISDEAA definition chosen by Congress in the CARES Act.

If Congress intended to exclude ANCs, it could have done so and in a much less convoluted way. And if Congress had intended for the Federal Tribal List to define the scope of eligible Indian Tribes under the CARES Act it could have easily referred to that list instead of

incorporating the ISDEAA definition—which again differs from other definitions of Indian Tribes by specifically including ANCs.

Accordingly, and without question, the plain, unambiguous statutory provisions prevail over any other provisions.  As such, courts must "apply the statute according to its terms."[5]  That is, if the intent of Congress is clear on the face of the statute, the court must "give effect to that intent."[6]

Thus, and according to the CARES Act, as cited above, the term "Indian Tribe" includes ANCs, formed by ANCSA.[7]  This inclusion is correctly read into the definition of Tribal government in Title V, and, as such, ANCs are rightfully included in the disbursements.  If Congress had wanted to eliminate the ANCs and the Native people from consideration, it could have done so.  Instead, it did the opposite with its inclusive definition of Tribal government - to facilitate maximum Native participation.  This also agrees with the Congressional intent of not only the CARES Act, but with the Indian Self-Determination and Education Assistance ("ISDEAA") as well.

**B.    Legislative Intent was Clear when it Included Alaska Native Corporations in the ISDEAA**

Even if legislative context of the ISDEAA is needed, which it is not, the legislative intent of including ANCs was clear.  That is, when Congress passed the provisions in the ISDEAA that explicitly and unequivocally included ANCs, it spoke its intent plainly and unambiguously.  Without question, Congress then and Congress now with the CARES Act intended a doctrine of inclusion, not exclusion of all Native peoples.  In 1974, one such Congressional record reiterates

---

[5]  *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009) (citing *United States v. Gonzales*, 520 U.S. 1, 4 (1997)).

[6]  *Cook Inlet Native Ass'n v. Bowen*, 810 F.2d 1471, 1473 (9th Cir. 1987).

[7]  *See* 25 U.S.C. 5304(e)-the ISDEAA.

the Congressional intent of inclusion: to engage in the most Native participation.  It states the

following:

> SEC. 3. (a) The Congress hereby recognizes the obligation of the United States
> to respond to the strong expression of the Indian people for self-determination
> by **assuring maximum Indian participation** in the direction of educational as
> well as other Federal services to Indian communities so as to render such
> services more responsive to the needs and desires of those communities.
> (b) The Congress declares its commitment to the maintenance of the Federal
> Government's unique and continuing relationship with and responsibility to the
> **Indian people through the establishment of a meaningful Indian self-
> determination policy** which will permit an orderly transition from Federal
> domination of programs for and services to Indian people in the planning
> conduct, and administration of those programs and services.[8]

The reference to Alaska village and regional corporations in the ISDEAA's definition is

specific and was added by amendment.  "Because the modifying language was in the law before

the reference to the native corporations, the secretaries reasonably interpreted the eligibility

clause to modify only the first entities listed in the definition."[9]

The U.S. House Report stated that the definition of "tribe" had been amended "to include

the regional and village corporations established by the Alaska Native Claims Settlement Act."[10]

Since "Congress chose to isolate this section for special consideration by way of amendment, the

language inserted should be given effect."[11]

Case law from various Federal Circuits reinforces that ANCs were deliberately included

as Indian Tribes.  Particularly instructive here is the Ninth Circuit's opinion in *Cook Inlet Native

Association v. Bowen*, 810 F.2d 1471 (9th Cir. 1987).  There, the court was asked to determine

the meaning of "Indian tribe" as used in the ISDEAA and, in the process, considered—and

---

[8]  Indian Self-Determination and Education Assistance Act, Report to Accompany S. 1017, 93rd Congress, 2nd Session, p. 2 (1974) (emphasis added).

[9]  *Bowen*, 810 F.2d at 1475 (citing 120 Cong. Rec. 40252).

[10]  H.R. Rep. 1600 93d Cong., 2d Sess. 14 (1974).

[11]  *Bowen*, 810 F.2d at 1475 (citing *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207 (1986)).

rejected—the exact argument presented by the plaintiffs here.  Specifically, Cook Inlet Native Association ("CINA") challenged the district court's judgment upholding an administrative interpretation of "tribe," which interpretation included ANCs, but excluded non-profit Native corporations.  The crux of CINA's argument, like the plaintiffs' here, focused on the eligibility clause of the ISDEAA's definition, that in order to be a "tribe," the corporation must be "recognized as eligible for special programs and services provided by the United States to Indians because of their status as Indians."[12]  CINA was not eligible for such programs.

The Ninth Circuit disagreed with CINA's argument.  According to the Court, just because an ANC may not be eligible for "special programs" due to its status, does not mean the statute is otherwise inoperable.[13]  "The words of a statute should be harmonized internally and with each other to the extent possible."[14]  In other words, the Court observed, "the statute should not be interpreted to render one part inoperative . . . ."[15]

The Court went on to consider the legislative history discussed above, noting the fact that the reference to ANCs was added by amendment.[16]  The Court was persuaded that because the regional profit corporations were "expressly mentioned by definition," customary rules of construction supported their recognition as tribes under the ISDEAA.[17]  "To avoid rendering their mention superfluous," the Assistant Solicitor for Indian Affairs interpreted the eligibility language "to modify only the words 'any Indian tribe, band, nation, or other organized group or community . . . .'"[18]  According to the court, "[b]ecause the modifying language was in the law

---

[12] *Id.* at 1474 (9th Cir. 1987) (citing precursor to 25 U.S.C. § 5304(e)).

[13] *Id.*

[14] *Id.* (citing *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 631—33 (1973)).

[15] *Id.* (citing *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237 (1985)).

[16] *Id.* at 1475.

[17] *Id.* at 1474.

[18] *Id.* (quoting Memorandum of Charles Soller, May 21, 1976).

before the reference to the native corporations, the secretaries reasonably interpreted the eligibility clause to modify only the first entities listed in the definition."[19]  Thus, "[r]egional profit corporations were properly recognized as Indian tribes for purposes of the [ISDEAA]."[20]

The court also found it persuasive that the ISDEAA's purpose is to insure maximum Native participation in and control over Native programs and that "the corporations formed pursuant to [ANCSA] also were established to provide maximum participation by Natives in decisions affecting their rights and property."[21]  Because "[t]he construction of the statute by the agency charged with its administration is entitled to substantial deference,"[22] and because the administrative interpretation of the statute here was reasonable and consistent with statutory language and legislative history, the Ninth Circuit affirmed the district court's judgment confirming the agency interpretation of inclusiveness.  The D.C. Circuit, as referenced above, would later (2003) do the same.

***This could not be more true as Indian Tribes actively work to prevent, respond to, and recover from COVID-19***.  Indigenous Alaska Native peoples should not be excluded because of a contorted interpretation of plain statutory language.  Accordingly, ANCs, by the clear language of the CARES Act, are Indian Tribes with Tribal governments, included in the $8 Billion distribution of Title V, Section 6, funds for COVID-19 Relief.  To infer that Congress would pass a law of inclusion without meaning to include indigenous Alaska Natives in a definition that explicitly does so is a strained reading.

## IV.   History of ANCSA

---

[19] *Id.* at 1475.
[20] *Id.*
[21] *Id.* at 1476.
[22] *Id.* at 1473 (citing *Young v. Community Nutrition Institute*, 476 U.S. 974 (1986)).

A.      **Basis and Structure of ANCSA**

It is important to consider these issues with the history and structure of ANCSA in the backdrop.  There are several misconceptions surrounding ANCs and ANCSA.  ANCSA is a Federal statute and configuration that was brought about because oil was discovered on the North Slope of Alaska, known as Prudhoe Bay.  In order to transport that oil, the outstanding land claims of the Alaska Native peoples had to be addressed as the pipeline for that oil would directly cross the indigenous peoples' lands.

Congress passed ANCSA and reserved all powers to amend ANCSA to itself.  Explicitly, it only allowed the state in which ANCSA corporations would be registered limited powers and if in conflict with any provision of ANCSA/Federal law, ANCSA would control.[23]

That is, Congress set forth the boundaries in ANCSA of what could be established, who could be enrolled - including blood quantum requirements- (on the Secretary of the Interior's 'Secretary' roll), that the original articles of incorporation and bylaws be approved by the Secretary, that the corporations would be managed by a board of directors and controlled by Alaska Natives, that there would be a sharing of revenues by and between Regional as well as Village corporations, and how land would be divided and selected among corporations.[24]  To characterize ANCs or ANCSA corporations as State chartered is, at best, woefully misinformed and misleading.  These corporations are a creation of the Federal government, which retains

---

[23]  Report from the House of Representatives, Mr. Udall, Chair, to accompany H.R. 4162, "Amending the Alaska Native Claims Settlement Act to Provide Alaska Natives with Certain Options for the Continued Ownership of Lands and Corporate Shares Received Pursuant to the Act and for Other Purposes," 99th Congress, 2nd Session, Report 99-712, 1986.  *See also,* Report From the House of Representatives, Additional Views, Mr. Udall, Chair, to accompany H.R. 278, Report 100-31, 100th Congress, 1st Session, 1987.  *See also* Public Law 92-203, December 18, 1971.
[24]  Public Law 92-203, December 18, 1971.

control of ANCSA, and they provide support and so much more to the Alaska Native people and the State of Alaska.

These corporations, as the GAO found, provide benefits to their shareholders and the communities, including the following: (1) employment opportunities/job training; (2) dividends; (3) scholarships; (4) cultural preservation programs; (5) land management; (6) economic development; and (7) advocacy for Alaska Native people and communities.

**B.    ANCSA Did Not Extinguish the Special Relationship with the Federal Government**

Congress, while trying to convey land without the reservation system, did not extinguish or abolish its rights under the Indian Commerce Clause; which forms, in part, the same basis for abolishing or honoring reservations and relationships with the Indians.  From the onset of ANCSA, Congress has and continues to order studies and reports as to how indigenous Alaska Native peoples through ANCs partake in and benefit from Federal programs.  While doing this, Congress enunciated clearly that it wished to convey the ANCSA lands to the Alaska Native people while NOT extinguishing the Federal relationship with them, as the following text demonstrates.

> (a) Congress hereby finds and declares that there is an immediate need for a fair, just, and final settlement of all land claims of Alaska Natives, Native Villages and groups;[25]
>
> ****
>
> no provision of this Act shall replace or diminish any right, privilege, or obligation of Natives as citizens of the United States or of Alaska, or relieve, replace, or diminish any obligation of the United States or of the State of Alaska to protect and promote the rights or welfare of Natives as citizens of the United States or of Alaska, the Secretary [of the Interior] is authorized and directed, together with other appropriate agencies of the United States Government, to make a study of all Federal programs primarily designed to benefit Native people and to report back to the Congress with his recommendations for the

---

[25]  Alaska Native Land Claims, Hearings before the Committee on Interior and Insurance Affairs, U.S. Senate, 92nd Congress, 1971.

future management and operation of these programs within three years of the date of enactment of this Act [ANCSA];

***

(b) the settlement should be accomplished rapidly, with certainty, in conformity with the real economic and social needs of Natives, without litigation, with **maximum participation by Natives in decisions affecting their rights and property**[26], without establishing any permanent racially defined institutions, rights, privileges, or obligations, without creating a reservation system or lengthy wardship or trusteeship, and without adding to the categories of property and institutions enjoying special tax privileges or to the legislation establishing special relationships between the United States Government and the State of Alaska;[27]

Clearly, Congress was dictating that while the intent was that the land rights would be settled quickly, it would not and did not extinguish its relationship with the indigenous people of Alaska.  Indeed, ANCSA spoke directly to Federal agencies conducting loan or loan and grants programs, like the CARES Act, with the following passage.

(g) no provision of this Act shall be construed to terminate or otherwise curtail the activities of the Economic Development Administration or other Federal agencies conducting loan or loan and grant programs in Alaska.[28]

The Federal Government did not abandon the indigenous people of Alaska when it provided for them without reservation or trust lands and placed their interests in Congressionally defined corporate entities.  Not only did it make that sentiment clear when it passed ANCSA, it reiterated that fact when it amended ANCSA.  "Both ANCSA, as amended, and this Act are

---

[26]  The maximum participation by Natives would be echoed in the ISDEAA, which is recognized and used to this day to be inclusive of the indigenous Native people, including those identified as ANCs.

[27]  Alaska Native Claims Settlement Act, Conference Report to Accompany H.R. 10367, December 14, 1971.

[28]  *Id.*; *see also* Public Law 92-203, December 28, 1971.

Indian legislation enacted by Congress pursuant to its plenary authority under the Commerce Clause to regulate Indian Affairs."[29]

A U.S. House bill, which passed the House and would later be adopted in great part by the Senate, went into the very telling history of ANCSA and the continuing relationship of the Federal government with the indigenous Alaska Native peoples of Alaska through the ANC structure. It told the story of the forced incorporation of the ANCs to give effect to the terms of ANCSA to convey land, while not abolishing the rights of the indigenous Alaska Native peoples, and not doing so effectively.[30]

> In enacting ANCSA, Congress adopted a novel, experimental approach in dealing with Native people. In section 2(b) of the Act, a congressional finding was made that-
> The settlement should be accomplished rapidly, with certainty, in conformity with the real economic and social needs of Natives, without litigation, with maximum participation by Natives in decisions affecting their rights and property * * *"
> **Fifteen years after the enactment of ANCSA, few of these goals have been achieved.**
>
> ****
>
> **It is of concern to the Committee that settlement has not been accomplished rapidly and with certainty**. Fifteen years after enactment, Native corporations **have received patents to less than 8% of their 44,000,000-acre land entitlement.**[31]

---

[29] Report from the House of Representatives, Mr. Udall, Chair, to accompany H.R. 4162, "Amending the Alaska Native Claims Settlement Act to Provide Alaska Natives with Certain Options for the Continued Ownership of Lands and Corporate Shares Received Pursuant to the Act and for Other Purposes," 99th Congress, 2nd Session, Report 99-712, 1986. *See also,* Report From the House of Representatives, Additional Views, Mr. Udall, Chair, to accompany H.R. 278, Report 100-31, 100th Congress, 1st Session, 1987.

[30] *See, generally, id.*

[31] Report from the House of Representatives, Mr. Udall, Chair, to accompany H.R. 4162, "Amending the Alaska Native Claims Settlement Act to Provide Alaska Natives with Certain Options for the Continued Ownership of Lands and Corporate Shares Received Pursuant to the Act and for Other Purposes," 99th Congress, 2nd Session, Report 99-712, 1986, p. 15 (emphasis added). In fact, the lands have not been fully conveyed and of the land conveyed, 1100 sites are considered contaminated lands "allotted" to the indigenous Alaska Native peoples.

The Report also evaluated the success of the Regional and Village Corporations and the *forced placement* of ancestral land in positions vulnerable to creditors.[32]

The Constitutional analysis contained in the House report is striking in that it explicitly embraces that Congress was exercising its power, in passing and amending ANCSA, pursuant to the Indian Commerce Clause, as enunciated in *Morton v. Mancari*, and did so by treating the Alaska Native peoples, through ANCs, as Indian tribes. Congress, in embracing this case, took it a step further and found that ANCSA corporations still have the *relationship* of "guardian-ward" status *even if* title to the lands was conveyed or, as is the actual case, should be conveyed to the indigenous Alaska Native peoples through ANCs. In short, the trust relationship, the fiduciary relationship, continues and did NOT run or end with the land conveyed.[33]

In contrast, and straying far from the terms of the CARES Act, and the historical context of Indian law, the plaintiffs take the position that ANCs, as corporate entities, lack traditional "government-to-government" relationships with the United States and so should not constitute "Tribal governments" under the CARES Act. In support, the plaintiffs completely ignore the history of ANCSA and rely, in part, on the Supreme Court's opinion in *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520 (1998), a case that is readily distinguishable from the matter at hand.

---

[32] *Id. See also,* Report From the House of Representatives, Additional Views, Mr. Udall, Chair, to accompany H.R. 278, Report 100-31, 100th Congress, 1st Session, 1987.

[33] Report from the House of Representatives, Mr. Udall, Chair, to accompany H.R. 4162, "Amending the Alaska Native Claims Settlement Act to Provide Alaska Natives with Certain Options for the Continued Ownership of Lands and Corporate Shares Received Pursuant to the Act and for Other Purposes," 99th Congress, 2nd Session, Report 99-712, 1986, p. 31. *See also,* Report From the House of Representatives, Additional Views, Mr. Udall, Chair, to accompany H.R. 278, Report 100-31, 100th Congress, 1st Session, 1987.

*Venetie* was limited to the issue of whether lands owned by the Native Village of Venetie Tribal Government pursuant to ANCSA constituted "Indian country" such that the Tribe could collect taxes from a contractor conducting business on the Tribe's land.[34]  In holding that these lands did not qualify as "Indian country" under 18 U.S.C. § 1151, the Court noted that through ANCSA, Congress departed from its "traditional practice of setting aside Indian lands," and "ended federal superintendence" over such lands.[35]  Notably, the Court's ***decision did not*** depend on the guardian-ward status of Alaska Native peoples; rather its holding focused on ANCSA's transfer of former reservation lands to ANCs and the lack of direct federal control over the land at issue in the limited context regarding "Indian country." [36]

In other words, while ANCSA extinguished the traditional concept of reservation lands in Alaska, it in no way extinguished the special relationship between the Alaska Natives and the United States ***nor did it declare them not to be tribes for federal programs***.  ANCSA itself reiterates this point. Notwithstanding any other provision of law, "***Alaska Natives shall remain eligible for all Federal Indian programs on the same basis as other Native Americans***."[37]  The relief funds of COVID-19 are no different.

As one Alaskan representative testified at the tribal consultations on April 2, 2020, sometimes one Alaska Native organization does not have the funding to build or maintain a service while another may have the capabilities or infrastructure in place to administer it.  While some communities, villages or tribes may be impoverished, the community of sharing in Alaska among Alaska Native people is incredible and profound, and ANCs play a major role.

---

[34] *Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 523, 525 (1998).
[35] *Id.* at 532-33.
[36] *Id.* at 533.
[37] 43 U.S.C. § 1626(d) (emphasis added).

Services ANCs currently provide pale in comparison to what will be demanded of them in the future.  As the Alaska tribes' declarations demonstrate, the cost of living and delivering services is extreme and the tribes are small.  In many cases, Regional and/or Village corporations either fund or deliver direct services to their shareholders that a Lower 48 tribe would or could provide through its governmental system.  This has been recognized in law and is part of the interwoven fabric of how Alaska tribes and ANCs survive in areas often only accessible by plane or boat or snow machine.  Many ANC Regionals have a strong percentage of at-large shareholders, meaning they do not also belong to a tribe or a village corporation.  For instance, Chugach Alaska Corporation ("Chugach") has over 50 percent at-large shareholder base and Cook Inlet Region, Incorporated ("CIRI") has a 40 percent at-large shareholder base - and if they do not benefit from COVID funds to Chugach or CIRI, they will receive nothing.

The ability to prevent, respond to, and recover from COVID-19 is a battle being fought throughout communities in Alaska.  Any hit on this vulnerable population with a pandemic of this magnitude is devastating and the effects will be felt for generations.  Alaska Natives all share the same vulnerabilities that the Alaska plaintiffs' identified - health, age, access to medical care, and remote locations.

**V.      Plaintiffs Do Not Meet the Basic Standards for a Preliminary Injunction/TRO**

**A.      Standards for the Extraordinary Relief of Preliminary Injunctions**

The plaintiffs urge the Court to adopt a loose, sliding scale approach in weighing the various harms and considerations surrounding their motion.[38]  Given precedent in this Circuit,

---

[38]  That is, where a movant "makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor.'" *Dallas Safari Club v. Bernhardt*, 2020 U.S. Dist. LEXIS 62551, *9 (D.D.C. Apr. 9, 2020) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009)).

this should not be entertained in the context of a clear, unambiguous statute that was passed by an overwhelming majority (96-0) nearly one month ago.

Rather, a preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."[39]  Such an exceptional remedy is "never awarded as of right"[40] and generally requires the plaintiffs to demonstrate "[1] that [they are] likely to succeed on the merits, [2] that [they are] likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of the equities tips in [their] favor, and [4] that an injunction is in the public interest."[41]

Contrary to the plaintiffs' suggestion that the Court should weigh these factors on a sliding scale, the D.C. Circuit "has suggested that *Winter* should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm."[42]  As this Court has unequivocally recognized, "courts in our Circuit have held that a failure to show a likelihood of success on the merits alone is sufficient to defeat the motion."[43]

In this case, the likelihood that the motion will succeed on the merits is low, as further set forth below.

**B.     The Plaintiffs are Unlikely to Succeed on the Merits and Have Failed to Meet their Burden pursuant to the Rational Review Standard**

---

[39]  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis in original).

[40]  *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008).

[41]  *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)).

[42]  *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 239 F. Supp. 3d 77, 83 (D.D.C. 2017) (citing *Sherley v. Sebelius*, 644 F.3d 388, 392-93 (D.C. Cir. 2011); *Davis*, 571 F.3d at 1291-92.

[43]  *Id.* at 83 (citing *Ark. Dairy Coop Ass'n, Inc. v. USDA*, 573 F.3d 815, 832 (D.C. Cir. 2009)).

The plaintiffs cannot defeat the plain language of a statute by invoking a doctrine of interpretation that simply is not there, particularly one that is subject to rational basis review having not met their burden for judicial action.  Such an approach defies the basic principles of statutory construction and interpretation.  The plaintiffs have not met their burden to demonstrate that they will likely succeed on the merits by shoe-horning a statute into an interpretation they want—not the one that was unambiguously written and passed and that is further entitled to a strong presumption of validity.

As the D.C. Circuit Court of Appeals has recognized, Indian Tribes*, specifically including ANCs in that definition*, have a special relationship, which is not considered race based, with the federal government.  In *American Federation of Government Employees (AFL-CIO) v. United States*, 330 F. 3d 513 (D.C. Cir. 2003), *cert. denied American Federation of Government Employees, AFL-CIO v. United States*, 540 U.S. 1088 (2003), the D.C. Circuit considered a constitutional challenge to the legitimacy of a Department of Defense set-aside contract to Chugach Management Services Joint Venture based, *inter alia*, on the joint venture consisting of Indian Tribes and the status that conveyed. [44]   The Court, citing to the definitional section of ISDEAA, the same definition at issue in this case, noted that two of the entities involved, Chugach Alaska Corporation, a regional ANC, and Afognak Village Corporation, a village ANC, both formed under ANCSA, were "federally recognized Indian tribes."[45]  In

---

[44]  ANCSA was interpreted by the lower *AFGE* court (affirmed by the D.C. Circuit) as the "modern mechanism that designates Native Alaskan Corporations as the vehicle used to provide continuing economic benefits in exchange for extinguished aboriginal land rights." *AFGE v. United States*, 195 F. Supp. 2d 4, 22 (D.D.C. 2002) (citing to *Koniag, Inc. v. Koncor Forest Res.*, 39 F. 3d 991, 997 (9th Cir. 1994)). Additionally, shares for Alaska Native Corporations have restrictions placed on them regarding how and to whom shares may be transferred and used in order to help ensure the shares continue to benefit the Alaska Native peoples. 43 U.S.C. § 1606(h).

[45]  *AFGE v. United States*, 330 F.3d 513, 516 (D.C. Cir. 2003).  *See also* 25 U.S.C. § 5304(e).

examining the unique relationship between Native Americans and the United States, this Court stated "the only question properly before us is whether the government violated the equal protection component of the Due Process Clause when it . . . grant[ed] a contract to a firm wholly owned by Indian tribes."[46]

The D.C. Circuit Court of Appeals*, again applying the analysis to an ANC*, further distinguished the strict scrutiny standard applied to racial classifications from Native American contractors in *Adarand Contractors, Inc. v. Pena*, 515 U.S. 200 (1995) by declaring that the Supreme Court "has made it clear enough that legislation for the benefit of recognized Indian Tribes is not to be examined in terms applicable to suspect racial classifications, " but rational review.[47]  "[I]n a sense the Constitution itself establishes the rationality of the . . . classification, by providing a separate federal power that reaches only to the present group."[48]

This Court found that Congress "is not required to articulate its reasoning for enacting a statute."[49]  Rather, the Constitution grants "Congress discretion to regulate its internal proceedings . . . Incident to its lawmaking authority, Congress has the authority to decide whether to conduct investigations and hold hearings to gather information.  And under the Constitution, Congress has broad discretion in determining what must be published in the official record."[50]  "[T]here is certainly no textual basis for requiring Congress to hold hearings, issue committee reports, or enact findings or statements of purpose, even though these might assist judicial review and sometimes carry weight."[51]

---

[46] *Id.* at 519.
[47] *Id.* at 521 (citing *Morton v. Mancari*, 417 U.S. 535, 551-52 (1974) (additional citations omitted).
[48] *Id*. (quoting *United States v. Cohen*, 733 F.2d 128, 139 (D.C. Cir. 1984) (en banc)).
[49] *Id*. at 522 (quoting *United States R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980)).
[50] *Id.* (internal quotation marks and citations omitted).
[51] *Id.* (internal citations omitted).

This was consistent with the lower court finding, which this Court upheld, that the set-aside award was subject to rational review because Congress's power to legislate affairs with Native Americans came *from its political and economic relationship with ANCs* as Indian Tribes, and was not a racial classification.[52]   As such, the lower court found, "'[o]n rational basis review . . . a statute . . . comes to us bearing a strong presumption of validity, and those attacking the rationality of the legislative classification have the burden to negative [sic-negate] every conceivable basis which might support it.'"[53]

This is also consistent with the history of ANCSA, in which Congress stated that ANCSA was passed pursuant to its *exclusive* Constitutional power to regulate commerce with the Indian Tribes.   Thus, the extraordinary remedy of injunctive relief cannot be granted when the plain reading of the statute is clear.   Moreover, as further set forth below, and the steep burden for overturning it on rational review has simply not be presented by the plaintiff in any manner.

## C.   Delay will Cause Harm to all Eligible Entities for Tribal CARES Act Funding

The plaintiffs seek an extraordinary remedy that is rarely granted and is unlikely to succeed on the merits.   The plaintiffs do so at the 11th hour, with the law and specific provisions at issue having been passed for nearly a month, and the funds that the Indian people desperately need—*all* Indian people as dictated by Congress—to be disbursed in a matter of days.   They do so without justification.

To address this sort of behavior, laches "'is designed to promote diligence and prevent enforcement of stale claims' by those who have 'slumber[ed] on their rights.'"[54]   It applies "where

---

[52]   *AFGE v. United States*, 195 F. Supp. 2d 4, 18 (D.D.C. 2002).
[53]   *Id*. at 24 (quoting *Calloway v. District of Columbia*, 216 F.3d 1, 8 (D.C. Cir. 2000) (citing to *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993)).
[54]   *Menominee Indian Tribe of Wis. v. United States*, 614 F.3d 519, 531 (D.C. Cir. 2010) (quoting *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 843 (D.C. Cir. 1982)).

there is (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense."[55]  "[A] court assessing whether to award the 'extraordinary remedy' of preliminary-injunctive relief . . . may determine whether laches renders that relief inappropriate."[56]  This Court in *Standing Rock Sioux Tribe*, for example, imposed, in part, the doctrine of laches to deny a preliminary injunction to prevent the construction of an oil pipeline where the movant failed to raise its religious exercise objections with the Corps of Engineers until just "a week or two" before  the expected commencement of oil flow despite opportunities to do so earlier, and where the Corps of Engineers would be prejudiced due to the substantial increase in cost were it forced to make other arrangements for the construction.[57]  As stated by the E.D. Va. Opinion cited to by the court, which applies equally here, "[e]quity demands that those who would challenge the legal sufficiency of administrative decisions concerning time sensitive public . . . projects do so with haste and dispatch."[58]

A failure to read and ascertain the statute's plain language—which statute is subject to a rational basis review and so already bears a "strong presumption of validity"[59]— does not justify waiting to seek redress.  Tribal consultations were held on this very matter.  The first occurred on April 2, 2020, and the second was held on April 9, 2020.  The consultations had Alaska Native Corporation participation as Tribes.  Yet, the plaintiffs chose to wait until nearly the last minute, a mere four days before disbursement, to file for a temporary restraining order and preliminary

---

[55]  *Id.* (quotation marks and citations omitted).
[56]  *Standing Rock Sioux Tribe*, 239 F. Supp. 3d at 84 (citing *Perry v. Judd*, 840 F. Supp. 2d 945, 953-55 (E.D. Va. 2012)).
[57]  *Id.* at 84-88.
[58]  *Perry*, 840 F. Supp. 2d at 950 (quoting Quince *Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989)).
[59]  *Calloway v. District of Columbia*, 216 F.3d 1, 8 (D.C. Cir. 2000) (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 314 (1993)).

injunctive relief in a matter in which they are not likely to succeed on the merits.[60]  In doing so, the harm that they could cause by failing to timely bring forth an action could directly harm plaintiffs and all other eligible Indian Tribes.  There was no sound reasoning for the stall and the harm it could bring could be devastating on Alaska Native peoples that would have voiced objection.

Their TRO motion and briefing spans forty (40) pages and was filed just four days before disbursement was to occur on a basis of distribution allocation that has not yet been set forth.  Consequently, the *amici* have had just two days to consider and respond to the plethora of arguments raised on an exceedingly important legal issue that will directly impact hundreds of thousands of lives in the midst of a global pandemic.  This was done even though the CARES Act has been passed for almost a month.

It was clear from the beginning (even from a cursory read) that Alaska Native Corporations were deliberately included in the CARES Act as "Indian tribes," as they are in countless other statutes.  The CARES Act was not written to exclude, but rather, to include.[61]  Despite this backdrop, the plaintiffs have waited until the last possible minute to bring their TRO and the 40 page briefing, just days before critically needed funds are disbursed, thereby jeopardizing *all* those Native entities that Congress intended to benefit from the statute.

---

[60]  The plaintiffs also filed an Amended Complaint over 40 pages long yesterday.
[61] This inclusion also did not preclude a tens of billions-dollar gaming industry group for filing for amici status even though the members may have to negotiate and pay state taxes/royalties and then have the agreements approved by the Federal government.  That does not seem like the government to government relationship touted by the plaintiffs free from any state interference or interaction.

## VI.     Conclusion

In creating ANCs under ANCSA, Congress clearly intended to create a new structure for Tribal authority and economies in Alaska.  In addition, Congress has subsequently recognized the status of ANCs as federally recognized tribes in numerous relevant statutes.  Relying on these and other authorities, federal courts, including Courts of Appeals and this Circuit, have ruled that ANCs are federally recognized Tribes.[62]  The plaintiffs' plea for injunctive relief is fatally flawed; it would require the court to rule that plaintiffs would have a likelihood of success on the merits of overturning all of the above statutes and judicial precedent, including in the D.C. Circuit Court of Appeals.

It would also require the Court to substitute the wishes of the plaintiffs for the clear intent of Congress in passing the unambiguous language in the CARES Act including ANCs in the definition of 'Tribe.'  Through ANCSA, Congress intended to create ANCs as entities through which economic benefit could flow to the Native communities, and Native peoples, each ANC represents.  ANCs are thus a logical vehicle for ensuring CARES Act funding reaches Native communities, and by including ANCs as COVID Relief funding recipients, Congress demonstrated this intent.  The plaintiffs are attempting to supplant this clear Congressional intent with their own; success on those merits is highly unlikely.

For the above reasons, as Amici Curiae, we humbly ask this Court to deny the Plaintiff's Motion for Injunctive Relief and Temporary Restraining Order.

---

[62] *See, e.g., American Federation of Government Employees v. United States*, 330 F. 3d 513, 516 (D.C. Cir. 2003); *cert denied American Federation of Government Employees (AFL-CIO) v. United States*, 540 U.S. 1088 (2003).

Dated this 22nd day of April, 2020.

/s/ Christine V. Williams
_____
Alaska Bar No. 0204007

/s/ J. Harrison Powell, II
_____
Virginia Bar No. 86308

OUTLOOK LAW, LLC
1016 West 6th Avenue, Suite 306
Anchorage, Alaska 99501
(907) 258-2200
christinewilliams@outlooklaw.com

Attorneys for *Amici Curiae*

Alaska Native Village Corporation
Association
880 H Street, Suite 201
Anchorage, Alaska 99501

ANCSA Regional Association
11500 C Street, Suite 150
Anchorage, Alaska 99515

/s/ William K. Walker
_____
Sponsoring Attorney
DC Bar No. 477414
Walker Reausaw
800 Connecticut Ave., Suite 300
Washington DC 20006
202-857-7910 (Voice/Fax)
202-329-1123 (Cell)
wkw@att.net

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 22nd day of April 2020, a true and correct copy of

the **Brief of *Amici Curiae*** was filed with CM/ECF, which will send notification to the parties on

record.

Jason C. Lynch
United States Department of Justice Civil Division
Federal Programs Branch
1100 L Street NW, Rm. 11214
Washington, DC 20005
Jason.Lynch@usdoj.gov

Riyaz A. Kanji
303 Detroit Street, Suite 400
Ann Arbor, MI 48104
rkanji@kanjikatzen.com

Lisa Koop Gunn
Tulalip Tribes, Office of the Reservation Attorney
6406 Marine Drive
Tulalip, WA 98271
lkoop@tulaliptribes-nsn.gov

Kaighn Smith, Jr.
DRUMMOND WOODSUM
84 Marginal Way, Suite 600
Portland, ME 04101
ksmith@dwmlaw.com

Cory J. Albright
811 1st Avenue, Suite 630
Seattle, WA 98104
calbright@kanjikatzen.com

Harold Chesnin
420 Howanut Road
Oakville, WA 98568
hchesnin@chehalistribe.org

By:   /s/ Christine V. Williams
          OUTLOOK LAW, LLC