1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| CONFEDERATED TRIBES OF THE CHEHALIS RESERVATION | Case No.: 1:20-cv-01002-APM |
| TULALIP TRIBES | |
| HOULTON BAND OF MALISEET INDIANS | PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION |
| AKIAK NATIVE COMMUNITY | |
| ASA'CARSARMIUT TRIBE | |
| ALEUT COMMUNITY OF ST. PAUL ISLAND | |
| THE NAVAJO NATION | |
| QUINAULT INDIAN NATION | |
| PUEBLO OF PICURIS | |
| ELK VALLEY RANCHERIA, CALIFORNIA | |
| SAN CARLOS APACHE TRIBE | |
|        Plaintiffs, | |
|    v. | |
| STEVEN MNUCHIN, SECRETARY, UNITED STATES DEPARTMENT OF THE TREASURY | |
|       Defendant. | |

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

Plaintiffs Confederated Tribes of the Chehalis Reservation ("Chehalis"), Tulalip Tribes ("Tulalip"), Houlton Band of Maliseet Indians ("Houlton Band"), Akiak Native Community ("Akiak"), Asa'carsarmiut Tribe ("ATC"), Aleut Community of St. Paul Island ("ACSPI"), Navajo Nation ("Navajo Nation"), Quinault Indian Nation ("Quinault"), Pueblo of Picuris ("Picuris"), Elk Valley Rancheria, California ("Elk Valley"), and San Carlos Apache Tribe ("San Carlos Apache"), federally recognized Indian Tribal governments that provide essential governmental services to their citizens.

The Secretary asks this Court to rule in his favor by taking a series of steps, each of which is contrary to well-established legal principles and which, taken together, would amount to an abdication of the judicial role.  He claims: (1) that he has unfettered discretion to determine the appropriate recipients of monies intended for Tribal governments when Congress clearly defined who those recipients should be; (2) that this Court should honor the plain text of the governing definitions by either writing language out of them or by writing them out of the statute entirely, even though they use terms which Congress has deemed to be of critical importance in the administration of Indian affairs; (3) that this Court should conclude that the permanent denial of monies Congress intended Tribal governments to use in responding to perhaps the most significant crisis of our lifetimes does not amount to irreparable harm; and (4) that the public interest lies in the Secretary's flouting of that clear Congressional directive. Plaintiffs respectfully ask this Court to reject arguments so patently at odds with the law.

## ARGUMENT

I. **Likelihood of Success on the Merits**

A. **The Secretary's Action Is Subject to Judicial Review.**

The Secretary argues that his decision to distribute funds to ANCs is not reviewable under the APA.  Doc. 21 at 7-8 (citing 5 U.S.C. § 701(a)(2)).  This is flatly incorrect.  There is a

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 2

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

"strong presumption that Congress intends judicial review of administrative action." *Oakland Physicians Med. Ctr. v. Azar*, 330 F. Supp. 3d 391, 398 (D.D.C. 2018) (quoting *Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1343-44 (D.C. Cir. 1996)).  Although the APA precludes judicial review where an "agency action is committed to agency discretion by law," 5 U.S.C. § 701(a)(2), this exception is "quite narrow[]" and only applies in "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019) (internal citations omitted).

The CARES Act provides meaningful standards by which the Secretary's decision can be judged because it contains express restrictions on the Secretary's distribution of the relief funds. Among other things, the Act expressly reserves $8,000,000,000 of the Coronavirus Relief Fund for "making payments to Tribal governments," Sec. 601(a)(2)(B), and it specifically defines the meaning of a "Tribal government," Sec. 601(g)(5).  The Secretary's compliance with these statutory restrictions is entirely nondiscretionary, and thus is reviewable under the APA.  *See Milk Train, Inc. v. Veneman*, 310 F.3d 747, 752 (D.C. Cir. 2002) (finding Congress' limitation on agency's "authority to disburse funds" provided "[s]tatutory reference point" for court review); *see also Lincoln v. Vigil,* 508 U.S. 182, 193 (1993) ("Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes").  Congress simply did not give the Secretary unfettered discretion to determine the appropriate recipients of monies expressly intended for Tribal governments.  While the Secretary has proceeded as if this is so in seeking to direct those monies to Alaska corporations, this Court

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 3

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

has a critical role to play under the APA in determining the legality of his actions.  Much as the

Secretary might like to, he may not escape that all-important safeguard.[1]

### B.    ANCs Are Not "Indian Tribes" Under the CARES Act or the ISDEAA.

#### 1.    The Plain Language of the Statute Is Susceptible to Only One Meaning.

The Secretary's reading of the definition of "Indian tribe," 25 U.S.C. § 5304(e), does

violence to the plain language chosen by Congress.  Title V of the CARES Act incorporates by

reference the definition of "Indian tribe" in the ISDEAA, which provides:

> "Indian tribe" means any Indian tribe, band, nation, or other organized group or
> community, including any Alaska Native village or regional or village corporation
> as defined in or established pursuant to the Alaska Native Claims Settlement Act
> (85 Stat. 688) [43 U.S.C. 1601 et seq.], which *is recognized as eligible for the
> special programs and services provided by the United States to Indians because
> of their status as Indians*[.]

25 U.S.C. § 5304(e) (emphasis added).  A critical point bears emphasis at the outset:  the

Secretary does *not* argue that ANCs are "recognized as eligible for the special programs and

services provided by the United States to Indians because of their status as Indians."  He

---

[1]  The cases relied upon by the Secretary are inapposite.  In *Curran v. Laird*, 420 F.2d 122, 128-29 (D.C. Cir. 1969), the court declined to interfere with decisions as to which ships would be used for American military cargo during the Vietnam war, finding that the executive was statutorily authorized to exercise this judgment and that "decisions relating to the conduct of national defense" lay outside the ordinary areas of judicial reviewability.  None of those considerations are applicable to this case.  In *Bd. of Trade of City of Chicago v. Commodity Futures Trading Comm'n*, 605 F.2d 1016, 1025 (7th Cir. 1979), the court determined that the language, structure, and legislative history of a statute indicated that Congress intended to give an agency discretion to determine whether an emergency existed requiring action to protect market participants.  Here, there is nothing in the CARES Act giving the Secretary discretion to determine the meaning of "Tribal governments."  And the fact that the CARES Act gives the Secretary a "recoupment" mechanism to recover funds that are misused by government recipients reflects no intention by Congress to preclude judicial review of the Secretary's *own* compliance with the Act.

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 4

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

concedes that they are not.  Instead the Secretary asks the Court to eliminate this eligibility requirement, as applied to ANCs, from the definition entirely.  That would take this Court far beyond the judicial role, as the Secretary's reading fails under any plausible construction of the text.

Under accepted principles of interpretation, there are only two possible ways to the read the definition.  According to the last antecedent rule, "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003).  Under this construction, the eligibility requirement would *only* apply to "any Alaska Native village or regional or village corporation."  The other option, the series-qualifier canon, provides that "'[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series,' a modifier at the end of the list 'normally applies to the entire series.'" *Lockhart v. United States*, 136 S. Ct. 958, 970 (2016) (Kagan, J., dissenting) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012)); *United States v. Laraneta*, 700 F.3d 983, 989 (7th Cir. 2012) ("[T]he 'series-qualifier' canon . . . provides that a modifier at the beginning or end of a series of terms modifies all the terms." (citing *Porto Rico Ry., Light & Power Co. v. Mor*, 253 U.S. 345, 348 (1920))).  The result is the same here using either canon—the eligibility clause applies to ANCs.

Moreover, under the presumption of the nonexclusive "include" canon, the term "including" introduces examples, not an all-inclusive list.  *See Fed. Land Bank v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) ("[T]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle."); *see also* Scalia & Garner at 132 (2012) ("The verb to include introduces examples, not an exclusive

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 5

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

list.").  Thus, "any Alaska Native village or regional or village corporation" is a subset of the set "any Indian tribe, band, nation, or other organized group or community."  And if the eligibility clause applies to the set, as the Secretary contends, then as a matter of plain language it must apply to the subset.  Again, there is simply no way to read the statute as exempting ANCs from the clause.  And because the Secretary of the Interior has not included ANCs on the authoritative List of Recognized Tribes to satisfy the eligibility clause, ANCs fall outside the statutory definition.  That should be the end of the matter.

### 2. The Secretary's Erroneous Construction of "Indian Tribe" Should Not Be Upheld.

While the Secretary purports to argue a plain language reading of the statute, he does no such thing.  To the contrary, the Secretary's argument boils down to the proposition that no matter how clear the language of a statute, if an agency has interpreted it contrary to that plain meaning, and if a court has blessed that interpretation (even where only as a matter of deference), the plain meaning evaporates.  This argument fails for three reasons.

First and foremost, the Court's function is to enforce the law as written.  If Congress has spoken plainly, it does not matter how long an agency has been erroneously interpreting a statute.  "[T]he courts are the final authorities on issues of statutory construction, and are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute."  *S.E.C. v. Sloan*, 436 U.S. 103, 118 (1978) (internal citations and quotation marks omitted); *Brown v. Gardner*, 513 U.S. 115, 122 (1994) ("A regulation's age is no antidote to clear inconsistency with a statute, and the fact, again, that § 3.358(c)(3) flies against the plain language of the statutory text exempts courts from any obligation to defer to it.").  For example,

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 6

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

in *Rapanos v. United States*, 547 U.S. 715 (2006), the Supreme Court rejected an interpretation of the Clean Water Act that the U.S. Army Corps of Engineers had used for thirty years because the plain language of the statute "establish[ed] that the Corps' interpretation of the statute is impermissible." 547 U.S. at 737. The Court rejected the argument that Congress through inaction had acquiesced in the erroneous interpretation. *Id.* at 749 (discussing the Court's "oft-expressed skepticism toward reading the tea leaves of congressional inaction"). Likewise, in *Milner v. Department of the Navy*, 562 U.S. 562 (2011), the Court rejected an argument that a construction of a FOIA exemption by the D.C. Circuit should continue because it "'ha[d] been consistently relied upon and followed for 30 years' by other lower courts. . . . It would be immaterial even if true, because we have no warrant to ignore clear statutory language on the ground that other courts have done so." *Id.* at 575-76; *see also Pub. Employees Ret. Sys. of Ohio v. Betts*, 492 U.S. 158, 169-71 (1989), *superseded by statute*, Older Workers Benefit Protection Act, Pub. L. No. 101-433, 104 Stat. 978 (1990) (courts do not afford deference to agency interpretations—"[e]ven contemporaneous and longstanding" ones—that are "at odds with the plain language of the statute itself"); *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 349 (D.C. Cir. 2019) (same).

Second, the Secretary is wrong that the legislative history of the ISDEAA supports his decision. The original bill, as introduced in 1973, defined "Indian tribe" as "any Indian tribe, band, nation, or other organized group or community, *including any Alaska Native community as defined in the Alaska Native Claims Settlement Act*, for which the Federal Government provides special programs and services because of its Indian identity." S. 1017, 93d Cong., 1st Sess. (Feb.

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 7

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

26, 1973) (emphasis added).[2]  But there was one glaring problem:  ANCSA does not define "Alaska Native community."  Indeed, the phrase appears nowhere in ANCSA.  *See* Pub. L. No. 92-203, 85 Stat. 688, Sec. 3 (Dec. 18, 1971).  While ANCSA defines "Native village," "Native group," "Native Corporation," "Regional Corporation," and "Village Corporation," it does not define "Alaska Native community."  43 U.S.C. § 1602(c), (d), (g), (j), (m).  Thus, the original bill was hopelessly ambiguous, begging the question as to what "Alaska Native community" might mean.  While Congress clarified that language to its current form ("any Alaska Native village or regional or village corporation"), from the outset of the bill the definition of "Indian tribe" included (a) Alaska entities, and (b) an eligibility requirement that applied to all of those entities, whatever they might be.  These two facts never changed during the legislative process, and the fact that ANCs were not specifically named in the original bill is beside the point.  Had Congress wanted to exempt ANCs from the eligibility requirement, it would not have placed them in the definition where it did.

Third, that the Ninth Circuit chose in 1987 to "defer" to the BIA's view of this legislative history, *Cook Inlet Native Ass'n v. Bowen*, 810 F.2d 1471, 1474-75 (9th Cir. 1987)—at a time when Congress had not yet mandated that the Secretary of the Interior publish "a list of *all*

---

[2]  The second iteration of this definition incorporated the phrase "recognized as eligible."  *See* S. 1017, Report No. 93-682, 93d Cong., 2d Sess. (Feb. 7, 1974) (defining "Indian tribe" as "any Indian tribe, band, nation, or other organized group or community, including any Alaska Native community as defined in the Alaska Native Claims Settlement Act, which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.").  Both the court in *Cook Inlet Native Ass'n v. Bowen*, 810 F.2d 1471, 1474-75 n.4-5 (9th Cir. 1987), and the Secretary erroneously cite a definition from H.R. 6372, a similar bill that was introduced in the House.  But H.R. 6372 was introduced in the House on March 29, 1973 *after* S. 1017, the bill that eventually became the ISDEAA, which was introduced in the Senate on February 26, 1973.

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 8

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

*Indian tribes* which the Secretary recognizes to be eligible for the special programs and services provided by the United States to Indians because of their status as Indians," 25 U.S.C. § 5131(a) (emphasis added)—does not justify the Secretary's defiance of the statutory language today. When Congress enacted the ISDEAA in 1974, ANCSA was just three years old. Through the definition of "Indian tribe," Congress recognized that "business corporations created under the [ANCSA]" *could* be "recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." *Bowen*, 810 F.2d at 1476. Plaintiffs do not dispute that since 1994 Congress has linked that phrase of art to the List Act, and ANCs have not been so recognized.[3]

The Secretary claims that the Ninth Circuit "continued to recognize ANCs as Indian tribes under ISDEAA, citing *Bowen*, even after the List Act was passed." Doc. 21 at 10 (citing *Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d 986, 988 (9th Cir. 1999)). Not true. In *Shalala*, the dispute centered on whether IHS could enter a 638 contract with Cook Inlet Region, Inc. ("CIRI"), a regional ANC, without the authorization of the federally recognized Alaska Native villages in the area. 166 F.3d at 987-88. The Ninth Circuit dismissed the appeal as moot because "[w]hile this appeal was pending, Congress definitively answered that question" by passing an Act providing that CIRI "is hereby authorized to enter into *contracts or funding*

---

[3]  The decision of the Courts of Appeals for the District of Columbia Circuit in *American Federation of Government Employees, AFL-CIO v. United States*, 330 F.3d 513 (D.C. Cir. 2003), cited by amici ANCs, Doc. 18-1 at 18, has no bearing on this matter and the Secretary properly does not rely on it. In that case, plaintiffs challenged under the equal protection component of the Due Process Clause a defense contract awarded to a joint venture of two subsidiaries wholly-owned by ANCs under a preference program for firms "under 51 percent Native American ownership." *Id.* at 516-17. The Court's characterization of the two parent corporations as "federally recognized Indian tribes" was plainly erroneous. *See id.* at 516.

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 9

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

*agreements* under [the ISDEA] for all services provided at or through the Alaska Native Primary Care Center or other satellite clinics in Anchorage or the Matanuska–Susitna Valley *without submission of any further authorizing resolutions from any other Alaska Native Region, village corporation, Indian Reorganization Act council, or tribe, no matter where located." Id.* at 989 (quoting Pub. L. No. 105–83, 111 Stat. 1543, 1598 (1997)) (court's emphasis). That is, Congress determined that specific statutory authorization was necessary to treat the ANC as an Indian tribe with a recognized governing body for purposes of the ISDEAA, as opposed to a "tribal organization" requiring authorization from a tribe's governing body. *See* Doc. 3 at 21-22 (Plaintiffs' Motion). If Congress had understood CIRI to *already* be an Indian tribe, the legislation would have been wholly unnecessary.

Regardless of the status of the *Bowen* decision in the Ninth Circuit today, it cannot override an act of Congress. Thus, the Secretary's claim that Congress did not "disturb[]" the BIA interpretation or the Ninth Circuit's ruling because the List Act did not amend the definition of "Indian tribe" in the ISDEAA misses the mark. Doc. 21 at 10. Congressional silence on a statute, of course, does not represent ratification of a judicial interpretation. *See, e.g., United States v. Wells,* 519 U.S. 482, 495-96 (1997) (rejecting arguments that Congress had ratified holdings by some Courts of Appeals because it had amended some portions of a statute "without rejecting those decisions" and "without ever touching the original phraseology;" "we have frequently cautioned that it is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law." (internal quotation marks and citation omitted)). And there is no controlling or consistent interpretation at issue here that Congress could be understood to have left undisturbed in any event—there is a single 1987 decision from a single

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 10

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

Court of Appeals (which self-evidently does not bind this Court), which predates Congress's action to statutorily define the critical language used in the ISDEAA. Even if there were a settled interpretation, it could not overcome the ISDEAA text itself. *See Milner*, 562 U.S. at 576-77. Finally, and as elaborated upon below, IHS does *not* recognize an ANC as the recognized governing body of an Indian tribe, making plain that there is no consistent interpretation among federal agencies. *See infra* at 15-16.

3.       **The Eligibility Clause in the Definition of "Indian tribe" is a Legal Phrase of Art Defined by Reference to the Secretary's List of Recognized Tribes.**

Decisions by the federal courts subsequent to the List Act confirm that when Congress uses the definition of "Indian tribe" that it employed in the ISDEAA, Congress intended the Secretary of the Interior's List of Recognized Tribes to define the universe of eligible tribes. As explained in Plaintiffs' opening brief, the Federally Recognized Indian Tribe List Act of 1994 ("List Act"), provides that "[t]he Secretary [of the Interior] shall publish in the Federal Register a list of all Indian tribes which the Secretary *recognizes to be eligible for the special programs and services provided by the United States to Indians because of their status as Indians*." 25 U.S.C. § 5131(a) (emphasis added). Since passage of the List Act, the federal courts have consistently held—and the United States has consistently argued—that the statutory definition of "Indian tribe" at issue in this case is controlled by the Secretary of the Interior's List of Recognized Tribes published pursuant to List Act. For example, in *Wyandot Nation of Kansas v. United States*, 858 F.3d 1392 (Fed. Cir. 2017), the Wyandot Nation sought an accounting under the Trust Fund Management Reform Act, which allows Indian tribes to request an accounting of federal trust funds. The definition of "Indian tribe" in the Reform Act, 25 U.S.C. § 4001(2), is

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 11

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

identical to the definition in the ISDEAA.  Because the Wyandot Nation was not on the List of

Federally Recognized Tribes, it was denied the right to seek an accounting.  In rejecting the legal

challenge that followed, the Federal Circuit explained:

> *The government contends that a tribe cannot be a recognized Indian tribe within the meaning of the Reform Act unless it is recognized as such by the Secretary of the Interior under the List Act*. The List Act requires the Secretary of the Interior to annually "publish in the Federal Register a list of all Indian tribes which the Secretary recognizes to be *eligible for the special programs and services provided by the United States to Indians because of their status as Indians*." 25 U.S.C. § 479a-1 (emphasis added). If an entity is not on the list, regulations provide a process for petitioning for federal acknowledgement. *See* 25 C.F.R. pt. 83(c). . . .
> We are persuaded that the List Act regulatory scheme exclusively governs federal recognition of Indian tribes.

*Wyandot Nation of Kansas*, 858 F.3d at 1398 (emphasis added).

This case is notable not only for its holding but also for the United States' position.  The

United States argued that the eligibility clause is a "phrase of art" controlled by the List Act:

> Plaintiff's absence from this list is dispositive of its status as a non-federally-recognized entity.  *See W. Shoshone Bus. Council v. Babbitt*, 1 F.3d 1052, 1057 (10th Cir. 1993) ("We therefore conclude that the Tribe's absence from this list is dispositive" of its status as a non-federally-recognized Indian entity).
> . . .
> Moreover, the Reform Act's application is limited to federally recognized Indian tribes. 25 U.S.C. § 4001(2). Specifically, the Reform Act applies only to Indian tribes "recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians," *id.*, *which is a phrase of art defined in the List Act*, 25 U.S.C. § 479a-1(a). Where Congress enacted the Reform Act and List Act a mere eight days apart and used identical language to define "Indian tribe" in each statute, the CFC correctly concluded that Congress intended to refer to the same group of Indian tribes in each statute. (Appx.4-5). Thus, because plaintiff is not federally-recognized under the List Act, it is not entitled to the accountings or reconciliations called for under the Reform Act.

Brief of the United States as Appellee, *Wyandot Nation of Kansas v. United States*, No. 2016-1654 (Doc. 18), 2016 WL 4442763, *24, *35 (Fed. Cir. Aug. 11, 2016) (emphasis added).

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 12

Kanji & Katzen, P.L.L.C.
811 1ˢᵗ Ave., Suite 630
Seattle, WA 98104
206-344-8100

The National Historic Preservation Act ("NHPA") shares the same definition of "Indian tribe" as the ISDEAA and the Reform Act.  *See* 54 U.S.C. § 300309 (formerly codified at 16 U.S.C. § 470w(4)).  And federal courts have consistently held that an Indian entity that is not federally recognized and does not appear on the Secretary of the Interior's List of Recognized Tribes is not an "Indian tribe" entitled to consultation under the NHPA.  *See*, *e.g.*, *Slockish v. U.S. Fed. Highway Admin.*, 682 F. Supp. 2d 1178, 1202 (D. Or. 2010) (holding that tribal plaintiffs fail to state a claim under NHPA because they "do not sufficiently allege that they are federally recognized tribes" and citing Secretary's List of Recognized Tribes); *Slockish v. U.S. Fed. Highway Admin.*, No. 3:08-CV-1169-ST, 2012 WL 3637465, at *4 n.4 (D. Or. June 19, 2012), *report and recommendation adopted*, No. 3:08-CV-01169-ST, 2012 WL 3637715 (D. Or. Aug. 22, 2012).

The instant case and the Secretary's position epitomize what the federal courts should not do:  Sanction an agency's construction of a legal phrase of art (appearing throughout the United States Code) that gives the same 23 words an entirely different meaning depending on the statute in which it is used.  In the CARES Act, by cross-referencing the ISDEAA definition of "Indian tribe"—and in the absence of any contextual evidence whatsoever—Congress cannot be understood to have ratified an isolated Ninth Circuit opinion from 1987 that runs counter to the plain language of the statute and to judicial interpretations of the very same language by other courts.  The Secretary's position that the Court should simply read out the eligibility requirement from the statute would suggest that ANCs should be treated as "Indian tribes" for purposes of the Reform Act, the NHPA and any other statutes using that definition.  But this outcome is clearly unacceptable because the text itself has a plain meaning.  The best understanding of the CARES

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 13

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

1    Act's cross-reference to the ISDEAA is that Congress did exactly what it purported to do: it

2    cross-referenced unambiguous text for the Secretary to follow.

3        **C.      ANCs Do Not Have "Recognized Governing Bodies."**

4        Under Title V of the CARES Act, Congress appropriated $8,000,000,000 "for making

5    payments to Tribal governments" and authorized the Secretary to pay those funds exclusively to

6    "Tribal governments."  Section 601(a)(2)(B), (b)(1).  Title V defines the term "Tribal

7    government" as "the recognized governing body of an Indian Tribe."  Section 601(g)(5).  Yet the

8    Secretary pays scant attention to this operative definition.  Indeed, he leads with the brazen

9    assertion that this definition and the separate definition of "Indian Tribe" "should not be read as

10   two independent requirements.  That is, a beneficiary of the Fund need not demonstrate both that

11   it is an 'Indian tribe' and also that it has a recognized governing body."  Doc. 21 at 18.  In other

12   words, the Secretary's *ipse dixit* argument again asks the Court to disregard Congress's plain

13   language.

14       But Congress set forth two separate terms and two separate definitions, and the Secretary

15   is not free to conflate them or to disregard one of them.  *See, e.g.*, *TRW Inc. v. Andrews*, 534 U.S.

16   19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the

17   whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be

18   superfluous, void, or insignificant.") (quotation marks omitted); *In re Surface Mining Regulation*

19   *Litig.*, 627 F.2d 1346, 1362 (D.C. Cir.1980) ("It is . . . a fundamental principle of statutory

20   construction that effect must be given, if possible, to every word, clause and sentence of a statute

21   . . . so that no part will be inoperative or superfluous, void or insignificant.") (quotation marks

22   omitted).

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 14

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

Plaintiffs made two key points in their opening brief.  The Secretary fails to refute either.  First, Plaintiffs explained that the "recognized governing body" of an Indian tribe has a distinct meaning under the ISDEAA, and that such governing bodies must authorize other "tribal organizations," like ANCs, to enter 638 contracts.  Doc. 3 at 21-22.  Pursuant to administrative guidelines adopted in 1981, the Indian Health Service (IHS) may treat an ANC as a "governing body" *only if* the federally recognized Alaska Native village does not have any village council at all.  *Id.* at 22-23.  But the Secretary does not contend that *any* of the 229 federally recognized Indian tribes in Alaska lack a recognized governing body.  Perhaps because the Alaska Guidelines are still in force, and perhaps because the United States reiterated its position in 2013 that it would not treat an ANC as the recognized governing body of an Indian tribe, *id.* at 23-24, *the Secretary concedes that ANCs do not have "recognized governing bodies" for purposes of the ISDEAA*, 25 U.S.C. § 5304(l).  Doc. 21 at 15 ("Defendant does not deny that that the ANC in *Ukpeagvik* . . . would have needed an authorizing resolution from a tribal village."); *id.* at 20 ("That choice sensibly leaves room for Defendant to make payments . . . to 'governing bodies' that might not have met the definition of that term in ISDEAA . . . .").  The Secretary likewise concedes that ANCs "are not federally recognized" in any other sense.  *Id.* at 6.[4]

These concessions are fatal to the Secretary's position.  While the Secretary would simply wave off the fact that Congress chose a phrase ("the recognized governing body of an Indian tribe") in the CARES Act that is all but verbatim of the phrase ("the recognized governing body of any Indian tribe") in the ISDEAA, that position is untenable.  Congress could not have

---

[4] Not even the ANCs argue that they have *recognized* governing bodies.  While their boards of directors preside over corporate affairs, they do not claim to be "recognized."  Doc. 18-1 at 4-5.

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 15

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

intended for this same language to carry such a dramatically different meaning across the two statutes. *See United States v. Davis*, 139 S. Ct. 2319, 2331 (2019) ("Usually when statutory language is obviously transplanted from other legislation, we have reason to think it brings the old soil with it.") (quotation marks and ellipses omitted). And a tribal governing body must be recognized by the Federal government as authorized to enter into 638 contracts on behalf of the Tribe. *See San Pasqual Band of Mission Indians v. Salazar*, Civil Action No. 09-1716 (RMC), 2010 WL 11594793, at *1 (D.D.C. 2010) (upholding the BIA's decision to hold in abeyance a proposed ISDEAA contract submitted by the tribe's putative governing body, "based on its determination that the resolution supporting the contract proposal was not from a recognized governing body of the Band").[5]

Plaintiffs' second key point was this: The concept of recognition has a very specific meaning in the field of Indian affairs and diverse case law makes plain that ANCs do not have recognized governing bodies. Doc. 3 at 18-19, 25-26. While the Secretary quibbles with (and

---

[5] While the Secretary cites *Central Council of Tlingit and Haida Indian Tribes v. Chief, Branch of Judicial Services, Bureau of Indian Affairs*, 26 IBIA 159, 163 (1994), the case does not support his position. The Department of the Interior's own Federal Register Notice announcing the program at issue defined eligible applicants as "[t]he governing body of a federally-recognized tribe, 25 U.S.C. 450b(e) [the ISDEAA definition] . . . ." *Notice of Availability of FY 1994 Special Tribal Court Funds*, 58 Fed. Reg. 53,374, 53,375 (Oct. 14, 1993). As the ALJ discussed, the BIA had included the Central Council of Tlingit and Haida Indian Tribes on every list of federally recognized tribes prior to the 1993 list. But the BIA removed Central Council from the 1993 list without warning. BIA's unilateral action was one of the motivating factors for Congress to enact the List Act. *See, e.g.*, H.R. Rep. No. 103-781, at 3 (1994) ("[I]n October, the Bureau unilaterally removed the Central Council of the Tlingit and Haida tribes from its list of recognized tribes. The BIA undertook this action precipitously, and with no more than a cursory post facto notification to the Council. . . . Congress was again required to intervene on behalf of the recognized group to restore federal recognition."). Indeed, when the List Act was enacted three months after the ALJ's decision, it included a provision compelling the BIA to relist the

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 16

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

misreads) these cases, Doc. 21 at 16, he offers no support for his atextual argument that *it simply does not matter* whether ANCs have recognized governing bodies for purposes of "Tribal government" status under the CARES Act.  The best the Secretary can muster is a suggestion that ANCs' corporate boards of directors might be recognized by someone in some sense.  But the Secretary offers no support for the contention that the phrase "recognized" in Section 601(g)(5) means anything other than recognized by the United States.

The point is not whether a particular body is called a board of directors—Plaintiff Tulalip Tribes' recognized governing body is the Tulalip Board of Directors.  Doc. 3-6 at 2, 5 ¶¶ 3, 19. The point is whether that body has been recognized as representing the authority of a federally recognized Indian tribe—i.e., whether it is a "recognized governing body of an Indian Tribe." Thus, *Village of Hotvela Traditional Elders v. Indian Health Services*, 1 F. Supp. 2d 1022 (D. Ariz. 1997), *aff'd*, 141 F.3d 1182 (9th Cir. 1998), provides the Secretary no comfort.  The court in *Village of Hotvela* recognized that the Village Board of Directors was a governing body under Hopi law, capable of exercising certain governmental powers such as sovereign immunity, because "[t]he Hopi Constitution bestows a limited self-governing status to local villages, including Hotevilla," and "the villages possess the power to enact a Village Constitution, so long as it remains consistent with the Hopi Constitution."  *Id.* at 1029.  Accordingly, the Court held that "as a recognized governing body within the Hopi Nation, the Hotevilla Board of Directors

Central Council.  Federally Recognized Indian Tribe List Act of 1994, Pub. L. No. 103-454, 108 Stat. 4791-92, at Title II (the "Tlingit and Haida Status Clarification Act").

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 17

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

enjoys sovereign immunity from suit, using a similar legal analysis as applied to the Hopi Tribal Council."  *Id.*[6]

The "recognized governing body" of an Indian tribe has a specific meaning in federal Indian law; ANCs and other private, state-chartered corporations do not meet that standard.  In *Big Sandy Rancheria Enterprises v. Becerra*, 395 F. Supp. 3d 1314 (E.D. Cal. 2019), the district court held that even a wholly owned tribal corporation incorporated under Section 17 of the Indian Reorganization Act was not a "tribe or band with a governing body duly recognized by the Secretary of the Interior."[7]  *Id.* at 1325 (quotation marks omitted).  And in *Kennedy v. U.S. Department of the Interior*, 282 F.R.D. 588 (E.D. Cal. 2012), the district court held that the tribe and tribal council were required parties under Federal Rule of Civil Procedure 19(a) where the plaintiff sought relief that would "divest the 2011 Elected Council of its status as the Tribe's recognized governing body," *id.* at 594, "and an order mandating that the 2011 Elected Council be divested of recognition and that the Tribe itself be divested of a recognized governing body," *id.* at 596.  A federal energy conservation program for buildings owned by units of local government defines "unit of local government" to include "the recognized governing body of an Indian tribe" and cross-references the definition of "Indian tribe" in 42 U.S.C. § 3002(27), which is the same as the ISDEAA definition.  42 U.S.C. § 6372.  These are just a few examples.

---

[6] The Secretary's reliance on 25 U.S.C. § 1603(29) is misplaced for a different reason.  Doc. 21 at 20.  An Urban Indian Organization may have a board of directors that controls its organizational activities.  However, like an ANC, an Urban Indian Organization is not a tribal government and its board of directors is not a "recognized governing body" for purposes of the CARES Act or the ISDEAA.

[7] The ANCs' suggestion that they might be analogized to such "Section 17" corporations, Doc. 18-1 at 4, thus does not support their claim to qualify for relief funds as "Tribal governments."

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 18

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

While the Secretary would wish away this vast body of law, the cases he cites defy his aims.  Doc. 21 at 19 n.13.  Intra-tribal leadership disputes can occur, and when they do the federal government must, of necessity, determine which putative governing body has been duly authorized under tribal law to represent the tribe in its government-to-government relations with the United States.  That is to say, the United States must determine which is the "recognized governing body" of the Tribe for purposes of participating in federal programs and services.  Such was the case in *Cayuga Nation v. Bernhardt*, 374 F. Supp. 3d 1 (D.D.C. 2019), which "deal[t] with decisions by the Bureau of Indian Affairs ('BIA') and the Assistant Secretary for Indian Affairs of the Department of the Interior ('DOI') that recognized one faction . . . as the governing body of the Cayuga Nation for the purposes of certain contractual relationships between that Nation and the United States federal government."  *Id.* at 4.  It was also the case in *California Valley Miwok Tribe v. Jewell*, 5 F. Supp. 3d 86, 88-91 (D.D.C. 2013), in which the Assistant Secretary for Indian Affairs was compelled to adjudge the legitimacy of a contested tribal election in order to determine whether the putative governing body was eligible to participate in ISDEAA contracting.  *See also*, *e.g.*, *Seminole Nation of Okla. v. Norton*, 223 F. Supp. 2d 122, 132-33 (D.D.C. 2002) (dispute regarding whether the Department of the Interior would recognize tribe's General Council as its governing body).  In sum, the United States knows exactly what constitutes the "recognized governing body" of an Indian tribe, and it has nothing to do with private, state-chartered corporations.

**D.     The Secretary's Decision Is Not Entitled to Deference.**

While the Secretary sprinkles references to deference throughout his brief, no deference to the Secretary's action is warranted.  To begin, the language of the CARES Act is plain, and

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 19

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

1   there is no basis for even limited deference under *Skidmore v. Smith & Co.*, 323 U.S. 134, 140

2   (1944).  *S.E.C. v. Sloan*, 436 U.S. 103, 118 (1978); *cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2414

3   (2019) ("[T]he possibility of deference can arise only if a regulation is genuinely ambiguous.

4   And when we use that term, we mean it—genuinely ambiguous, even after a court has resorted to

5   all the standard tools of interpretation.").  In any event, "the weight a court affords to an agency

6   interpretation 'will depend upon the thoroughness evident in its consideration, the validity of its

7   reasoning, its consistency with earlier and later pronouncements, and all those factors which give

8   it power to persuade, if lacking power to control.'"  *Orton Motor, Inc. v. U.S. Dep't of Health &*

9   *Human Servs.*, 884 F.3d 1205, 1211 (D.C. Cir. 2018) (quoting *Skidmore*, 323 U.S. at 140); *see*

10  *also United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) ("The fair measure of deference to

11  an agency administering its own statute has been understood to vary with circumstances, and

12  courts have looked to the degree of the agency's care, its consistency, formality, and relative

13  expertness, and to the persuasiveness of the agency's position.") (footnotes omitted) (citing

14  *Skidmore*, 323 U.S. at 139-40).

15          Here, the Secretary's determination lacks any of the imprimaturs of persuasiveness.

16  There is no thoroughness evident in the Secretary's consideration, which amounts to a single

17  sentence issued on April 23, 2020, stating that "[a]fter consultation with the Department of the

18  Interior, Treasury has concluded that Alaska Native regional and village corporations as defined

19  in or established pursuant to the Alaska Native Claims Settlement Act are eligible to receive

20  payments from the Fund in the amounts to be determined by the Secretary of the Treasury."[8]

21  Doc. 21 at 7 (quotation marks and footnote omitted).  The Secretary has no relative expertise, as

22

23  ──────────────

24  [8] There was no indication that the Secretary was even considering treating ANCs as Tribal
    governments for purposes of Title V until April 10, 2020.  *See* Declaration of Lisa Koop Gunn.

25

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR                    Kanji & Katzen, P.L.L.C.
TEMPORARY RESTRAINING ORDER AND                              811 1st Ave., Suite 630
PRELIMINARY INJUNCTION                                       Seattle, WA 98104
– Page 20                                                    206-344-8100

1   there is no evidence that he has ever interpreted the relevant statutory language in the ISDEAA.

2   And as the above discussion demonstrates, there is neither consistency of interpretation across

3   federal agencies, nor is the Secretary's position persuasive.

4   ## II.   **Irreparable Harm**

5       There can be no doubt that Plaintiffs have demonstrated irreparable harm.  If the

6   Secretary is permitted to disburse Title V funds to ANCs, and thereby diminish the share of those

7   funds available to federally recognized tribal governments, those funds would be lost to

8   Plaintiffs.  *See City of Houston, Tex. v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1428 (D.C.

9   Cir. 1994) ("When the relevant appropriation has lapsed or been fully obligated, as in this case,

10  the federal courts are without authority to provide monetary relief.").  There would be no legal

11  basis for Plaintiffs to recover the improperly expended funds from the United States by other

12  means.  *See Cty. of Suffolk, N.Y. v. Sebelius*, 605 F.3d 135, 141 (2d Cir. 2010) ("To seek funds

13  from another source is to seek compensation rather than the specific property the plaintiff aims to

14  recover.  A claim seeking the former type of relief falls outside the scope of the waiver of

15  sovereign immunity arising from § 702 of the APA.").  Absent an injunction Plaintiffs have no

16  remedy, and the loss of funding is therefore "irreparable per se."  *Feinerman v. Bernardi*, 558 F.

17  Supp. 2d 36, 51 (D.D.C. 2008); *see also Ambach v. Bell*, 686 F.2d 974, 986 (D.C. Cir. 1982).

18  While the Secretary professes to disagree with this authority, Doc. 21 at 19 n.14, he has cited

19  nothing to dispute it.

20      The Secretary contends that the harms facing Plaintiffs are "economic in nature."  Doc.

21  21 at 20.  While it is true that the relief being sought is monetary, Plaintiffs require these funds to

22  provide their citizens and communities with life-saving medical supplies, equipment, facilities,

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 21

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

and food and shelter, and to pay emergency workers as well as furloughed employees, Doc. 3 at 32-34—all in the face of a global pandemic that is without precedent in living memory.  Such circumstances bear scant resemblance to cases considering the impacts of "monetary loss" on "the movant's business."  *Dallas Safari Club v. Bernhardt*, No. 19-CV-03696 (APM), 2020 WL 1809181, at *5 (D.D.C. Apr. 9, 2020) (Mehta, J.).

Even if the "economic harm" rubric were the appropriate one to evaluate Plaintiffs' critical needs, the Secretary's arguments again ignore the critical fact that Plaintiffs have no remedy outside of injunctive relief.  *See Wisconsin Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("*Recoverable* monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." (emphasis added)).  However, "economic loss can constitute irreparable injury . . . where the claimed economic loss is unrecoverable[.]"  *Dallas Safari Club*, 2020 WL 1809181, at *5.  To be sure, irrecoverable economic loss does not automatically result in injunctive relief.  The harm must also be "serious in terms of its effect on the plaintiff."  *Id.* (quotation marks omitted).  And the Secretary does not dispute that the harms Plaintiffs face are serious indeed.  Doc. 21 at 20 ("Defendant does not deny that Plaintiffs face a dire situation.").

In arguing that Plaintiffs have not demonstrated sufficient harms, the Secretary attempts to hold them to an impossible standard.  He contends Plaintiffs must demonstrate that "the delta between the payment amounts they stand to receive under Defendants' determination, and the amounts they would receive if ANCs were excluded, would make the difference between irreparable harm or not."  Doc. 21 at 20.  Plaintiffs could not possibly meet the Secretary's proposed burden because only the Secretary knows what the distribution formula will be and

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 22

Kanji & Katzen, P.L.L.C.
811 1ˢᵗ Ave., Suite 630
Seattle, WA 98104
206-344-8100

therefore what percentage of the Title V funding will be diverted to ineligible ANCs.  Because Plaintiffs cannot know how much of their share of the funds in question will be lost under the Secretary's distribution formula, it would not be possible for them to predict how that funding would have been used to address the current crisis.

Nevertheless, Plaintiffs have amply demonstrated that the Secretary's choice to divert Title V funding to ANCs will inflict irreparable harm in terms of limiting their capacity to provide vital services to their communities in the midst of this unprecedented crisis.  For Plaintiff Tribes struggling to provide vital services, resources, and wages to communities devastated by the pandemic, every dollar counts.  *See* Doc. 3 at 33 ("Without CARES Act monies to stop the hemorrhage, the Tribe anticipates that it will need to severely diminish or entirely shut down essential government services to tribal members" (Pickernell Decl. ¶ 30) (Chehalis)); ("[w]ithout income from any source we will be unable to provide any more services . . . ." (Williams Decl. ¶ 4 (Akiak)).

It is true that Plaintiffs cannot predict with any certainty how many tribal citizens would be deprived of their salaries, food, housing, or life-saving medical care as a result of the Secretary's decision to divert a currently undisclosed portion of the Title V funding to non-tribal corporate entities.  It is clear, however, that a great deal of funding is at stake, and that in the face of this unprecedented crisis, all monies that Plaintiffs receive will go toward preventing further irreparable harm from being visited upon their citizens.  The Secretary's arguments acknowledge this as well.  In addition to faulting Plaintiffs for allegedly failing to demonstrate how the (again, unknowable) reduction in Title V funding they will receive under his preferred allocation would deprive them of sufficient resources to respond to the ongoing crisis, the Secretary also contends

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 23

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

that Plaintiffs are not entitled to relief because *no amount of* Title V funding would be able to eliminate the severe harms they are facing.  Doc. 21 at 21 ("ACSPI will not get the funding it needs *regardless* of how this case is resolved.").  If, as the Secretary acknowledges, Plaintiffs' needs exceed the funding available to address them, then there can be no dispute that every dollar diverted to ANCs is a dollar needed by Plaintiffs to reduce and mitigate the severe harms currently playing out across their communities.

### III.    The Balance of Equities and Public Interest

While Plaintiffs disagree fervently with the Secretary on the outcome of the analysis, we do agree that the final two factors—balance of equities and public interest—merge where the Government is the opposing party, and that Congress's intent is one in the same with the public's interest.  Doc. 3 at 35-36; Doc. 21 at 22.  Both sides' arguments are grounded in their legal analysis of the meaning of "Tribal governments," but the on-the-ground reality of who is doing what helps illuminate the public interest at issue.

In the face of overwhelming challenges, Plaintiffs—and other federally recognized Indian tribes—have stepped up to protect their members, employees, and communities from the unprecedented health, safety, and economic threats from the COVID-19 pandemic.  *See* Docs. 3-1 to 3-6; *see also* Doc. 20.  They have *already*—less than two months into the crisis—diverted the vast majority, and in some cases all, of their resources to the effort.  *E.g.*, Doc. 3-1 ¶ 4 (Akiak), Doc. 3-6 ¶¶ 53-55 (Tulalip).  When Congress enacted CARES Act Title V and reserved $8,000,000,000 in coronavirus relief funds for Tribal governments, it was because Congress knew that these *governments*—like State and local governments—were providing this critical

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 24

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

relief, and that they needed funds to continue to provide direct and immediate relief to their

citizens through the turmoil of the COVID-19 pandemic.

The ANC response is not comparable.  *See generally* Doc. 13-1, 13-2, 18-1.  While the

Secretary focuses on the supposed unfairness of ANCs not getting Title V funds intended for

coronavirus-related expenses, Doc. 21 at 23, Sec. 601(d), the Court should focus on what the

ANCs say on that topic.  *See generally* Doc. 18-1 (Alaska Native Village Corporation

Association (ANVCA) and ANCSA Regional Association (ARA)); Doc. 13-1 (Ahtna,

Incorporated) (collectively, "Amici ANCs").  The briefs of Amici ANCs are striking for several

reasons.  First, Amici ANCs submit *no* evidence that they are providing *any* government services

in response to the COVID-19 pandemic, let alone that they are suffering financial consequences

from, or need relief funds to continue, those non-existent efforts.  The single declaration from the

ANCs does not even mention the coronavirus or COVID-19.  *See* Doc. 13-2.  One would think

that now would be the time for ANCs to tout their COVID-19 relief efforts if they had made any.

Second, while the ANCs cite Congress's finding in ANCSA that "[n]otwithstanding any

other provision of law, Alaska Natives shall remain eligible for all Federal Indian programs on

the same basis as other Native Americans," 43 U.S.C. § 1626(d), *e.g.*, Doc. 18-1 at 4, 15, they

ignore the fact that there are 229 federally recognized Indian tribes in Alaska.  The ANCs'

briefing would erase these 229 sovereigns, including three of the Plaintiffs, from the landscape

entirely.  Yet it is these Tribal governments in Alaska who have expressed their dire need for

Title V relief funds to protect their citizens and sustain their communities in the face of the

pandemic.  *See* Doc. 3-1 (Akiak); Doc. 3-2 (ACSPI); Doc. 3-3 (ATC); *see also* Doc. 20-6

(discussing survey responses of Alaska Tribes regarding the needs and challenges they face due

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 25

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

to COVID-19).  As Plaintiffs explained in their opening brief, federally recognized Tribal governments in Alaska may *choose* to work with ANCs to deliver services using Title V relief funds, but there is no legal basis for the Secretary to pay those funds directly to ANCs.  Doc. 3 at 35 n.27.

Third, the ANCs do not dispute that they are not federally recognized Indians tribes, that they do not appear on the Secretary of the Interior's List of Recognized Tribes, that they do not have recognized governing bodies, and that they are not even governments at all.  Instead, they are private, for-profit corporations chartered under the laws of the State of Alaska.

In short, ANCs will not be harmed if the Secretary does not treat them as Tribal governments under the CARES Act because they are not Tribal governments.  ANCs will, however, receive a windfall if the Secretary treats them as though they are.  Meanwhile, notwithstanding the Secretary's rejoinder that Plaintiffs—and all federally recognized Indian tribes—"stand only to see a reduction in their payment amounts," Doc. 21 at 23, the undisputred fact is that the tribes would put those payments amounts to precisely the uses that Congress intended.  The COVID-19 pandemic is the worst in a century.  It has disrupted all of America, including all of Indian Country.  Tribal governments need every last cent of the funds Congress set aside for them for relief efforts—and it will still not be enough.  They should not be made to suffer further as a result of the Secretary's unlawful decision.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for a temporary restraining order and preliminary injunction.

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 26

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

Dated this 24th day of April, 2020.

KANJI & KATZEN, P.L.L.C.

/s/ Riyaz A. Kanji
Riyaz A. Kanji, D.C. Bar # 455165
303 Detroit Street, Suite 400
Ann Arbor, MI 48104
Telephone:  734-769-5400
Email:  rkanji@kanjikatzen.com

/s/ Cory J. Albright
Cory J. Albright, D.C. Bar Application Pending
WSBA # 31493
811 1st Avenue, Suite 630
Seattle, WA  98104
Telephone:  206-344-8100
Email:  calbright@kanjikatzen.com

*Co-Counsel for the Confederated Tribes of the*
*Chehalis Reservation and the Tulalip Tribes*

*Counsel for the Houlton Band of Maliseet Indians,*
*Akiak Native Community, Asa'carsarmiut Tribe*
*and Aleut Community of St. Paul Island*

CONFEDERATED TRIBES OF THE CHEHALIS
RESERVATION

/s/ Harold Chesnin
Harold Chesnin, WSBA # 398
Lead Counsel for the Tribe
420 Howanut Road
Oakville, WA  98568
Telephone:  360-529-7465
Email:  hchesnin@chehalistribe.org

TULALIP TRIBES

/s/ Lisa Koop Gunn
Lisa Koop Gunn, WSBA # 37115

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 27

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

Tulalip Tribes, Office of the Reservation Attorney
6406 Marine Drive
Tulalip, WA 98271
Telephone: 360-716-4550
Email: lkoop@tulaliptribes-nsn.gov


THE NAVAJO NATION

/s/ Paul Spruhan
Doreen McPaul, AZ Bar No. 021136
Attorney General
Paul Spruhan, D.C. Bar No. AZ0017
Assistant Attorney General
P.O. Box 2010
Window Rock, AZ 86515
Telephone: (928) 871-6345
Email: dmcpaul@nndoj.org
Email: pspruhan@nndoj.org


ROTHSTEIN DONATELLI LLP

/s/ Eric Dahlstrom
Eric Dahlstrom, AZ Bar No. 004680
April E. Olson, AZ Bar No. 025281
1501 West Fountainhead, Suite 360
Tempe, AZ 85282
Telephone: (480) 921-9296
Email: edahlstrom@rothsteinlaw.com
Email: aeolson@rothsteinlaw.com


Richard W. Hughes, NM Bar No. 1230
Donna M. Connolly, NM Bar No. 9202
Reed C. Bienvenu, NM Bar No. 147363
1215 Paseo de Peralta
Santa Fe, NM 87505
Telephone: (505) 988-8004
Email: rwhughes@rothsteinlaw.com
Email: dconnolly@rothsteinlaw.com
Email: rbienvenu@rothsteinlaw.com


*Counsel for Pueblo of Picuris*

*Co-Counsel for the Navajo Nation*

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 28

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100

1

2          QUINAULT INDIAN NATION

3          /s/ Derril B. Jordan
           Derril B. Jordan, D.C. Bar #470591
4          Quinault Office of the Attorney General
           136 Cuitan Street
5          Taholah, WA  98587
           Telephone:  360.276.8215, Ext. 1406
6          Email:  derril.jordan@quinault.org

7

8          ELK VALLEY RANCHERIA, CALIFORNIA

9          /s/ Bradley G. Bledsoe Downes
           Bradley G. Bledsoe Downes, CA Bar No. 176291
10         General Counsel
           2332 Howland Hill Road
11         Crescent City, CA 95531
           Telephone: 707.465.2610
12         Email: bdownes@elk-valley.com

13

14         SAN CARLOS APACHE TRIBE

15         /s/ Alexander B. Ritchie
           Alexander B. Ritchie, AZ Bar # 019579
16         Attorney General
           San Carlos Apache Tribe
17         Post Office Box 40
           16 San Carlos Avenue
18         San Carlos, AZ 85550
           Telephone:  (928) 475-3344
19         Email:  alex.ritchie@scat-nsn.gov

20

21

22

23

24

25

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
– Page 29

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 630
Seattle, WA 98104
206-344-8100