## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**CONFEDERATED TRIBES OF THE**          )
**CHEHALIS RESERVATION, et al.,**       )
                                        )
    **Plaintiffs,**              )
                                        )
       **v.**                )      **Case No. 20-cv-01002 (APM)**
                                        )
**STEVEN MNUCHIN, in his official capacity** )
**as Secretary of the Treasury,**       )
                                        )
    **Defendant.**               )
_____ )

**CHEYENNE RIVER SIOUX TRIBE, et al.,**  )
                                        )
    **Plaintiffs,**              )
                                        )
       **v.**                )      **Case No. 20-cv-01059 (APM)**
                                        )
**STEVEN MNUCHIN, in his official capacity** )
**as Secretary of the Treasury,**       )
                                        )
    **Defendant.**               )
_____ )

**UTE TRIBE OF THE UINTAH AND**          )
**OURAY RESERVATION,**                   )
                                        )
    **Plaintiff,**               )
                                        )
       **v.**                )      **Case No. 20-cv-01070 (APM)**
                                        )
**STEVEN MNUCHIN, in his official capacity** )
**as Secretary of the Treasury,**       )
                                        )
    **Defendant.**               )
_____ )

## <u>MEMORANDUM OPINION</u>

Under Title V of the Coronavirus Aid, Relief, and Economic Security Act, or CARES Act,

Congress set aside $8 billion in emergency aid for "Tribal governments" to combat the coronavirus

pandemic.  This case concerns what it means to be a "Tribal government" for the purpose of receiving Title V funds.

Plaintiffs are a group of federally recognized tribes from the lower 48 states and Alaska. They unquestionably qualify to receive some portion of the emergency relief set aside under Title V of the CARES Act.  What Plaintiffs fear, however, is that the Secretary of the Treasury, who Congress authorized to disburse the monies, is about to give away a significant percentage of the $8 billion to what are known as Alaska Native regional and village corporations, or ANCs. ANCs are for-profit corporations recognized under Alaska law that were established by Congress as part of the Alaska Native Claims Settlement Act.  The Secretary of Treasury has announced that ANCs are eligible to receive Title V funds, although he has yet to identify which ANCs will receive funds or how much.  The Secretary intends to disburse the funds tomorrow—April 28, 2020.

Plaintiffs ask this court to enjoin the Secretary from making Title V payments to ANCs. Their position is straightforward.  Title V grants $8 billion in relief funds for "Tribal governments," which the CARES Act defines as "the recognized governing body of an Indian Tribe." In Plaintiffs' view, ANCs do not meet the statutory definition of either "Indian Tribe" or "Tribal government."  ANCs therefore are not eligible for Title V funds.  Whether Plaintiffs' or the Secretary's reading of Title V is the correct one is at the heart of the parties' dispute.

Before the court are Plaintiffs' motions for a temporary restraining order and preliminary injunction.  Because the court finds that Plaintiffs have made a clear showing that they are likely to suffer irreparable harm in the absence of preliminary relief, that they are likely to succeed on the merits, and the balance of the equities and the public interest favor an injunction, the court grants Plaintiffs' motions—but only in part.  The court will preliminarily enjoin the Secretary from

disbursing Title V funds to any ANC, but will not direct him at this time to disburse the entire $8 billion in emergency relief to Plaintiffs and other federally recognized tribes.

## I.

### A.    Statutory Background

#### 1.    The CARES Act

Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020), to respond to the devastating impacts of the COVID-19 pandemic.  Its provisions direct tailored relief to specific sectors of American society, including economic aid to small businesses and employment retention programs for workers (Title I); unemployment insurance and other financial support systems for workers, businesses, and families (Title II); pandemic response and healthcare funding (Title III); support for economically struggling businesses regardless of size (Title IV); relief funding for State, Tribal, and local governments (Title V); and supplemental appropriations for federal agencies and programs (Title VI).

Title V, the title relevant here, amends the Social Security Act (42 U.S.C. 301 *et seq.*), and appropriates $150 billion for fiscal year 2020 for "payments to States, Tribal governments, and units of local government."  42 U.S.C. § 801(a)(1).  Of that sum, $8 billion is "reserve[d] . . . for making payments to Tribal governments." *Id.* § 801(a)(2)(B).  The Act requires the Secretary of the United States Department of the Treasury ("Secretary") to disburse the Title V funds to Tribal governments "not later than 30 days after" March 26, 2020, the date of enactment of this section— that is, by April 26, 2020.  *Id.* § 801(b)(1).  The Act further instructs that the funds are intended:

> to cover only those costs of the State, Tribal government, or unit of
> local government that – (1) are necessary expenditures incurred due
> to the public health emergency with respect to the Coronavirus
> Disease 2019 (COVID-19); (2) were not accounted for in the budget

> most recently approved as of the date of enactment of this section
> for the State or government; and (3) were incurred during the period
> that begins on March 1, 2020, and ends on December 30, 2020.

*Id.* § 801(d).

For purposes of Title V funding, the CARES Act defines "Tribal government" as "the recognized governing body of an Indian tribe." *Id.* § 801(g)(5). The Act further provides that "[t]he term 'Indian Tribe' has the meaning given that term in [section 5304(e) of the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 5304(e)]." *Id.* § 801(g)(1). The Indian Self-Determination and Education Assistance Act in turn defines "Indian tribe" as "any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act (85 Stat. 688) [43 U.S.C. 1601 *et seq.*], which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." 25 U.S.C. § 5304(e).

### 2.   *The Alaska Native Claims Settlement Act*

The Alaska Native Claims Settlement Act, enacted in 1971, Pub. L. No. 92–203, § 2(b), 85 Stat. 688, ("ANSCA") is "a comprehensive statute designed to settle all land claims by Alaska Natives," *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 523 (1998). Among other things, ANSCA extinguished all aboriginal claims to Alaska land, and "[i]n return, Congress authorized the transfer of $962.5 million in state and federal funds and approximately 44 million acres of Alaska land to state-chartered private business corporations that were to be formed pursuant to the statute; all of the shareholders of these corporations were required to be Alaska Natives." *Id.* at 524 (citing ANCSA, §§ 6, 8, 14 (codified at 43 U.S.C. §§ 1605, 1607, 1613)). The transfer of reservation lands to private, state-chartered Native corporations, or ANCs, was

"without any restraints on alienation or significant use restrictions," because Congress intended to avoid "'any permanent racially defined institutions, rights, privileges, or obligations.'" *Id.* at 532–33 (citing ANCSA, §§ 2b, 8, 14). "By ANCSA's very design, Native corporations can immediately convey former reservation lands to non-Natives, and such corporations are not restricted to using those lands for Indian purposes." *Id.* at 533.

Today, ANCs continue to own approximately 44 million acres of land. Resource Development Council, *Alaska Native Corporations*, https://www.akrdc.org/alaska-native-corporations (last visited Apr. 25, 2020) [hereinafter Res. Dev. Council]. The ANCs' "landholdings are equivalent to the total trust land base of all federally recognized Tribal governments in the Lower-48 states combined." First Am. Compl. for Declaratory and Inj. Relief, No. 20-cv-1059, ECF No. 14 [hereinafter Cheyenne River Am. Compl.], at 22. In fiscal year 2017, ANCs had a combined revenue of $9.1 billion, and the twelve regional ANCs have over 138,000 shareholders and employ more than 43,000 people worldwide. *See* Res. Dev. Council.

### 3.    *ISDEAA and ANCs*

Congress enacted the Indian Self-Determination and Education Assistance Act, or ISDEAA, in 1975 "to help Indian tribes assume responsibility for aid programs that benefit their members." *Menominee Indian Tribe of Wis. v. United States*, 136 S. Ct. 750, 753 (2016). Under ISDEAA, tribes may enter into "self-determination contracts," or "638" agreements, with federal agencies to provide services that otherwise would have been provided by the federal government, such as education, law enforcement, and health care. 25 U.S.C. § 5321(a)(1); *Menominee Indian Tribe*, 136 S. Ct. at 753; *Seminole Tribe of Fla. v. Azar*, 376 F. Supp. 3d 100, 103 (D.D.C. 2019).

Historically, federal agencies have treated ANCs as "Indian tribes" under ISDEAA and therefore as eligible to enter into 638 agreements. *See Cook Inlet Native Ass'n v. Bowen*, 810 F.2d

1471, 1473–77 (9th Cir. 1987) (setting forth history of agency treatment of ANCs under ISDEAA). However, the extent of actual 638 contracting with ANCs under ISDEAA is unclear.  The Secretary's counsel, for instance, was unable to identify any present or past 638 agreement with an ANC, *see* Hr'g Tr., 4/24/20, at 38—albeit, in fairness, the Secretary had only a limited time to conduct due diligence.

### B.      Factual and Procedural Background

On April 13, 2020, the Secretary published on the Treasury Department's website a form titled "Certification for Requested Tribal Data" ("Certification"), which requested certain data to effectuate disbursement of CARES Act funds.  *See* Confederated Tribes of the Chehalis Pls.' Mot. for TRO and Prelim. Injunction, ECF No. 3 [hereinafter Chehalis Mot.], Kanji Decl., Ex. 2, ECF No. 3-8 at 15–16 [hereinafter Certification].[1]  The Certification sought the following information:

(1)      "Name of Indian Tribe";

(2)      "Population," defined as "Total number of Indian Tribe Citizens/Members/Shareholders, as of January 1, 2020";

(3)      "Land Base," defined as "Total number of land acres held by the Indian Tribe and any tribally-owned entity (to include entities in which the Indian Tribe maintains at least 51% ownership) as of January 1, 2020" noting that such lands would "include lands held in trust by the United States, owned in restricted fee status, owned in fee, or selected pursuant to the Alaska Native Claims Settlement Act";

---

[1] Unless otherwise noted, all citations to the docket refer to the *Confederated Tribes of the Chehalis Reservation et al. v. Mnuchin* docket, Case No. 20-cv-1002 (APM).

(4)   "Employees," defined as "Total number of persons employed by the Indian Tribe and any tribally-owned entity (to include entities in which the Indian Tribe maintains at least 51% ownership) on January 1, 2020"; and,

(5)   "Total expenditures for the most recently completed fiscal year."

*Id*.  The Certification is notable in that it identifies metrics specific to ANCs.  ANCs, and not traditional Tribes, have "shareholders."  And the Certification asked for land base information for lands "selected pursuant to the Alaska Native Claims Settlement Act."  Federally recognized tribes understood from the terms of the Certification that the Secretary had deemed ANCs eligible for Title V funds, and immediately protested this apparent decision.  *See* Cheyenne River Sioux Tribe Pls.' Mot. for TRO and Prelim. Inj., Mem. of P. & A. in Support of Mot., ECF No. 4 [hereinafter Cheyenne River Mot.], Ducheneaux Decl., Exs. A–E, ECF No. 4-1 (letters from representatives of various tribal governments to Secretary Mnuchin, dated April 13, 2020, through April 16, 2020, asking that the Secretary not allow ANCs to be counted as Tribal governments under the CARES Act).[2]

Four days later, on April 17, 2020, the first of three suits was filed challenging the Secretary's ostensible treatment of ANCs as eligible for funding under Title V of the CARES Act.  The Confederated Tribes of the Chehalis Reservation, the Tulalip Tribes, the Houlton Band of Maliseet Indians, the Akiak Native Community, the Asa'carsarmiut Tribe, and the Aleut Community of St. Paul Island (collectively, "Chehalis Plaintiffs") filed an action against the Secretary under the Administrative Procedure Act ("APA").  Chehalis Compl., ECF No. 1.  As amended, the single-claim complaint alleges that the Secretary's designation of ANCs as eligible to receive Title V funds was arbitrary, capricious, an abuse of discretion, or otherwise not in

---

[2] Citations to the filings by the Cheyenne River Sioux Tribe Plaintiffs are found on the docket in *Cheyenne River Sioux Tribe et al. v. Mnuchin*, 20-cv-1059 (APM).

accordance with law.  Chahalis Am. Compl., ECF No. 7 [hereinafter Chahalis Am. Compl.], ¶ 119 –22.  Three days later, Plaintiffs moved for a temporary restraining order and preliminary injunctive relief.  *See* Chehalis Mot.  They ask the court both to enjoin the Secretary from disbursing any Title V funds to ANCs and to order the Secretary to disburse all $8 billion to federally recognized tribes.  Chehalis Am. Compl. ¶ 123; Chehalis Mot., Proposed Order, ECF No. 3-7.  Plaintiffs then filed an amended complaint, which added the Navajo Nation; Quinault Indian Tribe; Pueblo of Picuris; Elk Valley Rancheria, California; and San Carlos Apache Tribe as plaintiffs.  See Am. Chehalis Compl., ECF No. 7 [hereinafter Am. Compl.].  Plaintiffs again brought the same single count for violations of the APA.  *Id.* ¶¶ 117–23.

Two other lawsuits followed.  Plaintiffs Cheyenne River Sioux Tribe, Oglala Sioux Tribe, and Rosebud Sioux Tribe (collectively, "Cheyenne River Plaintiffs") filed their suit on April 22, 2020, *see* Cheyenne River Compl., ECF No. 1, and moved for preliminary injunctive relief the same day, *see* Cheyenne River Mot.[3]  Plaintiff Ute Indian Tribe of the Uintah and Ouray Reservation filed a third lawsuit and motion for a temporary restraining order the next day.  *See* Ute Compl., ECF No. 1; Mot. for TRO and Prelim. Inj., ECF No. 5.[4]  The court consolidated all three cases.  *See* Docket 20-cv-1070, Minute Order, April 24, 2020; Docket 20-cv-1059, Minute Order, April 23, 2020.

A number of amici curiae submitted briefs in support of and in opposition to Plaintiffs' motions.  The Alaska Native Village Corporation Association ("ANVCA"), a non-profit corporation that represents 177 Alaska Native village corporations, and the Alaska Native Claims

---

[3] On April 24, 2020, the Cheyenne River Plaintiffs filed an Amended Complaint, which added Nondalton Tribal Council, Arctic Village Council, and Native Village of Venetie Tribal Government as plaintiffs.  *See* Cheyenne River Am. Compl.

[4] Citations to the filings by the Ute Tribe Plaintiffs are found on the docket in *Ute Tribe of the Uintah and Ouray Reservation v. Mnuchin,* 20-cv-1070 (APM).

Settlement Act Regional Association ("ARA"), a non-profit association whose mission is to "promote and foster continued growth and economic strength of the Alaska Native regional corporations for the benefit of their Alaska Native shareholders and communities," filed a joint brief supporting the ANCs' eligibility for Title V funding.  *See* Br. of Amici Curiae, ECF No. 24 [hereinafter ANVCA Br.], at 1–2.  Ahtna, Inc., an Alaska Native Regional Corporation created pursuant to ANCSA, also filed an amicus brief supporting the Secretary.  Br. of Amicus Curiae Ahtna, Inc., ECF No. 23 [hereinafter Ahtna Br.], at 1.   Additionally, the National Congress of American Indians along with a group of national and regional organizations of federally recognized Indian tribes, and the Native American Finance Officers Association, the Gila River Indian Community, the Penobscot Nation, and the Nottawaseppi Huron Band of the Potawatomi filed their own amicus briefs supporting Plaintiffs' position.  *See generally* Br. of Amici Curiae National Congress of American Indians, et al., ECF No. 20; Amicus Curiae Br. of the Native American Finance Officers Association, the Gila River Indian Community, the Penobscot Nation, and the Nottawaseppi Huron Band of the Potawatomi, ECF No. 25.

On April 22, 2020, Defendant moved for an extension to oppose the pending motions. *See* Def.'s Mot. for Extension of Time, ECF No. 9.  In its motion, Defendant represented that the Secretary "has not yet arrived at a final decision on the question whether Alaska native corporations qualify as 'Tribal governments' under Title V of the CARES Act."  *Id.* at 1.  In a status hearing the following day, counsel for Defendant reiterated that the Secretary still had made no determination as to whether ANCs would be eligible for Title V funding.  Later that day, however, the Secretary announced a firm position.  In a posting on the agency's website, the Secretary stated that, "[a]fter consultation with the Department of the Interior, Treasury has concluded that Alaska Native regional and village corporations as defined in or established

pursuant to the Alaska Native Claims Settlement Act are eligible to receive payments from the Fund in the amounts to be determined by the Secretary of the Treasury." U.S. TREASURY DEP'T, CORONAVIRUS RELIEF FUND PAYMENTS TO TRIBAL GOVERNMENTS (April 23, 2020) (footnote omitted).[5]

The court heard argument on Plaintiffs' motions the next day, April 24, 2020. *See* Minute Entry, April 24, 2020. Plaintiffs contend that ANCs are not eligible for Title V funding under the CARES Act, because no ANC meets the statutory definition of "Tribal government"—i.e., no ANC or ANC board of directors is "the recognized governing body of an Indian tribe." 42 U.S.C. § 801(g)(5). Plaintiffs' argument is essentially two-fold: ANCs are not "Indian Tribes" under the ISDEAA definition incorporated into the CARES Act, and no ANC board of directors qualifies as a "recognized governing body." Chehalis Mot. at 16–21; Cheyenne Mot. at 20–27. Defendant, on the other hand, argues that ANCs are treated as "Tribal governments" under ISDEAA, relying primarily on a Bureau of Indian Affairs interpretation of the ISDEAA definition, upheld as reasonable by the Ninth Circuit over thirty years ago. Def.'s Cons. Opp'n to Pls.' Mot. for TRO and Prelim. Inj., ECF No. 21 [hereinafter Def.'s Opp'n] at 8–10 (citing *Cook Inlet*, 810 F.2d 1471). Defendant also contends that Plaintiffs have failed to demonstrate irreparable harm, *id.* at 19–22, and that, in any case, the Secretary's decision to disburse funds is committed to his discretion and is therefore unreviewable, *id.* at 7–8.

Following the hearing on Plaintiffs' motions, the Secretary confirmed that no Title V funds will be released to Tribal governments until April 28, 2020. *See* Notice to Court, ECF No. 32.

---

[5] https://home.treasury.gov/system/files/136/Coronavirus-Relief-Fund-Payments-to-Tribal-Governments.pdf.

## III.

Before turning to the merits of Plaintiffs' requested relief, the court addresses a threshold contention made by Defendant.  Defendant asserts that the Secretary's "ongoing decisions about how to implement an emergency relief fund . . . is not properly subject to judicial oversight." Def.'s Opp'n at 7.  The CARES Act commits to the Executive Branch the decision how to allocate emergency relief payments, *id.* (citing 42 U.S.C. § 801(c)(7) ("[T]he Secretary shall determine" the amount of the payments, which are to be made "in such manner as the Secretary determines appropriate")), and therefore, Defendant contends, such a discretionary determination is beyond the court's authority to review under the APA, *see id.*  That argument fails.

The D.C. Circuit recently explained that there are two categories of unreviewable discretionary agency actions, those that are "presumed immune from judicial review" and those that are presumptively reviewable but involve "rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply."  *Physicians for Soc. Responsibility v. Wheeler*, No. 19-5104, 2020 WL 1921539, at *4 (D.C. Cir. Apr. 21, 2020) (citing *Heckler v. Chaney*, 470 U.S. 821, 832 (1985), and *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)).  Defendant's argument falls into the former category.  In *Lincoln v. Vigil*, the Supreme Court observed that "[t]he allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion."  508 U.S. 182, 192 (1993).  Such decisions are treated as presumptively unreviewable, because "an agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise.'"  *Id.* at 193 (quoting *Heckler*, 470 U.S. at 831).  The Court added, however, that "an agency is not free simply to disregard statutory

responsibilities:  Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id.*

That is precisely what Congress did here.  True, Congress allocated a lump-sum amount for the Secretary to allocate to "Tribal governments."  42 U.S.C. § 801(a)(2)(B).  But it also circumscribed the agency's discretion by supplying a concrete definition of "Tribal government" against which to measure eligibility for Title V funds and, correspondingly, for the court to conduct judicial review.  *See id.* § 801(g)(5).  Thus, while the Secretary's decisions as to *how* much to disburse might not be reviewable,[6] his decisions concerning *to whom* to disburse those funds most certainly is.  *Cf. Milk Train, Inc. v. Veneman*, 310 F.3d 747, 752 (D.C. Cir. 2002) (holding that Congress's limitation on agency's "authority to disburse funds" provided a "statutory reference point" for judicial review).

Relatedly, Defendant argues that the Secretary's decision is insulated from review, because it is in the nature of a "time-pressed determination . . . to address a public health emergency." Def.'s Opp'n at 7.  But Defendant cites no authority to support the contention that his decision to make funds available to a particular entity—even in contravention of a statutory mandate—evades judicial review simply because Congress appropriated the funds to address an emergency.  *Curran v. Laird*, relied on by Defendant, Def.'s Opp'n at 7–8, is a different case.  It concerned "decisions relating to the conduct of national defense" that lie outside the bounds of judicial reviewability. *Curran*, 420 F.2d 122, 128–29 (D.C. Cir. 1969).  The Secretary's decision here, by contrast, concerns appropriations for domestic emergency spending that is cabined by specific statutory terms.  The mere emergency nature of the funding does not render it unreviewable.  *Cf. Milk Train*, 310 F.3d at 752 ("By providing in the 2000 Appropriations Act that the moneys are for 'economic

---

[6] This observation should not be construed as a holding.  The court offers no opinion as to whether it would be foreclosed from reviewing a decision on how much to award a particular Tribal government in Title V funds.

losses incurred during 1999,' Congress limited the Secretary's authority to disburse funds." (internal citation omitted)).

Finally, Defendant asserts that, because Title V contains a provision that authorizes the Treasury Department's Inspector General to recoup payments, Congress somehow signaled that it "did not intend judicial oversight of the manner in which the funds are distributed." Def.'s Mot. at 8 (citations omitted). There is nothing in the text of the CARES Act relating to the powers of the Inspector General, however, that would overcome the "strong presumption of reviewability under the [APA]." *Physicians for Soc. Responsibility*, 2020 WL 1921539 at *4 (quoting *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003)).

## IV.

The court turns now to the heart of Plaintiffs' motions. Injunctive relief is an "extraordinary and drastic remedy" that is "never awarded as [a matter] of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citations and internal quotation marks omitted). A court may only grant the "extraordinary remedy . . . upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). Specifically, Plaintiffs must show that they are: (1) "likely to succeed on the merits"; (2) "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20. Where, as here, the federal government is the opposing party, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

In this jurisdiction, courts evaluate the four preliminary injunction factors on a "sliding scale"—if a "movant makes an unusually strong showing on one of the factors, then it does not

necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp,* 571 F.3d 1288, 1291–92 (D.C. Cir. 2009). *Winter v. Natural Resources Defense Council,* however, called that approach into question and raised doubts over whether the "sliding scale" framework continues to apply, or whether a movant must make a positive showing on all four factors without discounting the importance of one factor simply because one or more other factors have been convincingly established. *See Davis,* 571 F.3d at 1296 (Kavanaugh, J., concurring) ("[T]he old sliding-scale approach to preliminary injunctions—under which a very strong likelihood of success could make up for a failure to show a likelihood of irreparable harm, or vice versa—is 'no longer controlling, or even viable.'") (quoting *Am. Trucking Ass'ns v. City of Los Angeles,* 559 F.3d 1046, 1052 (9th Cir. 2009)); *but see Archdiocese of Washington v. Washington Metro. Area Transit Auth.,* 897 F.3d 314, 334 (D.C. Cir. 2018) (explaining that the D.C. Circuit "has not yet decided whether *Winter* . . . is properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned").

In the absence of a D.C. Circuit decision overruling it, the sliding scale framework remains binding precedent that this court must follow. "[D]istrict judges, like panels of [the D.C. Circuit], are obligated to follow controlling circuit precedent until either [the D.C. Circuit], sitting en banc, or the Supreme Court, overrule it." *United States v. Torres,* 115 F.3d 1033, 1036 (D.C. Cir. 1997). Accordingly, at a minimum, a plaintiff seeking preliminary injunctive relief "must make a 'clear showing that four factors, taken together, warrant relief.'" *League of Women Voters of U.S. v. Newby,* 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC,* 831 F.3d 500, 505 (D.C. Cir. 2016)). While the sliding scale does not absolve Plaintiffs of their burden to make an independent showing on each of the four factors, it "allow[s] that a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius,* 644 F.3d 388, 392 (D.C. Cir.

2011).  "It is in this sense that all four factors 'must be balanced against each other.'"  *Davis*, 571

F.3d at 1292 (quoting *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 361 (D.C. Cir. 1999)).

The weighing of the four factors is within the district court's discretion.  *See id.* at 1291.

## V.

### A.     Irreparable Harm

The court begins with irreparable harm.  A plaintiff seeking injunctive relief must

"demonstrate that irreparable injury is *likely* in the absence of an injunction."  *Winter*, 555 U.S. at

22.  To make such a showing, a plaintiff must demonstrate an injury that is "both certain and great,

actual and not theoretical, beyond remediation, and of such imminence that there is a clear and

present need for equitable relief to prevent irreparable harm."  *Mexichem Specialty Resins, Inc. v.

EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (emphasis and internal quotation marks omitted).

Plaintiffs easily satisfy their burden to show that they will suffer irreparable injury in the

absence of immediate injunctive relief.  The $8 billion dollars allocated by Congress for "Tribal

governments" is a fixed sum that Plaintiffs and other Tribal governments are entitled to receive to

cover costs of combatting the COVID-19 pandemic in their communities.  *See* 42 U.S.C. § 801(d).

Any dollars improperly paid to ANCs will reduce the funds to Plaintiffs.  And, once disbursed,

those funds will not be recoverable by judicial decree.[7]  *See City of Houston, Tex. v. Dep't of Hous.

& Urban Dev.*, 24 F.3d 1421, 1424 (D.C. Cir. 1994) ("It is a well-settled matter of constitutional

---

[7] During oral argument, Defendant suggested that funds improperly allocated to ANCs could be recovered by the
agency's Inspector General under his statutory recoupment authority.  *See* Hr'g Tr. at 45.  That seems unlikely.  Title V
empowers the agency's Inspector General to recoup funds if he "determines that a State, Tribal government, or unit
of local government has failed to comply with subsection (d)."  42 U.S.C. § 801(f)(2).  Subsection (d) limits use of
Title V dollars to "expenditures incurred [from March 1, 2020, to December 30, 2020] due to the public health
emergency" that "were not accounted for in the budget most recently approved."  *Id.* § 801(d).  The statute, therefore,
does not appear to grant authority to the Inspector General to recoup monies that, say, are improperly disbursed to
ANCs.  Moreover, the statute directs that any recouped funds "shall be deposited in the general fund of the Treasury."
*Id.* § 801(f)(2).  Thus, even if the Inspector General could recover funds, there is no guarantee that those funds would
be redistributed to qualifying Tribal governments.

law that when an appropriation has lapsed or has been fully obligated, federal courts cannot order the expenditure of funds that were covered by that appropriation."); *Ambach v. Bell*, 686 F.2d 974, 986 (D.C. Cir. 1982) (holding that "interim relief" was proper in a case in which plaintiff States challenged the agency's formula for distributing educating funding, because, "[o]nce the . . . funds are distributed to the States and obligated, they cannot be recouped").[8]   Thus, "[i]t will be impossible in the absence of a preliminary injunction to award the plaintiffs the relief they request if they should eventually prevail on the merits."   *Ambach*, 686 F.2d at 986.

Defendant nevertheless maintains that Plaintiffs have failed to establish irreparable harm, asserting that any injury arising from reduced CARES Act funds would be "economic in nature." Def.'s Mot. at 20; *see Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 120 (D.D.C. 2012) (stating the rule in this Circuit that "economic harm alone is generally not sufficient to warrant . . . granting of a motion for a preliminary injunction").   But to characterize Plaintiffs' claimed harm as merely "economic" is terribly misguided.   These are not funds appropriated to carry out secondary or residual government functions.   These are monies that Congress appropriated on an emergency basis to assist Tribal governments in providing core public services to battle a pandemic that is ravaging the nation, including in Indian country.   As Plaintiffs' declarants establish, COVID-19 and the public health measures necessary to combat the novel coronavirus have caused their regular streams of revenue to run dry, creating a crisis in funding needed to deliver health care, procure medical equipment and supplies, and provide meals and expand food banks—just to name a few ways in which the CARES Act funds would be put to use.   *See* Chehalis Mot. at 30–33; Cheyenne

---

[8] Defendant argues in a footnote that *City of Houston* and *Ambach* cannot stand for the proposition that the "inability to recover funds after they are obligated constitutes irreparable harm 'as a matter of law.'"   Def.'s Opp'n at 19 n.14. The court makes no such holding.   The court's finding of irreparable harm is premised not solely on the inability to recover allocated funds, but also the purpose for which Congress allocated those funds and the serious effect diminishing those funds will have on Plaintiffs.

River Mot. at 32–34.  The diminishment of these funds, which cannot be recovered once disbursed, makes "a very strong showing of irreparable harm."  *Davis*, 571 F.3d at 1292.

Defendant asserts that Plaintiffs cannot show irreparable injury for another reason. Defendant argues that Plaintiffs have not established that "the delta between the payment amounts they stand to receive under Defendant's determination, and the amounts they would receive if ANCs were excluded, would make the difference between irreparable harm or not."  Def.'s Mot. at 20.  But demanding such a "delta" from Plaintiffs imposes an impossible burden.  After all, Defendant has not publicly confirmed how he will divide up the $8 billion that Congress allocated for "Tribal governments."  Absent some indication of the actual formula that Defendant is using to make allocation decisions, Plaintiffs are in no position to identify the loss "delta" they will suffer if ANCs are awarded Title V dollars.

From what is publicly known, however, the potential "delta" could be significant.  On April 13, 2020, Defendant published a "Certification for Requested Tribal Data" form on the Agency's website, which sought certain information from Tribal government applicants for Title V funds. Chahalis Am. Compl. ¶ 101.  Submission of the requested information is a condition of funding. *Id.*  Defendant requested "Population" data from applicants, which included the number of "Shareholders."  *Id.* ¶ 102.  It also asked for information about "Land Base," which included "lands . . . selected pursuant to the Alaska Native Claims Settlement Act."  *Id.* ¶ 103; Certification.  An internal agency document leaked to the media three days later shows that, if Defendant were to disburse Title V funds based on "Population," "Land Base," and other data, ANCs could receive a substantial share of Title V funds.  *See* Cheyenne River Mot. at 18.  The leaked document shows that ANCs comprised 32.6% of the total population listed for all Tribal governments; 45.2% of the total land base; 16.6% of total employees; and 11% of total expenditures for the most recent

completed year.  *See id*; Sealed Mot. for Leave to File Document Under Seal, Ex. 2, ECF No. 5-2.

If the agency were to base its allocation decisions on such data, using it as a proxy for need, ANCs

stand to reap a considerable percentage of Title V funds.  The "delta" suffered by Plaintiffs

therefore could be substantial.[9]

      To be fair, since the start of this case, Defendant has maintained that its allocation formula

remains a work in progress and that the data sought in the Certification should not be understood

as proxies for how much funding a Tribal government will receive.  Yet, it is this very uncertainty

that amplifies the likelihood of harm.  The agency has said that it will disclose how it made funding

decisions; however, it has not committed to making that information public *before* disbursing the

funds.  But once those dollars are committed, Plaintiffs will have no path to recover them.

*See supra* at 15–16 & n.7.  Their injury therefore will be irreparable absent injunctive relief.

### B.  Likelihood of Success

      Having found a strong case of irreparable harm, the court turns to the other key factor—

likelihood of success on the merits.  *See Nken*, 556 U.S. at 434 ("The first two factors of the

traditional standard are the most critical.").  Recall that under the "sliding scale" approach, "if the

movant makes a very strong showing of irreparable harm and there is no substantial harm to the

non-movant, then a correspondingly lower standard can be applied for likelihood of success."

---

[9] Curiously, there is no indication on the present record that the agency has considered data that matches the actual statutory criteria for disbursement of Title V funds to Tribal governments.  The CARES Act provides that:

> the amount paid . . . to a Tribal government shall be the amount the Secretary shall determine, in consultation with the Secretary of the Interior and Indian Tribes, that is based on *increased expenditures of each such Tribal government* (or a tribally-owned entity of such Tribal government) relative to aggregate expenditures in fiscal year 2019 by the Tribal government (or tribally-owned entity) and determined in such manner as the Secretary determines appropriate to ensure that all amounts available under subsection (a)(2)(B) for fiscal year 2020 are distributed to Tribal governments.

42 U.S.C. § 801(c)(7) (emphasis added).  Nothing on the present record suggests that the agency is making allocation decisions based, at least in part, on "increased expenditures" during the present fiscal year.

*Davis*, 571 F.3d at 1292.  That is not to say that a movant for whom the other three factors "clearly favor[]" injunctive relief can succeed by making only a modest showing of likelihood of success. *Id.* (quoting *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)).  Rather, likelihood of success remains a "foundational requirement" for injunctive relief.  *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019).  As the court considers Plaintiffs' likelihood of success it bears in mind that the other factors of irreparable harm—as discussed above—and the balancing of the equities—as will be seen below—"clearly favor[]" injunctive relief.  *Davis*, 571 F.2d at 1292.

>    *1.*    In determining whether Congress intended for ANCs to be eligible for CARES Act funds, the court begins, as required, with the statutory text.  *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003) (stating that the "starting point" for statutory analysis "is the statutory text").  Title V of the CARES Act allocates $8 billion "for making payments to Tribal governments." 42 U.S.C. § 801(a)(2)(B).  The Act defines the term "Tribal government" to mean "the recognized governing body of an Indian Tribe."  *Id.* § 801(g)(5).  The Act also defines "Indian Tribe," giving it the same meaning as "that term in section 5304(e) of title 25"—a cross-reference to the definition of "Indian Tribe" under ISDEAA.  *Id.* § 801(g)(1).  ISDEAA, in turn, defines "Indian tribe" as follows:

> [A]ny Indian tribe, band, nation, or other organized group or community, including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act (85 Stat. 688), which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

25 U.S.C. § 5304(e).  Thus, taken together, Congress allocated $8 billion in the CARES Act "for making payments to" "the recognized governing body of" "any Indian tribe, band, nation, or other

organized group or community, including any Alaska Native village or regional village corporation

. . . , which is recognized as eligible for the special programs and services provided by the United

States to Indians because of their status as Indians." *See* 42 U.S.C. § 801(a)(2)(B), (g)(1), (g)(5);

25 U.S.C. § 5304(e).

According to Plaintiffs, ANCs are not "Tribal governments," and thus are ineligible for

funds under Title V of the CARES Act, for two reasons.  First, they contend, ANCs are not "Indian

Tribes" under the ISDEAA definition incorporated into the CARES Act, because no known ANC

satisfies the limiting clause at the end of ISDEAA definition's —"which is recognized as eligible

for the special programs and services provided by the United States to Indians because of their

status as Indians." *See* Chehalis Mot. at 16–21.  The court refers to this text as the "eligibility

clause."   Second, Plaintiffs contend, no ANC board of directors qualifies as a "recognized

governing body."  *Id.* at 21–24; Cheyenne Mot. at 20–27.  Both arguments rest, in part, on the

contention that "recognition" is a term of art that is well understood in Indian law, and that no

ANC has been "recognized" as "eligible for special programs and services provided by the United

States to Indians because of their status as Indians" and, correspondingly, no ANC board of

directors has been "recognized" as the "governing body of an Indian tribe."  Chehalis Mot. at 19;

Cheyenne Mot. at 24–26.

For purposes of this preliminary injunction, the court is persuaded that, presently, no ANC

satisfies the definition of "Tribal government" under the CARES Act and therefore no ANC is

eligible for any share of the $8 billion allocated by Congress for Tribal governments.  For starters,

neither Defendant nor any ANC amici has identified an ANC that satisfies the eligibility clause

under ISDEAA's definition of Indian Tribe; that is, no ANC "is [presently] recognized as eligible

for the special programs and services provided by the United States to Indians because of their

status as Indians." *See* 25 U.S.C. § 5304(e).   As the Chehalis Plaintiffs point out, under the interpretative rule known as the series-qualifier canon, "[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series," a modifier at the end of the list "normally applies to the entire series."   *See* Chehalis Pls.' Reply in Supp. of Mot. for TRO & Prelim. Inj., ECF No. 30, at 5 (quoting *Lockhart v. United States*, 136 S. Ct. 958, 970 (2016) (Kagan, J., dissenting) (citing A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 147 (2012)); *United States v. Laraneta*, 700 F.3d 983, 989 (7th Cir. 2020) ("[T]he 'series-qualifier' canon . . . provides that a modifier at the beginning or end of a series of terms modifies all the terms.")).   Applying that canon here, the eligibility clause applies equally to all entities and groups listed in the statute, including "any Alaska Native village or regional or village corporation."   As no known ANC satisfies ISDEAA's eligibility clause, no ANC can partake in the $8 billion funding set aside for Tribal governments.

The court also agrees that the term "recognition" as used in Indian law statutes is a legal term of art, and that no ANC board of directors qualifies as a "recognized governing body" of an Indian Tribe.   *Cf. Mackinac Tribe v. Jewell*, 87 F. Supp. 3d 127, 131 (D.D.C. 2015) ("Federal 'recognition' of an Indian tribe is a term of art that conveys a tribe's legal status vis-à-vis the United State[s]. . . ."), *aff'd*, 829 F.3d 754 (D.C. Cir. 2016); *see also Frank's Landing Indian Cmty. v. Nat'l Indian Gaming Comm'n*, 918 F.3d 610, 613 (9th Cir. 2019) ("'Federal recognition' of an Indian tribe is a legal term of art meaning that the federal government acknowledges as a matter of law that a particular Indian group has tribal status.").   "[I]t is a 'cardinal rule of statutory construction' that, when Congress employs a term of art, 'it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken.'" *FAA v. Cooper*, 566 U.S. 284, 292 (2012) (quoting *Molzof v. United States*, 502 U.S.

301, 307 (1992)).  That rule of interpretation is particularly apt for statutes concerning Indians.

Federal recognition is "a formal political act confirming the tribe's existence as a distinct political

society, and institutionalizing the government-to-government relationship between the tribe and

the federal government." *Cal. Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1263 (D.C.

Cir. 2008) (quoting COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 3.02[3], at 138 (2005 ed.));

*see also* Chehalis Mot. at 19 (quoting H.R. Rep. No. 103-781, at 2–3 (1994) (stating that

recognition means a "formal political act, [which] permanently establishes a government-to-

government relationship between the United States and the recognized tribe as a 'domestic

dependent nation'").  "The definition of 'recognition' has evolved over time but historically the

United States recognized tribes through treaties, executive orders, and acts of Congress."

*Mackinac Tribe*, 829 F.3d at 755.  Today, uniform procedures exist through the Bureau of Indian

Affairs for a group to seek formal recognition.  *See id.* at 756.  As a legal term of art then,

Congress's decision to qualify only "recognized governing bod[ies]" of Indian Tribes for CARES

Act funds must be viewed through this historical lens.  And no ANC board of directors satisfies

that criteria.  *Cf. Seldovia Native Ass'n v. Lujan*, 904 F.2d 1335, 1350 (9th Cir. 1990) (holding that

a village corporation "is not a governmental unit with a local governing board organized under the

Indian Reorganization Act . . . [and thus] does not meet one of the basic criteria of an Indian tribe"

(citation omitted)).

    *2.*    Context also supports Plaintiffs' reading of the CARES Act.  *See Robinson v. Shell*

*Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined

by reference to the language itself, the specific context in which that language is used, and the

broader context of the statute as a whole.").  Congress placed monies for "Tribal governments" in

the same title of the CARES Act as funding for other types of "governments."  42 U.S.C.

§ 801(a)(1).  Title V appropriates money "for making payments to States, Tribal governments, and units of local government."  *Id.*.  "State" is defined as "the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, the Commonwealth of the Northern Mariana Islands, and American Samoa."  *Id.* § 801(g)(4).  The term "unit of local government" is also defined, and it means "a county, municipality, town, township, village, parish, borough, or other unit of general government below the State level with a population that exceeds 500,000."  *Id.* § 801(g)(2).  The term "Tribal government" must be read in this context.  *See Lagos v. United States*, 138 S. Ct. 1684, 1688–89 (2018) (referencing "*noscitur a sociis*, the well-worn Latin phrase that tells us that statutory words are often known by the company they keep").  A "government" is commonly understood to refer to "[t]he sovereign power in a country or state" or "organization through which a body of people exercises political authority; the machinery by which sovereign power is expressed."  *Government*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also Government*, MERRIAM-WEBSTER DICTIONARY ("[T]he body of persons that constitutes the governing authority of a political unit or organization," or "the organization, machinery, or agency through which a political unit exercises authority and performs functions and which is usually classified according to the distribution of power within it").[10]  Reading the CARES Act to allow the Secretary to disburse Title V dollars to for-profit corporations does not jibe with the Title's general purpose of funding the emergency needs of "governments."  *See Richards v. United States*, 369 U.S. 1, 9 (1962) (explaining that a court must "start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used" by Congress.").

 *3.*  Defendant and the ANC Amici advance their own textual analysis of the ISDEAA definition of "Indian tribe."  Echoing the rationale of the Ninth Circuit's decision in *Cook Inlet*,

---

[10] https://www.merriam-webster.com/dictionary/government.

810 F.2d at 1474, Defendants and ANC Amici argue that to apply the eligibility clause to ANCs would read the words "regional or village corporation" out of the statute because ANCs cannot satisfy the eligibility clause.   Def.'s Mot. at 10–11; Ahtna Br. at 20–21.   ANCs cannot satisfy that clause because, as corporations organized under state law, they cannot be "recognized" as "eligible for special programs and services provided by the United States to Indians because of their status as Indians."   So, Defendant and the ANC Amici maintain, the court must not apply the eligibility clause to those entities so as to give meaning to their placement in the statute.   *Id.*

The court is unpersuaded.   To be sure, courts must "interpret a statute to give meaning to every clause and word."   *Donnelly v. FAA*, 411 F.3d 267, 271 (D.C. Cir. 2005).   But the court cannot ignore the clear grammatical construct of the ISDEAA definition, which applies the eligibility clause to every entity and group listed in the statute.   The possibility that ANCs might not qualify under the eligibility clause is hardly fatal to carrying out Congress's purpose under ISDEAA.   "Alaska Native village[s]" are also in the statute.   They can and do satisfy the eligibility clause—in fact, there are 229 federally recognized Alaska Native villages, *see* Chehalis Mot. at 18.   Alaska Native villages are therefore able to fulfill ISDEAA's purpose of allowing Indian tribes to assume responsibility for federal aid programs that benefit its members; Congress expressed no preference for ANCs to fulfill the statute's objectives.   Accordingly, the ISDEAA definition of "Indian tribe" does not compel reading the eligibility clause to not apply to ANCs, as Defendant and the ANC Amici posit.

*4.*       Defendant and the ANCs rely heavily on agency guidance and case law to advance their position.   *See* Def.'s Opp'n at 9–10; Ahtna Br. at 18–19.   Those sources, Defendants assert, support reading the eligibility clause under ISDEAA as *not applying* to ANCs, contrary to the statute's plain text.   Defendant, for instance, points out that "immediately after this definition was

passed in 1975 as part of ISDEAA, the Bureau of Indian Affairs ("BIA") interpreted the [eligibility] clause *not* to apply to ANCs—i.e., that they need not satisfy the recognition clause." Def.'s Opp'n at 9.  Evidently, BIA adheres to that interpretation today.[11]  Additionally, Defendant and the ANC amici cite *Cook Inlet*, in which the Ninth Circuit confirmed BIA's reading of ISDEAA as "reasonable" and held that ANCs can be considered "Indian Tribes" for purposes of ISDEAA.  810 F.2d at 1476.  These citations to long-standing agency interpretation and a decades-old Ninth Circuit decision, the court is told, bear on Congress's present-day intent to *include* ANCs for funding under Title V.  The unstated assumption of this argument is that Congress is presumed to have known about these interpretations of ISDEAA and, by incorporating its definition of "Indian tribe" into the CARES Act, Congress meant to make ANCs eligible for Title V funding. Though not without some appeal, this argument is flawed for at least three reasons.

*First*, it is counter-textual.  As discussed, a straightforward reading of the eligibility clause of the ISDEAA definition cannot be reasonably construed to exclude ANCs.  Agency interpretations to the contrary, even if well-settled, cannot override congressional intent conveyed through a statute's plain text.  *See SEC v. Sloan*, 436 U.S. 103, 118 (1978) ("[C]ourts are the final authorities on issues of statutory construction, and are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." (internal quotation marks and citation omitted)); *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 349 (D.C. Cir. 2019) ("Even an agency's consistent and longstanding interpretation, if contrary to statute, can be overruled.").  Nor can a judicial decision supplant the clear text of a statute, no matter how

---

[11] Defendant does not cite to any contemporary guidance from BIA regarding the ISDEAA definition that could confirm that the agency continues to adhere to its original interpretation.  However, all parties appear to agree that BIA has not deviated from its original interpretation.

longstanding.  *See Milner v. Dep't of Navy*, 562 U.S. 562, 576 (2011) (rejecting argument that lower court decision should stand because it had been followed and relied upon for 30 years, "because we have no warrant to ignore clear statutory language on the ground that other courts have done so").  ISDEAA's plain meaning therefore surmounts any contrary agency or judicial interpretation.

*Second*, the administrative and judicial interpretations put forward by Defendant and the ANC amici are not as definitive as they appear at first blush.  It is true that "[w]hen administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well."  *See Bragdon v. Abbott*, 524 U.S. 624, 645 (1998).  But that presumption turns on whether existing interpretations have "settled the meaning" of a statutory provision.  That simply is not the case here.  For one, *Cook Inlet* is but one judicial decision, and "a lone appellate case hardly counts" as establishing a "'judicial consensus so broad and unquestioned that [a court] must presume Congress knew of and endorsed it.'"  *United States v. Garcia Sota*, 948 F.3d 356, 360 (D.C. Cir. 2020) (quoting *Jama v. ICE*, 543 U.S. 335, 349 (2005)).[12]

More significantly, post-ISDEAA legislation and judicial decisions raise the possibility that Congress did *not* mean to signal, by adopting the ISDEAA definition, that ANCs are eligible for Title V funds.  In 1994, some two decades after enacting ISDEAA, Congress passed the Federally Recognized Indian Tribe List  Act of 1994 ("List Act"), Pub. L. No. 103-454, § 103, 108

---

[12] Defendant maintains that the continuing validity of *Cook Inlet* is confirmed by a more recent decision from the Ninth Circuit, *Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d 986, 988 (9th Cir. 1999).  *See* Def.'s Opp'n at 9.  But that more recent decision simply cites to *Cook Inlet* as part of its factual recitation, *see Cook Inlet Treaty Tribes*, 166 F.3d at 988, and, in any event, a subsequent decision from the same circuit does nothing to create a "broad and unquestioned" judicial consensus, *Jama*, 543 U.S. at 349.

Stat. 4791.  The List Act directed the Secretary of the Interior to "publish in the Federal Register a list of all Indian tribes which the Secretary recognizes to be eligible for the special programs and services provided by the United States to Indians because of their status as Indians."  25 U.S.C. § 5131(a).  The Act's purpose was to "maintain[ ] an accurate, up-to-date list of federally recognized tribes."  *Koi Nation of N. Cal. v. Dep't of Interior*, 361 F. Supp. 3d 14, 59 (D.D.C. 2019).  No ANC appears on the Secretary's last-published list, as of January 30, 2020.  *See* Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 85 Fed. Reg. 5,462 (Jan. 30, 2020).[13]

Critically, since the List Act's passage, the government has taken the position, and courts have agreed, that the definition of "Indian tribe" in various federal statutes must be read in conjunction with the List Act.  In other words, unless the entity or group appears on the Secretary's List, it does not qualify as an "Indian tribe."  For instance, in *Wyandot Nation of Kan. v. United States*, the Federal Circuit held that the plaintiff was not a qualified "Indian tribe" permitted to demand an accounting under the American Indian Trust Fund Management Reform Act ("Reform Act"), Pub. L. No. 103-412, 108 Stat. 4239 (1994), because the plaintiff "is not on the list maintained by the Secretary of the Interior."  858 F.3d 1392, 1396, 1397–98 (Fed. Cir. 2017).  The Reform Act's definition of "Indian tribe" is *identical* to the ISDEAA definition of that term. *Compare* 25 U.S.C. § 4001(2) *with* 25 U.S.C. § 5304(e).  Interpreting the very same statutory language at issue here, the government in *Wyandot* argued that "a tribe cannot be a recognized Indian tribe within the meaning of the Reform Act unless it is recognized as such by the Secretary of the Interior under the List Act," 858 F.3d at 1398, and even asserted that the eligibility clause

---

[13] The most recent list contains 574 federally recognized Indian tribes, including 229 Alaska Native villages—including Plaintiffs Akiak Native Community, Asa'carsarmiut Tribe, and Aleut Community of St. Paul Island.  *See* Chehalis Mot. at 18; 85 Fed. Reg. at 5,466, 5,467.

found in the Reform Act's definition of "Indian Tribe"—that is, the exact same clause contained in the ISDEAA definition of "Indian Tribe"—"is a phrase of art defined in the List Act, 25 U.S.C. § [5131(a)]," Br. of United States as Appellee, *Wyandot Nation of Kansas v. United States*, No. 2016-1654 (Doc. 18), 2016 WL 4442763, *24, *35 (Fed. Cir. Aug. 11, 2016).  The Federal Circuit "was persuaded that the List Act regulatory scheme exclusively governs federal recognition of Indian tribes."  858 F.3d at 1398.

The decision in *Slockish v. U.S. Fed. Highway Admin.*, 682 F. Supp. 2d 1178 (D. Or. 2010), supplies another example.  There, the statute at issue was the National Historic Preservation Act, which defines "Indian tribe" in the same exact way as under ISDEAA.  *Compare* 54 U.S.C. § 300309 *with* 25 U.S.C. § 5304(e).  The government argued there, as it did in *Wyandot*, that the plaintiffs could not state a claim under the relevant statute, because they were "not federally recognized tribes."  682 F. Supp. 2d at 1202 (citing the Secretary's List as of December 19, 1988). The court agreed and dismissed the plaintiffs' claims.  *See id.*

Defendant does not satisfactorily explain why, in post-List Act cases like *Wyandot* and *Slockish*, the government has insisted that courts read the same definition of "Indian tribe" at issue here with the List Act, but not in this case.  But no matter.  The point is that when Congress incorporated the ISDEAA definition into the CARES Act, it is entirely plausible for it to have understood, based on cases like *Wyandot* and *Slockish*, that CARES Act eligibility under Title V would be limited only to federally recognized tribes.  Those cases, along with the government's post-List Act litigation positions, defeats the notion that the Ninth Circuit's decision in *Cook Inlet* is such settled law that Congress used that case's understanding of the ISDEAA definition of "Indian tribe" in the CARES Act.[14]

---

[14]  Amici ANVCA and ARA make the additional point that in *American Federation of Government Employees, AFL-CIO v. United States* ("*AFGE*"), 330 F.3d 513, 516 (D.C. Cir. 2003), the D.C. Circuit noted that certain Alaska Native

*Third*, Congress's adoption of the ISDEAA definition cannot be divorced from actual agency practice under ISDEAA, which seemingly is to contract with ANCs only, if at all, with tribal consent or as a last resort.  Although BIA has long viewed ANCs as qualifying as "Indian tribes" under ISDEAA, *see Cook Inlet*, 810 F.2d 1474, there is scant evidence on the present record—in fact, none—that BIA or any other federal agency has actually entered into a "self-determination contract," or 638 agreement, with an ANC.  Defendant's counsel's inability to identify any such current or past agreement between a federal agency and an ANC is telling *see* Hr'g Tr. at 38, and suggests that such contracts are at least rare.  Moreover, at least one agency, the Indian Health Service, has adopted guidelines that create a contracting hierarchy that prefers agreements for health services with Alaskan villages councils over ANCs.  *See* Alaska Area Guidelines for Tribal Clearances for Indian Self-Determination Contracts, 46 Fed. Reg. 27,178-02 (May 18, 1981).  Based on those guidelines, one court has held that an ANC cannot maintain a self-determination contract absent tribal villages' consent.  *See Ukpeagvik Inupiat Corp. v. Dep't of Health and Human Servs.*, Case No. 3:13-cv-00073-TMB, 2013 WL 12119576, at *2–3 (D. Alaska May 20, 2013).

This real-world treatment of ANCs by federal agencies under ISDEAA is informative.  It tells the court, even if an ANC can be potentially treated as an "Indian tribe" under ISDEAA, they rarely are.  And that infrequent treatment prevents the court from concluding at this stage that, by using ISDEAA's definition of "Indian tribe" in the CARES Act, Congress necessarily signaled its

---

Regional and village corporations qualify as "Indian Tribes" under ISDEAA.  *See* Not. and Request to Correct Procedural Defect, Not. of Controlling Authority, ECF No. 34.  But amici overread *AFGE*.  While they are correct that the court in *AFGE* referred to the ANCs at issue as "Indian Tribes" and cited to ISDEAA, the case sheds no light on the issues relevant here.  *AFGE* concerned an equal protection challenge to an appropriations act that gave preference to firms with 51 percent Native American ownership in defense contracting.  330 F.3d at 516–17.  The court had no occasion to consider ANCs' status as it pertains to the ISDEAA definition, and the court's statement that the ANCs "are federally recognized Indian tribes" is better viewed as dicta.  *See id.*

intent to treat ANCs and federally recognized tribes as equals for purposes of Title V funding eligibility.

    *5.*      Defendant and the ANC amici make another argument concerning Congress's selection of the ISDEAA definition of "Indian tribe" for the CARES Act.  They point out that the List Act's definition of "Indian tribe" clearly excludes ANCs.   *See* Def.'s Opp'n at 11; Ahtna Br. at 18–19.  The List Act defines "Indian tribe" to mean "any Indian or Alaska Native tribe, band, nation, pueblo, village or community that the Secretary of the Interior acknowledges to exist as an Indian tribe."  25 U.S.C. § 5130(2).  That clearly defined exclusion of ANCs begs the question:  If Congress wanted to exclude ANCs from receiving CARES Act funds, why not incorporate the definition of "Indian tribe" from the List Act, or refer expressly to the published list itself?  As amicus Ahtna puts it, "if Congress wanted to exclude [ANCs] it could have done so and in a much less convoluted way."  Ahtna Br. at 19.  That is a fair point, but it loses its luster when viewed against the backdrop of the post-List Act case law and government litigation positions described above.  Congress could have intended that the ISDEAA definition of "Indian Tribe" exclude ANCs under the CARES Act in the same way that the identical ISDEAA definitions exclude non-federally recognized tribes under the Reform Act and the National Historic Preservation Act.  The court therefore can glean no definitive congressional intent as to the inclusion or exclusion of ANCs under the CARES Act by Congress's selection of the ISDEAA definition over the List Act definition.

    *6.*      Defendant also resists reading the word "recognized" used in the CARES Act's definition of "Tribal government" as a legal term of art.  *See* Def.'s Opp'n at 18.  The Secretary points out that "recognized" as used in the CARES Act does not necessarily mean *federal* recognition, as understood in other statutes.  Statutes that do expressly concern federal recognition,

according to Defendant, use different words to signify that term of art.  The List Act, for example, uses the phrase "recognized tribes published by the Secretary," 25 U.S.C. § 5130(3), and the Indian Gaming Regulatory Act refers to tribes or groups that are "recognized as eligible by the Secretary," 25 U.S.C. § 2703(5)(A).

The court, however, does not view those modest statutory textual differences as bearing the weight that Defendant gives them.  As already discussed, in other statutes where the word "recognized" appears alone in the statutory text, such as the Reform Act and the National Historic Preservation Act, *see* 25 U.S.C. § 4001(2); 54 U.S.C. § 300309, the government has equated the term with federal recognition, *see Wyandot*, 858 F.3d at 1398; *Slockish*, 682 F. Supp. 2d at 1202. It is not clear why the government takes a different view here.  Moreover, given the history and significance of the term "recognition" in Indian law, the court doubts that Congress would have used the term if it did not mean to equate it with federal recognition.  The word "recognize" as it appears in the CARES Act is thus best understood as a legal term of art that no ANC presently satisfies.

**7.**     Finally, Defendant refutes that statutory context supports Plaintiffs' position. Citing the fact that tribal governments generate revenues from for-profit business operations, like casinos, Defendant contend that "Plaintiffs' argument assumes incorrectly that there is a clean dividing line between government and business operations . . . .  [such that] Title V eligibility cannot turn on whether the recipient is engaged in profitable businesses."  Def.'s Mot. at 11–12. But Plaintiffs' position, with which the court agrees, does not depend on a "clean dividing line." Rather, the question is whether treating an ANC's board of directors as a "Tribal government" makes sense when the other identified recipients of Title V funds include "States" and "units of local government."  *See* 42 U.S.C. § 801(a)(1).  It does not.

31

                              *        *        *

In summary, the court finds that Plaintiffs have met their burden of showing a likelihood of success on the merits of their claim.

### C.      Balance of the Equities and the Public Interest

The court turns finally to the remaining two injunctive relief factors:  the balance of the equities and the public interest.  Where the federal government is the opposing party, these two factors merge.  *See Nken*, 556 U.S. at 435.  Thus, in this case, the balance of the equities requires the court to "weigh[] the harm to [Plaintiffs] if there is no injunction against the harm to [the Treasury Department] if there is."  *Pursuing Am.'s Greatness*, 831 F.3d at 511.  The agency's harm and "the public interest are one and the same, because the government's interest *is* the public interest."  *Id.*

For the reasons already discussed, the harm to Plaintiffs absent an injunction will be great. The court need not recite the challenges that Plaintiffs are presently facing and will continue to face with reduced funding, though it notes that other Indian tribal governments who are not involved in this action also would benefit from an injunction.  On the other side of the balance, the tangible harm claimed by the agency from an injunction is not substantiated.  Defendant contends that halting disbursement of funds to ANCs would harm the native Alaskan communities that they serve.  *See* Def.'s Opp'n at 23.  But neither Defendant nor the ANC Amici present actual evidence demonstrating that ANCs are currently providing public services comparable to Plaintiffs to combat the coronavirus pandemic.  *See id.* at 23 (citing no evidence and simply cross-referencing ANVCA Br. at 15–16 , which identifies no coronavirus-related public services); Ahtna Br. at 2–3 (stating that Ahtna provides a "litany of social, educational, and health-related services," but not specifying what those are services are with respect to the coronavirus pandemic or specifying how

Title V funds would be used); ANVCA Br. at 16 (asserting, without detail or factual support, that "[s]ervices ANCs currently provide pale in comparison to what will be demanded of them in the future"). Moreover, it appears that ANCs may be eligible for funding made available in other parts of the CARES Act, *see* Def.'s Br. at 11 (stating that Congress could have "reasonably provided two avenues of relief for an entity in the CARES Act"), so whatever coronavirus-related services they do provide arguably could come from a different pot of appropriated funds. The claimed harm to ANCs from an injunction is simply not supported by the record.

Both sides also assert that the public interest is served by carrying out Congress's intent; in Plaintiffs' view, that means denying ANCs Title V funds, and in Defendant's view, that means not interfering with the discretionary allocation of funds to ANCs. *See* Chehalis Mot. at 36–37; Cheyenne River Mot. at 34–35; Def.'s Opp'n at 23. Because, as already discussed, the court finds that Plaintiffs have established a likelihood of success of showing that ANCs do not qualify for Title V funds, the public interest factor favors preliminarily enjoining the Secretary from disbursing Title V funds to ANCs. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (stating that "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations'") (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).

## VI.

Although the court has determined that an injunction is warranted, it does not grant relief to the full extent requested by Plaintiffs. The D.C. Circuit has "long held that '[a]n injunction must be narrowly tailored to remedy the specific harm shown.'" *Neb. Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (quoting *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 108 (D.C. Cir. 1976)). Here, preliminarily

enjoining the Secretary from disbursing funds to ANCs remedies the immediate harm that Plaintiffs face—the payment of Title V funds to ANCs that will be unrecoverable once made.  The added relief that Plaintiffs seek—an order directing the Secretary to distribute the full $8 billion only to federally recognized tribes—is greater than necessary to protect them against that injury. To be sure, the more limited remedy could mean that Plaintiffs will receive a lesser share of Title V funds in the short term, if the Secretary decides to award some money to ANCs and withholds those payments to comply with the court's order.  But at least such funds will remain available for later disbursement to federally recognized tribes for coronavirus-related public services, if the court ultimately enters a final judgment in Plaintiffs' favor.

## VII.

For the foregoing reasons, the court grants in part the Chehalis Plaintiffs', Cheyenne River Plaintiffs', and Ute Plaintiff's Motions for a Temporary Restraining Order and Preliminary Injunction, ECF No. 3; No. 20-cv-1059, ECF No 4; No. 20-cv-1070, ECF No. 5.  An Order entering the preliminary injunction accompanies this Memorandum Opinion.

Dated:  April 27, 2020

Amit P. Mehta
United States District Court Judge