**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CONFEDERATED TRIBES OF THE CHEHALIS RESERVATION, et al.<br><br>Plaintiffs,<br><br>- against -<br><br>STEVEN MNUCHIN, in his official capacity as Secretary of the Treasury,<br><br>Defendant. | Case No. 1:20-cv-01002-APM |
| CHEYENNE RIVER SIOUX TRIBE, et al.<br><br>Plaintiffs,<br><br>- against -<br><br>STEVEN MNUCHIN, in his official capacity as Secretary of the Treasury,<br><br>Defendant. | Case No. 1:20-cv-01059-APM |
| UTE TRIBE OF THE UINTAH AND OURAY RESERVATION,<br><br>Plaintiff,<br><br>- against -<br><br>STEVEN MNUCHIN, in his official capacity as Secretary of the Treasury,<br><br>Defendant. | Case No. 1:20-cv-01070-APM |

**MOTION TO INTERVENE AS DEFENDANTS**
**AND SUPPORTING MEMORANDUM OF LAW**

Pursuant to Federal Rule of Civil Procedure 24 and Local Civil Rule 7(j), Calista Corporation ("Calista"), Kwethluk, Incorporated ("Kwethluk"), Sea Lion Corporation ("SLC"), St. Mary's Native Corporation ("St. Mary's"), Napaskiak, Incorporated ("Napaskiak"), and Akiachak, Limited ("Akiachak") (collectively, "Movants") hereby move to intervene as defendants in these proceedings.[1]  Calista is one of the 13 original Alaska Native regional corporations ("ANCs")[2] created under the Alaska Native Claims Settlement Act of 1971 ("ANCSA"), Pub. L. No. 92-203, 85 Stat. 688.  Kwethluk, SLC, St. Mary's, Napaskiak, and Akiachak are among the many ANCSA village corporations in the Calista Region established pursuant to the ANCSA.  Together Movants represent tens of thousands of Alaska Natives, many of whom have suffered greatly in the wake of the COVID-19 pandemic.  Movants, which like traditional government entities serve to ensure that "the economic benefits of Native natural resources would be shared equitably among Alaska Natives whose lands were resource-poor as well as those that were rich," *Bay View, Inc. v. United States*, 278 F.3d 1259, 1267 (Fed. Cir. 2001), are currently mobilizing resources to help these Alaska Natives confront these challenging times.  But those resources are in increasingly short supply—which is why Congress stepped in and allocated billions of dollars in emergency relief funds to *all* Tribal governments, including entities like Movants that are responsible for stewarding the interests and supporting the livelihood of Alaska Natives.  These proceedings threaten to deprive Movants and their people of funds that Congress provided to them and thereby threaten Movants' ability to fulfill their basic sovereign

---

[1] Pursuant to Local Civil Rule 7(m), undersigned counsel conferred with counsel for all three groups of plaintiffs and counsel for the government.  The plaintiffs oppose Movants' request to intervene; the government takes no position on it.

[2] In its Memorandum Opinion, the Court used the term "ANC" to refer to both Alaska Native Regional Corporations and Alaska Native village corporations.  Movants do the same here, while emphasizing that they represent distinct constituencies and work together to optimally serve native populations.

functions by using these federally allocated funds to help Alaska Natives facing this unprecedented pandemic. These proceedings further threaten Movants' continued participation and eligibility under other federal programs using similar language as the CARES Act, as well as cooperation among and coordination of the efforts of regional corporations, village corporations, and tribes to further the interest of Alaska Natives. Given those stark threats—and given further that it has become clear over the past weeks that the government, the nominal defendant but not the real party in interest, does not adequately represent Movants' interests in these extremely important proceedings—Movants now timely seek to intervene. Therefore, and for the reasons outlined below and in the accompanying Declarations of Andrew Guy (Exhibit A), Paul "George" Guy (Exhibit B), Nancy Andrew (Exhibit C), Myron P. Naneng, Sr. (Exhibit D), Michael Kaganak (Exhibit E), and Jason George (Exhibit F), Movants respectfully request that the Court grant this Motion and permit Movants to intervene.[3]

## FACTUAL BACKGROUND

"The United States purchased Alaska from Russia in 1867." *Sturgeon v. Frost*, 139 S. Ct. 1066, 1073 (2019). For the next 90 years, "the Federal Government owned all [the] land" in Alaska—"an area more than twice the size of Texas." *Id.* "By the 1950s," however, "Alaskans hankered for both statehood and land—and Congress decided to give them both." *Id.* at 1073-74. To that end, the Alaska Statehood Act of 1958 not only "made Alaska the country's 49th State," but allowed the new State to choose "103 million acres of 'vacant, unappropriated, and unreserved' federal land." *Id.* at 1074 (quoting Pub. L. No. 85–508, §6(a)-(b), 72 Stat. 339, 340).

---

[3] Pursuant to Local Civil Rule 7(j), a copy of Movants' proposed Answer to each of the three complaints in this consolidated action are attached as Exhibits G, H, & I.

"[T]he State's bonanza provoked land claims from Alaska Natives," whose "ancestors had lived in the area for thousands of years." *Id.* After many Alaska Natives "asserted aboriginal title to much of the property the State was now taking," Congress enacted the ANCSA. *Id.* True to its name, the ANCSA was a settlement. *See generally* 43 U.S.C. §§1601-1629h. In exchange for surrendering their vast land claims, Alaska Natives received clear rights over (a fraction of) their ancestral lands. They also received the right to establish "regional corporations" (in lieu of reservations) that would manage land and mineral rights, along with "village corporations" that would be centered in existing communities. *See Sturgeon*, 139 S. Ct. at 1074.

Formation of these corporations was intended to assist Alaska Natives to remain in their traditional homes through the subsidies provided by their shares in these structures. *See* 43 U.S.C. §1606(r) (authorizing ANCs to provide for "the health, education or welfare of such shareholders or family members"). ANCs like Calista and the village corporations who join this Motion are thus representatives of longstanding Alaska Native communities, and work not only to maintain their communities' traditional cultures, but also to promote the education of future generations and the welfare of the community's "shareholders." They also stand in stark contrast to the typical corporation. Rather than purely maximizing shareholder returns, ANCs treat the preservation of their community's culture and way of life as among their primary duties to shareholders. Business operations are thus governed by the Native community's longstanding values and norms.

Calista is the one of the 13 original regional Alaska Native corporations created under the ANCSA. Today Calista represents more than 32,000 Alaska Natives. Declaration of Andrew Guy (Exhibit A) ¶ 2. Like all ANCs, Calista has a mandate to support Alaska Native shareholders economically, culturally, and socially, many of whom have limited incomes and live in remote locations in rural Alaska. *Id.* ¶¶ 2-3. Calista fulfills this mandate in a number of ways. For

3

instance, Calista has declared more than $75 million in dividends and distributions and has provided millions of dollars more in scholarships through its nonprofit Calista Education and Culture, Inc. *Id.* ¶ 4.

Calista Corporation is but one of many Tribal government entities through which the Alaska Natives in its region exercise all forms of self-determination. The Region encompasses more than 6.5 million acres of land and includes 56 villages, which are incorporated into 46 individual ANCSA village corporations. *See generally* 25 U.S.C. §5304(e) (defining "Indian tribe" to "includ[e] any Alaska Native village or regional or village corporation"); *see also, e.g.*, Declaration of Paul "George" Guy (Exhibit B) ¶ 7 ("The services that Kwethluk, Incorporated provides to [its] community are similar to those of any recognized tribe."); Declaration of Nancy Andrew (Exhibit C) ¶¶ 1, 7 (St. Mary's Native Corporation is "charged with advancing the interests of [its] people.… The function that St. Mary's Native Corporation provides in our community is essentially the same as any recognized tribe."). Calista works together with numerous ANCSA village corporations as well as many tribes in the Region (including some of the plaintiffs in this action) to address problems facing Alaska Natives in the Calista Region. *See* Exhibit A ¶ 9.

The scope of those problems, and the need to fulfill their mandates with respect to the Alaska Natives in their Region, have perhaps never before been as great as they are in 2020. Consider the circumstances facing the shareholders of St. Mary's. A number of elders are now "hunkered down in substandard housing and in need of assistance with everyday essentials," Exhibit C ¶ 3, but "[m]any households in St. Mary's live below the poverty line and do not have access to internet or even a computer," *id.* ¶ 8. The situation is perhaps even more dire outside their homes. "St. Mary's is not connected to any outside road system," and thus is reliant on a commercial air carrier (Ravn Alaska) not just for transporting people and mail, but also for

"bringing essential foods, supplies, and medical equipment." *Id.* ¶ 4.  In the wake of the COVID-19 pandemic, however, Ravn Alaska "has shut down its operations and filed for bankruptcy," effectively "cut[ting] off the St. Mary's community from the rest of the continent." *Id.*  St. Mary's is currently doing all it can to help those in need in its community—"provid[ing] school supplies" and "much needed shareholder employment assistance," and even going so far as "to provide assistance for [its] shareholders in filing their personal income taxes." *Id.* ¶ 7.

St. Mary's is not unique in making extraordinary efforts or going above and beyond for its community.  *See, e.g.*, Exhibit B ¶¶ 5-6 ("When this crisis came about, many of our shareholders were already in extreme financial hardship.… We declared an emergency divided to help our shareholders in this time of need, distributing approximately $45,000 to our shareholders for food and other essentials.").  For many in these communities, however, the ANCs' efforts are just that— extraordinary and unique.  In fact, if ANCs did not provide these services, many Alaska Natives would have no ability to receive them.  *See* Exhibit A ¶ 6 ("[N]ot all shareholders are tribally enrolled.… [A]ll of [these] Alaska Natives[] will be left out if ANCs are excluded from the distribution of the CARES Act Tribal Relief Funds."); *see also, e.g.*, Exhibit C ¶ 11 (similar).

That is just one of the many reasons why these proceedings are so critical and why Movants should be permitted to participate in them.  Movants have already provided substantial economic relief in the wake of the pandemic, and have incurred significant costs to address the public health and financial wellbeing of its shareholders.  They intend to do much more to help the many Alaska Natives who live on their lands and are struggling both healthwise and financially, should they receive funds from the federal government.  *See, e.g.*, Exhibit C ¶ 8 ("If provided the financial means during this time, these services could be expanded to include provision of PPE, assistance in securing much needed health supplies for the community, food distributions, dividends and elder

5

distributions, and providing assistance to families whose children are unable to attend school in person."); Declaration of Myron P. Naneng, Sr. (Exhibit D) ¶ 7 ("SLC would use any CARES funding it received to provide more support to the community in coordination with the tribe and our regional organizations").  Indeed, but for these proceedings, Movants likely would be working together as we speak to administer federal emergency relief to shareholders and other Natives living in the Region.  *See, e.g.*, Exhibit C ¶ 11 ("The reality of the situation in our region of Alaska is that tribes and village corporations work hand in hand to provide much needed, essential services in a region that suffers from some of the highest rates of unemployment in the country.").  But, given this lawsuit, and the Court's Order declaring that ANCs likes Movants are not entitled to receive any funds under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act" or "Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020), those efforts are now on hold—even though time is of the essence.

Congress enacted the CARES Act in response to the current pandemic.  At issue here is Title V, which appropriates $150 billion for "payments to States, Tribal governments, and units of local government," 43 U.S.C. §801(a)(1), and specifically "reserves $8 billion for making payments to Tribal governments," *id.* §801(a)(2)(B).  Congress intended these funds "to cover" the costs Tribal governments "incur[] due to the public health emergency" between March 1 and December 30, 2020.  *Id.* §801(d).  Given the scale of the crisis, the Act required the Treasury Secretary to disburse these funds "no[] later than" April 26.  *Id.* §801(b)(1).

The Act defines the term "Tribal government" to mean "the recognized governing body of an Indian Tribe," *id.* §801(g)(5), and further defines the term "Indian Tribe" to have the same meaning that it has "in section 5304(e) of title 25," *id.* §801(g)(1).  Section 5304(e), which is part

of the Indian Self-Determination and Education Assistance Act ("ISDEAA"), in turn defines

"Indian tribe" as:

> any Indian tribe, band, nation, or other organized group or community, ***including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act (85 Stat. 688)***, which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

25 U.S.C. §5304(e) (emphasis added); *see also Cook Inlet Native Ass'n v. Bowen*, 810 F.2d 1471,

1473-77 (9th Cir. 1987) (ANCs are considered "Indian tribes" under ISDEAA).

The plaintiff tribes in this action filed these consolidated lawsuits only after unsuccessfully

lobbying the Treasury Secretary to exclude ANCs from the universe of Tribal governments under

the CARES Act.  *See* Def.'s Consolidated Opp'n to Pls.' Mot. for TRO & Prelim. Inj. 5, Dkt. 21

(Apr. 23, 2020) ("After consultation with the Department of the Interior, Treasury has concluded

that Alaska Native regional and village corporations as defined in or established pursuant to the

[ANCSA] are eligible to receive payments from the Fund in the amounts to be determined by the

Secretary of the Treasury." (footnote omitted)).  Specifically, the plaintiffs filed these consolidated

suits seeking a judicial order preventing ANCs from receiving Title V funds.  They subsequently

moved for a temporary restraining order or preliminary injunction, asking the Court "both to enjoin

the Secretary from disbursing any Title V funds to ANCs and to order the Secretary to disburse all

$8 billion to federally recognized tribes."  Mem. Op. 7-8, Dkt. 36 (Apr. 27, 2020) ("Mem. Op.").

At the hearing on the plaintiffs' motions, which was held within a week of their filing, the

government—represented by the Justice Department's Civil Division, not any of the agencies

accustomed to dealing with Native Peoples or familiar with the intricate lattice of statutes,

regulations, and agreements that defines the federal government's relations with them and their

representatives—was unable to introduce any evidence "that [the Bureau of Indian Affairs] or any

other federal agency has actually entered into a 'self-determination contract,' or 638 agreement,

with an ANC." *Id.* at 29; *see also id.* (highlighting "Defendant's counsel's inability to identify any such current or past agreement"). Given what it accordingly (but incorrectly) believed to be the "real-world treatment of ANCs by federal agencies under ISDEAA," *id.*, the Court concluded that Title V should not be read to include ANCs, and granted the plaintiffs' motions in part. *See* Order, Dkt. 37 (Apr. 27, 2020). As demonstrated below, this factual record is incorrect, and granting this Motion will ensure that these proceedings are not conducted without real parties in interest that are capable of supplying complete and accurate information about this complex subject-matter.

## ARGUMENT

### I.   Each Movant Has A Right To Intervene Under Rule 24(a).

Rule 24 provides that "the court must permit anyone to intervene who … claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless the existing parties adequately represent that interest," provided that they filed a "timely motion." Fed. R. Civ. P. 24(a)(2). The D.C. Circuit "has distilled this rule into four factors": "(1) the timeliness of the motion; (2) whether the applicant 'claims an interest relating to the property or transaction which is the subject of the action'; (3) whether 'the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest'"; and (4) whether the 'applicant's interest is adequately represented by existing parties.'" *Washington All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 395 F. Supp. 3d 1, 9-10 (D.D.C. 2019) (quoting *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731 (D.C. Cir. 2003)). "[T]he D.C. Circuit has taken a liberal approach to intervention." *The Wilderness Soc'y v. Babbitt*, 104 F. Supp. 2d 10, 18 (D.D.C. 2000); *see, e.g.*, *NRDC v. Costle*, 561 F.2d 904, 910-11 (D.C. Cir. 1977)). "In addition to these four requirements, which emanate from the text of Rule 24(a) itself, a putative intervenor must further establish that it has standing under Article III."

8

*Cayuga Nation v. Zinke*, 324 F.R.D. 277, 280 (D.D.C. 2018). Each requirement is amply satisfied here.

*First*, this Motion is timely. A Rule 24 motion to intervene brought at the early stages of the litigation is generally deemed timely. Not even three weeks have gone by since these lawsuits were initiated; the plaintiffs filed their complaints on April 17, 2020, and their respective motions seeking a temporary restraining order or preliminary injunction on April 20. And just over one week has gone by since this Court ruled that Calista and all other ANCs are currently barred from recovering any funds under the CARES Act; this Court issued its Order and Memorandum Opinion on April 27. Dkts. 36-37. Upon learning of that ruling, Movants immediately acted to retain counsel and to prepare this Motion and the accompanying declarations. Those efforts, while speedy, were in the face of pandemic-related and logistical constraints (*e.g.*, the fact that Movants are based in Alaska and their counsel in Washington, DC). Under any circumstances—and particularly those presented here—this Motion is plainly timely. Indeed, less speedy intervention motions are routinely deemed timely, even in normal circumstances. *See, e.g., Karsner v. Lothian*, 532 F. 3d 876, 886 (D.C. Cir. 2008) (holding motion to intervene timely when filed one month after case was initiated); *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003) (holding motion to intervene timely when filed less than two months after filing of lawsuit and before agency had answered).

Furthermore, no party will suffer prejudice as a result of Movants' intervention. *See Ute Indian Tribe of Uintah & Ouray Indian Reservation v. U.S. Dep't of the Interior*, No. 1:18-CV-00547 (CJN), 2020 WL 1465886, at \*1 (D.D.C. Feb. 5, 2020) (deeming "'whether any delay in moving for intervention will prejudice the existing parties to the case'" the 'critical factor'" (quoting *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 584 F. Supp. 2d 1, 5 (D.D.C. 2008))).

No schedule has yet been set; in fact, the government has not even filed a responsive pleading. Movants will participate in the action on whatever schedule is ultimately established. They also will endeavor to work with the government and all potential intervenors to ensure that unnecessary delays and duplication of efforts will be avoided.[4]   Given the unprecedented and fast-moving nature of the pandemic and the CARES Act, as well as the pace of these proceedings themselves, Movants plainly satisfy the timeliness factor.

*Second*, Movants clearly have "an interest relating to the property or transaction that is the subject of" the plaintiffs' claims, Fed. R. Civ. P. 24(a)(2), and they just as clearly have suffered Article III injury-in-fact. "An intervenor's interest is obvious when"—as here—"he asserts a claim to property that is the subject matter of the suit." *Foster v. Gueory*, 655 F.2d 1319, 1324 (D.C. Cir. 1981); *see, e.g.*, *Deutsche Bank Nat'l Trust. Co. v. Fed. Deposit Insurance Corp.*, 717 F.3d 189, 193 (D.C. Cir. 2013) ("[Would-be intervenors] point to their economic interest in the receivership funds as a legally protected interest.   That much is clearly correct."). Here, the Treasury Department determined that ANCs like Calista and the other Movants are eligible for relief funding under Title V of the CARES Act.   But because of the plaintiffs' lawsuit and this Court's Order, no Movant (nor any other ANC) is currently eligible to receive any money under Title V.   That is textbook pocketbook injury, undoubtedly traceable to this case and redressable by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *cf. Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (holding that "any one competing for a governmental benefit" may

---

[4] Movants are aware that Ahtna, Inc. ("Ahtna"), a fellow ANC, has moved to intervene as well and that motion is currently pending.  Given that plaintiffs seek to deprive *all* ANCs of CARES Act funding (and given that the Court's Order has granted such relief on a temporary basis), Ahtna and Movants both satisfy the criteria for intervention.  Moreover, Calista and Ahtna can provide unique perspectives, even from one another—for example, Movants here include not only a regional ANC, but also village corporations. Granting Movants' request to intervene will thus provide the Court with the broadest possible perspective.

"assert competitor standing when the Government takes a step that benefits his rival and therefore injures him economically").  It is also far more than *merely* pocketbook injury.  As the Court recognized, to describe the deprivation of Title V funds in this circumstance "as merely 'economic' [injury] is terribly misguided."  Mem. Op. 16.  "These are monies that Congress appropriated on an emergency basis to assist Tribal governments in providing core public services to battle a pandemic that is ravaging the nation, including in Indian country…. COVID-19 and the public health measures necessary to combat the novel coronavirus have … creat[ed] a crisis in funding needed to deliver health care, procure medical equipment and supplies, and provide meals and expand food banks—just to name a few ways in which the CARES Act funds would be put to use." *Id.*  So whereas allowing Movants to intervene will cause no prejudice to any party, *not* allowing them to intervene will seriously harm their interests, as they may be deprived essential funding under Title V of the CARES Act without having been permitted to participate in that process.

Movants' injury is just the flip side of the injury that gives the plaintiffs standing—and this Court has already held to constitute irreparable harm.  If "[t]he *diminishment* of these funds, which cannot be recovered once disbursed, makes 'a very strong showing of irreparable harm,'" *id.* at 17 (emphasis added) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)), then the *complete loss* of these funds—and the potential for a ruling that will hinder Movants' ability to obtain federal benefits even beyond the CARES Act—is more than enough to satisfy Rule 24(a)'s direct-interest requirement and establish Article III injury-in-fact.

The direct, cognizable harms do not stop there.  If this Court were to issue a permanent injunction consistent with the temporary restraining order it issued last week, then Movants would suffer serious impairments to their ability to meaningfully respond to the pandemic and to protect their people and Region from the economic devastation the pandemic is leaving in its wake.  *See,*

*e.g.*, Exhibit C ¶¶ 7-10.  And while those short-term consequences would be severe and would

constitute sufficient interest for Rule 24 and sufficient injury for Article III, they are not the only

injuries such a decision would visit upon Movants.  A permanent injunction would also mean that

many of Movants' Alaska Native shareholders would receive no benefits under the CARES Act,

at precisely the time their need is greatest.  Longer term, such a result could also potentially

undermine Movants' eligibility for federal programs and benefits beyond the CARES Act, based

on the Court's statutory interpretation.  *Cf., e.g.,*, Exhibit D ¶ 5 ("SLC receives federal funding

from the United States Coast Guard through the Trustee for Wildlife Restoration.  SLC also

receives funding from the USFWS, USDA/NRCS, NPS as part of wildlife habitat conservation

and bird nest protection projects," and also "receives federal funding from the DOE/Tribal Energy

program for energy audits and training locals to become energy assessors.").  It also threatens to

undermine long established patterns of cooperation among regional corporations, village

corporations and tribes, to further the interests of Alaska Natives.  In sum, Movants plainly satisfy

the second prong of the intervention-of-right test and just as plainly satisfy the requirements for

Article III standing.

     *Third*, disposition of this action will clearly impair Movants' ability to protect their

interests.  In analyzing this factor, the Court must "loo[k] to the practical consequences of denying

intervention."  *NRDC v. Costle*, 561 F.2d 904, 909 (D.C. Cir. 1977).  Those consequences here are

stark.  The plaintiffs here seek to obtain a final judgment declaring that no ANC may receive *any*

relief funds under Title V of the CARES Act, which are intended to help keep Native families

afloat during this unprecedented crisis.  To state that goal is to prove that achieving it would impair

Movants' legal and economic interests with respect the current pandemic by denying them critical

relief funding and potentially negatively impact them with respect to broader legal issues—

especially in light of the government's clear statement that it "intend[ed] 'to award some money

to ANCs'" but for this Court's Order.  Joint Status Report 2, Dkt. 44 (May 1, 2020); *cf. County of*

*San Miguel v. MacDonald*, 244 F.R.D. 36, 47 (D.D.C. 2007) (showing an "imminent threat of lost

earnings" in actions challenging agency determination is sufficient to show a threat of impairment).

 *Fourth*, Movants' "interests are not adequately represented by the existing parties." *Foster*,

655 F.2d at 1325.  As a general matter, showing inadequate representation by the existing parties

is a "low" bar.  *Crossroads Grassroots Policy Strategies v. Fed. Election Comm'n*, 788 F.3d 312,

321 (D.C. Cir. 2015) (a movant "ordinarily should be allowed to intervene unless it is clear that

the party will provide adequate representation").  The bar is particularly low when the would-be

intervenor is a private party asserting a "'financial stake in the outcome' of the suit" and the

defendant is a government, *Alphapointe v. Dep't of Veterans Affairs*, No. 19-cv-02465, 2019 WL

7290853, at *1 (D.D.C. Aug. 26. 2019) (quoting Crossroads, 788 F.3d at 321), as "governmental

entities do not adequately represent the interests of aspiring intervenors," *Fund for Animals*, 322

F.3d at 736 n.9 (collecting cases); *see also Dimond v. District of Columbia*, 792 F.2d 179, 193

(D.C. Cir. 1986) (the government "would face a potential conflict of interest were it to represent

both the general interests of its citizens and the financial interests of" the proposed intervenor).

 That low bar is easily cleared here.  As the Court highlighted in its Memorandum Opinion

(at 32), the government—perhaps as a result of the extraordinary pace of these proceedings and

the extraordinary nature of the federal government's response to the pandemic—was unable to

"present actual evidence demonstrating that ANCs are currently providing public services

comparable to Plaintiffs to combat the coronavirus pandemic."  But that failure was not a result of

the ANCs' not providing such services.  *See, e.g.*, Exhibit A ¶ 8.  The government likewise

introduced no evidence "that [the Bureau of Indian Affairs] or any other federal agency has actually

entered into a 'self-determination contract,' or 638 agreement, with an ANC."   Mem. Op. 29.
Again, that is not because such agreements do not exist, or are in short supply; to the contrary,
Calista currently is a party to multiple 638 agreements.  *See* Exhibit A ¶ 5.  Had Movants' interests
been adequately represented from the start, the Court would not have received incorrect
information about the "real-world treatment of ANCs," Mem. Op. 28, let alone premised an Order
granting injunctive relief based on that incorrect information.

Moreover, even apart from the government's inability to document ANC participation in
existing programs, the government is an inadequate representative of Movants' interests in other
respects.  For example, because the government will distribute the funds at issue to recipients no
matter how this litigation is resolved, it did not consider the possibility of requiring the plaintiffs
to post a bond or other security to secure their preliminary injunction.  ANCs, by contrast, are
directly injured by the delay in their ability to receive funds, and thus would suffer a direct injury
from the preliminary injunction even if it is ultimately overturned on appeal.  Furthermore, the
government "is still deciding whether to appeal," Joint Status Report 3, Dkt. 44 (May 1, 2020).
*See Smoke v. Norton*, 252 F.3d 468, 471 (D.C. Cir. 2001) (even "a post-judgment motion to
intervene in order to prosecute an appeal is timely (if filed within the time period for appeal)" and
should be granted where the defendant may not to prosecute the appeal).

In sum, Movants will "be seriously harmed if intervention is denied"—and "courts should
be reluctant to dismiss such a request for intervention" in such "situations."  *Ute Indian Tribe*,
2020 WL 1465886, at *1 (quoting 7C Charles Alan Wright & Arthur R. Miller, et al. *Federal
Practice and Procedure* §1916 (3d ed. 2019)).  There is no basis to the notion that Movants—
whose concrete interests in emergency-relief funds the plaintiffs have sought to nullify (and thus

far have succeeded in doing so)—should be barred from these proceedings simply because the plaintiffs chose not to sue it.  Movants are entitled to intervene as of right under Rule 24(a).

## II.     In The Alternative, The Court Should Allow Movants To Intervene Under Rule 24(b).

Alternatively, the Court should grant permissive intervention under Rule 24(b), which applies when the movant has "a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1)(B).  Rule 24 is construed "liberally" in favor of intervention.  *In re Vitamins Antitrust Litig.*, No. 99-197, MDL 1285, 2001 WL 34088808, at *3 (D.D.C. Mar. 19, 2001).  Movants satisfy each Rule 24(b) requirement.  First, the Court has subject matter jurisdiction over Movants' defenses and arguments, which all arise under or relate to federal law under the APA or with respect to the interpretation of Title V of the CARES Act.  Second, as set forth above, this Motion is timely and will not "unduly delay or prejudice the adjudication of any original party's rights."  Fed. R. Civ. P. 24(b)(3).  In contrast, not permitting Movants to intervene could have grave consequences for Movants' rights, particularly given that the government (the sole defendant currently party to these proceedings) has not yet "decid[ed] whether to appeal" the Court's April 27 Order.  Joint Status Report 3, Dkt. 44 (May 1, 2020). Finally, Movants' anticipated defenses all relate to the core issues in dispute, though they will present a more accurate factual and legal picture than what the government has provided.

## CONCLUSION

For the foregoing reasons, the Court should grant the Motion to intervene as of right under Rule 24(a), or in the alternative should permit Movants to intervene under Rule 24(b).

Respectfully submitted,

/s/Ragan Naresh
PAUL D. CLEMENT  (*renewal pending*)
ERIN E. MURPHY
RAGAN NARESH
MATTHEW D. ROWEN  (*admission pending*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004
(202) 389-5000
ragan.naresh@kirkland.com

*Counsel for Movants*

May 5, 2020

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of May, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia using the CM/ECF system.

/s/ Ragan Naresh