**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CONFEDERATED TRIBES OF THE CHEHALIS RESERVATION *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> STEVEN MNUCHIN, in his official capacity as the Secretary of the Treasury, <br><br> Defendant. | <br><br><br> Case No. 1:20-cv-01002-APM |
| CHEYENNE RIVER SIOUX TRIBE *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> STEVEN MNUCHIN, in his official capacity as the Secretary of the Treasury, <br><br> Defendant. | <br><br><br> Case No. 1:20-cv-1059-APM |
| UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION, <br><br> Plaintiff, <br><br> v. <br><br> STEVEN MNUCHIN, in his official capacity as the Secretary of the Treasury, <br><br> Defendant. | <br><br><br> Case No. 1:20-cv-01070-APM <br><br> **CONSOLIDATED CASES** |

**PLAINITFFS CHEYENNE RIVER SIOUX TRIBE'S, ROSEBUD SIOUX TRIBE'S, OGLALA SIOUX TRIBE'S, NONDALTON TRIBAL COUNCIL'S, ARCTIC VILLAGE COUNCIL'S, NATIVE VILLAGE OF VENETIE TRIBAL GOVERNMENT'S, NAVAJO NATION'S, AND UTE INDIAN TRIBE OF THE UINTAH AND OURAY INDIAN RESERVATION'S MEMORANDUM IN SUPPORT OF
JOINT MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

On March 27, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Securities Act ("CARES Act"), H.R. 748, 116th Cong. (2020), to respond to the national COVID-19 pandemic, appropriating roughly $2 trillion to provide emergency relief to the Nation. The CARES Act is broad and includes specific relief for, among others, large corporations, small businesses, individuals, and, importantly, State, Tribal, and local governments. Specifically, Title V of the CARES Act sets aside $150 billion for State, Tribal, and local governments to ensure that these governments can adequately provide the ***government services*** necessary to respond to the crisis during a time when regular sources of government revenue are drying up. Title V appropriates $8 billion for the Nation's 574 federally recognized Tribes. Despite the clear directive to distribute Title V monies to "Tribal governments," a term the bill uses ***15 times*** in just over three pages, Defendant Steven Mnuchin, Secretary of the Department of the Treasury, decided instead to allocate Title V monies to Alaska Native Claims Settlement Act ("ANCSA") corporations ("ANCs"), for-profit, non-governmental entities established as part of the land settlement bill in 1971.

But these ANCs are not Tribal governments under any measure. For virtually every corporation that has intervened or filed an *amicus* brief or declaration in this case, there is a federally recognized Tribe in that same location entitled to that relief. By attempting to benefit from Title V, these ANCs are directly competing with, and taking resources from, federally recognized Tribes—something that has never been countenanced in any case, statute, or regulation. From the time they were established in 1971, ANCs have always been private landholders, and are, in the words of the Supreme Court, "state-chartered and state-regulated private business corporations." *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 534 (1998). No court

has ever held that ANCs are "Tribal governments" or have "recognized governing bodies." The primary drafter of ANCSA, Senator Ted Stevens of Alaska, designed ANCs this way and said it best himself when, in the midst of debating ANCSA on December 14, 1971, he assured Congress that ANCs "are not government bodies." 117 Cong. Rec. 46,964 (daily ed. Dec. 14, 1971) (statement of Senator Stevens).

Because it is clear that ANCs are not governments, the Court can stop there and need not consider the secondary question of whether ANCs are "Indian Tribes" under the Indian Self Determination and Education Assistance Act ("ISDEAA"); ANCs are not ***governments*** and therefore not entitled to Title V funds. This brief covers just these two issues and incorporates by reference the Statement of Facts and Sections II.B, III.A, III.B.2, III.C and IV of the Chehalis Plaintiffs' brief. The Cheyenne River Plaintiffs, the Navajo Nation, and the Ute Indian Tribe respectfully request that the Court grant summary judgement in their favor and an issue an order directing Defendant to distribute the remainder of the Title V funds to federally recognized Tribal governments.

## ARGUMENT

ANCs are not entitled to CARES Act Title V funds because they are not "Tribal governments." Title V reserved $8 billion of that appropriation "for making payments to Tribal governments." H.R. 748 § 601(a)(2)(B). The CARES Act defines "Tribal government" as "the recognized governing body of an Indian tribe." *Id*. § 601(g)(5).[1] The CARES Act further defines "Indian tribe" as it is defined in Section 4(e) of ISDEAA. *Id*. § 601(g)(1). ANCs are not entitled

---

[1] Each reference to "Tribal government" throughout Title V appears beside, and in the same context as, other political governing entities that exercise varying degrees of inherent sovereignty: "States," and other "units of local government," including "the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, the Commonwealth of the Northern Mariana Islands, and American Samoa." H.R. 748 § 601(a).

to Title V funds because none are a "*recognized governing body* of an Indian tribe" entitled to Title V funds. *C.f. Great Lakes Comnet, Inc. v. Fed. Commc'ns Comm'n*, 823 F.3d 998, 1003 (D.C. Cir. 2016) (the canon against surplusage "dictates that when construing a statute courts 'give effect, if possible, to every clause and word.'" (citation omitted)). ANCs simply cannot meet this definition because they do not have recognized governing bodies. Accordingly, they are not Tribal governments entitled to Title V funds.

In this case, Defendants will likely assert that every ANC should get CARES Act funding because ISDEAA defines "Indian tribe" as

> any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village or regional or village corporations defined in or established pursuant to the Alaska Native Claims Settlement Act (85 Stat. 688), which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

25 U.S.C. § 5304(e).

As discussed in greater detail below, the United States has consistently interpreted ISDEAA to mean that ANCs can be treated as "Indian tribe" for *limited* purposes, and they receive that treatment *if*, *and only if*, there is no eligible federally recognized Indian Tribe that can provide the specific services at issue. Thus, ISDEAA's definition of "Indian tribe" has never conferred upon ANCs, as corporate entities, a government status or attributes of sovereignty. Instead, it confers on them limited contracting authority to carry out certain programs and services on behalf of Native people under specific and limited circumstances. It is federally recognized Tribes that are the governments; it is federally recognized Tribes that are performing essential governmental services in Alaska and in the Lower 48; and it is solely to federally recognized Tribes that Title V funding for those government services can be distributed.

I.     **ANCS ARE NOT ENTITLED TO CARES ACT FUNDS BECAUSE THEY ARE NOT TRIBAL GOVERNMENTS.**

    A.     **Tribal Governments Provide Government Services and Have Expended Large Sums to Combat COVID-19.**

The provision of governmental services—such as the administration of courts, health and wellness programming, police and public safety, general welfare and assistance, water and sewage, fire protection, schools, sanitation and trash, roads, land use and community planning, and various regulatory and management services—is the fundamental, defining function of any state, Tribal or local government.[2]

In Alaska it is the federally-recognized, sovereign Alaska Native *Tribes*, not ANCs, that provide myriad governmental services to their communities as an exercise of their Tribal sovereignty, including medical care,[3] housing programs,[4] natural resource programs,[5] Tribal

---

[2] *See* U.S. Dep't of the Treasury, *Guidance to Tribes for Completing Supplemental Request for Information*, *available at* https://home.treasury.gov/system/files/136/Tribal-Employment-and-Expenditure-Submission-Instructions.pdf (last visited May 29, 2020) ("Governmental expenditures include, but are not exclusive of, general government, public safety, health services, wellness services, substance abuse, general welfare and assistance, community services, cultural programs, education, recreation, housing, economic development, planning and development, sanitation, judicial, and similar activities."); *see also* the Rosebud Sioux Tribe description of their extensive government functions and extensive civil and criminal code at Herman Decl. ¶¶ 5-6 and the Cheyenne River Sioux Tribe description of their government functions and extensive civil and criminal code at Frazier Decl. Ex. A,G,H.

[3] *See, e.g.*, the Kenaitze Indian Tribe's Dena'ina Wellness Center which provides medical, dental, behavioral health, chemical dependency, wellness, physical therapy, optometry, pharmacy support, and traditional healing services in a 52,000-square-foot facility. *About the Dena'ina Wellness Center*, KENAITZE INDIAN TRIBE, https://www.kenaitze.org/denaina-wellness-center/ (last visited May 29, 2020).

[4] *See, e.g.*, Ketchikan Indian Community's housing authority, which provides a rental program, home improvement assistance program, elder energy assistance program, among others. *Housing*, KETCHIKAN INDIAN CMTY., http://www.kictribe.org/housing (last visited May 29, 2020).

[5] *See, e.g.*, *Resource Protection*, SITKA TRIBE OF ALASKA, http://www.sitkatribe.org/pages/tribal-services-resource-protection-programs (last visited May 29, 2020).

courts,[6] child welfare and family assistance programs,[7] and transportation programs.[8] Some Tribes choose to not run their own individual programs but to instead join together and compact under ISDEAA with Tribal regional non-profit consortia and Tribal health organizations. It is the federally recognized, sovereign Tribes and Tribes' duly authorized regional non-profit Tribal consortia and non-profit Tribal health organizations ("THO")[9] that are overwhelmingly on the

---

[6] *See, e.g.*, *Tribal Court*, ORGANIZED VILL. OF KAKE, http://www.kake-nsn.gov/tribal-court.html (last visited May 29, 2020).

[7] *See, e.g.*, Central Council of Tlingit & Haida Indian Tribes of Alaska's extensive Family Services offerings, which include child care assistance, child support assistance, a child welfare unit, counseling services, suicide prevention, Tribal assistance for needy families, and other wellness programs. *Family Services*, CENT. COUNCIL TLINGIT & HAIDA INDIAN TRIBES OF ALASKA, http://www.ccthita.org/services/family/overview/index.html (last visited May 29, 2020).

[8] *See, e.g.*, the extensive transportation program run by the Chickaloon Native Village. *Transportation*, NAY'DINI'AA NA' KAYAX' (CHICKALOON NATIVE VILL.), https://www.chickaloon-nsn.gov/transportation-department/ (last visited May 29, 2020).

[9] Tribal regional non-profits and non-profit THOs are not to be confused with ANCs. In Alaska, such non-profit entities predate ANCSA and exist to enable Alaska Tribes to take advantage of efficiencies of scale in providing government services for their member Tribes, including social, educational, and health services. The non-profits are almost always a consortium of federally recognized Tribes. They exist only by express authorization of the Tribes. Their boards of directors are comprised of representatives of the Tribal governments that they serve. All actions taken by the consortiums are taken at the direction of the elected representatives of the federally recognized Tribes that constitute their board of directors. These consortia are authorized as the Tribal authority to compact government to government with the United States for federal programs and functions through the resolutions of each member Tribe. The consortia are accountable to all the beneficiaries of their programs through this representative structure and, unlike ANCs, as organizations of Tribes they enjoy the privileges of their member Tribes such as immunity from suit. *See, e.g.*, *Barron v. Alaska Native Tribal Health Consortium*, 373 F. Supp. 3d 1232, 1240 (D. Alaska 2019) ("While Alaska Native Corporations are owned and managed by Alaska Natives, they are distinct legal entities from Alaska Native tribes. . . . Unlike an Alaska Native Corporation, [the non-profit tribal health consortium] is an entity created and controlled by Alaska Native tribes that promotes tribal self-determination and fulfills governmental functions." (footnotes omitted)); *see also* ECF 71, AR008 Letter from Alaska Delegation at 1-2, 3-4 (describing the important role of tribal consortia in the delivery of services); ECF 71 AR009 at 123 (same). Similarly, Tribal governments in Alaska and the Lower 48 may approve other types of tribal organizations to receive ISDEAA funds from the federal government. 25 U.S.C. §§ 5321(a), 5304(l). Such non-governmental Tribal organizations include non-profit health boards approved by the Navajo Nation to operate Indian Health Service hospitals through ISDEAA contracts. *See, e.g., Main*, FORT DEFIANCE INDIAN HEALTH BD., INC., www.fdihb.org/main (last visited May 29, 2020).

front lines of protecting Alaska Native people from the COVID-19 pandemic. *See* 25 U.S.C. §
5304(e), (l); *see also* DAVID CASE & DAVID VOLUCK, ALASKA NATIVES AND AMERICAN LAWS 178
(2d ed. 2012) (explaining that it is the non-profit Tribal consortia that are the "service delivery
vehicles," not the ANCs).

In the hands of Tribal governments, both in Alaska and in the Lower 48, CARES Act funds
are being used to protect lives through emergency pandemic response services, preventative
governmental measures, and patient care. For example, the Cheyenne River Sioux Tribe is
purchasing and providing health care supplies and PPE, as well as and increasing emergency food
distribution to its members. Nelson Decl. ¶ 4. Importantly, moreover, the Cheyenne River Sioux
Tribe has expended significant funds on exercising sovereign governmental powers delegated by
the Tribe to the Tribal government in the Tribe's Constitution to protect the health and welfare of
Reservation residents, both members and nonmembers. Frazier Decl. at Ex. A. For instance, the
Cheyenne River Sioux Tribe has hired more than 150 emergency deputies to man 24-hour health
and safety checkpoints at all entrances to the Cheyenne River Sioux Reservation, where the Tribe
gathers health information, performs contact tracing, and enforces proper travel across the
Reservation. *Id.* ¶¶ 15-20. The Cheyenne River Sioux Tribe has also used significant government
funds in developing and enforcing civil regulations that govern both Tribal members and
nonmembers on the Reservation, including mandatory curfew, stay-at-home orders, non-essential
business closures, and travel restrictions. *Id.* The Cheyenne River Sioux Tribe and its Tribal courts
have authority to enforce these regulations as an exercise of the Tribe's sovereignty and as set forth
in both their Tribal Constitution, as well as the Tribe's duly enacted Law and Order Code and
Rules of Civil Procedure. *Id.* at Ex. A, G, H.

Similarly, the Rosebud Sioux Tribe has been dealing with the pandemic on a daily basis

since its onset in March 2020. Its first order of business was to issue a travel ban to certain cities and states. Then, on March 25, 2020, President Bordeaux issued an order instituting a reservation-wide curfew, ordering a shelter-in-place, limiting restaurants to take-out, limiting the size of gatherings and closing businesses to non-residents. In order to protect Tribal members against further infection, the Tribe has also instituted checkpoints at its own expense. Herman Decl. ¶¶ 9, 11-12.

Likewise, the Nondalton Tribal Council, Arctic Village Council, and Native Village of Venetie Tribal Government have exercised their inherent sovereign powers as Tribal governments to impose preventative measures and protocols to protect their communities, including travel bans or restrictions, mandatory self-quarantine orders, and strict social distancing guidelines. Alexie Decl. ¶¶ 7-9; Thumma Decl. ¶¶ 8-10; Yatlin Decl. ¶¶ 7-8. Each Tribe has also provided services to assist their Tribal members and communities in response to the COVID-19 pandemic. Alexie Decl. ¶ 10; Thumma Decl. ¶¶ 10-11; Yatlin Decl. ¶¶ 9-10. Facing a shortage of housing in the community, Native Village of Venetie Tribal Government has prioritized setting up homes for people to stay during the mandatory fourteen-day quarantine it imposed on all individuals returning to the community. Thumma Decl. ¶ 10. All three villages are accessible only by small, single engine airplanes and have faced significant challenges in securing adequate food and other supplies as a result of limitations on travel. Alexie Decl. ¶ 10; Thumma Decl. ¶¶ 8, 11; Yatlin Decl. ¶¶ 6-7. For instance, Nondalton Tribal Council operates a food bank and the Tribe has expended significant resources keeping the shelves stocked to meet increased need. Alexie Decl. ¶ 10. Nondalton Tribal Council has not yet received CARES Act funding and without additional funding the Tribe may not be able to continue meeting the increased demand for services. *Id.* Arctic Village Council is hiring Tribal members to provide subsistence foods to each household in the village and

harvest firewood to provide heat, as heating fuel is prohibitively expensive. Yatlin Decl. ¶¶ 9-10.

Every dollar taken away from Tribes' CARES Act allocations diminishes the resources available to these and other Tribal governments, and in turn diminishes their ability to prevent or control infection on behalf of their citizens.

### B.   ANCSA Created ANCs but Did Not Divest Alaska Tribes of Their Governmental Status.

Enacted in 1971, ANCSA was a lands settlement bill that: (1) extinguished aboriginal lands claims in exchange for approximately $1 billion and 45.7 million acres of land; (2) established village and regional ANCs to receive this money and land to be conveyed under the terms of the settlement; and (3) authorized stock in those ANCs to be issued to eligible Alaska Natives. 43 U.S.C. §§ 1603, 1605, 1606, 1607; *see also* CASE & VOLUCK, *supra*, at 171. In short, ANCSA "converted the communal, aboriginal claims of the Alaska Natives into individual private property, represented by shares of stock" in village and regional ANCs. CASE & VOLUCK, *supra*, at 167. ANCSA's purpose was to bring clarity to land ownership and pave the way for oil development by extinguishing any aboriginal land claims that might hold up construction for the Trans-Alaska Pipeline. *See id.* at 155-57 (describing the land freeze and its impacts on the Alaska pipeline).

Previous filings in this case perpetuate a dangerous narrative that ANCSA supplanted actual Tribal governments in Alaska with ANCs. In previous briefing, Intervenors ANCSA Regional Association went so as far as to claim, incorrectly, that the United States exercises its trust responsibility to Alaska Natives through ANCs. ECF 24, ARA *Amici* Br. at 14. Nothing could be farther from the truth. The text itself contradicts this:

> [T]he settlement should be accomplished rapidly, with certainty, in conformity with the real economic and social needs of Natives, without litigation, with maximum participation by Natives in decisions affecting their rights and property, *without establishing any permanent racially defined institutions, rights, privileges, or obligations, without creating a reservation system or lengthy wardship or*

> *trusteeship, and without adding to the categories of property and institutions*
> *enjoying special tax privileges or to the legislation establishing special*
> *relationships between the United States Government and the State of Alaska*[.]

43 U.S.C. § 1601(b) (emphasis added). Furthermore, while "ANCSA extinguished all aboriginal

title and claims to Alaska land and revoked all existing Indian reservations[,] . . . [it] did not divest

Alaska Native villages of their sovereign powers." *Alaska v. Native Vill. of Tanana*, 249 P.3d 734,

743 (Alaska 2011) (citing *John v. Baker*, 982 P.2d 738, 747-48 (Alaska 1999)); CASE & VOLUCK,

*supra*, at 177 (explaining that ANCSA "did not abolish the preexisting tribal governments").

As described above, Tribal governments are sovereigns that enjoy similar powers and

immunities as state and local governments, including both civil and criminal jurisdiction over

conduct arising within their territory and the power to establish courts, pass and enforce

ordinances, levy taxes, and regulate commerce. *See generally* COHEN'S HANDBOOK OF FEDERAL

INDIAN LAW § 4.01, at 206-22 (Nell Jessup Newton ed., 2015, sup. 2019) (detailing nature of Tribal

sovereignty and powers). Recognized Tribal governments are entitled to immunities and

privileges, such as immunity from federal income tax and sovereign immunity from suit. *See, e.g.,*

25 C.F.R. § 83.2.

ANCs have none of the responsibilities, powers, limitations, or obligations of federally

recognized Tribes, and they cannot exercise governing powers or jurisdiction over anyone, not

even their shareholders. Unlike recognized Tribal governments, ANCs' *only obligation* is to their

boards of directors and shareholders. *Accord* 16 U.S.C. §§ 1606(d) (ANCs "shall be incorporated

under the laws of Alaska"), 1607(a); Alaska Stat. § 10.06.450(b) ("A director shall perform the

duties of a director . . . in good faith, in a manner the director reasonably believes to be in the best

interest of the corporation.").[10] Since their creation nearly fifty years ago, many ANCs have

---

[10] Though ANCs may work in partnership with the federally recognized Tribes in their region,

operated various programs that benefit their shareholders, including scholarship programs, burial assistance, dividends, and life insurance assistance. *See, e.g.*, ECF 45-1 to 45-24. While no doubt beneficial, these programs do not covert ANCs into governments or equate them to Tribal governments in any way. Congress intended the Title V CARES Act stabilization funds to be allocated to "Tribal *governments*," not "state-chartered and state regulated private business corporations," *Venetie*, 522 U.S. at 534, with shareholders that include non-Indians. 43 U.S.C. §§ 1606(h)(2), (h)(3)(D), 1607(c).

## C. Federal Courts Have Routinely Rejected Arguments that ANCs Are Tribal Governments.

While ANCs may be treated as "Indian tribe[s]" for limited purposes under the ISDEAA, this does not transform ANCs into Tribal governments, and they do not mean that ANCs possess attributes of Tribal sovereignty or that they are "recognized governing bodies" entitled to Title V funds. The federal government has recognized the important differences between Tribes and ANCs, stating affirmatively that ANCs "are not governments" and "lack tribal status in a political sense." Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 56 Fed. Reg. 54,364, 54,364-65 (Oct. 21, 1993). Likewise, *no court* has ever held that ANCs are Tribal governments or possess recognized governing bodies.

For example, in *Seldovia Native Association v. Lujan*, the United States Court of Appeals for the Ninth Circuit held that the village ANC "is not a governmental unit with a local governing board organized under the Indian Reorganization Act[.] . . . Because [the village ANC] is not a

---

they are not Tribally-controlled or Tribally-designated. *See, e.g.*, ECF 45-15 at 1 (confirming the Tyonek Native Corporation "is a separate and legally distinct entity with no formal relationship to the Native Village of Tyonek"); ECF 71, AR009 at 122 (stating ANC Bristol Bay Native Corporation "has relatively deep pockets but not the direct connection with the local tribal governments" that the regional Tribal consortium has).

governing body, it does not meet one of the basic requirements of an Indian tribe." 904 F.2d 1335, 1350 (9th Cir. 1990) (citations omitted). In *Eaglesun Systems Products, Inc. v. Association of Village Council Presidents*, the Northern Oklahoma District Court held that even though ANCs "are recognized as tribes for limited purposes, . . . they do not possess key attributes of an independent and self-governing Indian tribe . . . [and] are not governing bodies." No. 13-CV-0438-CVE-PJC, 2014 WL 1119726, at *6 (N.D. Okla. Mar. 20, 2014) (citation omitted). And in *Pearson v. Chugach Government Services Inc.*, the Delaware District Court observed that "ANCs are not federally recognized as a 'tribe' when they play no role in tribal governance." 669 F. Supp. 2d 467, 469 n.4 (D. Del. 2006) (citation omitted). The court was unable to "find [any] evidence to suggest[] that [ANCs] are governing bodies." *Id.*; *see also* CASE & VOLUCK, *supra*, at 177 ("At times the tribes and corporations have seemed at odds as the corporations are defined as 'tribes' in some post-ANCSA program and service legislation. It is clear, though, that as a matter of common law that the corporations are not tribes in the political sense of the term, nor are they recognized as such."); *c.f. Aleman v. Chugach Support Servs., Inc.*, 485 F.3d 206, 213 (4th Cir. 2007) ("While the sovereign immunity of Indian tribes 'is a necessary corollary to Indian sovereignty and self-governance,' . . . Alaska Native corporations are not comparable sovereign entities[.]" (internal citations omitted)). As a matter of law, ANCs are not Tribal governments and do not possess recognized governing bodies and attributes of Tribal sovereignty entitling them to Title V funds. That they may provide programs beneficial to their shareholders does not change their legal status.

The assertion that ANCs are Tribal governments is belied by the very purpose and structure of ANCSA. ANCSA, and the creation of ANCs, explicitly rejects the notion that ANCs possess governmental functions or attributes of Tribal sovereignty. ANCSA established ANCs as "state-chartered and state regulated private business corporations," *Venetie*, 522 U.S. at 534, "governed

by state law, *not tribal sovereigns.*" *Nenana Fuel Co. v. Native Vill. of Venetie*, 834 P.2d 1229, 1240 (Alaska 1992) (Moore, J., concurring) (emphasis added). In creating ANCs, ANCSA "did not abolish preexisting tribal governments." CASE & VOLUCK, *supra*, at 177; *Tanana*, 249 P.3d at 743 (citing *John*, 982 P.2d at 747-48) (ANCSA "did not divest Alaska Native villages of their sovereign powers."). ANCSA established ANCs to engage in "profitmaking" for Alaska Natives while leaving undisturbed Tribal governments to continue to function and provide governmental services to their citizens and members. *Nenana*, 834 P.2d at 1240 (quoting 117 Cong. Rec. 46,964 (daily ed. Dec. 14, 1971) (statement of Senator Stevens) ("[The ANCs] are not governmental entities, but they are part of a profitmaking picture for the native people of Alaska for the future. . . . They are not government bodies."); CASE & VOLUCK, *supra*, at 48 (ANCs "established through the state do not have either defined or implied powers of social or political governance").

ANCs themselves have disclaimed government status;[11] yet, they now seek to clothe themselves under the cloak of Tribal sovereignty to benefit from a program expressly created to aid Tribal governments in a time of unprecedented crisis.[12] The Court must deny any such effort and ensure that Title V relief funds are provided to their intended beneficiaries: Tribal governments.

## II.   ANCS MAY BE TREATED AS A TRIBE UNDER ISDEAA ONLY FOR LIMITED PURPOSES IF THERE IS NO TRIBE THAT CAN PERFORM THE SERVICES, BUT THEY ARE NOT GOVERNMENTS FOR PURPOSES OF THE CARES ACT.

---

[11] Indeed, ANCs have themselves for years vigorously argued that they are *not* Tribal governments and that they do not exercise governmental functions. *See e.g.*, Comments of Arctic Slope Reg'l Corp., 2013 WL 3096205, *1 (May 31, 2013) ("*a governing body of Alaska Natives* would constitute an Indian tribal government, [] an [ANC] would not *because it does not exercise governmental functions*") (emphasis added).

[12] Excluding ANCs from Title V relief will not exclude ANCs from all CARES Act relief. ANCs still have access to the full suite of assistance offered to private business under the CARES Act, including but not limited to the Paycheck Protection Program and the Employee Retention Credit. H.R. 748 §§ 1102, 2301.

The Court does not need to examine ISDEAA and whether ANCs meet its definition of Indian Tribe, as they are expressly prohibited from receiving Title V funds under the CARES Act's definition of "Tribal government." Nonetheless, ANCs' treatment as Indian Tribes under ISDEAA is for a *limited* purpose and does not transform them into Tribal governments or confer on them sovereign powers. ANCs may qualify under ISDEAA's definition of "Indian tribe" only as a stop-gap to ensure critical services are provided to Alaska Natives in regions where there are no actual federally recognized Tribal governments, or where Tribal governments choose to compact with ANCs to provide services under ISDEAA.[13]

The Bureau of Indian Affairs ("BIA") and the Indian Health Service ("IHS")—the two agencies tasked with administering ISDEAA contracts—have for decades relied on identical guidelines that suggest how to treat ANCs in the ISDEAA funding regime. These guidelines set forth the order of preference for what entities the agencies will contract services with under ISDEAA. These guidelines, which have been in use for decades, establish a hierarchy, whereby Tribal governments are given precedence over ANCs:

> For the purposes of contracting under Pub. L. 93–638, the Alaska Area will recognize as the village governing body the following entities in order of precedence:
>
> > If there is an Indian Reorganization Act (IRA) Council, and it provides governmental functions for the village, it will be recognized.
> >
> > If there is no IRA Council, or it does not provide governmental functions, then the traditional village council will be recognized.

---

[13] *See, e.g.*, ECF 45-6, Dec. of Cook Inlet Region, Inc. at 2-3 (describing how CIRI receives 638 contracts to serve Alaska Native people living in Anchorage, Alaska's largest urban area, where there is no one federally recognized Tribe); ECF 45-5, Dec. of Sheri Bretta at 1-2 (noting that Chugach Alaska Corporation acts as a conduit for ISDEAA contracts for two communities in its region—Seward and Valdez—where no federally recognized Tribes exist, but which have established Native communities seeking federal recognition).

> If there is no IRA Council and no traditional village council, then the village profit corporation will be recognized.
>
> If there is no IRA Council, no traditional village council, and no village profit corporation, then the regional profit corporation will be recognized for that particular village.

Alaska Area Guidelines for Tribal Clearances for Indian Self-Determination Contracts in 1981, 46 Fed. Reg. 27178, 27179 (May 18, 1981) ("Guidelines"); *see also* BUREAU OF INDIAN AFFAIRS, VILLAGE SELF-DETERMINATION WORKBOOK, No. 1 (Nov. 1977), *available at* https://tinyurl.com/yc2sftzo (last visited May 29, 2020). The Guidelines make clear that an ANC is considered an "Indian tribe" only as a last resort; that is, if there is no Tribal government in the area with which to contract services. However, Defendant has already stated publicly that all federally recognized Tribes including Alaska Tribes are eligible.  U.S. Dep't of Treasury, *Coronavirus Relief Fund: Allocations to Tribal Governments*, *available at* https://home.treasury.gov/system/files/136/Coronavirus-Relief-Fund-Tribal-Allocation-Methodology.pdf (last visited May 29, 2020). This last resort stop-gap is critical because it facilitates ISDEAA funds, such as healthcare dollars, going to urban centers where there is not a singular controlling Tribal government that represents all Alaska Natives. There are a significant number of urban Indians that would be left without services absent this provision. But this stop-gap does not transform ANCs into entities that can be described as recognized governing bodies as Defendant would suggest.

Since ISDEAA's enactment, the Federal government has understood that ANCs may be treated as having "limited tribal status" under ISDEAA in the narrow circumstances described above. *See, e.g.,* U.S. Resp. in Opp'n to Mot. for Prelim. Inj., Dkt. 22 at 19, *Ukpeagvik Inupiat Corp. v. U.S. Dep't of Health & Human Servs.*, No. 3:13-CV-00073-TMB (D. Alaska). The same year that ISDEAA was passed, Congress established the American Indian Policy Review

Commission ("Commission") "to conduct a comprehensive review of the historical and legal developments underlying the Indians' unique relationship with the Federal Government in order to determine the nature and scope of necessary revisions in the formulation of policies and programs for the benefit of Indians." Pub. L. No. 93-580, 88 Stat. 1910 (1975).[14]

The Commission's Final Report includes a section focusing on Alaska and provides a thoughtful, thorough analysis of the relationship, or lack thereof, between Alaska's Tribal governments and the ANCs that were formed in ANCSA and their respective roles and powers. AM. INDIAN POLICY REVIEW COMM'N, FINAL REPORT 495 (May 17, 1977). The Commission described the four entities listed in the IHS Guidelines—(1) a Tribal council organized under the Indian Reorganization Act ("IRA"); (2) a traditional Tribal council; (3) a village for profit corporation (village ANC); and (4) a regional profit corporation (regional ANC)—and acknowledged that "[a]lthough any organization of any of these forms meets the definition of 'Indian tribe' in [ISDEAA], it is only" the first two "that are repositories of tribal sovereignty and are capable of exercising residual sovereign powers." *Id.* The Commission further explained that only the IRA and traditional Tribal governments in Alaska are entities who are both "tribal and governmental in nature." *Id.* In contrast, the Commission acknowledged that even though the ANCs "are predominantly Native," the "village and regional corporations organized pursuant to [ANCSA] are ***neither tribal nor governmental in nature***. They are for-profit corporations organized under State law." *Id*. (emphasis added).

The Federal government's understanding that ANCs serve a limited role in ISDEAA, and are not the same as federally recognized Tribes, has been consistent over the decades. For example,

---

[14] The Department of Interior still relies in this Report. *See* Sol. Op. M-37045, Reaffirmation of the United States' Unique Trust Relationship with Indian Tribes and Related Indian Law Principles, 2017 WL 7805664 at *7 (Jan. 18, 2017).

in the 1993 list of federally recognized Tribes, the BIA noted that "[u]nder longstanding BIA policy, priority for contracts and services in Alaska is given to reorganized [IRA] and traditional governments over non-tribal corporations." 58 Fed. Reg. 54,364, 54,366 n.2 (Oct. 21, 1993). And in the 1994 ISDEAA amendments, Congress affirmed its intent to prioritize the governing bodies of federally recognized Tribes stating, "Clearly, the law envisions maintaining tribal government control of the contracting process." S. Rep. No. 100-274 at 19 (1987). ISDEAA's definition and order of precedence have likewise been consistently interpreted by the courts. *See Cook Inlet Native Ass'n v. Bowen*, 810 F.2d 1471 (9th Cir. 1987); *Ukpeagvik Inupiat Corp. v. U.S. Dep't of Health & Human Servs.*, No. 3:13-CV-00073-TMB, 2013 WL 12119576 *1-2 (D. Alaska May 20, 2013) (recognizing that the Department of Health and Human Services must defer to the governing bodies of federally recognized Tribes rather than village ANCs); *see also* U.S. GENERAL ACCOUNTING OFFICE, INDIAN SELF-DETERMINATION CONTRACTING: EFFECTS OF INDIVIDUAL COMMUNITY CONTRACTING FOR HEALTH SERVICES IN ALASKA 4 n.4 (June 1988), *available at* https://www.gao.gov/archive/1998/he98134.pdf (noting IHS's longstanding order of precedence and that it has "withstood several court challenges"). The governing bodies of federally recognized Tribes are given first priority for ISDEAA funds, and when present, control the distribution of those funds. Only if a Tribal government does not exist for a specific area, or if it compacts its ISDEAA services with an ANC, does an ANC receive ISDEAA funds. Indeed, Intervenor Calista Corporation admitted this and acknowledged the limited role of ANCs in ISDEAA in its April 23, 2020, letter to Defendant when it noted the order of precedence's priority for federally recognized Tribes and encouraged Defendant to incorporate the order of precedence "into the Treasury's guidelines and decision-making regarding" the Tribal relief fund. ECF 71, AR010x, Letter from

Calista Corp. at 2 (April 23, 2020).[15]

Defendants and Intervenors are attempting to do here what Ukpeagvik Inupiat Corporation ("UIC") sought to do in *Ukpeagvik Inupiat Corp.*, 2013 WL 12119576, which is to conflate ANCs' inclusion in the definition of Indian tribe in ISDEAA with the power and authorities of actual sovereign Tribal governments. In the United States's own words, "UIC assert[ed] that because it [was] considered a 'tribe' for the purpose of being eligible to enter into a self-determination contract with the IHS under the ISDEAA, it only need[ed] a resolution of support from its own corporate governing body to provide services." U.S. Resp. in Opp'n to Mot. for Prelim. Inj., Dkt. 22 at 18, *Ukpeagvik Inupiat Corp. v. U.S. Dep't of Health & Human Servs*., No. 3:13-CV-00073-TMB (D. Alaska). The United States vigorously pushed back on UIC's overreach, noting that UIC was not, nor ever had been a federally recognized Tribe, and recognizing that although UIC was "one of the entities eligible to enter into an ISDEAA contract, it could only do so if it had authorizing resolutions from the tribal governments in UIC's proposed service area." *Id*. at 18.[16]

The potential for ANCs to be treated as Indian Tribes under ISDEAA does not bear the heavy weight Defendant and Intervenors places on it here. It does not confer governmental status upon ANCs, allowing them to compete with Tribal governments for scarce funding exclusively

---

[15] Intervenor Calista Corporation further explained that following the order of precedence would "preclude any 'double dipping' or 'double counting' of Alaska Natives or Alaska Native Tribal communities" and attested that "Calista, along with many other ANCs, submitted their data to [Defendant], under the belief that that [Defendant] would follow" the order of precedence— meaning that an ANC would only receive CARES Act funding in the absence of a Tribal government. ECF 71, AR010x at 2.

[16] The United States mistakenly hypothesized that "if all UIC wanted to do was provide support services to the residents of the Village of Barrow . . . nothing more would be required." *Id.* at 18-19. However, the Native Village of Barrow Inupiat Traditional Government, the federally recognized Tribe in Utqiagvik (previously called Barrow), had already provided a resolution designating the Arctic Slope Native Association as the recipient of its ISDEAA funds. *Ukpeagvik Inupiat Corp.*, 2013 WL 12119576 at *1 n.8.

set aside for sovereign governing bodies. As the Commission noted, while it might be true that a village or regional ANC might be the best suited to have an ISDEAA contract in some circumstances—for example, for when a federally recognized Tribal government decides as such—"the need is to obviate conflicts among organizations all of which are qualified applicants for benefits under particular laws and programs," such as ISDEAA. AM. INDIAN POLICY REVIEW COMM'N, *supra* at 495. "The solution is not to disqualify certain kinds of Alaska Native organizations but to assign priorities among them." *Id*.

ANCs are not allowed to compete with Tribal governments in ISDEAA contracting when a Tribe wants to provide the service itself. If a federally recognized Tribe would like to enter into its own ISDEAA contract, the village ANC and the regional ANC are not permitted to also obtain ISDEAA contracts to provide the same services to the same Tribal members. Yet this is exactly the result that Defendant and *Amici* ANCs propose here. *If they are correct, the CARES Act would represent a monumental shift in both the legal status of ANCs and the administration of ISDEAA funding streams.*

## CONCLUSION

For the foregoing reasons, and those set forth in the incorporated sections of Chehalis Plaintiffs' brief the Chehalis Plaintiffs, the Cheyenne River Sioux Plaintiffs, Navajo Nation and the Ute Indian Tribe collectively request that the Court grant them summary judgment that ANCs are not "Tribal governments" and therefore not entitled to funds under Title V of the CARES Act.

RESPECTFULLY SUBMITTED this 29th day of May, 2020.

*/s/ Nicole E. Ducheneaux*
Nicole E. Ducheneaux (DC Bar No. NE001)
BIG FIRE LAW & POLICY GROUP LLP
1404 South Fort Crook Road
Bellevue, NE 68005
Telephone: (531) 466-8725

Facsimile: (531) 466-8792
Email: nducheneaux@bigfirelaw.com

*Counsel for Plaintiff Cheyenne River Sioux Tribe*

*/s/ Natalie A. Landreth*
*/s/ Erin C. Dougherty Lynch*
*/s/ Matthew N. Newman*
*/s/ Wesley James Furlong*
*/s/ Megan R. Condon*
Natalie A. Landreth (D.D.C. Bar No. AK0001)
Erin C. Dougherty Lynch (*pro hac vice*)
Matthew N. Newman (*pro hac vice*)
Wesley James Furlong (D.D.C. Bar No. AK0003)
Megan R Condon (*pro hac vice*)
NATIVE AMERICAN RIGHTS FUND
745 West 4th Avenue, Suite 502
Anchorage, AK 99501
Telephone: (907) 276-2466
Facsimile: (907) 276-2466
Email: landreth@narf.org
dougherty@narf.org
mnewman@narf.org
wfurlong@narf.org
mcondon@narf.org

*Counsel for Plaintiffs Rosebud Sioux Tribe,
Nondalton Tribal Council, Arctic Village Council,
and Native Village of Venetie Tribal Government*

*/s/ Jennifer Bear Eagle*
Jennifer Bear Eagle (*pro hac vice*)
OGLALA SIOUX TRIBE LEGAL DEPARTMENT
P.O. Box 1204
Pine Ridge, SD 57770
Telephone: (605) 867-2138
Facsimile: (605) 867-2140
Email: jenniferbe@ostlegal.org

*Counsel for Plaintiff Oglala Sioux Tribe*

*/s/ Paul Spruhan*
Doreen McPaul (AZ Bar No. 021136)
Attorney General
Paul Spruhan (D.C. Bar No. AZ0017)
Assistant Attorney General

NAVAJO NATION DEPARTMENT OF JUSTICE
P.O. Box 2010
Window Rock, AZ 86515
Telephone: (928) 871-6345
Email: dmcpaul@nndoj.org
pspruhan@nndoj.org

*Counsel for Navajo Nation*

*/s/ Jeffrey S. Rasmussen*
Jeffrey S. Rasmussen (*pro hac vice*)
Frances C. Bassett (*pro hac vice*)
Jeremy J. Patterson (*pro hac vice*)
NATIVE LAW GROUP
357 South McCaslin Boulevard, Suite 200
Louisville, CO 80027
Phone: (303) 926-5292
Facsimile: (303) 926-5293
Email: jrasmussen@nativelawgroup.com
fbassett@nativelawgroup.com
jpatterson@nativelawgroup.com

*/s/ Rollie E. Wilson*
Rollie E. Wilson (D.C. Bar No. 1008022)
NATIVE LAW GROUP
601 Pennsylvania Avenue Northwest
South Building, Suite 900
Washington, D.C. 20004
Telephone: (202) 340-8232
Facsimile: (202) 639-8238
Email: rwilson@nativelawgroup.com

*Counsel for Ute Indian Tribe of the Uintah and Ouray Indian Reservation*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of May, 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

*/s/ Nicole Ducheneaux*
Nicole E. Ducheneaux (D.C. Bar No. NE001)
BIG FIRE LAW & POLICY GROUP LLP