## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CONFEDERATED TRIBES OF THE CHEHALIS RESERVATION, et al., <br><br> Plaintiffs, <br><br> v. <br><br> STEVEN MNUCHIN, in his official capacity as Secretary of the Treasury, <br><br> Defendant. | Case No. 1:20-cv-1002-APM |
| CHEYENNE RIVER SIOUX TRIBE et al., <br><br> Plaintiffs, <br><br> v. <br><br> STEVEN MNUCHIN, in his official capacity as Secretary of the Treasury, <br><br> Defendant. | Case No. 1:20-cv-1059-APM |
| UTE TRIBE OF THE UINTAH AND OURAY RESERVATION, <br><br> Plaintiff, <br><br> v. <br><br> STEVEN MNUCHIN, in his official capacity as Secretary of the Treasury, <br><br> Defendant. | Case No. 1:20-cv-1070-APM |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF INTERVENOR-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

BACKGROUND .......................................................................................................4

    A.    The Federal Government's Historical Relationship with Alaska
Native Peoples ...............................................................................................4

    B.    The Alaska Native Claims Settlement Act ...........................................6

    C.    ANCs' Foundational Role in the Day-to-Day Lives of Alaska
Natives ...........................................................................................................9

        1.    Alaska Native regional corporations .................................14

        2.    Alaska Native village corporations ....................................16

        3.    ANCs and the pandemic ......................................................18

    D.    Against that Backdrop, Congress Enacts Title V of the CARES Act ...............21

    E.    Procedural History ......................................................................................22

SUMMARY OF ARGUMENT ................................................................................23

STANDARD OF REVIEW .....................................................................................26

ARGUMENT ...........................................................................................................26

I.       THE PLAIN TEXT OF THE CARES ACT INCLUDES ANCS...................26

    A.    The Plain Text of the CARES Act Makes Funds Available to
Indian Tribes, "Including Any Alaska Native Village or Regional
or Village Corporation." ............................................................................27

    B.    Nothing in the Text Undermines that Straightforward Conclusion. ..................32

        1.    The burden is firmly on Plaintiffs to prove that ANCs are
ineligible to receive CARES Act funds notwithstanding
their express inclusion. ........................................................33

        2.    Plaintiffs' argument that "recognized as eligible" in the
eligibility clause means "recognized pursuant to the List
Act" is belied by the statute's text and context. .....................34

    C.    To the Extent Relevant, the Histories of Both ISDEAA and the List
Act further Rebut Plaintiffs' Atextual Interpretation. .........................37

        1.    The History of ISDEAA Confirms ANCs' Inclusion. ............37

        2.    The History of the List Act Confirms that It Was Not
Intended to Strip ANCs of their Eligibility for Indian-
Specific Programs and Services. ..........................................39

II.      REAL-WORLD CONTEXT CONFIRMS WHAT THE TEXT MAKES
CLEAR:  ANCS ARE EXPRESSLY INCLUDED IN TITLE V OF THE
CARES ACT...........................................................................................43

|   | A. | Alaska Native Corporations Have Traditionally Provided Services to Alaska Natives and Have Continued to Do So Throughout the Pandemic. | 43 |
|   | B. | Alaska Native Corporations Are Not Second-Class Indian Tribes | 50 |
| III. | THE SECRETARY'S DETERMINATION THAT ANCS ARE ELIGIBLE FOR FUNDS UNDER TITLE V IS CONSISTENT WITH LONGSTANDING FEDERAL PRACTICE AND ENTITLED TO RESPECT. | | 53 |
| IV. | CONCLUDING THAT ANCS ARE NOT "INDIAN TRIBES" UNDER ISDEAA WOULD HAVE FAR-REACHING CONSEQUENCES WELL BEYOND THE PRESENT DISPUTE. | | 56 |
| CONCLUSION | | | 59 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska v. Native Village of Venetie Tribal Government*,
    522 U.S. 520 (1998)................................................................................................................7

*Aleutian Pribilof Islands Ass'n. v. Nw. Rep. Office of Self-Governance*,
    44 IBIA 11 (Aug. 31, 2006)................................................................................................54

*Am. Fed'n of Gov't Emps. (AFL-CIO) v. United States*,
    195 F. Supp. 2d 4 (D.D.C. 2002), *aff'd*, 330 F.3d 513 (D.C. Cir. 2003)................................10

*Am. Fed'n of Gov't Emps., AFL-CIO v. United States*,
    330 F.3d 513 (D.C. Cir. 2003)..............................................................................................56

*Atascadero State Hosp. v. Scanlon*,
    473 U.S. 234 (1985)..............................................................................................................31

*Az. Health Care Cost Containment Sys. v. McClellan*,
    508 F.3d 1243 (9th Cir. 2007) ..............................................................................................36

*BedRoc Ltd., LLC v. United States*,
    541 U.S. 176 (2004)..............................................................................................................27

*Bodkin v. Cook Inlet Region, Inc.*,
    182 P.3d 1072 (Alaska 2008).................................................................................10, 55, 56

*Branch v. Smith*,
    538 U.S. 254 (2003)..............................................................................................................41

*Broad v. Sealaska*,
    85 F.3d 422 (9th Cir. 1996) ....................................................................................................9

*Burgess v. United States*,
    553 U.S. 124 (2008)..............................................................................................................31

*Carter v. United States*,
    530 U.S. 255 (2000)..............................................................................................................38

*Cent. Council of Tlingit and Haida Indian Tribes v. Chief, Branch of Judicial
    Serv., Bureau of Indian Affairs*,
    26 IBIA 159, 1994 WL 447872 (Aug. 3, 1994).................................................................54

*Cheyenne River Sioux Tribe v. Mnuchin*,
    1:20-cv-01059-APM, Dkt. 15  (D.D.C. Apr. 24, 2020)........................................................51

*Ex parte Collett,*
    337 U.S. 55 (1949)............................................................................................33

*Conn. Nat'l Bank v. Germain,*
    503 U.S. 249 (1992)...................................................................................30, 37

*Cook Inlet Native Ass'n v. Bowen,*
    810 F.2d 1471 (9th Cir. 1987) ..................................................................37, 55

*Cook Inlet Treaty Tribes v. Shalala,*
    166 F.3d 986 (9th Cir. 1999) ..........................................................................55

*Frank's Landing Indian Cmty. v. Nat'l Indian Gaming Comm'n,*
    242 F. Supp. 3d 1156 (W.D. Wash. 2017), *aff'd,* 918 F.3d 610 (9th Cir. 2019) ....................35

*Gebser v. Lago Vista Indep. Sch. Dist.,*
    524 U.S. 274 (1998)........................................................................................32

*Gen. Dynamics Land Sys., Inc. v. Cline,*
    540 U.S. 581 (2004)........................................................................................35

*Hansen v. Kake,*
    939 P.2d 1320 (Alaska 1997)..........................................................................47

*Hawaii v. Office of Hawaiian Affairs,*
    556 U.S. 163 (2009)........................................................................................27

*Hosp. of Univ. of Pa. v. Sebelius,*
    847 F. Supp. 2d 125 (D.D.C. 2012) ...............................................................26

*Jones v. United States,*
    527 U.S. 373 (1999).......................................................................................35

*Kahawaiolaa v. Norton,*
    386 F.3d 1271 (9th Cir. 2004) .......................................................................28

*King v. Burwell,*
    135 S. Ct. 2480 (2015)...................................................................................58

*Koniag, Inc. v. Koncor Forest Res.,*
    39 F.3d 991 (9th Cir. 1994) ...........................................................................10

*Menominee Indian Tribe of Wis. v. United States,*
    136 S. Ct. 750 (2016)......................................................................................11

*Metlakatla Indian Cmty. v. Egan,*
    369 U.S. 45 (1962)............................................................................................5

*Mohamad v. Palestinian Auth.*,
566 U.S. 449 (2012)..................................................................................31

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
138 S. Ct. 617 (2018)...............................................................................27

*Navajo Nation v. Dep't of Health & Human Servs., Sec'y*,
325 F.3d 1133 (9th Cir. 2003) .................................................................48

*Nielsen v. Preap*,
139 S. Ct. 954 (2019)...............................................................................30

*Olson v. Clinton*,
602 F. Supp. 2d 93 (D.D.C. 2009), *aff'd*, 409 F. App'x 359 (D.C. Cir. 2011).......................26

*Organized Village of Kake v. Egan*,
369 U.S. 60 (1962)......................................................................................6

*Permanent Mission of India to United Nations v. City of N.Y.*,
551 U.S. 193 (2007)..................................................................................27

*Posadas v. Nat'l City Bank*,
296 U.S. 497, 56 S.Ct. 349 (1936)............................................................41

*Russello v. United States*,
464 U.S. 16 (1983)....................................................................................31

*Schmasow v. Native Am. Ctr.*,
978 P.2d 304 (Mont. 1999).......................................................................42

*Sekhar v. United States*,
570 U.S. 729 (2013)..................................................................................34

*Sturgeon v. Frost*,
136 S. Ct. 1061 (2016)................................................................................1

*Sturgeon v. Frost*,
139 S. Ct. 1066 (2019)................................................................................2

*U.S. Student Aid Funds, Inc. v. DeVos*,
No. 15-cv-1137 (APM) (Feb. 23, 2017) .............................................26, 43

*Ukpeagvik Inupiat Corp. v. U.S. Dep't of Health & Human Serv.*,
2013 WL 12119576 (D. Alaska May 20, 2013) ......................................55

*United States v. Atlantic Richfield Co.*,
435 F. Supp. 1009 (D. Alaska 1977), *aff'd*, 612 F.2d 1132 (9th Cir. 1980)..............................5

*United States v. Sandoval*,
   231 U.S. 28 (1913) ........................................................................................30

*United States v. United Cont'l Tuna Corp.*,
   425 U.S. 164 (1976) ......................................................................................41

*United States v. Wong Kim Bo*,
   472 F.2d 720 (5th Cir. 1972) ......................................................................31

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,
   529 U.S. 765 (2000) ......................................................................................31

*W. Va. Univ. Hosps., Inc. v. Casey*,
   499 U.S. 83 (1991) ........................................................................................30

*Wash. Mkt. Co. v. Hoffman*,
   101 U.S. 112 (1879) ......................................................................................30

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ......................................................................................33

**Statutes**

12 U.S.C. §§4702(11)-(12) ..................................................................................2, 12

16 U.S.C. §470bb(5) ............................................................................................2, 12

16 U.S.C. §4302(4) ....................................................................................................2

16 U.S.C. §4702(9) ..................................................................................................12

20 U.S.C. §§1401(12)-(13) ..................................................................................3, 12

20 U.S.C. §4402(5) ..................................................................................................28

20 U.S.C. §7011(6) ..............................................................................................3, 12

20 U.S.C. §9101(5) ..............................................................................................3, 12

25 U.S.C. §450a ......................................................................................................55

25 U.S.C. §450f(a) ..................................................................................................54

25 U.S.C. §476 ........................................................................................................36

25 U.S.C. §2703(5)(A) ............................................................................................35

25 U.S.C. §3001(7) ..................................................................................................28

25 U.S.C. §3501(2)(c) ..................................................................................................48

25 U.S.C. §3501(4)(B) .............................................................................................2, 29

25 U.S.C. §4101 *et seq.* ............................................................................................12

25 U.S.C. §4103(13)(B) .........................................................................................12, 47

25 U.S.C. §4111 .........................................................................................................12

25 U.S.C. §5130(2) .................................................................................................28, 34

25 U.S.C. §5131(a) .....................................................................................................35

25 U.S.C. §5301 *et seq.* ............................................................................................10

25 U.S.C. §5302 .........................................................................................................55

25 U.S.C. §5304 .........................................................................................................29

25 U.S.C. §5304(e) ................................................................................................. *passim*

25 U.S.C. §5304(*l*) .....................................................................................................38

25 U.S.C. §5321 .........................................................................................................11

25 U.S.C. §5322 ....................................................................................................11, 52

25 U.S.C. §5384 ....................................................................................................11, 52

26 U.S.C. §139E .........................................................................................................29

26 U.S.C. §139E(c)(1) ..............................................................................................3, 12

34 U.S.C. §10389(3) ...................................................................................................28

42 U.S.C. §301 *et seq.* ...............................................................................................21

42 U.S.C. §801(a)(1) .............................................................................................21, 26

42 U.S.C. §801(a)(2)(B) ......................................................................................... *passim*

42 U.S.C. §801(b)(1) ...................................................................................................22

42 U.S.C. §801(c)(7) ...................................................................................................21

42 U.S.C. §801(d) .................................................................................................3, 21, 26

42 U.S.C. §801(g)(1) ............................................................................................... *passim*

42 U.S.C. §§801(g)(1), (5) .................................................................12

42 U.S.C. §801(g)(5) ..................................................................... *passim*

42 U.S.C. §1602(j) ............................................................................8

42 U.S.C. §4368b(c)(1) .....................................................................3

42 U.S.C. §5122(6) ..........................................................................28

43 U.S.C. 1601 et seq. ......................................................................49

43 U.S.C. §1601 ..............................................................................55

43 U.S.C. §1601(a) ............................................................................7

43 U.S.C. §1601(b) ...................................................................7, 9, 51

43 U.S.C. §1601 *et seq.* .....................................................................2

43 U.S.C. §1602(b) ............................................................................8

43 U.S.C. §1602(c) ............................................................................8

43 U.S.C. §1602(t)(2) .........................................................................9

43 U.S.C. §1605 ...............................................................................7

43 U.S.C. §1606(a) ............................................................................8

43 U.S.C. §1606(d) ........................................................................7, 8

43 U.S.C. §1606(f) ............................................................................8

43 U.S.C. §1606(r) .......................................................................9, 47

43 U.S.C. §1607(a) ........................................................................7, 8

43 U.S.C. §1608 ...............................................................................7

43 U.S.C. §1613(h)(1) ........................................................................8

43 U.S.C. §1626(d) ..........................................................................59

Pub. L. 93-638, 88 Stat. 2203 (1975) ..................................................10

Pub. L. 103-454, 108 Stat. 4791 (1994) ...............................................28

Pub. L. No. 73-383, 48 Stat. 984 (1934) ................................................5

Pub. L. No. 74-538, 49 Stat. 1250 (codified at 25 U.S.C. §5119) ..................................................5

Pub. L. No. 92-203, 85 Stat. 688 (1971).......................................................................2, 22, 27, 32

Pub. L. No. 93-638, 88 Stat. 2203 (1975) .................................................................................11

Pub. L. No. 100-241, 101 Stat. 1788 (1988).................................................................................6

Pub. L. No. 105-333, 112 Stat. 3129 (Oct. 31, 1998) ..................................................................47

Pub. L. No. 106–79, 113 Stat. 1212 (1999) ................................................................................56

Pub. L. No. 108-199, 118 Stat. 3 (2004)......................................................................................12

Pub. L. No. 108-447, 118 Stat. 2809 (codified at 25 U.S.C. §5301 note) ....................................12

Pub. L. No. 115-325, §202(a) (2020)...........................................................................................29

Pub. L. No. 116-136, 134 Stat. 281 (2020) (codified at 42 U.S.C. §801) ......................................1

**Regulations**

25 C.F.R. §83.4.....................................................................................................................35, 42

**United States Constitution**

U.S. Const. art. I, §8, cl. 3...........................................................................................................4

**Other Authorities**

120 Cong. Rec. 40252 (Aug. 6, 1974) ........................................................................................37

144 Cong. Rec. S26254 (1998)....................................................................................................10

146 Cong. Rec. S5019 (daily ed. June 13, 2000).........................................................................10

44 Fed. Reg. 7,235 (Feb. 6, 1979) .........................................................................................36, 39

46 Fed. Reg. 27,178 (May 18, 1981) ......................................................................................52, 53

47 Fed. Reg. 53,133 (Nov. 24, 1982).........................................................................................39

53 Fed. Reg. 52,829 (Nov. 29, 1988).....................................................................................40, 42

58 Fed. Reg. 54,364 (Oct. 21, 1993).................................................................................36, 40, 41

60 Fed. Reg. 9,250 (Feb. 16, 1995) ......................................................................................36, 41

77 Fed. Reg. 13,137 (March 5, 2012) ....................................................................................46, 55

85 Fed. Reg. 5,462 (Jan. 30, 2020) .................................................................41

85 Fed. Reg. 23,935 (Apr. 30, 2020) ..............................................................36

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012) ............................................................................................30

David S. Case & David A. Voluck, *Alaska Natives and American Laws* 24 (3d ed. 2012) ...........................................................................................................5

Greta Swanson *et al*., *Understanding the Government-to-Government Consultation Framework for Agency Activities that Affect Marine Natural Resources in the U.S. Arctic*, 43 Envtl. L. Rep. News & Analysis 10872 (2013) ........................................................................................................13

H. Rep. 93-1600, 93th Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.C.C.A.N. 7775.............................................................................................................38

*Revision to Policy Statement on Consultation with Indian Tribes in Comm'n Proceedings*, 169 FERC ¶ 61036, 2019 WL 5288290, at *1, 3 (Oct. 17, 2019) (revising policy to require "consultation with Alaska Native Corporations . . . on the same basis as Indian Tribes under Executive Order No. 13175") ...............13

Robert D. Arnold, *Alaska Native Land Claims* 1-26 (1975).............................................4

Treasury, Guidance, *Coronavirus Relief Fund: Payments to Tribal Governments* (Apr. 23, 2020), https://bit.ly/3d7oyl2 .....................................................23

U.S. Am. Ind. Policy Review Comm'n, *Final Report* n.21 ........................................21

U.S. Am. Ind. Policy Review Commission, *Final Report* n.21 ...................................57

U.S. Dep't of Energy, Office of Indian Energy Pol'y & Programs, *About Us*, https://www.energy.gov/indianenergy/about-us ..............................................48

U.S. Dep't of Treasury, Guidance, *Coronavirus Relief Fund: Allocations to Tribal Governments* 3 (May 5, 2020), https://bit.ly/2A8BQzf .........................................23

U.S. Treasury Dep't, *Coronavirus Relief Fund Payments to Tribal Governments* (Apr. 23, 2020), https://bit.ly/2X406vs.......................................................51

## INTRODUCTION

In response to the public health and economic crisis the COVID-19 pandemic has wrought, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020) (codified at 42 U.S.C. §801).   Title V of that Act directs the Secretary of the Treasury (the "Secretary") to provide $8 billion for emergency-relief funds to Indian tribes, which the statute in turn defines expressly to "includ[e] any Alaska Native . . . regional or village corporation" (collectively, "ANCs").   42 U.S.C. §§801(g)(1), (5); 25 U.S.C. §5304(e).   In light of that express "inclu[sion]" of "Alaska Native . . . regional [and] village corporation[s]," the Secretary correctly recognized that ANCs are eligible to receive funds under Title V.   The plain text of the CARES Act resolves this case and confirms the correctness of the Secretary's interpretation:   By expressly and unambiguously including ANCs in its statutory definition of "Indian tribes,"[1] Congress made plain that ANCs are eligible to receive funds under Title V of the CARES Act.

In light of its sheer scope, its distance from the continental United States, and its relatively late entry into the Union, "Alaska is often the exception, not the rule." *Sturgeon v. Frost*, 136 S. Ct. 1061, 1071 (2016).   But, in this case as in so many others, the differences should not obscure what is the same.   And, most relevant here, what is the same is a federal commitment to ensuring the health and welfare of Native peoples both in the contiguous United States and in Alaska.   When the differences (and, for that matter, the similarities) are understood in the proper context, the intent of Title V is clearer still.

---

[1] The term "Indian tribe" appears frequently throughout the U.S. Code, with the "t" in "tribe" sometimes in lowercase and other times in uppercase.   We use the lowercase, as that is how the term is found in the statute that provides the governing definition.   *See* 25 U.S.C. §5304(e).

The differences between the federal government's treatment of Alaska Natives and its treatment of Native Americans in the Lower 48 are a function of history and geography. While the federal government cycled through removal and assimilation policies toward Lower 48 tribes, Alaska's sparse population, expanse of underdeveloped lands, and widely dispersed small villages meant that most Alaska Natives had relatively limited and specific interactions with the federal government. By the time that statehood and the development of Alaska's vast resources caused Congress to turn its full attention to Alaska Natives, Congress was ready to adopt a different approach. Those efforts culminated in the Alaska Native Claims Settlement Act ("ANCSA"), Pub. L. No. 92-203, 85 Stat. 688 (1971) (codified as amended at 43 U.S.C. §1601 *et seq.*), which eschewed reservations and other traditional approaches and required the establishment of regional corporations and village corporations to take title to ceded Native lands, with the latter centered in existing Native communities. *Sturgeon v. Frost*, 139 S. Ct. 1066, 1074 (2019).

As a result of Congress' unique treatment of Alaska Natives, there can be some ambiguity as to whether a generic reference in federal law to "Indian tribes" or "Tribal governments" includes institutions that are unique to Alaska, like ANCs. Yet Congress can, and often does, resolve that potential ambiguity in the exercise of its plenary authority to regulate Indian affairs. In some contexts, Congress eliminates that ambiguity by expressly *excluding* ANCs. *See, e.g.*, 25 U.S.C. §3501(4)(B) ("For the purpose of paragraph (12) and sections 3503(b)(1)(C) and 3504 of this title, the term 'Indian tribe' does not include any [Alaska] Native Corporation."). In other contexts, it eliminates that ambiguity by expressly *including* ANCs in the definition of "Indian tribe." *See, e.g.*, 12 U.S.C. §§4702(11)-(12); 16 U.S.C. §470bb(5); 16

2

U.S.C. §4302(4); 20 U.S.C. §§1401(12)-(13); 20 U.S.C. §7011(6); 20 U.S.C. §9101(5); 26 U.S.C. §139E(c)(1); 42 U.S.C. §4368b(c)(1).

In Title V of the CARES Act, Congress plainly adopted the latter approach.  Title V "reserve[s]" $8 billion in emergency-relief funds for "Tribal governments," 42 U.S.C. §801(a)(2)(B), (d), defines "'Tribal government'" to mean "the recognized governing body of an Indian Tribe," *id.* §801(g)(5), and defines "'Indian Tribe'" to have "the meaning given that term in section 5304(e) of title 25," *id.* §801(g)(1).  Section 5304(e) in turn defines "Indian tribe" as expressly "including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act."

Congress' decision to adopt that ANC-inclusive definition resolves this case.  While Plaintiffs have offered subtle theories as to how Congress might have indirectly excluded ANCs, those arguments fail in light of Congress' decision to use a definition that expressly includes ANCs, thereby rejecting readily available alternative definitions that would have expressly excluded ANCs.  To be sure, the CARES Act makes funds available to tribes' "recognized governing bod[ies]," *i.e.*, "Tribal governments," not to "Indian Tribes" directly.  42 U.S.C. §801(g)(5).  But Congress included the expressly-ANC-inclusive definition of "Indian tribes" for the very purpose of clarifying its definition of "Tribal governments."  And Congress could not have gone out of its way to expressly include in its definition of "Indian Tribes" a whole class of tribes that somehow lack "Tribal governments."

Congress' choice to include ANCs also makes ample sense; neither the global pandemic nor its devastating economic consequences have spared Alaska Natives.  The isolated nature of many Alaska Native villages and communities makes them particularly vulnerable to extraordinarily high costs of transportation and supply-chain disruption precipitated by the

pandemic, and ANCs are a critical avenue for providing federal aid to Alaska Natives in need. Accepting Plaintiffs' argument thus not only threatens to deprive thousands of Alaska Natives of much-needed aid at a critical juncture. Of equal if not greater importance, accepting Plaintiffs' argument threatens to unwind not only half a century of congressional expansion of the role of ANCs in federal Indian policy in Alaska, but settled practice under which ANCs participate in important government programs providing for the health, education, and welfare of Alaska Natives that use the same ANC-inclusive definition that Congress incorporated into the CARES Act. Congress' express decision to include ANCs in these critical programs must be honored.

**BACKGROUND**

A.     **The Federal Government's Historical Relationship with Alaska Native Peoples**

Congress exercises plenary power to regulate Indian affairs concerning Alaska Natives, just as it does with respect to Native Americans in the Lower 48. *See generally* U.S. Const. art. I, §8, cl. 3. But Alaska's unique history and geography have caused Congress to exercise that power differently in Alaska than in the continental United States. The unique history of Alaska Natives—and their relationship with and treatment by the federal government—informs Congress' decision to expressly include ANCs in its definition of "Indian tribes" in Title V of the CARES Act.

When Russian explorers "discovered" Alaska in 1741, they came upon a land of abundant natural resources and a diverse Native population, the vast majority of whom subsisted in small villages or groups along the thousands of miles of coastline and in the territory's mountainous inland regions. The Native peoples' self-governance did not change much over the next 150-odd years, despite the intervening change in oversight authority from St. Petersburg to Washington, D.C. *See* Robert D. Arnold, *Alaska Native Land Claims* 1-26 (1975). Upon

4

acquiring Alaska in 1867, the United States did remarkably little in the nineteenth century to create a functioning government in the vast territory it now nominally controlled—and even less to change the sovereignty of the Native peoples who inhabited that vast territory.

In part because of the federal government's initial *laissez faire* approach to Alaska in general, and in part because "Alaskans, both Native and non-Native, opposed creation of reservations on the grounds that reservations were socially divisive and tended to perpetuate a wardship rather than equality for the Natives," *United States v. Atlantic Richfield Co.*, 435 F. Supp. 1009, 1015 (D. Alaska 1977), *aff'd*, 612 F.2d 1132 (9th Cir. 1980), "[t]here was never an attempt in Alaska to isolate Indians on reservations," and "[v]ery few were ever created." *Metlakatla Indian Cmty. v. Egan*, 369 U.S. 45, 51 (1962). That said, the few rules or regulations that were put in place regarding Alaska's Native peoples and lands clearly reflected Congress' exercise of authority over Alaska Natives because of their status as Natives. *See* David S. Case & David A. Voluck, *Alaska Natives and American Laws* 24 (3d ed. 2012).

The turn of the century brought with it minor variations on this theme of the federal government recognizing Alaska Natives as members of distinctly Indian communities but tailoring its relationships in a manner slightly different from the relationships it had established with the Lower 48 tribes. For instance, shortly after enacting the Indian Reorganization Act ("IRA"), Act of June 18, 1934, Pub. L. No. 73-383, 48 Stat. 984, which, though it included a few provisions specific to Alaska, was largely inapplicable to Alaska given that it was focused on reservations, and Alaska Natives generally did not live on reservations.

Congress enacted legislation that provided for a unique approach to organizing IRA councils in Alaska. *See* Act of May 1, 1936 ("Alaska IRA"), Pub. L. No. 74-538, §1, 49 Stat. 1250 (codified at 25 U.S.C. §5119). And shortly after that, the Bureau of Indian Affairs ("BIA")

established detailed instructions for implementing the Alaska IRA in a manner that reflected the federal government's unique approach to Alaska. Those instructions provided for three different kinds of Alaska Native organizations: one type that would exercise municipal and public powers; and two other would be "authorized to engage in business and to provide for the common welfare, but no to exercise municipal and public powers." Op. Dep't of Interior Solicitor M-36978 (Jan. 19, 1993) ("Sansonetti Op."), at 31-32. This nuanced approach to Alaska Native communities reflected a view that, in Alaska, aboriginal governmental functions should be fashioned to avoid duplication while promoting the effectiveness of existing governmental authorities. *See id.* at 32 ("The second kind of organization would consist of a group of all Native persons in a community and was said to be especially suitable for a group of Natives living among non-Natives in a town or city already organized to exercise governmental powers, as well as for Native groups already incorporated as a municipality under territorial law."). [2]

## B.    The Alaska Native Claims Settlement Act

Alaska Statehood in 1959 gave rise to significant tension with Alaska Natives over land ownership. But Statehood did not result in the immediate resolution of Alaska Natives' rights or of the status of their lands. *See Organized Village of Kake v. Egan*, 369 U.S. 60, 62 (1962). It was the discovery of the Prudhoe Bay oil field in the late 1960s that finally precipitated efforts to resolve Alaska Natives' aboriginal land claims. That process culminated in ANCSA.

ANCSA's enactment in 1971 was a revolutionary development in American Indian law. *See generally* Alaska Native Claims Settlement Act Amendments of 1987, Pub. L. No. 100-241, §2(9), 101 Stat. 1788, 1814 (ANCSA is "Indian legislation enacted by Congress pursuant to its plenary authority under the Constitution of the United States to regulate Indian affairs."). In

---

[2] The 69 councils organized pursuant to the Alaska IRA are today among the 229 federally recognized tribes in Alaska. *See* Case & Voluck, *supra*, at 100-02.

enacting ANCSA, which aimed to provide a "fair and just settlement" of all "claims by Natives of Alaska," 43 U.S.C. §1601(a), through a grant of legal title to approximately 44 million acres of land and $962.5 million in monetary compensation, 43 U.S.C. §§1605, 1608, Congress sought to end "the sort of federal supervision over Indian affairs that had previously marked federal Indian policy." *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520, 523-24 (1998).

Unlike the Lower 48 system of reservations, ANCSA ensured that Alaska Natives would own their lands free and clear and would thus be able to develop them for their own benefit. Settlement of Alaska Natives' land claims was to be accomplished "without litigation, with maximum participation by Natives in decisions affecting their rights and property, without establishing any permanent racially defined institutions, rights, privileges, or obligations, [and] without creating a reservation system or lengthy wardship or trusteeship." 43 U.S.C. §1601(b). But, to be clear, the lack of reservations and a distinct approach to land did not mean that Congress intended there to be no organizations designed under Indian law to further the collective interests of Alaska Natives. To the contrary, ANCSA mandated the creation of 12 "regional corporations" and approximately 200 "village corporations" that would take title to the transferred lands and, in the case of the village corporations, be centered in existing Native communities. 43 U.S.C. §§1606(d), 1607(a); *see also* Sansonetti Op. 23 ("Although Congress utilized Native villages as a basis for organizing the settlement, it determined not to convey settlement lands to the villages. Rather, . . . land and associated property rights were conveyed to newly established Village and Regional Corporations established under state law.").

The 12 regional corporations were drawn up based on the division of the State into 12 geographic regions, "composed as far as practicable of Natives having a common heritage

and sharing common interests," and approximating the areas covered by the operations of the twelve listed Native associations that participated in the settlement negotiations on behalf of their respective regions.  43 U.S.C. §1606(a).  Congress also transferred to the Alaska Native regional corporations title to the subsurface estate under the villages, certain other lands within the region, and Alaska Native cemeteries and historical sites.  *Id.* §1613(h)(1).  As directed by Congress, each regional corporation was required to be incorporated by incorporators named by the Native association in the region, *id.* §1606(d), and to have its management vested in an elected board of directors, *id.* §1606(f).  Indeed, each member of an ANC's board of directors must be an Alaska Native from that Native community.  Each regional corporation would remain "eligible for the benefits of this chapter so long as it is organized and functions in accordance with this chapter." *Id.* §1606(d).

As a condition to receive lands or benefits under the settlement, ANCSA required the Alaska Native residents of each village to organize as a for-profit or nonprofit corporation under the laws of the State.  *Id.* §1607(a).  ANCSA defined "Native" based on quantum of "Alaska Indian . . . Eskimo, or Aleut blood" or recognition as Native by a "Native village or Native group."  *Id.* §1602(b).  It further defined "Native village" as "any tribe, band, clan, group, village, community, or association in Alaska" that was "composed of twenty-five or more natives" and was "listed in" or "meets the requirements of" ANCSA.  *Id.* §1602(c).  The purpose of requiring Alaska Native villages to form village corporations, as defined by ANCSA, was to create entities to "hold, invest, manage and/or distribute lands, property, funds, and other rights and assets *for and on behalf of a Native village* in accordance with the terms of this chapter."  *Id.* §1602(j) (emphasis added).

Congress created ANCs to serve a purpose in the lives of Alaska Natives far beyond that of corporations in the usual sense, the latter of which focus on maximizing shareholder value.[3] The intent, rather, was to address "the *real economic and social needs* of Natives, without litigation, with maximum participation by Natives in decisions affecting their rights and property." *Id.* §1601(b) (emphasis added).  Of particular relevance in the context of a global pandemic, Congress expressly authorized and confirmed that ANCs provide benefits to Alaska Native shareholders and their immediate families "to promote [their] health, education, or welfare," *id.* §1606(r), and to convey corporate assets to "settlement trusts" "to promote the health, education, and welfare" of Alaska Natives, *id.* §§1602(t)(2), 1629e(b)(1).  *See also Broad v. Sealaska*, 85 F.3d 422, 427-28 (9th Cir. 1996); A.R. Tab 010q at 1 (stating that, pursuant to ANCSA, Old Harbor Native Corporation's "mission" is "to preserve and protect the culture, values and traditions of its community, shareholders and descendants; and to work together to create economic and educational opportunities while promoting self-determination and pride."). In short, Congress has used ANCSA as a foundation to govern and guide ANCs as tools to empower and serve Alaska's indigenous communities.

### C.     ANCs' Foundational Role in the Day-to-Day Lives of Alaska Natives

Congress' unique treatment of Alaska Natives is reflected in the role ANCs play in the day-to-day lives of Alaska Natives—including in ways that are no different from those played by the Plaintiffs in this case.  The ANCs' missions include a substantial social benefit component, which they further through health care services, elder benefits, language preservation and cultural programs, burial assistance, community infrastructure development, scholarship

---

[3] Hence, for instance, Ahtna's mission is not to maximize profit, but the "[w]ise stewardship of Ahtna lands and responsible economic growth, for future generations of Ahtna people." *Mission, Vision, and Values*, Ahtna, Inc., https://www.ahtna.com/mission-vision-and-values.

programs, job training, educational support, food security and subsistence, land management and

protection, and other means.[4]   Indeed, as a judge of this Court pointed out nearly 20 years ago,

Congress intended that ANCs would play a role in Alaska Native civic life typical of that

traditionally reserved to Indian tribes in the Lower 48 reservation system:

> Although "[t]reaties . . . were originally the primary instrument for
> the expression of this relationship," in the modern era "[f]ederal
> laws like [S]ection 8014 are the means by which the United States
> carries out its trust responsibilities and the [f]ederal policy of self-
> determination and economic self-sufficiency."   Amendment No.
> 3319, 146 Cong. Rec. S5019 (daily ed. June 13, 2000).   The
> ANCSA is one such modern mechanism that designates Native
> Alaskan Corporations as the vehicle used to provide continuing
> economic benefits in exchange for extinguished aboriginal land
> rights.   *See Koniag, Inc. v. Koncor Forest Res.*, 39 F.3d 991, 997
> (9th Cir. 1994).   Intervenor-defendants Chugach are two such
> firms formed under the auspices of the ANCSA.   *See* Defs.' Mem.
> in Supp. of Mot. for Summ. J. at 31.

*Am. Fed'n of Gov't Emps. (AFL-CIO) v. United States*, 195 F. Supp. 2d 4, 21-22 (D.D.C. 2002)

(footnotes omitted), *aff'd*, 330 F.3d 513 (D.C. Cir. 2003).

Consistent with ANCSA's objectives, ANCs have long served certain core "tribal

functions"—sometimes in part, working shoulder-to-shoulder with Alaska Native villages;

sometimes in full, where there is no other tribal entity to provide the services commensurate to

the *governmental* role a tribe would typically be expected to play in the Lower 48.   ANCs

execute many of their services through contracts or compacts authorized under the Indian Self-

Determination and Education Assistance Act ("ISDEAA"), Pub. L. 93-638, 88 Stat. 2203 (1975)

(codified as amended at 25 U.S.C. §5301 *et seq.*), which Congress enacted "to help Indian tribes

---

[4] *See* 144 Cong. Rec. S26254 (1998) (quoted in *Bodkin v. Cook Inlet Region, Inc.*, 182 P.3d 1072
(Alaska 2008)) (statement of Sen. Frank Murkowski) (explaining that "[e]xamples of the type of
programs authorized [by §7(r)] include: scholarships, cultural activities, shareholder employment
opportunities and related financial assistance, funeral benefits, meals for the elderly and other
elders['] benefits including cash payments, and medical programs").

assume responsibility for aid programs that benefit their members." *Menominee Indian Tribe of Wis. v. United States*, 136 S. Ct. 750, 753 (2016).

ISDEAA represented a continuation of Congress' new approach to relations with Native Americans.  Upon enacting ISDEAA, the federal government began to shift from a pattern of providing services directly to individual Indians through the BIA and the U.S. Department of Health and Human Services' Indian Health Service ("IHS") to providing grants to tribes and enabling direct administration of programs by the tribes themselves.  *See* 25 U.S.C. §§5321, 5322.  And, consistent with their role in the lives of Alaska Natives, ISDEAA expressly includes both ANCs and Alaska Native villages in its definition of "Indian tribes" entitled to receive ISDEAA contracts.  *See id*. §5340(e).

Thus, ANCs execute many of their services through so-called "638 contracts" (ISDEAA Title I) or "638 compacts" (ISDEAA Title V), each referencing ISDEAA's enactment as Public Law No. 93-638.  Under ISDEAA Title I, ANCs contract with federal agencies such as the U.S. Department of the Interior's Bureau of Land Management and the IHS to plan, conduct, and administer programs, functions, services, or activities ("PFSAs") that the agencies would otherwise provide for Indians because of their status as Indians.  Under ISDEAA Title V, ANCs can compact with the agencies to assume *full funding and control* over PSFAs that the agencies would otherwise provide for Indians because of their status as Indians.  *See* 25 U.S.C. §5384. Compacting is, by definition, self-governance, *see id.*, and is viewed by the United States as a "government-to-government relationship between Indian tribes and the United States."  *Id.* §5384.

Other statutes, too, vest in ANCs the right to avail themselves of opportunities by virtue of their eligibility for the special programs and services provided by the United States to Indians.

11

For example, the Native American Housing Assistance and Self-Determination Act of 1996 ("NAHASDA"), 25 U.S.C. §4101 *et seq.*, provides (among other things) block grant funding to "Indian tribes" through the U.S. Department of Housing and Urban Development ("HUD") to carry out affordable housing activities.  *Id.* §4111.  ANCs are eligible for these HUD block grants by virtue of being expressly included in NAHASDA's definition of "Federally recognized tribes," without regard to whether ANCs have that status for other purposes.[5]  *Id.* §4103(13)(B). Similarly, a substantial number of statutes throughout the U.S. Code explicitly include ANCs within their definition of "Indian tribe."  *See, e.g.*, 12 U.S.C. §4702(11)-(12) (Community Development Banking and Financial Institutions Act); 16 U.S.C. §470bb(5) (Archaeological Resources Protection Act); 16 U.S.C. §4702(9) (Aquatic Nuisance Prevention and Control Act); 20 U.S.C. §1401(12)-(13) (Individuals with Disabilities Education Act); 20 U.S.C. §7011(6) (No Child Left Behind Act); 20 U.S.C. §9101(5) (Museum and Library Services Act); 26 U.S.C. §139E(c)(1) (Internal Revenue Code).

In addition, Congress requires "all Federal agencies" to "consult with Alaska Native corporations on the same basis as Indian Tribes under Executive Order No. 13175." Consolidated Appropriations Act of 2004, Pub. L. No. 108-199, Div. H. §161, 118 Stat. 3, 452, *as amended by* Consolidated Appropriations Act of 2005, Pub. L. No. 108-447, Div. H., Title V. §518, 118 Stat. 2809, 3267 (codified at 25 U.S.C. §5301 note).  As a result, all federal agencies must consult with ANCs "on federal policy, regulatory, or legislative actions that may have substantial effects on tribes, their relationship with the federal government, or the distribution of

---

[5] Congress' decision to define ANCs as "federally recognized tribes" within NAHASDA is not intended to reflect their sovereign status.  It simply highlights that Congress has plenary power to define terms relating to Indians as it deems appropriate within the context of a specific statute, as it has done in the CARES Act by defining ANCs as "Tribal governments" entitled to relief funds.  *See* 42 U.S.C. §§801(g)(1), (5).

power between tribes and the federal government."  Greta Swanson *et al.*, *Understanding the Government-to-Government Consultation Framework for Agency Activities that Affect Marine Natural Resources in the U.S. Arctic*, 43 Envtl. L. Rep. News & Analysis 10872, 10876 (2013); *see, e.g.*, *Revision to Policy Statement on Consultation with Indian Tribes in Comm'n Proceedings*, 169 FERC ¶ 61036, 2019 WL 5288290, at \*1, 3 (Oct. 17, 2019) (revising policy to require "consultation with Alaska Native Corporations . . . on the same basis as Indian Tribes under Executive Order No. 13175").

All of this goes to show that federal law does not draw a strict, mutually exclusive distinction between  "Indian tribes" and "ANCs"—and that ANCs, no less than Indian tribes appearing on the List Act list, have many rights and provide many services *because of* their status as Indian tribes.  The distinction is even less apparent in the actual operation of ANCs and tribes.   In light of Alaska's unique history and geography, which entity plays the more prototypically "tribal" role is in large part situational.  *See, e.g.*, Johns Decl. ¶ 4, Dkt. 43-1 ("Although Ahtna is a corporation, it is impossible to unravel the ties between Ahtna and its tribes.  We are the same people.  The same blood runs through our veins."); Naneng Decl. ¶ 9, Dkt. 46-4 ("The reality of the situation in our region of Alaska is that tribes and village corporations work hand in hand to provide much needed essential services in a region that suffers from some of the highest unemployment rates in the country.").[6]  In fact, ANCs perform many of the "government services" depicted in Plaintiffs' pleadings.  Put simply, ANCs stand together with tribal villages in Alaska to provide the most effective and efficient services to Alaska Natives spread across a state more than twice the size of Texas.  *See* A.R. Tab 010q at 2 (describing how the Alutiiq tribe of Old Harbor and Old Harbor Native Corporation are "united"

---

[6] Unless otherwise indicated, all references to the docket are to Case No. 1:20-cv-01002 (D.D.C.).

to provide benefits to the community); A.R. Tab 008 at 1 ("Alaska Natives often take a "regional approach" to harness economies of scale and consolidate technical capacity, while also providing a support system for smaller Tribes with less capacity.").

As explained *infra*, this Court can and should decide this case based on the text of the CARES Act.  But the evidence before this Court confirms beyond doubt that the CARES Act's express inclusion of ANCs in the statutory definition of "Indian tribe" is not merely theoretical. It is a bedrock component of the daily lives of tens of thousands of Alaska Natives.

### 1.    Alaska Native regional corporations

To serve their communities and shareholders, numerous regional ANCs have utilized federal programs designed for the benefit of Indian tribes.  For example, regional ANCs have entered into 638 contracts and compacts over the course of decades, and many have current such agreements—which, again, are available only because of their status as Indian tribes.  *See, e.g.*, Johns Decl. ¶ 17, Dkt. 43-1 ("Ahtna, Incorporated has a PL-638 contract for cadastral survey work through the U.S. Department of the Interior, Bureau of Land Management."); Hegna Decl. ¶ 4, Dkt. 45-4 ("Over the years, Koniag has received federal grants and contract awards based on the inclusion of Alaska Native Corporations within a legal definition of 'Indian Tribe.' Examples of this include [ISDEAA] Section 638 agreements with the Bureau of Land Management, a federal grant from the Institute of Museum and Library Science, HUD grant funding connected to the [NAHASDA], and federal contracts in connection with the Buy Indian Act awarded to lower-tier subsidiaries of Koniag."); *see also, e.g.*, Minich Decl. ¶¶ 10-13, Dkt. 45-6 (discussing multitude of health care services provided pursuant to a decades-old 638 compact with IHS, which was renewed in 2010, and critical housing services provided using NAHASDA block grants); Westlake Decl. ¶ 15, Dkt. 45-7 (stating that NANA has a current 638 contract with the U.S. Bureau of Land Management).

Of particular relevance, regional ANCs provide essential services to their shareholders and their communities that look every bit as governmental as the services provided elsewhere by Alaska Native villages and the Indian tribes of the Lower 48 States.  For example, regional ANCs construct infrastructure and provide other public works projects for their communities. *See*, *e.g.*, Johns Decl. ¶ 4, Dkt. 13-2 (Ahtna builds and maintains trails for access to hunting and fishing grounds); Glenn Decl. ¶ 7, Dkt. 45-3 (ASRC engages with North Slope communities on public works projects); Westlake Decl. ¶ 8, Dkt. 45-7 (NANA contributes to a Village Economic Development program, which allows tribes and municipal entities to fund infrastructure projects).  The conditions in Alaska can be harsh, and tribes, villages, and regional ANCs often utilize "economies of scale" to provide support for smaller entities and their shareholders with fewer resources and "capacity."  A.R. Tab 008 at 1-2.

Additionally, regional ANCs have created, funded, and supported affiliated tribal organizations that provide health and welfare services to Alaska Natives and the broader, diverse communities they represent.  *See, e.g.*, Johns Decl. ¶ 5, Dkt. 13-2 (Ahtna provides significant financial and organizational support to many of its regional nonprofits who are responsible for feeding elders, providing health and dental care, and other services.); Schutt Decl. ¶¶ 10-11, Dkt. 45-1 (Doyon has designated tribal authority to: (1) Tanana Chiefs Conference, a nonprofit tribal consortium that is not itself a federally recognized tribe, to apply for grants and contracts for the health and social service needs of tribal members and beneficiaries in interior Alaska; and (2) Fairbanks Native Association, a BIA and IHS service provider serving 10,000-12,000 Alaska Natives); Buretta Decl. ¶ 3, Dkt. 45-5 (Chugach's eligibility as an Indian tribe allows the communities of Valdez and Seward to have access to federal funds to provide health and welfare services); Minich Decl. ¶ 7, Dkt. 45-6 (CIRI has affiliated tribal organizations which provide

health and social services to Alaska Native and American Indian peoples living in the CIRI region). It is through these ANC-affiliated organizations and the ANC governing body delegations that hundreds of millions of dollars in BIA and IHS programs have been provided to Alaska Native people. *See e.g.*, Indian Health Serv., U.S. Dep't of Health & Human Serv., *Fiscal Year (FY) 2018 Report to Congress on Contract Funding of Indian Self-Determination and Education Assistance Act Awards*, https://bit.ly/2XKkNLI; Dep't of Indian Affairs, U.S. Dep't of the Interior, *Contract Support Cost for FY 2014*, https://on.doi.gov/2Xc9ZHs.

Regional ANCs also provide benefits to the many Alaska Native individuals who have no Tribal affiliation, acting as the "tribe" for those individuals. *See, e.g.*, Buretta Decl. ¶¶ 2-3, Dkt. 45-5 ("Since the passage of ANCSA, Chugach has acted as the Indian Tribe in accordance with federal law for these Shareholders."). These "at-large" Alaska Native shareholders will be entirely excluded from benefits under Title V of the CARES Act if Plaintiffs' argument is successful. *See, e.g.*, Schubert Decl. ¶ 9, Dkt. 45-22 (describing how BSNC has approximately 1,330 shareholders who are not members of any village corporation or tribe, and thus would receive no benefits from the CARES Act if ANCs are excluded from the Title V funds and thus not able to provide the additional services Title V funds would enable them to afford).

## 2. Alaska Native village corporations

Village ANCs also provide essential services to their shareholders and communities. Regional ANCs and village ANCs work together and separately as necessary to provide services to Alaska Native communities and their shareholders. Indeed, many village ANCs provide *primary* essential services to their communities, including housing assistance, access to groceries, fuel, and internet service. *See, e.g.*, Philemonoff Decl. ¶ 4, Dkt. 45-20 (TDX provides the entire community of St. Paul with satellite access); J. George Decl. ¶ 6, Dkt. 46-6 (Akiachak

provides electricity for the community through Akiachak Native Community Electric Company, and gas and oil for the community); *see also* Addendum at 2-4 (summarizing services provided).

Moreover, village ANCs are entrenched with their shareholders in some of the most remote and harsh living conditions in the United States, and provide necessary services in an effort to ameliorate those on-the-ground circumstances. *See* A.R. Tab 010q at 2 (explaining that Alaska Native communities, including Old Harbor, an Alutiiq village, face unique "health, safety and economic challenges," including limited sanitation infrastructure and lack of public health services); *see also* Kirk Decl. ¶¶ 3, 6, Dkt. 45-21 (describing Stebbins' efforts to "mitigate and eliminate" the community's conditions, which include a lack of running water and flush toilets, and "which are unconscionable in America today"). Village ANCs responded immediately to the unprecedented circumstances created by the COVID-19 pandemic, no differently than traditional local governments. *See* A.R. Tab 004 at 1-2 (explaining that ANCs are "are playing a critical role in responding to the COVID-19 challenge"). Numerous declarants have stated that village ANCs have ordered additional food supplies for anticipated shortages resulting from COVID-19, *see, e.g.*, Blair Decl. ¶ 3 & Attachments, Dkt. 45-10, purchased personal protective equipment and additional fuel to maintain lifesaving facilities in remote communities, including the only food and gas station in Chitina, *see, e.g.*, Herndon Decl. ¶¶ 3, 6, Dkt. 45-12; Barlow Decl. ¶ 3, Dkt. 45-15, suspended payment penalties and disconnection notices for utilities, *see, e.g.*, Christiansen Decl. ¶ 9, Dkt. 45-17, and provided direct payments to shareholders to offset the loss of income resulting from COVID-19 shutdowns, *see, e.g.*, Avner Decl. ¶ 3, Dkt. 45-13; Gould Decl. ¶ 3 & Attachments, Dkt. 45-11; P. G. Guy Decl. ¶ 6, Dkt. 46-2.

The situation unfolding in the Calista region provides a particularly helpful illustration of how closely regional and village ANCs work together for the benefit of Natives in a particular

area, as well as how imperative it is for ANCs to receive funding under Title V of the CARES Act. The Calista region encompasses more than 6.5 million acres of land and includes 56 villages, 46 of which have individual ANCSA village corporations. Many of these village corporations joined with Calista Corporation, the regional ANC, in intervening in these lawsuits. Although these village corporations perform somewhat different functions and have somewhat different responsibilities than regional corporations, they all work hand-in-hand to further the social, cultural, and economic wellbeing of their people. *See, e.g.*, Andrew Decl. ¶¶ 1, 7, Dkt. 46-3 (St. Mary's is "charged with advancing the interests of [its] people. . . . The function that St. Mary's . . . provides in our community is essentially the same as any recognized tribe."). Indeed, regional and village corporations not only work with one another, but with numerous Alaska Native villages to address challenges facing Alaska Natives in the region. A. Guy Decl. ¶ 9, Dkt. 46-1.

### 3.   ANCs and the pandemic

Unfortunately, the challenges facing Alaska Natives today are dire. Consider, for instance, the circumstances facing the shareholders of St. Mary's village corporation. A number of elders are now "hunkered down in substandard housing and in need of assistance with everyday essentials," Andrew Decl. ¶ 3, Dkt. 46-3, and "[m]any households in St. Mary's live below the poverty line and do not have access to internet or even a computer," *id.* ¶ 8. Like many communities in Alaska, "St. Mary's is not connected to any outside road system," and thus is reliant on a commercial air carrier, Ravn Alaska, not just for transporting people and mail, but for "bringing essential foods, supplies, and medical equipment." *Id.* ¶ 4. In the midst of the pandemic, however, Ravn Alaska "has shut down its operations and filed for bankruptcy," effectively "cut[ting] off the St. Mary's community from the rest of the continent." *Id.*

The St. Mary's community is not alone in terms of its remoteness, substandard living conditions, and need for bare essentials. *See, e.g.*, Hughes Decl. ¶ 3, Dkt. 45-14 (describing how "basic necessities like food, cleaning supplies, and fuel are running low" and how "[t]he village [of Teller] doesn't have running water so it must be hauled from an aging laundry mat"); Barlow Decl. ¶ 3, Dkt. 45-15 (discussing closure of Tyonek and inadequate housing and medical facilities and transportation infrastructure); Mills Decl. ¶ 3, Dkt. 45-19 ("Seventy-four percent of KTC families are classified as low-income . . . with 28% of Kake's children living below the poverty line."); Schubert Decl. ¶ 4, Dkt. 45-22 ("In the Bering Straits region, the villages of Wales, Diomede, Shismaref, Stebbins and Teller have no water or sewer infrastructure at all, instead relying on hauling water and honey buckets."); *id.* ¶ 5 (detailing how goods, including basic necessities must be flown or barged into the region and how "the regional air carrier utilized by most of the BSNC villages filed for bankruptcy and discontinued all of its flights causing food shortages in several villages").

As always, both village and regional ANCs are currently doing all they can to help those in need in their communities during these unprecedented times. *See, e.g.*, Blair Decl. ¶ 3, Dkt. 45-10 (Cape Fox has "purchased over $50,000 in food and we have orders pending for another $50,000 in food to distribute to the Village; [w]e have also spent more than $15,000 on masks, hand sanitizer and related safety equipment[.]"); Avner Decl. ¶ 3, Dkt. 45-13 (stating that Baan O Yeel Kon Corporation distributed over $100,000 to assist with the "purchase of supplies and provisions for the shelter in place order issued by governmental authorities."); Christiansen Decl. ¶¶ 6, 8, Dkt. 45-17 ("MTNT declared over $135,000 in special COVID-19 distributions to its Shareholder Members" to help alleviate hardships caused by "travel restrictions, the Stay at Home mandates, the high unemployment rate, the limited access to traditional means of

communication . . . , and the lack of access to resources"); Andrew Decl. ¶ 7, Dkt. 46-3 (St. Mary's is "provid[ing] school supplies" and "much needed shareholder employment assistance").

The ANCs that intervened in these proceedings intend to do much more to help the many Alaska Natives who live on their lands and are struggling mightily in the wake of the pandemic, should they receive funds from the federal government.  *See, e.g.*, Johns Decl. ¶¶ 10-13, Dkt. 43-1 (noting that Ahtna not only has worked to provide funds for "wages and materials to build greenhouses" and to "add sewer and water access to" villages "to bring much needed sanitation," but also is working with its regional healthcare non-profits to develop emergency response plans, working with tribes to secure food caches, and purchasing personal protective equipment and hand sanitizer); P. G. Guy Decl. ¶¶ 5-6, Dkt. 46-2 ("When this crisis came about, many of our shareholders were already in extreme financial hardship. . . . We declared an emergency dividend to help our shareholders in this time of need, distributing approximately $45,000 to our shareholders for food and other essentials."); Andrew Decl. ¶ 8, Dkt. 46-3 ("If provided the financial means during this time, these services could be expanded to include provision of PPE, assistance in securing much needed health supplies for the community, food distributions, dividends and elder distributions, and providing assistance to families whose children are unable to attend school in person."); Naneng Decl. ¶ 7, Dkt. 46-4 ("SLC would use any CARES [Act] funding it received to provide more support to the community in coordination with the tribe and our regional organizations").

For many Alaska Natives, however, their village or regional corporations' efforts are not just extraordinary, but unique.  To put it bluntly, if ANCs do not provide these much-needed services, then many Alaska Natives will have no ability to receive them.  *See, e.g.*, Schubert

Decl. ¶ 9, Dkt. 45-22 (describing how BSNC has approximately 1,330 shareholders who are not

members of any village corporation or tribe, and thus would receive no benefits from the CARES

Act if ANCs are excluded from the Title V funds); A. Guy Decl. ¶ 6, Dkt. 46-1 ("[N]ot all

shareholders are tribally enrolled. . . . [A]ll of [these] Alaska Natives[] will be left out if ANCs

are excluded from the distribution of the CARES Act Tribal Relief Funds.").  That is because—

as Congress has long recognized—there are wide swaths of the State where ANCs (or their

designees) are the sole providers of important services to Alaska Natives and others.  *See, e.g.*,

U.S. Am. Ind. Policy Review Comm'n, *Final Report* n.21, submitted to Congress May 17, 1977

("To limit benefits of programs only to Natives who could apply through a conventional tribal

organization might disqualify certain Alaska Natives, who no longer adhere to such

organizations but who are organized currently in other forms, such as regional and village

corporations. . . .").

    That is just one of the many reasons why these proceedings are so critical.  If ANCs are

unable to provide emergency relief because they are deemed ineligible to receive CARES Act

funds, then thousands of Alaska Natives will have nowhere to look for essential services.

### D.    Against that Backdrop, Congress Enacts Title V of the CARES Act

    Congress enacted the CARES Act as part of the federal response to the public health and

economic crisis wrought by the COVID-19 pandemic.   Title V, which amends the Social

Security Act, 42 U.S.C. §301 *et seq.*, "appropriate[s]" $150 billion of emergency-relief

"payments to States, Tribal governments, and units of local government," *id.* §801(a)(1).  The

statute "reserve[s]" $8 billion of that sum for "Tribal governments," *id.* §801(a)(2)(B), "to cover"

the costs they have incurred and will continue to "incur[] due to the public health emergency" in

2020, *id.* §801(d); *see id.* §801(c)(7) ("the amount paid" to each Tribal government "shall

be . . . based on increased expenditures of each such Tribal government . . . relative to aggregate

expenditures in fiscal year 2019").  It delegates to the Secretary authority to "determine[]" the "manner" in which disbursals to Tribal governments will be made but requires him "to ensure that all amounts available under subsection (a)(2)(B) for fiscal year 2020 are distributed to Tribal governments."  *Id.*

"Tribal governments" is a defined term in the Act.  In selecting the definition, Congress had a number of options from which to choose.  *See infra* pp. 27-28.  The one it chose is telling.  Title V of the CARES Act defines "'Tribal government'" to mean "the recognized governing body of an Indian Tribe," *id.* §801(g)(5), and it defines "'Indian tribe'" to have "the meaning given that term in section 5304(e) of title 25," *id.* §801(g)(1).  Section 5304(e), part of ISDEAA, in turn defines "Indian tribe" as:

> any Indian Tribe, band, nation, or other organized group or community, ***including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act (85 Stat. 688),*** which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

25 U.S.C. §5304(e) (emphasis added).  Thus, Title V of the CARES Act incorporates a definition of "Indian tribe" that expressly includes ANCs.

### E.    Procedural History

The CARES Act provides that disbursements should be made to all Tribal governments "not later than 30 days after March 27, 2020."  42 U.S.C. §801(b)(1).  To assist in the allocation, Tribal governments submitted certain requested data to the Treasury Department via a web portal.  Based on the plain language of the CARES Act, ANCs expected to receive their allotted relief funds to assist with critical activities in support of their Native communities on or before April 27, 2020.  Consistent with the plain text and ANCs' expectation, the Department issued formal guidance on April 23, 2020, confirming ANCs' eligibility to receive relief funds.  *See*

U.S. Dep't of Treasury, Guidance, *Coronavirus Relief Fund: Payments to Tribal Governments* (Apr. 23, 2020), https://bit.ly/3d7oyl2.

Three sets of plaintiffs filed complaints and motions for injunctive relief between April 17 and April 21, 2020.  The Court consolidated the three actions and held a hearing on the motions on April 24, 2020.  On April 27, 2020, the Court granted Plaintiffs' request for a temporary restraining order prohibiting the Treasury Department from distributing any funds to ANCs but permitting distributions to other Tribal governments.  In response to that opinion, the Treasury Department distributed the first 60 percent of the $8 billion in funds to all of the non-ANC Indian tribes eligible to receive relief funds and withheld those portions of the funds that would otherwise have been allocated to the ANCs.  *See* U.S. Dep't of Treasury, Guidance, *Coronavirus Relief Fund: Allocations to Tribal Governments* 3 (May 5, 2020), https://bit.ly/2A8BQzf ("As previously stated, Treasury, after consultation with the Department of the Interior, has concluded that Alaska Native regional and village corporations as defined in or established pursuant to the Alaska Native Claims Settlement Act are eligible to receive payments from the Fund.  Payments are not being made to the Alaska Native corporations at this time due to pending litigation.").  The outcome of this litigation will determine who receives the relief funds the Secretary has set aside for ANCs.

Intervenor-Defendants subsequently intervened.  *See* Order, Dkt. 70 (granting intervention as of right).  Cross-motions for summary judgment now follow.

## SUMMARY OF ARGUMENT

This case begins and ends with the text of the CARES Act.  Given the unique history of Alaska and Alaska Natives, generic references to "Tribal governments" and "Indian tribes" sometimes leave ambiguity as to whether or which Alaska Native entities are included.  In the CARES Act, Congress eliminated any ambiguity by incorporating a definition of "Indian tribe"

23

that expressly "*includ[es]* . . . Alaska Native . . . regional [and] village corporation[s]." 25 U.S.C. §5304(e) (emphasis added); *see* 42 U.S.C. §801(g)(1), (5). That clear, expressly inclusive language resolves this dispute. The plain meaning of the legislative text is reinforced by the reality that, in enacting the CARES Act, Congress had a number of statutory definitions of "Indian tribe" from which to choose. Some of those definitions expressly exclude ANCs; some expressly include them. By adopting expressly inclusive language in the face of available models that just as clearly exclude ANCs, Congress made its decision to include ANCs unmistakable.

Because their position runs headlong into the text and negates Congress' choice of an ANC-inclusive definition, the burden is firmly on Plaintiffs to prove that ANCs are ineligible to receive CARES Act funds notwithstanding their express inclusion. Plaintiffs cannot carry that heavy burden. Plaintiffs suggest that, notwithstanding Congress' clear decision to include ANCs, the reference to tribes "recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians" effectively limits CARES Act funding to Tribes recognized under the List Act. There are multiple problems with reading the eligibility clause to exclude ANCs—starting with the reality that, if Congress wanted to exclude ANCs or limit funding to tribes recognized by the Department of the Interior under the List Act, it had far more straightforward ways to do so. Moreover, ANCs satisfy the terms of the eligibility clause because they in fact are recognized as eligible entities under a number of special programs designed to provide aid to Indians because of their Indian status. And even if that were not the case, the eligibility clause can alternatively and readily be construed to address only which tribes, beyond the expressly enumerated and specifically added ANCs, are eligible under ISDEAA.

24

More broadly, it is fundamentally anachronistic to read, as Plaintiffs suggest, the eligibility clause as a means to indirectly exclude ANCs.  ISDEAA's definition of "Indian tribe" already included the eligibility clause when Congress amended it to expressly include ANCs. Unless that amendment was without substantive effect, the eligibility clause cannot be read to exclude ANCs.  In addition, ISDEAA's definition of "Indian tribe," including the eligibility clause's reference to receiving special Indian-program funding, predates the List Act.  ISDEAA cannot have silently cross-referenced a statute that did not yet exist.  Nor did the enactment of the List Act refix the meaning of "Indian tribes" generally.  In the decades since it enacted the List Act, Congress has passed a number of statutes (including the CARES Act) that define the term "Indian tribes" expressly to include ANCs.

The text of the CARES Act decides this case, but the real-world context of the crisis facing Alaska Natives reinforces that Congress' decision to expressly include ANCs was entirely reasonable.  Alaska Natives face extreme hardship due to the pandemic and the related economic crisis.  Some have lost their main transportation artery and have seen scarcities and prices skyrocket due to the bankruptcy of a regional airline.  ANCs are the natural entities to administer emergency-relief funds for these and tens of thousands of Alaska Natives negatively affected by the pandemic.  After all, even in ordinary times, ANCs provide essential governmental services to Alaska Natives, many of whom are not members of any recognized Alaska Native village.

The negative consequences of accepting Plaintiffs' arguments extend beyond the current crisis.  The CARES Act is not the only federal statute that incorporates ISDEAA's expressly-ANC-inclusive definition of "Indian tribe."  A ruling for Plaintiffs could thus cut off access to federal programs that Alaska Natives have relied on for decades, consistent with their and the government's collective understanding of the law.  To read ANCs out of the ISDEAA definition

25

of "Indian tribe" would exclude many Alaska Natives from numerous federal programs specifically designed to benefit Alaska Native peoples.  Congress did not intend to accomplish that abrupt and inexplicable departure from federal Indian policy in Alaska by adopting, in an emergency-relief statute, a definition that expressly includes ANCs.

## STANDARD OF REVIEW

Where, as here, the court reviews final agency action, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Hosp. of Univ. of Pa. v. Sebelius*, 847 F. Supp. 2d 125, 133 (D.D.C. 2012).  While the court's review is based on the administrative record, *see Olson v. Clinton*, 602 F. Supp. 2d 93, 100-01 (D.D.C. 2009), *aff'd*, 409 F. App'x 359 (D.C. Cir. 2011), consideration of non-record evidence is permissible to the extent it provides context in complicated cases.  *See, e.g.*, Mem. Op. & Order 5-7, *U.S. Student Aid Funds, Inc. v. DeVos*, No. 15-cv-1137 (APM), Dkt. 29  (Feb. 23, 2017) (permitting the administrative record to be supplemented with 15 extra-record declarations because the administrative record alone was not sufficient to resolve the relevant issues).

## ARGUMENT

### I.    The Plain Text Of The CARES Act Includes ANCs.

Title V of the CARES Act "appropriated" $150 billion of emergency-relief "payments to States, Tribal governments, and units of local government," 42 U.S.C. §801(a)(1), and "reserve[s]" $8 billion of that sum for "Tribal governments," *id.* §801(a)(2)(B), "to cover" the costs they have incurred and will "incur[] due to the public health emergency with respect to the Coronavirus Disease 2019" in fiscal year 2020, *id.* §801(d).  The statute defines "Tribal government" as "the recognized body of an Indian Tribe," and "Indian Tribe" is expressly defined to include "any Alaska Native village or regional or village corporation."  *Id.* §801(g)(1),

(5); 25 U.S.C. §5304(e).  Thus, the statute answers the question presented by this case—whether

Alaska Native regional corporations and Alaska Native village corporations (collectively,

"ANCs") are eligible for Title V funds set aside for "Indian tribes."  ANCs are expressly and

definitively included.

A.     **The Plain Text of the CARES Act Makes Funds Available to Indian Tribes, "Including Any Alaska Native Village or Regional or Village Corporation."**

"We begin, as always, with the text of the statute."  *Hawaii v. Office of Hawaiian Affairs*,

556 U.S. 163, 173 (2009) (quoting *Permanent Mission of India to United Nations v. City of N.Y.*,

551 U.S. 193, 197 (2007)).  And when the text is clear, the statutory inquiry "ends there as well."

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 631 (2018) (quoting *BedRoc Ltd., LLC v.*

*United States*, 541 U.S. 176, 183 (2004) (plurality op.)).  This is just such a case.  Title V of the

CARES Act defines the term "Tribal government" as "the recognized governing body of an

Indian Tribe." 42 U.S.C. §801(g)(5).  It further defines the term "Indian Tribe" to have the same

meaning that term has "in section 5304(e) of title 25," *id.* §801(g)(1), which in turn defines

"Indian tribe" as follows:

> any Indian Tribe, band, nation, or other organized group or community, ***including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act (85 Stat. 688),*** which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

25 U.S.C. §5304(e) (emphasis added).  That express "inclu[sion]" of ANCs resolves this case.

As detailed above, the federal government's relationship with Native Americans in Alaska is in

many important respects different from the situation in the Lower 48 States.  For that reason, an

undefined use of the phrase "Tribal government" or "Indian Tribe" might create some ambiguity

with respect to Alaska.  But when Congress employs a definition that expressly "includ[es] any

Alaska Native village or regional or regional corporation" in the definition of "Indian Tribe," the ambiguity disappears.  ANCs are, quite literally, expressly included.

While the text of the statute is clear and dispositive, the fact that Congress chose an ANC-inclusive definition is telling.  Congress has ready-made, off-the-shelf alternatives, some of which expressly exclude ANCs.  "There is no universally recognized legal definition of the phrase ['Indian Tribe'], and no single federal statute defining it for all purposes."  *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1272 (9th Cir. 2004).  Some statutory definitions of "Indian Tribe" turn on whether an agency has formally recognized an entity.  *See, e.g.*, 25 U.S.C. §5130(2) ("The term 'Indian Tribe' means any Indian or Alaska Native tribe, band, nation, pueblo, village or community that the Secretary of the Interior acknowledges to exist as an Indian Tribe.").  Some definitions cross-reference the Federally Recognized Indian Tribe List Act of 1994 (the "List Act"), Pub. L. 103-454, 108 Stat. 4791.  *See, e.g.*, 42 U.S.C. §5122(6) ("The term 'Indian tribal government' means the governing body of any Indian or Alaska Native tribe, band, nation, pueblo, village, or community that the Secretary of the Interior acknowledges to exist as an Indian Tribe under the Federally Recognized Indian Tribe List Act of 1994.").  Others include Alaska Native *villages*, but not Alaska Native *corporations* (of either variety), while being otherwise identical to the ISDEAA definition.  *See, e.g.*, 20 U.S.C. §4402(5) ("'Indian Tribe' means any tribe, band, nation, or other organized group or community of Indians, including any Alaska Native village (as defined in, or established pursuant to, the Alaska Native Claims Settlement Act), which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians."), 25 U.S.C. §3001(7) (same); 34 U.S.C. §10389(3) (same).

A few statutes expressly *exclude* ANCs, *see, e.g.*, 25 U.S.C. §3501(4)(B) ("For the purpose of paragraph (12) and sections 3503(b)(1)(C) and 3504 of this title, the term 'Indian Tribe' does not include any Native Corporation."), while others expressly *include* them.  For example, in 2018, Congress amended the Tribal Forest Protection Act of 2004 for the purpose of establishing "a biomass demonstration project for federally recognized Indian tribes *and Alaska Native corporations* to promote biomass energy production."  Indian Tribal Energy Development and Self-Determination Act Amendments of 2017, Pub. L. No. 115-325, §202(a) (emphasis added).   Congress defined "Indian tribe" for purposes of the "Alaska Native Biomass Demonstration Project" subsection to have the "meaning given the term in section 4 of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304)."  *Id.* §202(c)(1)(B).  The only way to give effect to the stated purpose of this relatively recent, post-List-Act statute is to read ANCs as constituting "Indian tribes" within the meaning of ISDEAA.

Like that 2018 amendment, the CARES Act firmly falls into the inclusive category.  In Title V of the CARES Act, Congress chose to incorporate ISDEAA's definition of "Indian tribe," which expressly and unambiguously includes ANCs.  42 U.S.C. §801(g)(1); 25 U.S.C. §5304(e).  Congress thus chose that ANC-inclusive definition of "Indian tribe" in lieu of other definitions that could have just as clearly excluded ANCs.  That express inclusion must be given effect.

To be sure, the CARES Act makes funds available to "Tribal governments," not Indian tribes themselves.  But there is nothing novel about treating ANCs as "Tribal governments," either.  Indeed, Congress has expressly included ANCs within the definition of "Indian tribal government" in other statutes.  *See, e.g.*, 26 U.S.C. §139E.  Consistent with that usage, the CARES Act includes its ANC-inclusive definition of "Indian tribes" for the sole purpose of

clarifying its definition of "Tribal governments" as the "recognized governing body of an Indian Tribe." 42 U.S.C. §801(g)(5). Congress could not have gone out of its way to expressly include in its definition of "Indian Tribes" a whole class of tribes that, under Plaintiffs' theory, lack "Tribal governments." Indeed, any interpretation of "Tribal government," "Indian Tribe," or accompanying terms that renders nugatory Congress' express choice of an ANC-inclusive definition not only would dampen Congress' plenary power in this area, *see United States v. Sandoval*, 231 U.S. 28, 46 (1913), but would fail the most basic rule of statutory construction.

Congress defines terms to remove ambiguity. Here, Congress could have eliminated the ambiguity in the term "Indian Tribe" either by expressly including or expressly excluding ANCs. In the CARES Act, Congress plainly did the former. Any construction of the statute that ends up excluding ANCs through implication or indirection cannot be squared with Congress' overt textual choice to include. *See, e.g., Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (Congress "says in a statute what it means and means in a statute what it says there."). More broadly, effectively construing Congress' ANC-inclusive definition to exclude ANCs indirectly, when other competing definitions Congress employed in other statutes and forswore in the CARES Act do that expressly and directly, would violate the fundamental principle that courts are "to make sense rather than nonsense" out of the corpus of federal statutes. *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 101 (1991).

That result would also violate the anti-superfluity canon—"the idea that 'every word and every provision is to be given effect [and that n]one should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.'" *Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012)); *see also Wash. Mkt. Co. v. Hoffman*, 101 U.S. 112,

115-16 (1879) ("We are not at liberty to construe any statute so as to deny effect to any part of its language.  It is a cardinal rule of statutory construction that significance and effect shall, if possible, be accorded to every word. . . . This rule has been repeated innumerable times.").  That canon applies with particular force when, as here, an alternative construction would render expressly inclusive language superfluous, *i.e.*, would exclude what Congress expressly included. *See, e.g.*, *Burgess v. United States*, 553 U.S. 124, 132 (2008) (rejecting reading of statute that would nullify "the express inclusion of foreign offenses in §802(44)'s definition of 'felony drug offense'").  In short, reading the words "Alaska Native village or regional or village corporation" out of the statute, or to mean only "Alaska Native village," would be inconsistent with the plain language of the statute and basic principles of statutory interpretation.

Ignoring the definition Congress actually chose would also effectively deny Congress the ability to expeditiously differentiate among extant definitions of a term.  That is no small thing. The "general[] presum[ption] that Congress acts intentionally and purposely in the disparate inclusion or exclusion" of particular statutory language, *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)), provides more than just an interpretive rule of thumb.  It serves to ensure that Congress "remains free . . . to give [terms] a broader or different meaning" without having to go to absurd lengths to spell out its intentions, *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 455 (2012), and that the courts remain faithful agents of the democratically elected legislature, and not the other way around.

Hence the Supreme Court has honored Congress' decision to expressly include States in the definition of "person" in some statutes, but not others.  *E.g.*, *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 783 (2000); *Atascadero State Hosp. v. Scanlon*, 473 U.S.

31

234, 242 (1985).  Likewise, with Congress' decision to expressly include agents in the definition

of "employer" in Title VII, but not Title IX of the Education Amendments of 1972.  *Gebser v.*

*Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 283 (1998) (concluding that, unlike Title VII, Title

IX does not incorporate principles of agency liability).  And so on.  In cases such as these—

where Congress could have chosen one definition that excludes, but instead favored a different

definition that expressly includes—the interpretative answer is straightforward:  Congress'

deliberate choice must be given effect.

> **B.**    **Nothing in the Text Undermines that Straightforward Conclusion.**

Plaintiffs nonetheless argue that, despite its express decision to include ANCs in Title V's

definition of "Indian Tribe," Congress actually intended to exclude them through subtle

references to recognition or eligibility elsewhere in the definition.  In particular, Plaintiffs argue

that because Title V of the CARES Act defines "tribal government" as "the *recognized*

governing body of an Indian Tribe," which is defined as "any Indian Tribe, band, nation, or other

organized group or community, ***including any Alaska Native village or regional or village***

***corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act***

***(85 Stat. 688)***, which is *recognized* as eligible for the special programs and services provided by

the United States to Indians because of their status as Indians," 42 U.S.C. §§801(a)(2)(B), (g)(1),

(g)(5); 25 U.S.C. §5304(e) (italics and bolding added), the key to this case is the term

"recognized," and ANCs are not "recognized" Tribes.  Put simply, Plaintiffs argue that the

italicized language essentially renders the bolded language without effect.  This argument fails

for a host of reasons.

**1. The burden is firmly on Plaintiffs to prove that ANCs are ineligible to receive CARES Act funds notwithstanding their express inclusion.**

The principal reason this subtle argument for excluding ANCs fails is that there is nothing subtle about Congress' express decision to include ANCs, and that direct and express decision must be given effect. At a minimum, any effort to avoid the clear import of Congress' decision to include ANCs faces a heavy burden. Just as Congress does not generally "hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001), it does not lightly use cross-references and subclauses to erase through indirection what it expressly accomplished directly through an inclusive statutory definition—particularly when it had a number of other off-the-rack definitions that would have excluded ANCs in a far more straightforward manner. *See Ex parte Collett*, 337 U.S. 55, 67 (1949) ("A canon of construction which would discount statutory words pro tanto, the greater the expertise or the more meticulous the Committee consideration devoted thereto, or the longer and more complex the legislation, would be absurd, not least because it would make mockery of the techniques of statutory interpretation which have heretofore been used by the courts."). Any construction of Title V that excludes the directly included terms must therefore be rejected unless it is inarguable that that is what Congress intended.

Plaintiffs cannot carry that heavy burden. In fact, ANCs are recognized as eligible entities under a number of special programs designed to provide aid to Indians because of their Indian status, so nothing in the CARES Act definition is in any tension with Congress' express inclusion of ANCs. Furthermore, any tension between the eligibility clause and Congress' express decision to include ANCs could be reconciled by reading the eligibility clause to address only the eligibility of those Indian tribes that are required to seek formal recognition by the United States—a condition not imposed on ANCs. Either way, any effort to interpret the

eligibility clause as an indirect reference only to the subset of Indian tribes recognized and listed pursuant to the List Act is incompatible with the statutory text and Congress' deliberate decision not to incorporate the List Act definition, but instead to expressly include ANCs.

> **2.    Plaintiffs' argument that "recognized as eligible" in the eligibility clause means "recognized pursuant to the List Act" is belied by the statute's text and context.**

Even though ANCs *in fact* participate in a wide array of programs that are available only to Indians, Plaintiffs would have this Court believe that ANCs are not "recognized as eligible" for these programs within the meaning of ISDEAA.   There is no merit to that argument. Adopting Plaintiffs' position would mean that an ANC that is recognized as eligible for services or programs as a matter of fact (and that, consistent with that recognition, in fact receives open-to-Natives/Indians-only services and/or in fact participates in for-Natives/Indians-only programs) is somehow not recognized as eligible as a matter of law.   That "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013).   That absurdity—and the fact that ISDEAA *predates* the List Act—belies any assertion that "recognized as eligible" in ISDEAA means "recognized pursuant to the List Act."   *See, e.g.*, Mot. for TRO & Prelim. Inj. 20-21, Dkt. 3.

So does the text of the statute, which confirms the commonsense conclusion that "recognized as eligible for the special programs and services provided by the United States to Indians" as used in ISDEAA (and thus Title V of the CARES Act) does not mean "recognized pursuant to the List Act."   To be sure, both ISDEAA and the List Act use the phrase "eligible for the special programs and services provided by the United States."   But the similarities end there.

First, not only does the List Act's definition of "Indian Tribe" omit ANCs, *see* 25 U.S.C. §5130(2), but the list itself "does not include any Alaska Native regional or village corporations."   Amended Compl. ¶ 94, Dkt. 7 (emphasis omitted).   That is unsurprising, as the regulations governing acknowledgment under the List Act, which itself uses a different

definition of "Indian tribe" than ISDEAA, would not permit *any* ANC to qualify for inclusion on the list.  *See* 25 C.F.R. §83.4 (prohibiting recognition of "an association, organization, corporation, or entity of any character formed in recent times unless the entity has only changed form by recently incorporating or otherwise formalizing its existing politically autonomous community"); *id.* §83.11(a) (setting criteria for recognition including that "[t]he petitioner has been identified as an American Indian entity on a substantially continuous basis since 1900."). In stark contrast, ISDEAA—the statute Congress consciously chose to incorporate into the CARES Act—expressly includes ANCs.  *See* 25 U.S.C. §5304(e).  Thus, any suggestion that in expressly incorporating the ISDEAA definition of "Indian Tribe," which expressly includes ANCs, Congress also incorporated the List Act concept of recognition, which might be said to implicitly exclude ANCs only because the List Act excludes ANCs, cannot be correct.  After all, "[s]tatutory language must be read in context [since] a phrase gathers meaning from the words around it."  *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 596 (2004) (alterations in original) (quoting *Jones v. United States*, 527 U.S. 373, 389 (1999)).  And the most relevant context here is the express inclusion of ANCs in the statutory definition—particularly given that Congress could have chosen any number of other off-the-rack definitions that do not expressly include ANCs.

Second, whereas the only recognition that matters under the List Act is recognition by the Secretary of the Interior for purposes of the list published in the Federal Register, 25 U.S.C. §5131(a), ISDEAA is not so limited.  Unlike the List Act, ISDEAA "does not require recognition by *the Secretary*."  *Frank's Landing Indian Cmty. v. Nat'l Indian Gaming Comm'n*, 242 F. Supp. 3d 1156, 1166 (W.D. Wash. 2017) (emphasis in original), *aff'd*, 918 F.3d 610 (9th Cir. 2019). That is a distinction with a difference.  *See, e.g.*, 25 U.S.C. §2703(5)(A) (Indian Gaming

Regulatory Act) (defining Tribe as those tribes or groups that are "recognized as eligible by the Secretary"). And it is a distinction that makes perfect sense, as the Department of the Interior does not administer many of the for-Natives/Indians-only programs that fall under ISDEAA's umbrella. *See infra* pp. 46-49 (highlighting ANCs' participation in Native/Indian-specific programs run by Departments of Energy, Housing and Urban Development, and so on).

Third and finally, the List Act is focused on issues of sovereignty and has never limited the definition of "Indian tribe" under ISDEAA. The end-points of recognition under the List Act (*i.e.*, "through the Part 83 Process") are generally that "the tribe may seek to reorganize itself pursuant to the Indian Reorganization Act" under 25 U.S.C. §476, and that the tribe may then assume a government-to-government relationship with the United States. *See* 44 Fed. Reg. 7,235 (Feb. 6, 1979); 58 Fed. Reg. 54,364 (Oct. 21, 1993); 60 Fed. Reg. 9,250 (Feb. 16, 1995). But, in light of ANCSA, ANCs have neither warranted nor needed to try to reorganize themselves under that Act, *see supra* pp.10-13, *supra*, and they have long been recognized as eligible for the special programs and services provided by the United States to Alaska Natives pursuant to ANCSA and numerous other statutes. *See, e.g.*, 85 Fed. Reg. 23,935 ("The Department of the Interior strives to strengthen its government-to-government relationship with Tribes and Alaska Native corporations through a commitment to consultation and recognition of their right to self-governance and tribal sovereignty."); *see also Az. Health Care Cost Containment Sys. v. McClellan*, 508 F.3d 1243, 1245 (9th Cir. 2007) (discussing the federal government's "unique government-to-government relationship with American Indian Tribes and Alaska Native corporations"); *infra* pp. 48, 51, *infra* (discussing CIRI compact). The List Act's basic aims are therefore irrelevant to entities like ANCs that were made statutorily eligible to receive services

36

provided to Indians.  Reading the List Act to erase ANCs from a separate statute in which they are expressly included would thus make no sense.

C.    **To the Extent Relevant, the Histories of Both ISDEAA and the List Act further Rebut Plaintiffs' Atextual Interpretation.**

1.    **The History of ISDEAA Confirms ANCs' Inclusion.**

The drafting history of ISDEAA further underscores that 25 U.S.C. §5304(e)'s eligibility clause ("which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians") does not nullify the provision's express inclusion of ANCs.  The initial version of ISDEAA "included the eligibility clause but did not mention the Alaska regional corporations"; "[s]pecific reference to Alaska village and regional corporations was added by amendment."  *Cook Inlet Native Ass'n v. Bowen*, 810 F.2d 1471, 1474-75 (9th Cir. 1987); *see* 120 Cong. Rec. 40252 (Aug. 6, 1974).  In that amendment, Congress went out of its way to add ANCs to a statutory definition of "Indian tribe" that already included the eligibility clause.   Congress plainly did not think the eligibility clause was inconsistent with inclusion of ANCs or that it rendered the entire amendment without substantive effect.  Congress may have intended the eligibility clause to simply mean eligibility for programs that provide special benefits to Native peoples (*i.e.*, that ANCs satisfied the eligibility clause). Alternatively, Congress may have intended that the eligibility clause only regulate the eligibility of those tribes that are otherwise required to seek formal recognition from the United States, a requirement obviously not imposed on ANCs (*i.e.*, that the eligibility clause is therefore inapplicable to ANCs).  But the one thing Congress could not have thought is that the eligibility clause implicitly negated its entire effort to amend the statute to expressly include ANCs.  After all, the best indication of Congress' intent is a change in the statutory text itself.  *See, e.g.*, *Germain*, 503 U.S. at 253-54.  Reading the final clause to nullify that addition would render

Congress' deliberate action a fool's errand and would effectively deprive Congress of the ability to make sensible edits to extant statutes.  *See Carter v. United States*, 530 U.S. 255, 270-71 (2000).

The text and history of ISDEAA similarly belie any assertion that 42 U.S.C. §801(g)(5), which defines "'Tribal government'" to mean "the recognized governing body of an Indian Tribe," silently cross-references the List Act or otherwise limits the CARES Act's explicit definition of "Indian Tribe" to the tribes listed in the Federal Register.  Given that the CARES Act expressly defines "Indian Tribe" to include ANCs, the "recognized governing body of an Indian Tribe," so defined, must be capacious enough to include the governing bodies of ANCs.

Moreover, the term "recognized governing body of an Indian Tribe" is not a CARES Act innovation, but is a phrase that appears in ISDEAA too.  *See* 25 U.S.C. §5304(*l*) (defining "tribal organization" to mean, *inter alia*, "the recognized governing body of any Indian Tribe").  That phrase originally referenced "*elected* governing body," but use of the term "elected" caused some consternation, as it raised fears that tribes whose governing bodies were chosen by some other means would wind up being excluded.  *See* H. Rep. 93-1600, 93th Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.C.C.A.N. 7775, 7793 (statement of Morris Thompson, Comm'r of Indian Affairs).  The Commissioner accordingly suggested that Congress change the term to "elected or otherwise recognized."  *Id.*  While Congress ultimately dropped the "elected or otherwise" language without explanation, the change was plainly intended to broaden the phrase—*i.e.*, to include Indian tribes that did not use formal elections to choose representatives—not narrow it.

Nothing in the history indicates that the phrase "recognized governing body" has ever been thought to refer to recognition in the hypertechnical, List-Act-only sense—especially since, again, the List Act did not yet exist when Congress passed ISDEAA.  To the contrary, the phrase

"recognized governing body" is, and long has been, simply a means for Congress to clarify which body associated with a given Indian tribe has the authority to represent the Indian tribe for purposes of the relevant program. Indeed, in a 1976 BIA Memorandum on the scope of the definition of "Indian Tribe" under ISDEAA, the Assistant Solicitor General for Indian Affairs explicitly identified an ANC's board of directors as its "governing body." A.R. Tab 12 at 2 ("It follows that regional and village corporations may request to contract for the provision of BIA services" and that "[s]uch requests should be by a resolution of a corporation's board of directors, which is its 'governing body'" for such purposes). Congress' choice to include this commonplace feature of Indian law in Title V of the CARES Act thus does nothing to detracts from its express and intentional inclusion of ANCs. In sum, the drafting history of the statute it cross-references confirms that ANCs and their governing bodies fit comfortably within the definition of "Indian tribe" in ISDEAA and the CARES Act, and "Tribal government" in the CARES Act.

> **2.     The History of the List Act Confirms that It Was Not Intended to Strip ANCs of their Eligibility for Indian-Specific Programs and Services.**

The history of the List Act likewise belies Plaintiffs' position. The BIA first published a list of Indian Tribal Entities on February 6, 1979, with the notation that "[t]he list of eligible Alaskan entities will be published at a later date." 44 Fed. Reg. 7,235. The BIA then published an updated list in 1982, to which it appended a list of "Alaska Native Entities Recognized and Eligible to Receive Services From the United States Bureau of Indian Affairs." 47 Fed. Reg. 53,133-53,134. The 1982 preamble explained that "eligibility for services administered by the Bureau of Indian Affairs is generally limited to historical tribes and communities of Indians residing on reservations, and their members, *[but] unique circumstances have made eligible additional entities in Alaska which are not historical tribes*." *Id.* (emphasis added).

ANCs were eventually added to the list in 1988 in recognition of their statutory eligibility for services under ISDEAA and other statutes.  *See* 53 Fed. Reg. 52,829, 52,833 (listing Alaska entities satisfying the ISDEAA definition and expressly including ANCs).  The 1988 preamble explained that the list was amended "to reflect the Alaska entities which are *statutorily eligible* for funding and services from the Bureau of Indian Affairs," such as ANCs, which were "included without the necessity of completing the Federal Acknowledgment Process because of more explicit statutory provisions on groups eligible to receive funding and services on behalf of Alaska Natives."  *Id.* at 52,832 (emphasis added).  In outlining the relevant statutory framework, moreover, the BIA observed that "[o]ther Federal agencies should be aware that some statutes authorize the government to serve other organizations which are not listed while others specify only some of the criteria listed above" and, thus, "each agency must look at its particular statutory authorities to make a final eligibility determination."  *Id*.  Significantly, this same notice also affirmed that "Indian statutes, such as the Indian Self-Determination Act, *specifically include* Alaska Native villages, *village corporations and regional corporations* defined or established under the Alaska Native Claims Settlement Act (ANCSA)."  *Id*. (emphasis added).

The inclusion of ANCs on the 1988 list caused controversy, so a new list was published in 1993, which outlined the confusion caused by the inclusion of both sovereign tribes and statutorily eligible native entities like ANCs on the same list, and removed ANCs in light of that concern.  *See* 58 Fed. Reg. 54,364.  Nonetheless—and crucially—the BIA confirmed that the non-inclusion of ANCs on the list emphatically did *not* reflect a determination of, or impact in any way, ANCs' statutory eligibility for programs and services available only to Indians:

> Because the list published by this notice is limited to entities found
> to be Indian Tribes, as that term is defined and used in 25 C.F.R.
> part 83, it does not include a number of non-tribal Native entities
> in Alaska that currently contract with or receive services from the

> Bureau of Indian Affairs pursuant to specific statutory authority, including ANCSA village and regional corporations and various tribal organizations. ***These entities are made eligible for Federal contracting and services by statute and their non-inclusion on the list below does not affect the continued eligibility of the entities for contracts and services.***

58 Fed. Reg. 54,363, 54,366 (emphasis added).

The enactment of the List Act in 1994 did nothing to change that. It simply mandated that all future lists should also be limited to Indian tribes *requiring* federal recognition. *See* 60 Fed. Reg. 9,250, 9,251 (notice of publication of the 1995 list).[7] In fact, the original notice identifying federally recognized tribes under the List Act acknowledged that "[t]he regional, village and urban corporations organized under state law in accordance with the Alaska Native Claims Settlement Act . . . were not listed although they had been designated as 'tribes' for the purposes of some Federal laws, primarily the Indian Self-Determination and Education Assistance Act. . . ." *Id.* (emphasis added). There is thus no basis to suggest, let alone conclude, that in enacting the List Act Congress intended to modify or repeal ANCs' longstanding statutory eligibility under ISDEAA. *See Branch v. Smith*, 538 U.S. 254, 273 (2003) ("An implied repeal will only be found where provisions in two statutes are in 'irreconcilable conflict,' or where the latter Act covers the whole subject of the earlier one and 'is clearly intended as a substitute.'" (quoting *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503, 56 S.Ct. 349 (1936))); *United States v. United Cont'l Tuna Corp.*, 425 U.S. 164, 168 (1976) (It is "a cardinal principle of statutory construction that repeals by implication are not favored.").

---

[7] The above history of the list and its various iterations prior to 1994 (during which it both included and omitted ANCs) also explains why the current list continues to be titled "Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs" even though it does not reflect all such Native entities. *See* 85 Fed. Reg. 5,462.

In sum:  "The legislative history [of the List Act] indicates no Congressional intent to take away the federal benefits offered to other Indian Tribes that are not federally recognized or to modify the contractual provisions associated with the federal benefits they receive." *Schmasow v. Native Am. Ctr.*, 978 P.2d 304, 389 (Mont. 1999).  Before the List Act was enacted, the BIA not only recognized that ANCs were eligible for programs and services available to Indians/Natives only, but included ANCs on its List of Native Entities within the State of Alaska Recognized and Eligible to Receive Services from the BIA.  *See, e.g.*, 53 Fed. Reg. 52,829-52,902 (listing numerous ANCs).  The reason the final version of the List Act omits ANCs is not because Congress wanted to terminate their relationship to the federal government or exclude Alaska Natives from important benefits to which they already were entitled, but because the federal acknowledgment procedures were never designed to apply to entities that were statutorily eligible for Indian services under the distinct statutory regime specifically addressed to ANCs. *See id.* at 52,832-52,833 (noting "Congressional recognition of the types of entities in Alaska eligible to receive funding or services from the Bureau of Indian Affairs," and highlighting that Indian statutes, such as the Indian Self-Determination Act, specifically include Alaska Native villages, village corporations and regional corporations defined or established under the Alaska Native Claims Settlement Act (ANCSA)").  The List Act, in other words, was predicated on existing federal acknowledgement regulations that exclude ANCs because of the distinct approach reflected in ANCSA.  *See, e.g.*, 25 C.F.R. §83.4 (prohibiting recognition of "an association, organization, corporation, or entity of any character formed in recent times unless the entity has only changed form by recently incorporating or otherwise formalizing its existing politically autonomous community"); *id.* §83.11 (setting criteria for recognition including that "[t]he petitioner has been identified as an American Indian entity on a substantially continuous

basis since 1900"). So while ANCs cannot achieve "federal recognition" pursuant to the List Act, they were never intended to and have no need to do so—and that was never thought to undermine the fact that they are eligible to receive benefits under ISDEAA.

*   *   *

In enacting the CARES Act, Congress chose a definition of "Indian tribe" that explicitly includes ANCs. That choice, and the resulting clear text, suffice to resolve this case. There is no reason to adopt a strained, atextual construction that undoes, through indirection and implication, what Congress did directly and expressly. If Congress wished to exclude ANCs, it easily could have done so in the statutory text. Instead, it went out of its way to include ANCs among the entities eligible to receive CARES Act Title V funding. ANCs are eligible to receive CARES Act funding under a plain-text reading of the statute.

## II.   Real-World Context Confirms What The Text Makes Clear:  ANCs Are Expressly Included In Title V Of The CARES Act.

### A.   Alaska Native Corporations Have Traditionally Provided Services to Alaska Natives and Have Continued to Do So Throughout the Pandemic.

Congress' incorporation of the ANC-inclusive ISDEAA definition of "Indian tribe" into Title V of the CARES Act makes perfect sense in light of the real-world problems facing Alaska Natives and the ANCs' real-world roles in Alaska Natives' lives and communities.[8] The devastation wrought by the global pandemic and its economic repercussions have not spared Alaska Natives. While the remote nature of many of the communities served by ANCs has kept

---

[8] This Court previously noted the relevance of the practical inquiry and "actual agency practice under ISDEAA" to its understanding of the law. Mem. & Op. 29, Dkt. 37. While outside of the Administrative Record, as used here the declarations (and the summary of them provided in the Addendum hereto) readily fall within the class of extra-record materials that the Court can consider as an aid to better understand the basis for the challenged agency action. *See, e.g.*, *U.S. Student Aid Funds, Inc. v. DeVos*, No. 15-cv-1137 (APM) (D.D.C. Feb. 23, 2017), Dkt. 29.

the arrival of the disease at bay, the very remoteness of many of those villages has caused the economic repercussions of the pandemic to hit Alaska Natives with particular force.

Many Alaska Native villages and communities were facing alarming circumstances even before the current crisis. *See, e.g.*, Christiansen Decl. ¶¶ 3-4, Dkt. 45-17 (describing how the "lack of running water will have a significant impact in our Shareholder Members' ability to limit the spread by frequently washing hands" and how the "Takotna village medical clinic burned down during the Pandemic on March 28," which "could have a devastating effect on our Shareholder Members in the village if there is an outbreak of COVID-19 and they lack access to available medical treatment"); McCarty Decl. ¶ 3, Dkt. 45-18 ("The main issue is to always sanitize and keep clean, but some households in Ruby do not have running water or showers and we rely on the local laundromat."); Kirk Decl. ¶¶ 3, 6, Dkt. 45-21 ("Our community of 1,000 doesn't have running water and flush toilets. . . . Human waste is collected in 5-gallon buckets and carried from the home to waste containers on the streets where it is hauled and dumped into an open sewage lagoon. 'Honey' buckets slop and spill foul liquid that that dries into dust on the streets where kids play."); Andrew Decl. ¶ 8, Dkt. 46-3 ("Many households in St. Mary's live below the poverty line and do not have access to internet or even a computer."); J. George Decl. ¶ 5, Dkt. 46-6 ("Even before the COVID-19 pandemic arose, the Akiachak community has faced . . . chronic unemployment and underemployment.").

With the onset of the pandemic and its economic devastation, the circumstances facing many communities served by ANCs have turned truly dire. For instance, King Cove Corporation has already lost at least two Elder members to the Corona virus, and it remains "without any passenger airline service to Anchorage ([its] main urban hub for supplies and medical care) except for charter service," which is especially concerning to those who "can't meet their health

needs."  Gould Decl. ¶¶ 3, 5, Dkt. 45-11.  The majority of residents in the Village of Saxman, which is accessible only by plane or ship and is heavily dependent on tourism, "will have little or no seasonal income to rely upon for food this winter" and "most will not be able to afford the safety equipment necessary to protect themselves and their families through an extended virus outbreak."  Blair Decl. ¶¶ 3, 6, Dkt. 45-10.  Elsewhere, Kwethluk, St. Mary's, and Akiachak have lost their primary means of transportation in the wake of its regional airline's COVID-precipitated bankruptcy.  *See, e.g.*, Andrew Decl. ¶ 4, Dkt. 46-3; J. George Decl. ¶ 3, Dkt. 46-6; *see also, e.g.*, Mallott Decl. ¶ 4, Dkt. 45-2 (Sealaska covers "an area with remote villages situated on an expansive island archipelago.  There is no road system, rather the communities are connected by a ferry system and plane service.").  The resulting loss of transportation and supply-chains has caused prices to skyrocket and caused a difficult situation to turn from bad to worse.  *See* P. G. Guy Decl. ¶¶ 3-4, Dkt. 46-2; Andrew Decl. ¶ 5, Dkt. 46-3; J. George Decl. ¶ 4, Dkt. 46-6.

Even with the promised CARES Act funding on hold, ANCs have already played a critical role in providing much needed assistance to Alaska Natives in the current crisis.  A number of ANCs have distributed tens of thousands of dollars to their shareholders "in this time of need" to help with purchasing "food and other essentials."  *E.g.*, P. G. Guy Decl. ¶¶ 5-6, Dkt. 46-2.  Ahtna has "ordered 5,000 units of hand sanitizer" as well as "personal protective equipment," which it intends "to provide directly to the villages that protect [its] tribal members."  Johns Decl. ¶ 13, Dkt. 43-1.  Sea Lion Corporation has literally opened the doors to its homes, "ma[king] . . . apartments available" for those in need and turning a separate "housing unit [into] a temporary quarantine center for the community of Hooper Bay."  Naneng Decl. ¶ 7, Dkt. 46-4.  Similar examples abound of ANCs going to extraordinary lengths during this time of

crisis for the Native peoples who rely on them.  *See, e.g.*, Hegna Decl. ¶ 5.c, Dkt. 45-4 ("Due to . . . the COVID-19 national emergency," Koniag has provided significant "[f]unding to six federally recognized tribes on Kodiak Island in order to support local community farms to enhance food security for remote villages without roads that can only be accessed by airplane or boat.").

The ANCs' role in the current crisis is hardly a novelty.  It is consistent with the role Congress envisioned in ANCSA and the role ANCs have long played under a number of federal programs.  Rather than vest all responsibilities and duties to protect Alaska Natives in Native villages alone, Congress intended for ANCs to work closely with villages to fulfill those responsibilities and duties and to promote the health, education, and welfare of Alaska Natives. *See* 77 Fed. Reg. 13,137 (ANCs "were established to provide for the economic and social needs, including the health, education and welfare of their Native shareholders.").  Excluding ANCs from funding under Title V of the CARES Act would frustrate these goals.

The role of ANCs as providers of essential governmental services alongside (or even in lieu of) Alaska Native villages is not merely theoretical.  While Alaska has federally recognized Native villages, the role of providing vital governmental services often falls heavily on ANCs. Of course, that is not to say Native villages provide no such services, only that the ANCs—at both the village and regional levels—are integral to the provision of services, and in some remote areas are for all practical purposes the *only* providers able to distribute services in a timely manner.  This is a function of the unique history and challenges of Native life in Alaska, a uniqueness recognized by Congress when it enacted ANCSA and deliberately departed from historical Indian policy, which largely centered on traditional tribal entities and reservations.

ANCs are not ordinary profit-seeking entities,[9] and are not viewed as such by the Alaska Natives who rely on them.  Rather, ANCs were an innovative effort to establish organizations designed to serve Alaska Natives, without superimposing a Lower-48 model that did not correspond to the unique history and circumstances of Alaska Natives.  ANCs are intertwined with the communities they serve and to which they have responsibilities.  *See A*. Guy Decl. ¶ 11, Dkt. 46-1 ("The reality of the situation in our region of Alaska is that tribes and village corporations work hand in hand to provide much needed, essential services in a region that suffers from some of the highest rates of unemployment in the country.").  Thus, ANCs are looked to—by both Alaska Natives and the federal government—to provide governmental services like housing assistance, health care, community infrastructure development, and food assistance.

Indeed, not only do ANCs provide essential governmental services to Alaska Natives because of the ANCs' status as "Indian tribes," *see, e.g.*, *supra* pp. 10-13, but ANCs in fact *are*, and long have been, "recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians" under ISDEAA.  25 U.S.C. §5304(e).

*Housing assistance.*  ANCs participate in Federal programs under the NAHASDA, which cites to ISDEAA and mirrors the ISDEAA definition of "Indian tribe" in defining "federally recognized tribe" for NAHASDA purposes.  *See* 25 U.S.C. §4103(13)(B).  True to their name, these Native American Housing Assistance and Self-Determination Act programs do

---

[9] Congress' adoption of 43 U.S.C. §1606(r) is illustrative of the point.  When the Supreme Court of Alaska, applying state law, held that ANCs could not provide disproportionate health, education, and welfare benefits to Native shareholders, *see Hansen v. Kake*, 939 P.2d 1320 (Alaska 1997), Congress acted swiftly in response, adopting §1606(r) the following year to expressly permit ANCs to do just that.  Pub. L. No. 105-333, §12, 112 Stat. 3129, 3135 (Oct. 31, 1998).

not merely "collaterally benefit Indians as a part of the broader population," but rather exist *solely "'for the benefit of Indians because of their status as Indians.'"* *Navajo Nation v. Dep't of Health & Human Servs., Sec'y*, 325 F.3d 1133, 1138 (9th Cir. 2003) (emphasis added; citation omitted). NAHASDA programs are available to ANCs *because of* their Indian tribe status. *See, e.g.*, Hegna Decl. ¶ 4, Dkt. 45-4 ("Over the years, Koniag has received federal grants and contract awards based on the inclusion of Alaska Native Corporations within a legal definition of "Indian Tribe[,]" including "HUD grant funding connected to [NAHASDA]"); Buretta Decl. ¶ 3, Dkt. 45-5 ("It is through Chugach's eligibility to participate as a tribe under [NAHASDA] that the North Pacific Rim Housing Authority is able to apply for NAHASDA funding that provides housing support to Alaska Natives and American Indians in our Chugach communities."); A. Guy Decl. ¶ 5.c, Dkt. 46-1 ("Participation in NAHASDA provides critical housing in the Calista region.  Calista partners with the Association of Village Council Presidents in the administration of NAHASDA programs."); *see also* Schutt Decl. ¶ 9, Dkt. 45-1 (describing how Doyon's designee "administer[s] U.S. Department of Housing & Urban Development (HUD) programs throughout the state"); Minich Decl. ¶ 13, Dkt. 45-6 (explaining how CIRI has received NAHASDA block grant funding for decades and, through one of its designated tribal organizations, has provided critical housing services to underserved Alaska Native and American Indian peoples).

**Energy assistance.**  ANCs are eligible to obtain tribal grant funding from the Department of Energy, which is available only to Indian tribes.  *See* U.S. Dep't of Energy, Office of Indian Energy Pol'y & Programs, *About Us*, https://www.energy.gov/indianenergy/about-us ; *see also* 25 U.S.C. §3501(2)(c) (defining "[t]he term 'Indian land'" for "Indian tribal energy programs" to include "land that is owned by an Indian tribe and was conveyed by the United States to a Native

Corporation pursuant to the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.), or that was conveyed by the United States to a Native Corporation in exchange for such land"). To be clear, ANCs are not just *eligible* for these funds; they have consistently been awarded grant funding under this special program. In 2016, for instance, Calista Corporation received funding for the Calista Energy Management Assistance Initiative to help address the high costs of energy in its region. A. Guy Decl. ¶ 5.b, Dkt. 46-1. "This collaborative regional project coordinates delivery of energy assistance training to villages that are thousands of miles away from major roads and highways[,]" which is "critical to a remote area where heating fuel, gasoline, and electricity costs are often substantially higher than costs in other Alaska communities that are on the road system." *Id.* Sea Lion, a Native village corporation, likewise participates in the "DOE/Tribal Energy program," Naneng Decl. ¶ 5, Dkt. 46-4, as do numerous other village and regional ANCs.

*Social services.* ANCs are eligible for 638 compacts under ISDEAA Title V to deliver "child and family services, educational and cultural programs, job placement and training, substance abuse services, and welfare assistance." Minich Decl. ¶ 8, Dkt. 45-6. For instance, CIRI's designated tribal organization, Cook Inlet Tribal Council ("CITC"), has operated as a 638 contractor for nearly 40 years and has delivered such services "to tens of thousands of Alaska Native and American Indian residents of Anchorage, without regard to the recipients' home region, tribe or village." *Id.* (emphasis omitted). The "wraparound services" CITC provides include "Tribal Temporary Assistance to Needy Families, Child Care subsidies, Tribal Vocational Rehabilitation, academic programs inside the Anchorage School District, supervised visitation for families involved in the child welfare system," as well as "a comprehensive

continuum of recovery and behavioral health services, including outpatient treatment and transitional and sober supportive living." *Id.* ¶¶ 8-9.

    ***Healthcare services.*** ANCs provide a broad range of services to Alaska Natives using the IHS and BIA funding. *See, e.g.*, Schutt Decl. ¶ 11, Dkt. 45-1 (explaining how a Doyon designee is a BIA and IHS provider serving "10,000-12,000 Alaska Native people living in Fairbanks, Alaska, [and] has used Doyon's designation of tribal authority to serve their clients and patients"); Buretta Decl. ¶ 3, Dkt. 45-5 (emphasizing that IHS and BIA have "recognized Chugach as the Indian Tribe for Alaska Natives within and without the Chugach Region who have no other tribal affiliation."); Minich Decl. ¶¶ 10-12, Dkt. 45-6 (describing a decades-old 638 compact between Cook Inlet Region Inc.'s (CIRI) designated tribal organization and the Department of Health and Human Services, under which nearly 60,000 Alaska Natives receive "primary care services; emergency services; pediatric, obstetric and gynecological services; optometry services; audiology services; chiropractic services; laboratory services; imaging services; pharmacy services; physical, occupational, and speech therapy services; wellness, exercise and health promotion services; dental, orthodontic, endodontic, prosthodontic, and oral surgery services; residential and outpatient behavioral health and substance use treatment services; [and] domestic violence prevention and education services").

    **B.**    **Alaska Native Corporations Are Not Second-Class Indian Tribes.**

    The foregoing examples not only demonstrate that ANCs stand shoulder-to-shoulder with state, local, and other tribal governments with respect to providing relief and critical services, but confirm that ANCs do in fact provide governmental services to Alaska Natives based on their treatment as "Indian tribes" under ISDEAA and various other federal statutes containing similar definitions, much in the same way that Plaintiffs provide to their communities. *See, e.g.*, Mot. for TRO & Prelim. Inj. 30-31, Dkt. 3. In short, interpreting the CARES Act as authorizing

disbursement of funds to ANCs is not only textually compelled, but entirely reasonable in light of the real-world situations of Natives in Alaska.[10]

Notwithstanding the history in Alaska of ANCs working side-by-side with state, local, and other tribal entities to assure (as ANCSA envisioned) the "maximum participation by [Alaska] Natives" in the benefits available to them as Indians, 43 U.S.C. §1601(b), Plaintiffs argued in their TRO papers that the ANCs' 638 agreements should not be viewed on equal footing with those of Indian tribes appearing on the List Act list.  *See, e.g.*, Mot. for TRO & Prelim. Inj. 21-24, Dkt. 3.  According to Plaintiffs, ANCs generally obtain 638 agreements when a List Act Indian tribe requests it—in other words, Plaintiffs argue that ANCs are, at best, second-class Indian tribes.

This contention is wrong for multiple reasons.  First and foremost, it flatly misrepresents how ISDEAA operates.  As noted, there is no question that ISDEAA expressly includes ANCs within the definition of "Indian tribe."  Several Plaintiffs even concede this.  *See, e.g.*, Reply to Opp'n to Mot. for TRO 5-6, *Cheyenne River Sioux Tribe v. Mnuchin*, 1:20-cv-01059-APM, Dkt. 15  (D.D.C. Apr. 24, 2020) ("Cheyenne TRO Reply").  Nor can there be any dispute that ANCs do in fact receive special services and participate in special programs that are available only to Indian tribes.  *See supra* pp. 10-13, 46-48.  Yet Plaintiffs nonetheless contend the Court should demote ANCs to "stop-gap" tribal status and deny them access to relief funds under the CARES Act simply because IHS implements ISDEAA contracting in Alaska pursuant to a "hierarchy,"

---

[10] Plaintiffs have previously raised the specter of potential "double-dipping" into CARES Act funding.  That concern is illusory, as the government has made clear.  *See* U.S. Treasury Dep't, *Coronavirus Relief Fund Payments to Tribal Governments* (Apr. 23, 2020), https://bit.ly/2X406vs.  The reality is in fact the opposite:  Without the Title V funding, some of the most vulnerable communities in Alaska will be excluded from funding designed to ease hardships during the COVID-19 pandemic.  *See, e.g.*, Schutt Decl. ¶ 13, Dkt. 45-1; Minich Decl. ¶ 14, Dkt. 45-6.

under which, according to Plaintiffs, "an ANC is considered an 'Indian Tribe' only as a last resort."  Cheyenne TRO Reply at 5-6; *see* Alaska Area Guidelines for Tribal Clearances for Indian Self-Determination Contracts in 1981, 46 Fed. Reg. 27,178 (May 18, 1981) ("Guidelines").

The problems with that position are legion.  To start with the obvious, Plaintiffs' argument focuses only on how HIS implements its own 638 programs; it sheds no light on how other federal agencies implement their programs for dealing with Indian Tribes.  And other agencies, pursuant to specific congressional mandates, do in fact deal with ANCs as Indian tribes on equal footing with other Indian tribes, as noted above.  *See supra* pp. 10-11 & n.5, 46-48. Furthermore, ANCs' 638 agreements do not necessarily depend on requests from tribes on the List Act list, as the Guidelines themselves make clear.  CIRI, for example, compacts as the tribal entity recognized by the United States for government-to-government relations.  *See* Ex. B (Supplemental Minich Decl., Attachment 1); *supra* p. 48.  On its face, CIRI's compact recites that it is a "Compact of Self-Governance" entered into with "certain Alaska Native Tribes recognized by the United States" (even though not all of the signatories to the Compact are "Federally Recognized Tribes").  Ex. B at 1.  The compact further clarifies that it is entered into under Title V of ISDEAA, which authorizes the Secretary of the Department of Health and Human Services to "enter into Compacts and Funding Agreements with the governing bodies of participating Tribal governments."  *Id.*  It is of course true that, where a tribe on the List Act list is the preferred entity under the IHS Guidelines, it can request that the contract be given to another "tribal organization," including an ANC.  *See* 25 U.S.C. §5322.  But, because every potential contracting entity under the Guidelines is equally an "Indian tribe," the reverse is also true:  If the ANC is the contracting entity, it can do the same.  *See id.* §5381(b) (allowing

compacting Indian tribe to authorize another tribal organization to execute services under the compacting agreement).

Plaintiffs' "stop-gap" argument is also incomprehensible within the CARES Act.  In Title V of the CARES Act, Congress gave the Secretary clear direction to disburse critically needed relief funds to Tribal governments within thirty days.  It necessarily expected the Secretary to act expeditiously and to distribute the funds to the categories of eligible Tribal governments set forth in the statutory definition—a definition which specifically includes ANCs.  There is nothing in the statute to suggest Congress was directing the Treasury Department to determine which ANCs were acting in a "stop-gap" capacity with respect to the COVID-19 pandemic and thus, were eligible.  Nor it is clear what standard Treasury could even use to make such a determination.

Finally, even taking Plaintiffs' misguided argument at face value, an Indian tribe of "last resort" is *still an Indian tribe*.  Indeed, the foundational premise of the Guidelines is that *all* of the potential contracting entities are "Indian Tribes."  That is for good reason.  ISDEAA expressly includes ANCs in the definition of "Indian tribe," as explained at length above.  Plaintiffs' ANCs-as-second-class argument is fundamentally wrong.  This Court should reject the premise of plaintiffs' argument that some Indian tribes are "more equal" than others.

## III.   The Secretary's Determination That ANCs Are Eligible For Funds Under Title V Is Consistent With Longstanding Federal Practice And Entitled To Respect.

Congress' decision to include ANCs in the statutory definition of "Indian tribe" was clear and unambiguous.  Indeed, that expressly inclusive language eliminates any ambiguity that could result from an undefined use of a phrase like "Indian tribe," given the unique history of Alaska's Native population.  Thus, there is no need here to resort to doctrines of deference.  But if there was any remaining ambiguity, the Secretary's decision to include ANCs among the "Tribal government[s]" and "Indian tribe[s]" eligible for CARES Act funding would surely be entitled to

respect.  To the extent the statute leaves any room for agency discretion in disbursing funds in the midst of a humanitarian crisis, the exercise of that discretion cannot be lightly second-guessed.  That is particularly true here, where the Secretary's view is consistent with decades of administrative practice under ISDEAA.

For nearly half a century, Congress has included ANCs in the definitions of "Indian tribes" and "Tribal governments" in some contexts, but excluded them in others.  And, for nearly half a century, federal agencies have acted accordingly—treating ANCs as eligible when they are expressly included in statutory definitions of "Indian tribes" and "Tribal governments."  *See, e.g.*, *Aleutian Pribilof Islands Ass'n. v. Nw. Rep. Office of Self-Governance*, 44 IBIA 11 (Aug. 31, 2006) ("For purposes of the ISDEAA, an 'Indian Tribe' is '[a]ny Indian Tribe, band nation, or other organized group or community, including any Alaska Native village or regional or village corporation as defined in or established pursuant to [ANCSA]. . . .' Accordingly, ANCSA Regional Corporations are legally entitled to submit resolutions authorizing ISDEAA contracts pursuant to 25 U.S.C. §450f(a)."); *Cent. Council of Tlingit and Haida Indian Tribes v. Chief, Branch of Judicial Serv., Bureau of Indian Affairs*, 26 IBIA 159, 163, 1994 WL 447872, at *3 (Aug. 3, 1994) ("deem[ing]" a Native entity that had "entered into a self-governance compact" to be "an Indian Tribe under [ISDEAA]" even though it was not listed on the federal register); *see also supra* pp. 10-13,46-48.  This decades-long practice confirms the reasonableness of the Secretary's conclusion that, in expressly including ANCs within the scope of "Tribal governments" eligible to receive CARES Act funds, Congress indeed meant to make ANCs eligible to receive CARES Act funds.

That conclusion is also consistent with the weight of judicial authority.  In May 1976, the BIA confronted the possibility that ISDEAA's eligibility clause could render ANCs ineligible

despite Congress' explicit decision to include them in the statutory text. The BIA rejected that construction, which would have rendered Congress' amendment a nullity, by interpreting the ISDEAA eligibility clause as modifying only the phrase "any Indian tribe, band nation, or other organized group or community," not the phrase "Alaska Native . . . regional or village corporation." *See* A.R. Tab 012 (May 21, 1976 Memo. from Ass't Solicitor for Indian Affairs to Comm'r of Indian Affairs). The BIA reached that conclusion in part in light of the provision's legislative history. *See* 77 Fed. Reg. 13,137 (recognizing that ANCs "were established to provide for the economic and social needs, including the health, education and welfare of their Native shareholders"). The Ninth Circuit upheld this interpretation in *Cook Inlet Native Association v. Bowen*, 810 F.2d 1471 (9th Cir. 1987). The Ninth Circuit concluded that "the plain language of the statute allows business corporations created under [ANCSA] to be recognized as tribes; and the Bureau of Indian Affairs decision to treat ANCs as eligible for all ISDEAA programs was reasonable in light of Congress' expressed intent." *Id.* at 1476; *see also id.* (observing that ISDEAA "was promulgated to insure maximum Indian participation in and control over the programs and services for Indians" and finding it "instructive" that "the corporations formed pursuant to [ANCSA] also were established to provide maximum participation by Natives in decisions affecting their rights and property" (citing 25 U.S.C. §450a (transferred to 25 U.S.C. §5302); 43 U.S.C. §1601)).

The Ninth Circuit's decision in *Cook Inlet* remains good law after the 1994 enactment of the List Act. *See, e.g., Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d 986, 988-90 (9th Cir. 1999) (observing that ANCs are Indian tribes under the ISDEAA); *Ukpeagvik Inupiat Corp. v. U.S. Dep't of Health & Human Serv.*, 2013 WL 12119576, at *2 & n.21 (D. Alaska May 20, 2013) (noting that Alaska village corporation was an "Indian tribe" under ISDEAA). And its

conclusion has been followed by numerous other courts.  *See, e.g.*, *Am. Fed'n of Gov't Emps.,*
*AFL-CIO v. United States*, 330 F.3d 513, 516 (D.C. Cir. 2003) (recognizing that the ANC parties
are "Indian tribes" that "qualified for special treatment under §8014(3) of the FY 2000
appropriations act," which was available only to Indians, *see* Pub. L. No. 106–79, §8014(3), 113
Stat. 1212, 1234 (1999) (granting an outsourcing preference for firms "under 51 percent Native
American ownership")).

To be sure, *Cook Inlet* and the BIA opinion could have also found the eligibility clause
satisfied rather than inapplicable to ANCs.  *See supra* pp. 26-42.  But that is of no moment.  The
critical point is that every relevant actor—including legislators, agency administrators, federal
judges, ANCs, and now the Secretary in making his initial disbursement decisions under the
CARES Act—has consistently recognized that it would make no sense to exclude ANCs from
ISDEAA.  The plain text of the statute should put any dispute about the eligibility of ANCs for
CARES Act funds to rest.  But to the extent any doubt remains, the Secretary's interpretation of
the CARES Act, backed by decades of consistent interpretation of the ISDEAA definition the
CARES Act incorporates, cannot be disturbed.

**IV.  Concluding That ANCs Are Not "Indian Tribes" Under ISDEAA Would Have Far-Reaching Consequences Well Beyond The Present Dispute.**

Plaintiffs' position, if upheld, would portend disastrous consequences for Alaska Natives.
The short-term consequences are obvious, and bleak.  Thousands of Alaska Natives either not
affiliated with or not able to receive services from a federally recognized Alaska Native village
will stand to go without critical governmental services, because the ANCs to which they look for
traditional government assistance will have fewer resources, in the absence of CARES Act
funding, to provide complete and much-needed assistance.  *See, e.g.*, Minich Decl. ¶ 14, Dkt. 45-
6 ("[I]t is CIRI's entitlement to participate in Federal programs as an Indian Tribe under

ISDEAA and other Federal statutes that allow CIRI and its designated tribal organizations to provide . . . critical services to thousands of Alaska Native and American Indian residents in the Anchorage area[,]" and "funding requirements for those critical services are in even greater demand today" due to COVID-19.); A. Guy Decl. ¶¶ 7-9, Dkt. 46-1 (discussing COVID-19 impacts on the Calista region and the need for relief funds under Title V of the CARES Act).

Yet the longer-term consequences are potentially even more dire.  If this Court concludes that, despite their express inclusion, ANCs are actually not within the ISDEAA definition of "Indian tribe," then ANCs' basic ability to contract with the federal government—and obtain federal assistance to deliver critical services to their communities—will be called into question. Nor will those questions be at all academic.  As explained, *see supra* pp. 10-13, 46-48, ANCs currently have and rely on 638 agreements, as well as other engagements that flow directly from the longstanding recognition that ANCs are "Indian tribes" under ISDEAA (and statutes using similar definitions).  A ruling that ANCs fall outside the ISDEAA definition would jeopardize *all* of those arrangements, and *all* of the benefits that flow to Alaska Natives.

The losers in that scenario will not just be ANCs; they will be tens of thousands of Alaska Natives.  *See, e.g.*, Minich Decl. ¶ 14, Dkt. 46-6 ("The undeniable fact is that our Alaska Native and American Indian peoples will not receive these essential services from any other source."); A. Guy Decl. ¶ 9, Dkt. 46-1 ("[T]he ruling that Calista (and other ANCs) are excluded from the definition of 'Indian Tribe' in Title V of the CARES Act clear cuts an entire ecosystem of entities performing governmental services for Alaska Natives by punishing both Alaska tribes and ANCSA corporations that work together to provide governmental services."); *accord* U.S. Am. Ind. Policy Review Commission, *Final Report* n.21, May 17, 1977 ("To limit benefits of programs only to Natives who could apply through a conventional tribal organization might

disqualify certain Alaska Natives, who no longer adhere to such organizations but who are organized currently in other forms, such as regional and village corporations under the Settlement Act.").  To be sure, there are many Alaska Native villages that are "federally recognized" and, in their organization, independent of ANCs.  But, as explained, ANCs—sometimes working hand-in-hand with the other Alaska tribal entities and sometimes working alone—provide many essential governmental services to Alaska Natives.  To exclude ANCs from the definition of "Indian tribe" is thus to exclude many Alaska Natives from federal programs specifically designed to benefit Native peoples.

That simply cannot have been Congress' intent in the context of a statute that directs emergency-relief funds to Tribal governments.  *See King v. Burwell*, 135 S. Ct. 2480, 2489 (2015).  The ultimate beneficiaries of the $8 billion Congress set aside in Title V are the Native Americans and Alaska Natives who are served by the respective eligible recipient entities that are providing COVID-19-related services.  It would be odd, to say the least, for the federal government to spend so much money on local governments for the sake of those governments themselves.  The obvious impetus of the CARES Act is the COVID-19 pandemic and the added costs with which those governments have been or expect to be saddled with on account of the increased needs *of their residential populations*.  Construing Title V to leave out ANCs would add insult to injury by essentially saying the COVID-19-related hardships faced by Alaska Natives are not on equal footing with the COVID-19-related hardships faced by Lower 48 tribal populations (or, for that matter, the populations of any other locality receiving CARES Act funds).

It would also single-handedly rewrite a definition of "Indian tribe" to cut off access to federal programs that Alaska Native peoples rely upon and have relied on for decades, consistent

with longstanding practice and collective understanding by ANCs and the government alike under the ANCSA framework.  *See* 43 U.S.C. §1626(d) ("Notwithstanding any other provision of law, Alaska Natives shall remain eligible for all Federal Indian programs on the same basis as other Native Americans.").  For all the reasons stated above, the Court should avoid this result and rule that Treasury's decision to treat ANCs as eligible for CARES Act funds is consistent with Title V of the CARES Act and not otherwise arbitrary or capricious or contrary to law.

## CONCLUSION

The Court should grant summary judgment for Intervenor-Defendants.


Dated:  May 29, 2020

Paul D. Clement
Erin E. Murphy
Ragan Naresh
Matthew D. Rowen
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004
(202) 389-5000
paul.clement@kirkland.com

*Counsel for Calista Corporation, Kwethluk, Incorporated, Sea Lion Corporation, St. Mary's Native Corporation, Napaskiak, Incorporated, and Akiachak, Limited*

Jon W. Katchen
Michael O'Leary (D.C. Bar #1014610)
HOLLAND & HART LLP
1029 W. Third Avenue
Anchorage, AK 99501
(907) 865-2600
jwkatchen@hollandhart.com

*Counsel for Ahtna, Inc.*

Respectfully submitted,

/s/ Daniel W. Wolff
Daniel W. Wolff (D.C. Bar #486733)
David Y. Chung (D.C. Bar #500420)
Kirsten L. Nathanson (D.C. Bar #463992)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004
Tel: (202) 624-2500
dwolff@crowell.com
dchung@crowell.com
knathanson@crowell.com

Christine V. Williams
J. Harrison Powell, II
Outlook Law, LLC
1016 West 6th Avenue, Suite 306
Anchorage, Alaska 99501
(907) 258-2200
christinewilliams@outlooklaw.com
harrisonpowell@outlooklaw.com

*Counsel for Alaska Native Village Corporation Association, Inc. and Association of ANCSA Regional Corporation Presidents/CEO's, Inc.*

# ADDENDUM

| ANCs and challenges to its village(s)/region | Performs or Supports Governmental Functions in these areas | Provides additional support in these areas | Consequences of COVID-19 and Response | "At large" share-holders |
|---|---|---|---|---|
| **Ahtna, Inc.** Food security; lack of infrastructure; lack of access to food and household staples; lack of security and trespass enforcement | ✓ Security and Trespass Services ✓ Food security ✓ Emergency planning support ✓ Economic development ✓ Funding for Housing ✓ Wildfire management | ✓ Dividends ✓ Elder Benefits ✓ Burial Support ✓ Village work programs ✓ Cultural programs ✓ Scholarships ✓ Vocational training ✓ Employment ✓Internships ✓ Donations ✓ Land management | ✓ Special dividends ✓ Purchased PPE ✓ Villages closed to public ✓ Shareholder mask program ✓ Consultation with villages ✓ Hunting and fishing assistance ✓ Pandemic emergency planning support | ✓ |
| **Arctic Slope Regional Corporation** Remotely located; Arctic living conditions; high COL; subsistence lifestyle | ✓ Health care ✓ Housing ✓ Economic development ✓ Public works | ✓ Sports camps ✓ Cultural programs ✓ Scholarships ✓ Vocational training ✓ Employment ✓ Donations | | |
| **Bering Straits Native Corporation** No running water, infrastructure; no road access; limited health care; high unemployment; housing shortages; high COL | ✓ Health care ✓ Public Schools ✓ Search & Rescue | ✓ Dividends ✓ Bereavement ✓ Scholarships ✓Internships ✓ Donations ✓ Employment | ✓ Special dividends ✓ Shut down hotel and hardware store ✓ Canceled community engagement travel | ✓ |
| **Calista Corporation** No running water, infrastructure; single airline that serves communities has gone out of business; high poverty; high COL | ✓ Public utilities (light and power) ✓ Housing | ✓ Dividends ✓ Donations ✓ Burial Support ✓ Elder Assistance ✓ Scholarships | ✓ Special dividends ✓ Donation to Bethel Community Service Center ✓ Providing technical and administrative assistance to village councils and village corporations | ✓ |
| **Chugach Alaska Corporation** | ✓ Health care ✓ Housing ✓ Business Assistance | ✓ Distributions ✓ Scholarships ✓ Youth and elder camps ✓ Educational Programs ✓ Annual summit | ✓ Chugach Regional Response Group ✓ Needs Assessment ✓ CRRG COVID-19 Tools and Research portal ✓ Early distribution ✓ Supplemental dividends ✓ Purchased masks ✓ Donations for food | ✓ |

| ANCs and challenges to its village(s)/region | Performs or Supports Governmental Functions in these areas | Provides additional support in these areas | Consequences of COVID-19 and Response | "At large" share-holders |
|---|---|---|---|---|
| **Cook Inlet Region, Inc.** Serves approximately 55,221 Native Active Users to deliver vast array of health care | ✓ Health care ✓ Co-management of Medical Center ✓ Housing ✓ Welfare assistance ✓ Child care subsidies | ✓ Academic Programs ✓ Children's services ✓ Employment | ✓ Employment and training ✓ Crisis intervention ✓ Financial Support for food | ✓ |
| **Doyon, Limited** Affected by tourism and oil and gas industry | ✓ Health care through designated entities ✓ Housing | ✓ Distributions ✓ Employment ✓ Donations ✓ Training ✓ Bereavement ✓ Workshops | ✓ Virtual meetings ✓ Issued health precautions ✓ Administrative expenses ✓ Layoffs ✓ Supported Verizon's network capacity ✓ Donations to schools, communities | ✓ |
| **Koniag, Inc.** Boat or plane access only; food security; limited sanitation infrastructure; lack of public health; unpredictable weather | ✓ Food security ✓ Commerce | ✓ Elder benefits ✓ Burial assistance ✓ Scholarships ✓ Dividends ✓ Advocacy | ✓ Stay at home packages ✓ Cleaning and food kits ✓ Funding for food security | |
| **NANA Regional Corporation** No running water; no road systems; limited health care; housing shortage | ✓ Construction of buildings and roads ✓ Resource development ✓ Food programs ✓ Social services programs | ✓ Schools ✓ Land management | ✓ Furlough workers ✓ Emergency distribution ✓ Plan for field clinic ✓ Funds for supplies ✓ Care kits ✓ Radio support | |
| **Sealaska** Communities dispersed, isolated, and costly to serve; limited health care access; no road system | ✓ Resource development ✓ Economic development ✓ Health care ✓ Housing | ✓ Employment ✓ Youth programs ✓ Cultural programs ✓ Scholarships ✓ Internships | ✓ Working with and contributions to tribes and other organizations ✓ Food security needs ✓ Infuse emergency relief for essential workers | ✓ |
| **The Aleut Corporation** Extreme remoteness; limited transportation; high COL; lack of public health care; declining infrastructure; unreliable broadband | ✓ Health care ✓ Transportation ✓ Housing | ✓ Elder support ✓ Burial assistance ✓ Scholarship ✓ Training ✓ Dividends ✓ Advocacy ✓ Cultural preservation | ✓ Contributions to organizations ✓ Financial assistance to shareholders ✓ Elder care packages ✓ Training ✓ Cultural support | |
| **Akiachak Limited** No connection to road system; only airline that serviced has ceased operations; subsistence lifestyle; lack of access to computers and internet | ✓ Health care ✓ Public utility (electric) ✓ Fuel distributor | ✓ Burial assistance ✓ Employment | ✓ Food security needs ✓ PPE needs | |

| ANCs and challenges to its village(s)/region | Performs or Supports Governmental Functions in these areas | Provides additional support in these areas | Consequences of COVID-19 and Response | "At large" share-holders |
|---|---|---|---|---|
| **Baan O Yeel Kon** | | ✓ Dividends<br>✓ Distributions<br>✓ Scholarships | ✓ Emergency distribution<br>✓ Depleted savings | |
| **Cape Fox Corporation**<br>Remotely located; tourism reliant; limited stores | ✓ Emergency supplies | ✓ Employment<br>✓ Food security<br>✓ Cultural preservation<br>✓ Village support | ✓ Purchased food and supplies for entire community | |
| **Chefarnrmute, Incorporated**<br>Subsistence lifestyle | ✓ Fuel distributor | ✓ Grocery store<br>✓ Subsistence supplies and equipment<br>✓ Employment | ✓ Layoffs<br>✓ Dividend distribution threatened | |
| **Chitina Native Corporation**<br>Aging power plant; single outdated clinic; limited supplies; income from tourism loss | ✓ Fuel distributor<br>✓ Electricity service | ✓ Sole Grocery store<br>✓ Sole gas station<br>✓ Employment<br>✓ Dividends<br>✓ Scholarships<br>✓ Bereavement benefits | ✓ Worked with tribe to prioritize needs<br>✓ Limited staples and supplies<br>✓ Plans to update single clinic, upgrade generator, build water filtration system<br>✓ RV park cancellations<br>✓ Annual meeting delay | |
| **Dineega Corporation**<br>No running water; remotely located | ✓ Housing<br>✓ Water infrastructure<br>✓ Health care | ✓ Protect culture<br>✓ Manage land and assets | ✓ Purchased supplies<br>✓ Created task force<br>✓ Staged homes<br>✓ MOU for better housing, plumbing | |
| **Kake Tribal Corporation**<br>Accessible by ferry or light aircraft; low income; limited employment; subsistence lifestyle; seasonal income based | ✓ Housing<br>✓ Energy service (fuel) | ✓ Employment<br>✓ Groceries<br>✓ Internet | ✓ Reduced flights<br>✓ Six ferries for the year<br>✓ Tourism shut down<br>✓ Shipment costs doubling | |
| **King Cove Corporation**<br>Air or boat transportation only; no air service unless chartered; high COL | ✓ Energy distributor (fuel) | ✓ Employment<br>✓ Scholarships<br>✓ Community playgrounds<br>✓ Utility assistance<br>✓ Youth Center<br>✓ Support elders | ✓ Immediate distribution<br>✓ Elders have died<br>✓ Unable to fund scholarship<br>✓ Renovated hotel rooms for quarantine<br>✓ Purchased supplies | |
| **Knikatnu Inc.**<br>Lack of housing | ✓ Housing<br>✓ Resource development | ✓ Land donation<br>✓ Wildlife conservation | ✓ Halted housing development | |

3

| ANCs and challenges to its village(s)/region | Performs or Supports Governmental Functions in these areas | Provides additional support in these areas | Consequences of COVID-19 and Response | "At large" share-holders |
|---|---|---|---|---|
| **Kootznoowoo, Incorporated** Located on an island; limited barge and ferry service; airport under construction | ✓ Housing ✓ Air transportation ✓ Hydroelectric project | ✓Elders program ✓ Burial assistance ✓ Shareholder resources ✓ Land donation | ✓Carrier service extremely limited ✓Limited supplies ✓ Distributions ✓ Tourism affected ✓ Probable layoffs | ✓ |
| **Kwethluk, Incorporated** High COL; many shareholders cannot afford electricity, fuel, or cooking oil; high unemployment rates | ✓ Food distributor | ✓ Dividends ✓ Burial assistance ✓ Employment | ✓ Reduced grocery store hours ✓ Reductions in staff ✓ Schools closed | |
| **MTNT, Inc.** No running water; accessible by air in summer and snow machine in winter; limited health care; high COL; limited phone and internet | ✓ Power plant | ✓ Residential management ✓ Economic benefits ✓ Cultural values | ✓ Special distribution ✓ Travel ban precludes utility repair ✓ Clinic burned down during pandemic | |
| **Napaskiak Incorporated** Food security; chronic unemployment and underemployment | ✓Food distributor | ✓ Dividends ✓ Burial Assistance ✓ Employment | ✓ Plan for emergency dividends | |
| **Sea Lion Corporation** High levels of unemployment | ✓ Health care ✓ Public utilities (water and sanitation) ✓ Public infrastructure projects | ✓ Donations for Domestic Violence Center ✓ Charter school ✓ Wildlife conservation | ✓ Made additional housing available for community members ✓ Temporary quarantine center | ✓ |
| **St. Mary's Native Corporation** High COL; remote location | ✓ Search & Rescue ✓ Public schools | ✓ Education ✓ Village clean up ✓ Fundraising ✓ Workshops ✓ Employment ✓ Bereavement benefits | | ✓ |
| **Stebbins Native Corporation** No running water or flush toilets; vulnerable to extreme weather and flooding | ✓ Build water and sewer infrastructure ✓ Build sea wall for flood protection ✓Health care | ✓Natural resource supplies ✓ Bereavement benefits ✓ Food assistance ✓ Educational programs | | |
| **Tanadgusix Corporation** Located on an island; no passenger air service; limited internet broadband; seasonal income | ✓Internet service ✓Transportation ✓ Satellite | ✓ Dividends ✓ Scholarships ✓ Burial assistance ✓Lodging ✓ Job Training ✓ Internships ✓ Employment | ✓Close tourism for 2020 ✓ Limited bandwidth for students ✓ Plan for subsidized transportation | ✓ |

| ANCs and challenges to its village(s)/region | Performs or Supports Governmental Functions in these areas | Provides additional support in these areas | Consequences of COVID-19 and Response | "At large" share-holders |
|---|---|---|---|---|
| **Teller Native Corporation** No running water; remotely located | ✓Fuel distributor | ✓Groceries ✓ Fuel ✓ Supports neighboring village | ✓Shortage of food, supplies, and fuel | |
| **Tyonek Native Corporation** Accessible only by airplane or boat; high rate of unemployment; subsistence lifestyle; old airstrip and bridge | ✓Air Transportation ✓ Road maintenance ✓ Major construction ✓ Natural resource conservation ✓ Health care | ✓Cultural programs ✓ Social activities ✓ Educational activities ✓ Training programs ✓ Youth programs ✓ Wildlife conservation ✓ Safety protocols ✓ Marine Facility | ✓Purchased masks ✓ Worked with tribe to develop policies ✓ Travel restrictions ✓Plan for emergency shelters | |