UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CONFEDERATED TRIBES OF THE CHEHALIS RESERVATION, et al., <br>  Plaintiffs, <br> v. <br><br> STEVEN MNUCHIN, in his official capacity As Secretary of the Treasury, <br>  Defendant. | Case No. 20-cv-01002 (APM) |
| CHEYENNE RIVER SIOUX TRIBE, et al., <br>  Plaintiffs, <br> v. <br><br> STEVEN MNUCHIN, in his official capacity As Secretary of the Treasury, <br>  Defendant. | Case No. 20-cv-01059 (APM) |
| UTE TRIBE OF THE UINTAH AND OURAY RESERVATION, <br>  Plaintiffs, <br> v. <br><br> STEVEN MNUCHIN, in his official capacity As Secretary of the Treasury, <br>  Defendant. | Case No. 20-cv-01070 (APM) |

**BRIEF OF *AMICI CURIAE,* NATIONAL CONGRESS OF AMERICAN INDIANS; AFFILIATED TRIBES OF NORTHWEST INDIANS; ALL PUEBLO COUNCIL OF GOVERNORS; CALIFORNIA TRIBAL CHAIRPERSONS' ASSOCIATION; GREAT PLAINS TRIBAL CHAIRMEN'S ASSOCIATION, INC.; INTER TRIBAL ASSOCIATION OF ARIZONA, INC.; INTER-TRIBAL COUNCIL OF THE FIVE CIVILIZED TRIBES; MIDWEST ALLIANCE OF SOVEREIGN TRIBES; UNITED SOUTH AND EASTERN TRIBES SOVEREIGNTY PROTECTION FUND; NATIONAL INDIAN GAMING ASSOCIATION; ARIZONA INDIAN GAMING ASSOCIATION; AND CALIFORNIA NATIONS INDIAN GAMING ASSOCIATION IN SUPPORT OF PLAINTFFS' MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Contents………………………………………………………………...... i

**Interests of** *Amici Curiae*…………………………………………………………....1

**Introduction**………………………………………………………………………….3

**Argument**……………………………………………………………………………6

    I.     Introduction…………………………………………………………………6

    II.    In Alaska, The Federal Government Historically Has Recognized
           Only Alaska Native Villages as Governments…………………………….....8

        A.  Background:  The Context for the United States' Colonization of Alaska……..10

        B.  A Brief History of Alaska Natives…………………………………………....11

            1.  *First Contact and the 1867 Treaty of Cession with Russia*…………………11

            2.  *Before Statehood*………………………………………………………………12

            3.  *ANCSA*……………………………………………………………….....15

            4.  *Post-ANCSA:  Executive Action to Definitively Recognize
                Alaska Native Villages and To Disclaim Recognition of the ANCs*………...18

    III.   The ANCs' Inclusion In the ISDEAA Definition of "Indian Tribe" Reflects
           Uncertainties Surrounding the Novel "Experiment" Taking Place In
           Alaska, Not the Bestowal of Governmental Authorities Upon ANCs………….....20

    IV.   Alaska Native Villages Possess Governmental Powers Like States And Local
           Governments Entitled To the CARES Act Relief Funds, But the ANCs Do Not…..23

**Conclusion**………………………………………………………………………...25

**Certificate of Service**…………………………………………………….........26

### INTERESTS OF *AMICI CURIAE*

Established in 1944, the National Congress of American Indians ("NCAI") is the oldest and largest national organization comprised of tribal nations and their citizens.  NCAI's mission, as embodied in its Constitution, is to preserve the relationship between federally recognized Indian tribes and the United States, and to promote a better understanding of tribal nations and to improve the welfare of Indians.  As such, NCAI is uniquely situated to provide critical context to the Court with respect to Tribal governments, specifically in Alaska, and the government-to-government relationship.

The other eleven *amici* likewise are national and regional organizations representing federally recognized Indian tribes and their interests across the United States.  They each have an interest in this case because it involves important matters of tribal sovereignty:  the allocation of desperately needed relief funds to assist Tribal governments in dealing with the COVI-19 pandemic.  Leaders of these organizations have provided testimony regarding the dire consequences befalling their member Indian Tribes and challenges faced by their constituent Tribal governments in the face of this crisis.  *See* ECF Nos. 20-1, 20-2, 20-3, 20-4, 20-5.  We briefly describe each of these *amici*:

- Affiliated Tribes of Northwest Indians ("ATNI") has been dedicated to tribal sovereignty and self-determination since its founding in 1953.  ATNI is a nonprofit organization comprised of nearly 50 federally-recognized Indian tribes from the greater Northwest with the intent to represent and advocate for the interests of its member Tribes.

- All Pueblo Council of Governors ("APCG") is comprised of the governors of the 19 Pueblo Nations of New Mexico and one in Texas.  APCG was formally established in 1598 and has convened regularly ever since to advocate, foster, protect, and encourage the social,

1

cultural, and traditional well-being of the Pueblo Nations.

- California Tribal Chairpersons' Association ("CTCA") is a non-profit corporation, consisting of ninety (90) federally recognized tribes (represented by tribal chairpersons and vice-chairpersons) ("CTCA Member Tribes") from across the State of California.

- Great Plains Tribal Chairmen's Association, Inc. (GPTCA) is organized under Section 17 the Indian Reorganization Act, to support the 16 Indian nations and tribes of the Great Plains Region (North Dakota, South Dakota, and Nebraska) and their treaty rights, reserved rights to self-determination and self-government.  As a Section 17 Corporation, GPTCA operates as an arm of its member Indian nations and tribes.

- Inter tribal Association of Arizona, Inc. ("ITAA") is comprised of 21 federally recognized Indian tribes with lands located primarily in Arizona, as well as in California, New Mexico and Nevada.  Founded in 1952, ITAA is a united voice for tribal governments on common issues and concerns. The representatives of ITAA are the highest elected tribal officials from each Indian tribe, including tribal chairpersons, presidents and governors.

- Inter-Tribal Council of the Five Civilized Tribes ("ITC) is an organization that unites the Tribal Governments of the Cherokee, Chickasaw, Choctaw, Muscogee (Creek) and Seminole Nations representing over 750,000 Indian people throughout the United States.

- Midwest Alliance of Sovereign Tribes ("MAST") was established in 1996 to protect, serve, and enhance the interests of its thirty-five members, which are federally-recognized Indian tribes from Minnesota, Wisconsin, Iowa, and Michigan.  Its mission is to advance, protect, preserve, and enhance the mutual interests of its member tribes.

- United South and Eastern Tribes Sovereignty Protection Fund (USET SPF), which represents 30 federally recognized Tribal Nations from the Northeastern Woodlands to the

Everglades and across the Gulf of Mexico. USET SPF was formed in 2014 as an affiliate

of the United South and Eastern Tribes, Inc. to advocate on behalf of USET SPF's Tribal

Nation members by upholding, protecting, and advancing their inherent sovereign

authorities and rights.

- National Indian Gaming Association ("NIGA") mission is to protect and preserve the general welfare of Tribes striving for self-sufficiency through gaming enterprises in Indian Country. To fulfill its mission, NIGA works with the Federal government and Congress to develop sound policies and practices and to provide technical assistance and advocacy on gaming-related issues.  In addition, NIGA seeks to maintain and protect Indian sovereign governmental authority in Indian Country.

- Arizona Indian Gaming Association ("AIGA") organization is comprised of eight federally-recognized Indian tribes in Arizona, AIGA is committed to protecting and promoting the welfare of Tribes striving for self-reliance by supporting tribal gaming enterprises on Arizona Indian lands.

- California Nations Indian Gaming Association ("CNIGA"), founded in 1988, is a non-profit organization.  Its specific purposes are to promote, protect and preserve the general welfare and interests of federally-recognized Indian Tribes through the development of sound policies and practices with respect to the conduct of gaming activities in Indian country and the promotion of tribal sovereignty.

## INTRODUCTION

Pursuant to Title V of the Coronavirus Aid, Relief, and Economic Security Act ("CARES

Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020), Congress amended the Social Security Act (42

U.S.C. 301 et seq.) to allocate $150 billion in fiscal year 2020 to "States, Tribal governments, and

3

units of local government" to address unprecedented costs associated with the COVID-19 pandemic. 42 U.S.C. § 801(a)(1). Of that $150 billion allocation, $8 billion is "reserve[d] . . . for . . . Tribal governments." *Id.* § 801(a)(2)(B). The term "Tribal government" means "the recognized governing body of an Indian Tribe," *id.* § 801(g)(5), and the term "Indian Tribe" "has the meaning given that term in [section 5304(e) of the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 5304(e)]," *id.* § 801(g)(1). The Indian Self-Determination and Education Assistance Act ("ISDEAA") defines "Indian tribe" as

> any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act (85 Stat. 688) [43 U.S.C. 1601 et seq.], which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

25 U.S.C. § 5304(e). (We refer to the clause commencing with "which" as the "eligibility clause.")

As this Court previously summarized: "taken together, Congress allocated $8 billion in the CARES Act 'for making payments to' 'the recognized governing body of' 'any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village or regional or village corporation . . . , which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.'" Memorandum Opinion, ECF No. 36 ("Mem. Op.") at 19-20 (citations omitted).

This case presents the question of whether for-profit, private corporations formed under the laws of the State of Alaska (the "ANCs") may share in this $8 billion targeted for "Tribal governments." That is, whether the ANCs are the "*recognized* governing bod[ies]" of "any Alaska Native village or regional or village corporation . . . , which is *recognized* as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." We emphasize "recognized" because the construction of that term is a central focus of this brief.

4

By final agency action, the Defendant Secretary of the Treasury, Steven Mnuchin (the "Secretary"), determined that ANCs may share in the $8 billion targeted for "Tribal governments" in the CARES Act, and on the Plaintiffs' motions, this Court preliminarily enjoined the Secretary from distributing relief funds to the ANCs.

In so doing, the Court ruled, for the purposes of the preliminary injunction motion, *inter alia*, that "recognition" is a well-established Indian law "legal term of art" that Congress understood when it used that term to define "Tribal governments." Mem. Op. at 21-22. Summary judgment should now be entered for the Plaintiffs for the central reason that the ANCs are not "recognized" by the United States as having the unique government-to-government relationship reserved for sovereign Indian tribes. That special status is held only by the 229 Alaska Native villages included on the list of federally recognized Indian tribes published in the Federal Register by the Secretary of the Interior in accord with the Federally Recognized Indian Tribe List Act, Law 103-454, Nov. 2, 1994, 108 Stat. 479, ("the List Act"), codified at 25 U.S.C.A. § 5131. *See* Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 85 Fed. Reg. 5,462 (Jan. 30, 2020).

* * *

In this brief, the *amici curiae* describe the unique historical context for the federal recognition of the Alaska Native villages and why the ANCs do not share in that status.

*First,* neither Congress nor the Executive has ever recognized ANCs as Indian tribes. On the contrary, only the Alaska Native villages have held that unique governmental status, and the history of colonization in Alaska, while of relatively recent vintage, fully bears that out. The 1971 Alaska Native Claims Settlement Act, Pub. L. No. 92–203, § 2(b), 85 Stat. 688, ("ANSCA"), which spawned the ANCs, did not disturb that status. Nor did ANCSA bestow that status upon

the ANCs.

*Second,* ISDEAA did nothing more than identify ANCs as eligible pass through entities, or contractors, for the provision of services and programs to Alaska Natives.  The ANCs' inclusion in the ISDEAA's "Indian tribe" definition alongside Alaska Native villages, *see* 25 U.S.C. § 5304(e), merely reflects uncertainty at the time about how federal services were to be provided to Alaska Natives in the aftermath of the complex and novel framework established by ANCSA.  And that uncertainty mirrors similar confusion when, in 1988, the ANCs were included on the Secretary's list (one predating the List Act) of "entities" deemed "eligible" for funding from the federal government for programs designed for Native Americans.  *See* Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs, 58 FR 54,364, 54,365 (Oct. 21, 1993).  As the Secretary carefully explained in 1993 to avoid future misimpressions, the ANCs would be removed from the list because "these corporations are not governments." *See id.* at 54,365-66.

*Third,* as we set forth in our *amicus* brief in support of the Plaintiffs' motions for temporary restraining order and preliminary injunction (ECF No. 20) and as we revisit briefly below, the ANCs lack the sovereign powers of a Tribal government; those powers are retained and exercised only by Alaska Native villages.

## ARGUMENT

### I.   INTRODUCTION

Corporations have no power *to govern*.  Rather, they *are governed*.  They are subject to the governmental authority of one of the three sovereigns in this country – the Federal, State, or Tribal governments, sometimes concurrently.  *See generally,* The Honorable Sandra Day O'Connor, *Lessons from the Third Sovereign: Indian Tribal Courts*, 33 Tulsa L.J. 1, 1 (1997) ("[I]n the

United States, we have three types of sovereign entities--the Federal government, the States, and the Indian tribes.").

The Defendants before the Court in this case have differing and inconsistent theories for why the corporations here, the ANCs, which seek to appropriate federal funds earmarked for "Tribal governments," should be deemed to hold such a status.   The Secretary apparently understands that the eligibility clause at issue employs a federal Indian law term of art – "recognized" – for the "political act" of establishing a government-to-government relationship between the United States and an Indian tribe.   *See* Def.'s Mem. Of Law in Support of Def. Mot. For Summ. J., ECF No. 79-1 ("Sec. Br.") at 7, 13.   *See also* Mem Op. at 28 (quoting United States' brief filed in *Wyandot Nation of Kan. v. United States,* 858 F.3d 1392 (Fed. Cir. 2017) (characterizing the eligibility clause as employing this "phrase of art").   But because the ANCs do not satisfy that term of art, the Secretary simply abandons the clause.   *See* Sec. Bf. at 7, 13.   In so doing, as this Court noted in its preliminary injunction ruling, the Secretary violates a cardinal principle of statutory construction:   that the words of a statute cannot be rendered surplusage.   *See* Mem. Op. at 24 (citing *Donnelly v. FAA,* 411 F.3d 267, 271 (D.C. Cir. 2005)).

In contrast to the Secretary's complete abandonment of the clause, the ANCs wish to throw the well-established federal Indian law meaning of the eligibility clause out the window entirely.   *See* Intervenor-Def.'s Mem of P. & A. in Support of Mot. For Summ. J, ECF No. 78-1 ("ANC Br.") at 24, 33.   In doing so, they contort the clause into something unrecognizable:   they bootstrap out-of-context authority allowing non-tribal entities to participate in some federal programs (*with the approval or partnership of Tribal governments*) that further tribal interests.   Beyond this, they claim to serve "essential governmental functions" for Alaska Natives (*including "'at-large' Alaska Native shareholders," devoid of any tribal citizenship*) through voluntary, charitable donations and

7

other philanthropic activities (e.g., trails maintenance).  *See* ANC Br. at 15-16 (emphasis added).

These are the kinds of activities that private corporations undertake and then deduct on their tax

forms, not governmental functions for a citizenry.  In Alaska, like every place else in the country,

governmental functions are performed only by one of three sovereigns:  the Federal, State, or

Tribal governments.

The bottom line is this:  everyone knows what a "Tribal government," or "recognized

governing body of an Indian tribe," is.  It is a cognizable political entity, *one that governs*.  As a

matter of federal Indian law, it is, and always has been, a federally recognized Indian tribe.  In

Alaska, only the Alaska Native villages are "Tribal governments."  Only Alaska Native villages

have "recognized governing bod[ies] . . . of Indian Tribe[s]."

## II.    IN ALASKA, THE FEDERAL GOVERNMENT HISTORICALLY HAS RECOGNIZED ONLY ALASKA NATIVE VILLAGES AS GOVERNMENTS.

Indian tribes are governments, "pre-existing the Constitution," *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 56 (1978), "that exercise inherent sovereign authority over their members

and territories," *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.,* 498 U.S.

505, 509 (1991).  Federal recognition is "a formal political act confirming [a] tribe's existence as

a distinct political society, and institutionalizing the government-to-government relationship

between the tribe and the federal government."  *Cal. Valley Miwok Tribe v. United States,* 515

F.3d 1262, 1263 (D.C. Cir. 2008) (quoting COHEN'S HANDBOOK OF FEDERAL INDIAN LAW §

3.02[3], at 138 (2005 ed.)). [1]  In the field of federal Indian law, such "recognition" is an established

"term of art," confirming an Indian tribe's sovereign status in relation to the United States.

---

[1] Upon enacting the List Act, Congress found that "the United States has a trust responsibility to recognized Indian tribes, maintains a government-to-government relationship with those tribes, and recognizes the sovereignty of those tribes."  Pub. L. 103-454, 108 Stat. 4791-4792 § 103(2).

*Mackinac Tribe v. Jewell,* 87 F. Supp. 3d 127, 131 (D.D.C. 2015)), *aff'd,* 829 F.3d 754 (D.C. Cir. 2016).  *Accord,* Mem Op. at 20-21.

Treaty agreements between the United States and Indian tribes were among the first means of federal recognition.  *See Mackinac Tribe*, 829 F.3d at 755.  Congress abolished treaty-making in 1871.  25 U.S.C. § 71.  Thereafter, apart from the few instances where federal courts have determined Indian tribes to under a federal common law test, *see, e.g., Montoya v. United States,* 180 U.S. 261, 266 (1901)*; Joint Tribal Council of the Passamaquoddy Tribe v. Morton,* 528 F.2d 370, 375 (1st Cir. 1975), the federal government recognizes Indian tribes by statute, *e.g.*, National Defense Authorization Act of 2020, Pub. L. 116-92, Sec. 2870 (Dec. 20, 2019) (recognizing the Little Shell Tribe of Chippewa Indians as an Indian tribe with a government-to-government relationship with the United States), or through a formal administrative process, *see Procedures for Federal Acknowledgement of Indian Tribes,* 25 C.F.R. §§ 83 *et seq.*  As discussed in greater detail below, the 1936 Alaska Amendment to the Indian Reorganization Act, Pub. L. 74-538, 49 Stat. 1250 (1936) (codified at 25 U.S.C. § 5119), provided a congressionally-mandated framework for the federal recognition of tribes in Alaska.  In 1994, with the enactment of the List Act, Congress established the means for unequivocally confirming the recognized status of any Indian tribe and its concomitant eligibility for special federal programs and services:  the tribe's inclusion on the list of federally recognized Indian tribes.

* * *

In this case, the Defendants seek to change a fundamental reality:  that in Alaska, the only recognized Tribal governments are the Alaska Native villages, which are now included on the list of federally recognized tribes.  This would be a profound paradigm shift for federal-tribal relations in Alaska.  This can best be understood by placing the United States' relationship with the

Indigenous peoples of Alaska in historical context.  For the history shows that the ANCs have never been "recognized" as Tribal governments as that term has been long understood in the field of federal Indian law.

### A.  Background:  The Context for the United States' Colonization of Alaska

Our Nation's colonization of the Tribal nations indigenous to our 50 states has been a brutal process.  *See generally,* TOCQUEVILLE, DEMOCRACY IN AMERICA (1848) (Doubleday Edition 1969) at 339 (observing that the United States accomplished the subjugation of Native Americans with its laws as or more effectively than the Spaniards did with brutal force).  In dealing with "the Indian problem," "Federal Indian policy [has been] schizophrenic." *United States v. Lara,* 541 U.S. 193, 219 (2004).  It has shifted from actions to "remove" tribes from their homelands to distant lands, presumed to be of no interest to white settlers; to attempts to end Tribal governments and cultures through "assimilation" and "termination"; to the current "modern era," from the 1970s to the present, when the federal government has committed to promote tribal sovereignty and self-government.  *See generally* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW at 8-108 (2012) (Nell Jessup Newton ed.) ("COHEN").  The Tribal nations of Alaska, while uniquely situated, have not been spared from the dispiriting consequences of this colonizing process.

In a comprehensive analysis of the sovereign status of Alaska Native villages and their relationship to the United States undertaken in 1993, the Solicitor of the Department of the Interior (the "Solicitor") observed that although "Alaska was the last territorial acquisition of the United States on the North American continent," "[d]ealings with Native groups in Alaska have . . . reflected elements of then-current national policies."  Op. Sol. Interior M-36975 at 2 (Jan. 11,

1993) (*Governmental Jurisdiction of Alaska Native Villages Over Land and Nonmembers*, 1993 WL 13801710) (hereinafter "Op. Sol. Interior M-36975").[2]

**B.  A Brief History of Alaska Natives.**

1.  <u>First Contact and the 1867 Treaty of Cession with Russia</u>

Russians in first contact with the Indigenous peoples of Alaska in the 1700s encountered numerous "distinct cultural groups" of Alaska Natives, including the Inupiat, the Yupik, the Aleuts, the Athabascans, the Haida, and the Tlingit.  *See* Op. Sol. Interior M-36975 at 29.  These were highly organized communities, which, like any sovereign, set rules for trade and subsistence activities; recognized land boundaries; conducted war; and managed domestic and diplomatic affairs.  *Id*. at 9 (citations omitted).

In 1867, the United States assumed possession of present-day Alaska by means of the Treaty of Cession with Russia.  *See* 15 Stat. 539 (1867).  The Treaty "maintained and protected" the Alaska Native tribes' "free enjoyment of their liberty, property, and religion" and provided that the "tribes will be subject to such laws and regulations as the United States may, from time to time, adopt in regard to the aboriginal tribes of [the United States]."  *Id.* art. III-IV.  The United States never negotiated treaties with the numerous Alaska Native tribes for the relinquishment of their retained aboriginal title to their homelands.  *See* Op. Sol. Interior M-36975 at 10.  As the Solicitor noted, "[t]he remote location, large size and harsh climate of Alaska further delayed the need to confront questions concerning the relationship between the Native peoples of Alaska and the United States."  *Id.* at 4.

---

[2] Page citations to Op. Sol. Interior M-36975 herein track the pagination (e.g. "*1") of the version found on Westlaw, 1993 WL 13801710.

2.  <u>Before Statehood</u>

In 1871, Congress declared an end to treaty-making with Tribes in response to rapid westward expansion of the U.S. population.  *See* 25 U.S.C. § 71.  Congress then embraced a policy of forced assimilation under the General Allotment Act of 1887 (the "Dawes Act").  *See* General Allotment Act of Feb. 8, 1887, ch. 119, 24 Stat. 388 (codified as amended at 25 U.S.C. §§ 331 – 358 (2019)).  The Dawes Act and a series of other federal statutes sought to assimilate and dissolve Tribal nations and their citizens, open their lands, and eradicate their separate political identity. *See id.*; Alaska Native Allotment Act of 1906, Pub. L. No. 59-171, 34 Stat 197 (repealed by ANCSA in 1971).  As a result of allotment, Indian landholdings decreased from 138 million acres in 1881 to 48 million acres in 1934.  C OHEN at 73.

In 1928, a comprehensive report commissioned by the Secretary of Interior found that the allotment/assimilation efforts had proved to be a colossal failure.  *See* I NSTITUTE FOR GOVERNMENT RESEARCH, THE PROBLEM OF INDIAN ADMINISTRATION 3 (L. Meriam ed., 1928) (the "MERRIAM REPORT").  In 1934, John Collier, the Commissioner of Indian Affairs, urging repudiation, reported to Congress, "[i]t is difficult to imagine any other system which with equal effectiveness would pauperize the Indian while impoverishing him, and sicken and kill his soul." Hearings on H.R. 7902 (Readjustment of Indian Affairs (Index)) before the House Committee on Indian Affairs, 73d Cong., 2d Sess., 17 (Comm.Print 1934) at 18.  Congress ended the allotment policy that year by passing the Indian Reorganization Act of 1934 ("IRA").  *See* 48 Pub. L. No. 73-3863, 48 Stat. 984 – 88 (1934) (codified as amended at 25 U.S.C. §§ 461 – 479 (2019)).  The IRA shifted federal Indian policy to focus on rebuilding the Tribes' land bases by taking land into trust on behalf of Tribal nations.  *See* 25 U.S.C. § 465.  In addition, the Act promoted a policy of

enhancing Tribal self-governance and encouraged Tribes to adopt constitutions and form federally chartered corporations as arms of the Tribes to further economic development.  *Id.* §§ 476-477.

Many Alaskan tribes took advantage of opportunities afforded by IRA amendments, specifically targeting Alaska, to organize their governments.[3]  The Alaska Amendment to the IRA was carefully crafted to be specific to Alaska Natives and their political structure, allowing Alaska Natives to organize as Indian tribes under the IRA, *see* 25 U.S.C. § 5123, to establish Section 17 Corporations on par with other federally recognized Indian tribes, *see* 25 U.S.C. § 5124, and to receive loans set aside for Indian chartered corporations, *see* 25 U.S.C. § 5113 and to acquire land in trust status, *see* 25 U.S.C. § 5108, among other benefits.  25 U.S.C. § 5119.

With respect to organizing as an Indian tribe, Congress took careful consideration to ensure Alaska Natives could organize in a manner that made sense in Alaska, stating:

> [G]roups of Indians in Alaska not *recognized* prior to May 1, 1936, as bands or tribes, but having a common bond of occupation, or association, or residence within a well-defined neighborhood, community, or rural district, may organize to adopt constitutions and bylaws, and to receive charters of incorporation and Federal loans under sections 5113, 5123, and 5124 of [the IRA].

---

[3] Approximately one-third of today's 229 federally recognized Indian tribes in Alaska formally organized their governments through the Alaska amendments to the IRA and thereby govern through IRA Councils.  Op. Sol. Interior M-36975 at 1-2. The rest retain Traditional Councils organized under tribal law and custom.  Op. Sol. Interior M-36975 at 52-53, 79.  Organizing as an IRA council requires a tribe to adopt a constitution and bylaws, obtain Secretarial approval of the constitution, and then to have the constitution ratified by a majority vote of the adult members of the tribe in an election conducted by the BIA.  *See* 25 U.S.C. § 5123.  The inherent governmental powers of Traditional Councils are the same as the powers of IRA councils: both possess the inherent sovereign authority of Indian tribes.  *John v. Baker*, 982 P.2d 738, 748-49 (Alaska 1999).  These powers include the power to adopt and operate a government of the tribe's own choosing, define conditions of membership, prescribe rules of inheritance, and control conduct of its members.  COHEN, at § 4.01(1).  Both Traditional Councils and IRA Councils possess sovereign immunity from suit unless waived.  *McCrary v. Ivanof Bay Vill.*, 265 P.3d 337 (Alaska 2011).

*Id.* Because of the unique history of Alaska Natives, many groups that would organize as Indian tribes were groups bonded by their "occupation," such as fishing communities. *See* AUTHORITY OF THE SECRETARY OF INTERIOR TO RESERVE WATERS IN CONNECTION WITH, AND INDEPENDENTLY OF, LAND RESERVATIONS FOR ALASKAN [SIC] NATIVES UNDER THE ACT OF MAY 1, 1936, 56 Interior Dec. 110, 13 (D.O.I.), 1937 WL 3346 (stating: "One of the most usual bond of occupation is that of fishing and it is certain that many of the communities organized under the Reorganization Act will be fishing communities."). Others organized based on their shared residency within an Alaska Native community. The common bond standard also allowed for the reorganizing of Alaska Natives from different origins. *See* Memorandum from Harold Ickes, Secretary, Department of the Interior, *Instructions for Organization in Alaska under the Reorganization Act of June 18, 1934 (48 Stat. 987), and the Alaska Act of May 1, 1936 (49 Stat. 1250), and the Amendments Thereto*, at 1-2 (Dec. 22, 1937). In other words, in determining how best to recognize governing bodies in Alaska, Congress did not rubber stamp the process in the IRA of 1934 – which was intended to organize Indians on a reservation – but instead carefully crafted criteria specific to how Alaska Natives had organized themselves in Alaska up until that point. This all occurred 35 years prior to Congress' passage of ANCSA.

"Pursuant to the IRA, sixty-nine Alaska Native villages and regional groups adopted constitutions [approved by the Secretary of Interior]." Op. Sol. Interior M-36975 at 19. Thus, "[b]y the time of enactment of the IRA, the preponderant opinion was that Alaska Natives were subject to the same legal principles as Indians in the contiguous 48 states, and had the same powers and attributes as other Indian tribes, except to the extent limited or preempted by Congress." Op. Sol. Interior M-36975 at 26.

The 1940s ushered in another reversal of federal Indian policy, back towards assimilation, the era known as "Termination," when Congress and the Bureau of Indian Affairs pursued formal policies to terminate the existence of Indian tribes.  *See* COHEN at 84-93.  This policy resulted in the legislative and administrative termination of the federal government's relationship with countless Indian tribes and the unwanted extension of state jurisdiction over many tribes.  *See id.* at 92.  The termination policies, like those of allotment/assimilation, only led to the further impoverishment of Indian people.  *Id.*  It would not be until the 1970s that the federal government would again change course and commit to the "modern era" to a federal Indian policy of tribal self-determination.  *See id.* at 93-108.[4]

This, then, was the stage for Alaska's statehood in 1958 and ANCSA in 1971.

3.  <u>ANCSA</u>

Like so many stories involving the displacement of Indigenous peoples, the one in Alaska involves the discovery of, and desire to exploit, a lucrative natural resource.  In the early 1960's, just years after statehood, "Atlantic Richfield Company discovered a huge oilfield on Alaska's 'north slope' of the Brooks Range and native groups blanketed the proposed right-of-way for a trans-Alaska oil pipeline with claims of aboriginal title."  *Native Vill. of Venetie I.R.A. Council v. State of Ak.*, 1994 WL 730893, at *1 (D. Alaska Dec. 23, 1994).  The state had selected large areas of federal land and made application for patents for the land.  *People of Vill. of Gambell v. Clark,* 746 F.2d 572, 574 (9th Cir. 1984).

These conflicting claims hindered both development and protection of Native and national interests in Alaska.  In 1966, Secretary of Interior Stewart Udall froze all public land transactions in Alaska pending resolution of the conflicting claims.  In 1971 Congress passed the [ANCSA] in an effort to accommodate in a rational manner the interests of the

---

[4] In the 1994 List Act, Congress recounted that it "has expressly repudiated the policy of terminating recognized Indian tribes, and has actively sought to restore recognition to tribes that previously have been terminated."  P.L. 103-454 (H.R. 4180) § 103(5).

state, Native groups, conservationists, and potential developers, including the oil companies.

*Id.  See also* COHEN at 329 (describing the conflict).  ANCSA "extinguished" the Alaska Tribal nations' claims of aboriginal title to their homelands in exchange for $962,500,000 and 40,000,000 acres of land.  *Cape Fox Corp. v. United States,* 646 F.2d 399, 400 (9th Cir. 1981).  But instead of employing the "usual model of vesting existing tribal governments with the assets reserved after the extinguishment of the aboriginal claims, Congress adopted an experimental model initially calculated to speed assimilation of Alaska Natives into corporate America."  COHEN at 330.  In order to receive benefits under the Act, Native residents of Native villages were required to form profit or nonprofit corporations.  *See* 43 U.S.C. § 1607.[5]

Most Alaska Natives were enrolled in the villages where they resided.  Op. Sol. Interior M-36975 at 22.  Those alive on December 31, 1971, were permitted to be issued stock in one of 13 regional corporations, incorporated as for-profit corporations, and in one of the over 200 for-profit village corporations.  *See* 43 U.S.C. §§ 1606-1607.  (The thirteenth regional corporation, comprised of Natives residing outside of Alaska, received only money.  *Id*. §§ 1606(c), 1611(c).)  With respect to land allocations, 38 million acres were to be selected and conveyed to Native village corporations and to 12 of the 13 regional corporations.  43 U.S.C. § 1611.  As for the distribution of settlement proceeds, ANCSA allocated the entire $962,500,000 to the ANCs.  *Id*. § 1605(c).  *See also* Mem. Op. at 4 (discussing same).

The corporate allocations of ANCSA "parallel termination statutes in significant respects."  Op. Sol. Interior M-36975 at 61.  Nevertheless, while this "formidable framework" "threw into question the future *role* of the tribes," ANCSA recognized "their continued existence" as sovereign

---

[5] Every village corporation opted for the for-profit form.  *See* Op. Sol. Interior M-36975 at 50 n.225.

governments.  COHEN at 353 (emphasis in original).  Unlike the Alaska Native villages, the ANCs are chartered under state law to "perform proprietary, not governmental functions," *id.,* and, as the Solicitor found, "are clearly not tribes," Op. Sol. Interior M-36975 at 35 n.152.  They are not "recognized" as Tribal governments.  *See* 58 Fed. Reg. at 54,365-66 (Oct. 21, 1993).

Consistent with this and notwithstanding the "formidable" corporate overlay imposed upon Alaska Natives by ANCSA, "[n]othing in ANCSA . . .  required the dissolution of tribal governments." COHEN at 353.  Indeed, ANCSA did not revoke or disrupt in any way the governmental authorities confirmed by the IRA.  *See* Op. Sol. Interior M-36975 at 23 (stating "ANCSA did not revoke the village IRA constitutions or the IRA corporate charters for those villages that also had charters.").  Nor did ANCSA repeal the authority in section 1 of the Alaska Amendment of the IRA, affording Alaska Native villages continuing authority to reorganize and adopt constitutions.  *Id.*  At its core, therefore, "Congress intended ANCSA to free Alaska Natives from the dictates of 'lengthy wardship or trusteeship,' *not to handicap tribes by divesting them of their sovereign powers.*"  *John v. Baker,* 982 P.2d at 753 (quoting H.R. Rep. 92-523, 1971 U.S.C.C.A.N. 2192 at 2220)) (emphasis added).  "[T]he tribes continue to exist" and "*Tribal governments, as opposed to regional and village corporations, are the only Native entities that possess inherent powers of self-government*."  COHEN at 353 (emphasis added).

In 1975, closely on the heels of ANCSA, Congress established the American Indian Policy Review Commission to undertake "the most comprehensive review of federal Indian policy" since the Merriam Report.  Op. Sol. Interior M-36975 at 3.  In a chapter dedicated to the status of Alaska Tribal nations, the Commission reported:

> When, after the beginning of the 20th century, the United States began to take notice of the Alaska Natives. . .  it regarded the Alaska Native tribes as dependent domestic sovereigns, possessed of the same attributes and powers as the Native tribes of the lower 48.  And, just as in the case of other Native tribes, [the United States] *acknowledged* that a special

17

relationship existed between it and the Alaska Native tribes and their members, as an incident of which it undertook to provide them with special services.
* * *
The Alaska Native tribes (*referring, of course, to the historic and traditional tribal entities, not to the Native corporations organized under the Settlement Act*), just as the tribes of the lower 48, are domestic sovereigns.  They possess all of the attributes and powers normally appertaining to such status, except those that have been specifically denied or taken from them by Congress.

AMERICAN INDIAN POLICY REVIEW COMMISSION, FINAL REPORT 95th Cong., 1st Sess. 489-91

(Comm. Print 1977) (footnotes omitted) (emphasis added).

In sum, ANCSA did not require the dissolution of tribal governments; rather, tribes in

Alaska still exist and are the only Native entities that possess inherent powers of self-government.

4.  Post-ANCSA:  Executive Action to Definitively Recognize Alaska Native Villages and To Disclaim Recognition of the ANCs

The above-referenced 1993 analysis of the sovereign status of Alaska Native villages

undertaken by the Solicitor stopped short of identifying all recognized governing bodies of Indian

tribes in Alaska.  *See* Op. Sol. Interior M-36975 at 27-28, 35.  "The question of federal recognition

of Alaska tribes was definitively settled [later] in 1993, when the Department of the Interior

published a revised list of federally recognized tribes."  COHEN at 354.  The Interior Department's

"definitive" recognition of the Alaska Native villages was set forth in the preamble to

Department's 1993 Federal Register Notice of "Indian Entities Recognized and Eligible To

Receive Services From the United States Bureau of Indian Affairs."  *See* 58 Fed. Reg. at 54,365.

The Notice states:

The purpose of the current publication is to . . . unequivocally acknowledg[e] that . . . the villages and regional tribes listed below . . . have the same governmental status as other federally acknowledged Indian tribes by virtue of their status as Indian tribes with a government-to-government relationship with the United States; are entitled to the same protection, immunities, privileges as other acknowledged tribes; have the right, subject to general principles of Federal Indian law, to exercise the same inherent and delegated authorities available to other tribes; and are subject to the same limitations imposed by law on other tribes.

*Id.* at 54,365-66 (emphasis added).   Equally definitive was the Department's clarification that

ANCs have no such recognition as Tribal governments.   The Interior Department explained:

> Rather than being limited to . . . Native *governments* . . . as were the prior lists, the 1988
> list was expanded to include . . . [the ANCs] . . . [in] respon[se] to a "demand by the Bureau
> and other Federal agencies . . . for a list of organizations *which are eligible for their funding*
> and services based on their inclusion in categories frequently mentioned in statutes
> concerning Federal programs for Indians."   53 FR at 52,832.
>
> The inclusion of *non-tribal entities* on the 1988 Alaska entities list . . . created a
> discontinuity from the list of tribal entities in the contiguous 48 states . . . .   As in Alaska,
> Indian entities in the contiguous 48 states *other than recognized tribes* are frequently
> eligible to participate in Federal programs under specific statutes.   For example, "tribal
> organizations" associated with recognized tribes, but not themselves tribes, are eligible for
> contracts and grants under the ISD[EE]A.   25 U.S.C. 450b(c), 450f, 450g.   Unlike the
> Alaska entities list, the 1988 entities list for the contiguous 48 states was not expanded to
> include such entities.
> * * *
>
> [T]the inclusion of ANCSA corporations, *which lack tribal status in a political sense*,
> called into question the status of all the listed entities.

*Id.* (emphasis added).   Thus, the Interior Department refused to include the ANCs on the 1993 list

because they were "non-tribal entities" and not "recognized" as Tribal governments.   *Id.*   From

that year forward, to this day, the Alaska Native villages are on the list and, therefore, "recognized"

by the federal government, but the ANCs are not.[6]

---

[6] *See Indian Entities Recognized and Eligible To Receive Services From the United States
Bureau of Indian Affairs,* 60 Fed. Reg. 9,250 (Feb. 16, 1995); 61 Fed. Reg. 58,211 (Nov. 11,
1996); 62 Fed. Reg. 55,270 (Oct. 23, 1997); 63 Fed. Reg. 71,941 (Dec. 30, 1998); 65 Fed. Reg.
13,298 (Mar. 13, 2000); 67 Fed. Reg. 46,327 (Jul. 12, 2002); 68 Fed. Reg. 68,179 (Dec. 5, 2003);
70 Fed. Reg. 71,193 (Nov. 25, 2005); 72 Fed. Reg. 13,648 (Mar. 22, 2007); 73 Fed. Reg. 18,553
(Apr. 4, 2008); 74 Fed. Reg. 40,218 (Aug. 11, 2009); 75 Fed. Reg. 60,810 (Oct. 1, 2010); 75
Fed. Reg. 66,124 (Oct. 27, 2010); 77 Fed. Reg. 47,868 (Aug. 10, 2012); 78 Fed. Reg. 26,384
(May 6, 2013); 79 Fed. Reg. 4,748 (Jan. 29, 2014); 80 Fed. Reg. 1,942 (Jan. 14, 2015); 81 Fed.
Reg. 5,019 (Jan. 29, 2016); 81 Fed. Reg. 26,826 (May 4, 2016); 82 Fed. Reg. 4,915 (Jan. 17,
2017); 83 Fed. Reg. 4,235 (Jan. 30, 2018); 83 Fed. Reg. 34,863 (Jul. 23, 2018); 84 Fed. Reg.
1,200 (Feb. 1, 2019); 85 Fed. Reg. 5,462 (Jan. 30, 2020).

### III.   THE ANCS' INCLUSION IN THE ISDEAA DEFINITION OF "INDIAN TRIBE" REFLECTS UNCERTAINTIES SURROUNDING THE NOVEL "EXPERIMENT" TAKING PLACE IN ALASKA, NOT THE BESTOWAL OF GOVERNMENTAL AUTHORITIES UPON ANCS.

As set forth above, in the 1970s, the United States began to implement a new policy of Indian self-determination, which included giving more authority over programs and services to tribal citizens.  The ISDEAA, 25 U.S.C. §§ 5301 *et seq.*, enacted in 1975, just four years after ANCSA, is a centerpiece of this federal policy.  ISDEAA authorizes Indian tribes to step into the shoes of the federal government through contracts and compacts in order to provide programs and services to trust beneficiaries – American Indians and Alaska Natives.  Consistent with federal contracting policies, ISDEAA only allows for the contracting of administrative or ministerial functions and does not delegate inherent federal functions.[7]  As such, ISDEAA does not bestow upon eligible contractors, including ANCs listed next to Alaska Native villages in the definition of "Indian tribe," any governmental powers or governing authority.  It only allows for, through federal contracting, the streamlined delivery of administrative functions tied to programs and services benefiting American Indians and Alaska Natives.

The history set forth above is directly relevant to the inclusion of the ANCs in ISDEAA's definition of "Indian tribe."  ANCSA was a complex "experimental model."  For one, it allocated settlement funds for the "extinguishment" of Tribal nations' aboriginal titles to private corporations, instead of the Tribal nations themselves.  *See* COHEN at 330-31 (citing 43 U.S.C. §

---

[7] *See, e.g.,* 25 U.S.C. § 5321 ("The programs, functions, services, or activities that are contracted under this paragraph shall include administrative functions of the Department of the Interior and the Department of Health and Human Services . . . that support the delivery of services to Indians."); 25 U.S.C. at § 5387(C)(1)(A)(ii) (Including the fact that "the program, function, service, or activity (or portion thereof) that is the subject of the final offer is an inherent Federal function that cannot legally be delegated to an Indian tribe" as an appropriate reason for the Secretary to reject a Self-Governance compact proposal.").

1605(c)).[8]  *See also* Mem. Op. at 4-5 (describing the allocation of settlement funds and transfer of reservation lands to ANCs) (quoting *Alaska v. Native Vill. of Venetie Tribal Gov't,* 522 U.S. 520, 523 (1998)).   For another, it vested land allocations out of the settlement with the same corporations, not with the Tribal nations themselves.  *See id.* (describing the land allocations under ANCSA).

At the same time, while ANCSA did not divest the Alaska tribes of their pre-existing sovereign status, there was uncertainty as to which of those tribes or affiliated entities could be considered "recognized."  There was no formal federal recognition process in place in 1971 at the time of ANCSA's enactment or in 1975 at the time of the ISEAA's enactment.   The Interior Department thereafter began publishing its list of federally recognized tribes, and in 1978 promulgated its acknowledgment procedures.  43 Fed. Reg. 39,361 (Sept 5, 1978); 25 C.F.R. §§ 83.1–83.11 (1978).  When Congress enacted ISDEAA (1975), and continuing for nearly 20 years thereafter, neither the federal courts nor the Interior Department could definitively confirm which Alaska Native villages were recognized Indian tribes with the unique government-to-government relationship with the United States.  *See Native Vill. of Venetie I.R.A.,*1994 WL 730893, at *12; Op. Sol. Interior M-36975 at 27-28, 35.  Given this uncertainty and the complexity of the ANCSA "experiment" with its "formidable" corporate overlay, it is no wonder that Congress included not only the Alaska Native villages but also the ANCs, each with the potential option to fulfill the requirements of the "Indian tribe" definition's eligibility clause.

---

[8] Until extinguished by the United States, Indian tribes, *not individuals or corporations*, retain aboriginal title to the lands that they exclusively occupy and govern.  *See Johnson v. M'Intosh*, 21 U.S. 543, 574 (1823) (discussing the nature of aboriginal title retained by Indian tribes); *Pueblo of Jemez v. U.S.,* 790 F.3d 1143, 1154 (10th Cir. 2015) (same).

Of course, as set forth above, the Interior Department "definitively" resolved that issue for the Alaska Native villages with its preamble to the 1993 list of federally recognized Indian tribes published in the Federal Register.  As for the ANCs, they found themselves on the 1988 list of entities eligible for funding and services.  But in 1993, in the same Federal Register notice that it unequivocally announced the federally recognized status of Alaska Native villages, the Interior Department definitively established that the ANCs are *not* Tribal governments; they are not "recognized" as Indian tribes with a government-to-government relationship with the United States.

In 1994, on the heels of the Interior Department's 1993 list and definitive clarifications with respect to the "recognized" status of the Alaska Native villages, and lack thereof for the ANCs, Congress chose to enact the List Act.  Congress thereby made perfectly clear that federal recognition is demonstrated by inclusion on the list of Indian entities recognized as "eligible for the special programs and services provided by the United States to Indians because of their status of Indians."  25 U.S.C. § 5131(a).  The Defendants cannot bootstrap ANCs into "Tribal government" status for Title V CARES Act funds through their placement within the ISDEAA definition of "Indian tribe," either by writing out the eligibility clause entirely (as the Secretary would do), or by construing it as something it is not (as the ANCs would do).

The Plaintiffs in the Confederated Tribes of the Chehalis Reservation case have aptly explained the contexts in which the ANCs may enter into 638 contracts as tribal organizations authorized to do so by federally recognized Alaska Native villages.  *See* Confederated Tribes of the Chehalis Pls.' Mot. For Summ. J. and Mem. On P. & A., ECF No. 77 at 35-39.  The ANCs have that ability not because they are "recognized" in accord with the formal act of establishing a government-to-government relationship with the United States as required by the eligibility clause

within the ISDEAA definition of Indian tribe, but because they partner with, or attain authority

from, a formally "recognized" Alaska Native village.  Again, such recognition is reserved for only

Tribal governments.[9]

IV.     **ALASKA NATIVE VILLAGES POSSESS GOVERNMENTAL POWERS LIKE STATES AND LOCAL GOVERNMENTS ENTITLED TO THE CARES ACT RELIEF FUNDS, BUT THE ANCS DO NOT.**

As the Court observed in its preliminary injunction decision, "Congress placed monies for

'Tribal governments' in the same title of the CARES Act as funding for other types of

"governments," specifically, "for making payments to States, Tribal governments, and units of

local government."  Mem. Op. at 22-23.   In accord with time-honored rules of statutory

construction, "[t]he term 'Tribal government' must be read in this context."  Mem. Op. at 23.

As set forth above and discussed in detail in our *amicus* brief in support of the Plaintiffs'

motion for preliminary injunction, federally recognized Indian tribes are governments.  Indeed,

federal recognition confirms their very status as governments and their government-to-government

relationship with the United States.  ANCs have no such status – they are private corporations –

and their attempt to stand shoulder to shoulder with the recognized governing bodies of Alaska

Native villages "denigrates" the sovereign dignity of Indian tribes.  *Merrion v. Jicarilla Apache*

*Tribe,* 455 U.S. 130, 140-146 (1982) (quotations omitted) (citing *United States v. Mazurie*, 419

U.S. 544, 557 (1975)); *accord Bryan v. Itasca Cty., Minnesota,* 426 U.S. 373, 388 (1976).  As the

Supreme Court in *Mazurie* said, Tribal governments represent "'a separate people' possessing 'the

power of regulating their internal and social relations . . .,' *United States v. Kagama,* 118 U.S. 375,

---

[9] Further, as the Court pointed out in its preliminary injunction decision, "the possibility that ANCs might not qualify under the eligibility clause is hardly fatal to carrying out Congress's purpose under ISDEAA."  Mem Op. at 24.  The statutory language uses "or" to separate "Alaska Native village[s] or regional or native village corporation[s]."  25 U.S.C. § 5304(e).  "Alaska Native villages are therefore able to fulfill ISDEAA's purposes."  Mem Op. at 24.

381-2 (1886); *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 173 (1973) . . . and are "a good deal more than 'private, voluntary organizations.'" *Mazurie*, 419 U.S. at 556-57.

The ANCs, unlike the 229 federally recognized Alaska Native villages, exercise no governmental functions whatsoever.  While, as the ANCs point out, ANCSA "*permit[s]*" them to provide their shareholders with benefits to their health, education, and welfare, *see* ANC Br. at 58 n.9 (citing 43 U.S.C. § 1606(r)) (emphasis added), they have no *duty* to do so.  Tribal governments on the other hand, have inherent duties to provide for their citizens.  Indeed, Alaska Native villages, as governments, set legal criteria for their enrolled citizens, whom they govern with duly enacted laws, enforceable within their judicial forums.  *See, e.g., State v. Native Vill. of Tanana,* 249 P.3d 734, 750 (Alaska 2011); *In re C.R.H.,* 29 P.3d 849, 854 (Alaska 2001); *Baker,* 982 P.2d at 751-59.  The ANCs, private, state-chartered corporations do no such thing; they are owned by corporate shareholders, who do not even have to be enrolled citizens of an Alaska Native village.  *See* COHEN at 353 ("[M]any Natives are not shareholders in Native corporations, because stock was initially limited to Natives alive on December 18, 1971).  And they are overseen by executives enjoying salaries in the seven figures, not public servants responsible to a constituency.[10]  As the COHEN treatise points out, "Tribal governments, as opposed to regional and village corporations, are the only Native entities that possess inherent powers of self-government and that can develop autonomous membership rules."  *Id*.

Particularly telling in this regard is the ANCs' misleading suggestion that they engage in "essential governmental functions" because they "provide benefits" to 1,330 shareholders who are

---

[10] For example, in 2018, the top five executives for Arctic Slope Regional Corporation ("ASRC"), each earned annual salaries of between $1.87 million and $5.1 million.  Arctic Slope Reg'l Corp., 2019 Proxy Statement to Shareholders, at 26 (Apr. 26, 2019) available at https://alaskalandmine.com/wp-content/uploads/2019/12/2019-ASRC-Proxy-Statement-5-9-19.pdf (last visited June 3, 2020).

not enrolled citizens of any federally recognized Indian tribe.  *See* ANC Br. at 27.  Again, Tribal governments – like States and units of local government, the other governmental entities included in Title V of the CARES Act – function to serve *their citizens*.  Corporations serving or giving dividends to *individual shareholders*, or engaged in charitable activities, are not functioning as governments.

Finally, as discussed in our *amicus* brief in support of the Plaintiffs' motion for preliminary injunction, part-and-parcel to the government-to-government relationship between the United States and federally recognized Indian tribes, the federal government owes a unique trust obligation to tribes.  *See* ECF 20 at 5-6.  *Oneida County v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985).  The ANCs enjoy no such relationship.  *See Cape Fox Corp. v. United States,* 456 F. Supp. 784, 799 & n.51 (D. Alaska 1978) (federal trust duty does not extend to land acquisitions of village corporation), *rev'd in part on other grnds,* 646 F.2d 399 (9th Cir. 1981).  The Alaska Native villages do.  *See People of Togiak v. United States,* 470 F.Supp. 423, 428 (D.D.C. 1979.

## CONCLUSION

For all of the above reasons, the Court should grant summary judgment in favor of the Plaintiffs.

Dated:  June 4, 2020                    Respectfully submitted,

                                        */s/   Kaighn Smith, Jr.*
                                        Kaighn Smith, Jr. (D.C. Bar No. MI0027)
                                        Michael Corey Francis Hinton
                                        Erick J. Giles
                                        DRUMMOND WOODSUM
                                        84 Marginal Way, Suite 600
                                        Portland, ME 04101
                                        (207) 772-1941
                                        ksmith@dwmlaw.com

                                        *Co-Counsel for National Congress of American*
                                        *Indians; Counsel for Affiliated Tribes of Northwest*

*Indians; All Pueblo Council of Governors; California Tribal Chairpersons' Association; Great Plains Tribal Chairmen's Association, Inc.; Inter Tribal Association of Arizona, Inc.; Inter-Tribal Council of the Five Civilized Tribes; Midwest Alliance of Sovereign Tribes; United South and Eastern Tribes Sovereignty Protection Fund; National Indian Gaming Association; Arizona Indian Gaming Association; and California Nations Indian Gaming Association*

NATIONAL CONGRESS OF AMERICAN INDIANS

*/s/   Derrick Beetso*
Derrick Beetso

National Congress of American Indians
Embassy of Tribal Nations
1516 P Street NW,
Washington, DC 20005
(202) 466-7767
dbeetso@NCAI.org

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2020, I electronically filed the foregoing brief with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Kaighn Smith Jr.*
Kaighn Smith Jr.
Drummond Woodsum
84 Marginal Way, Suite 600
Portland, Maine 04101
Tel: (207) 772-1941
Fax: (207) 772-3627
ksmith@dwmlaw.com