**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CONFEDERATED TRIBES OF THE CHEHALIS RESERVATION et al., <br><br> Plaintiffs, <br><br> v. <br><br> STEVEN MNUCHIN, in his official capacity as Secretary of the Treasury, <br><br> Defendant. | Case No. 1:20-cv-1002-APM |
| CHEYENNE RIVER SIOUX TRIBE et al., <br><br> Plaintiffs, <br><br> v. <br><br> STEVEN MNUCHIN, in his official capacity as Secretary of the Treasury, <br><br> Defendant. | Case No. 1:20-cv-01059-APM |
| UTE TRIBE OF THE UINTAH AND OURAY RESERVATION, <br><br> Plaintiff, <br><br> v. <br><br> STEVEN MNUCHIN, in his official capacity as Secretary of the Treasury, <br><br> Defendant. | Case No. 1:20-cv-01070-APM |

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL

Defendant Steven Mnuchin, in his official capacity as Secretary of the Treasury, hereby files this opposition to Plaintiffs' Motion for Injunction Pending Appeal (ECF No. 99).

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

LEGAL STANDARD .................................................................................................... 2

ARGUMENT ................................................................................................................. 3

I.   PLAINTIFFS ARE NOT LIKELY TO PREVAIL ON APPEAL, BECAUSE THEY HAVE NOT RAISED A
SERIOUS LEGAL QUESTION. ...................................................................................... 3

   A.   The Court's Opinion at the Preliminary-Injunction Stage Does Not, without More,
Create a "Serious Legal Question." ........................................................................ 3

   B.   Plaintiffs' Disagreement with this Court's Decision Does Not Warrant an Injunction
Pending Appeal ......................................................................................................... 5

      1.   Interpretation of "Indian Tribe" under ISDEAA. ........................................ 5

      2.   The Court's conclusion does not "rest[] on a faulty assumption." .............. 6

      3.   The government's contemporary interpretation of ISDEAA, consistently held for 40
years, merits *Skidmore* deference. ..................................................................... 8

      4.   ANCs have "recognized governing bodies." ............................................. 10

II.   THE BALANCE OF EQUITIES DOES NOT FAVOR PLAINTIFFS. ...................................... 13

CONCLUSION ............................................................................................................ 15

**INTRODUCTION**

The funds at issue in this case were appropriated to meet the needs of a national emergency. As this Court recently held in a related case, "Congress plainly recognized the immediate need for emergency funds to assist Tribal governments in addressing the COVID-19 pandemic, as evidenced by the remarkably short 30-day deadline to distribute the aid." Mem. Op. at 6, *Agua Caliente v. Mnuchin*, No. 1:20-cv-1136-APM (D.D.C. June 15, 2020). In these cases, the Court preliminarily enjoined Defendant from issuing payments to Alaska Native corporations ("ANCs") in order to allow Plaintiffs an opportunity to brief their claims at summary judgment. They have now had that chance, and this Court has rightly concluded, in a comprehensive opinion, that ANCs are entitled to payments from the Coronavirus Relief Fund. The Court should deny Plaintiffs' motion allow Defendant to disburse these funds without further delay.

First and foremost, there is no "serious legal question" sufficient to enter the extraordinary remedy of an injunction pending appeal. The salient issues in this case have been settled administratively for more than 40 years, and judicially for more than 30 years. The definitive body of caselaw, administrative pronouncements, congressional actions, and secondary sources confirms that ANCs meet the definition of "Indian Tribes" under ISDEAA and are empowered to contract through their "recognized governing bod[ies]." This Court's preliminary-injunction opinion is the only legal authority that Plaintiffs cite to the contrary. But that opinion was issued on a highly expedited timeframe—a mere *one week* after the motion was filed—in which neither the Parties nor the Court had a chance to fully develop and consider the relevant arguments. Since its dissolution, there is no longer *any* legal authority in support of Plaintiffs' arguments.

Second, the balance of equities also favors denying the motion. At every turn in these three consolidated cases, and in related litigation to expedite disbursements, all 26 Plaintiff Tribes have argued that money from the Coronavirus Relief Fund must be disbursed *immediately*, lest its intended recipients suffer grave and irreparable harm. Plaintiffs now argue that they are the only ones to which that premise applies. But as the ANCs have documented, they provide—and will use the Coronavirus Relief Fund to continue providing, as the CARES Act requires—much needed

1

services to Alaska Natives struggling in this pandemic.

Third, even if this Court concluded that Plaintiffs were at risk of suffering irreparable harm should payments be made to ANCs, that conclusion would apply equally to ANCs. As Plaintiffs argue in their motion, the public has a strong interest in ensuring that Congress's directive is followed. Here, as this Court correctly held, that directive provides for payments to ANCs, and the public interest strongly favors making those payments to ANCs as soon as possible. Thus, as Plaintiffs' case for irreparable harm gets stronger, the balance of equities tips even further against them. Given their unlikely success on the appeal, the factors weigh against injunctive relief.

## LEGAL STANDARD

In this circuit, a court considers four factors when deciding whether to enter an injunction pending appeal: (1) whether the movant has made a strong showing that it is likely to prevail on the merits of its appeal; (2) whether the movant has shown that without such relief, it will be irreparably injured; (3) whether the issuance of in injunction would substantially harm other parties interested in the proceedings; and (4) where the public interest lies. *WMATA v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977) (citing *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958)). These factors interrelate on a "sliding scale" and must be balanced against each other. *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998). "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Id.* (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).

The D.C. Circuit has noted that its sliding-scale approach might have been superseded by the Supreme Court's decision in *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008). *See Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) ("Like our colleagues, we read *Winter* at least to suggest if not hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction[.]'") (quoting *Davis v. Pension Benefit Guaranty Corp.*, 571 F.3d 1288, 1296 (2009) (Kavanaugh, Henderson, JJ., concurring)); *see also Aamer v. Obama*,

742 F.3d 1023, 1043 (D.C. Cir. 2014) ("In this circuit, it remains an open question whether the 'likelihood of success' factor is 'an independent, free-standing requirement,' or whether, in cases where the other three factors strongly favor issuing an injunction, a plaintiff need only raise a 'serious legal question' on the merits.").

While Defendant surely would prevail under *Winter*'s "more demanding" standard, *Davis*, 571 F.3d at 1292, the motion should be denied even if the Court applies the sliding-scale approach from *Holiday Tours*, as it did in *Cigar Association of America v. FDA*, 317 F. Supp. 3d 555, 560 (D.D.C. 2018) (Mehta, J.) ("While acknowledging this uncertainty, the district judges in this Circuit continue to adhere to binding precedent and apply the sliding scale approach to determine whether a movant is entitled to an injunction pending resolution of its appeal. This court must do the same.") (citations omitted).

## ARGUMENT

### I.   PLAINTIFFS ARE NOT LIKELY TO PREVAIL ON APPEAL, BECAUSE THEY HAVE NOT RAISED A SERIOUS LEGAL QUESTION.

As Defendant explained in its motion for summary judgment and reply brief—arguments that this Court correctly accepted—Congress intended that ANCs be eligible for CARES Act funding. Although Plaintiffs suggest that there are "vulnerabilities" in the Court's opinion, the mere possibility that there are arguments to the contrary do not demonstrate the existence of a "serious legal question" warranting the extraordinary remedy of an injunction pending appeal.[1]

### A.   The Court's Opinion at the Preliminary-Injunction Stage Does Not, without More, Create a "Serious Legal Question."

The general tenor of Plaintiffs' motion is that there are two competing judicial opinions: one at the preliminary-injunction stage and one at the summary-judgment stage. But those are not contemporaneous, conflicting opinions—they were sequential. The Court reconsidered the first and found it erroneous in several material respects. The preliminary injunction has been legally

---

[1] The arguments herein are not meant to reiterate comprehensively Defendant's merits briefing, but rather to respond succinctly to Plaintiffs' motion. Defendant incorporates here all arguments made in its motion for summary judgment and reply brief.

and jurisprudentially dissolved; it bears no continuing legal weight.[2]

Even while it was in place, the Court's preliminary-injunction opinion stood alone. At no point in this litigation have Plaintiffs cited *any* authority—no case, no legislation, no administrative pronouncement, no secondary source—disputing the propositions that ANCs are "Indian Tribes" under ISDEAA or that they can contract under ISDEAA through their "recognized governing bod[ies]." 25 U.S.C. §§ 5304(e), (l).

To the contrary, for 40 years, the relevant government agencies have—consistently and publicly—interpreted ISDEAA's definition of "Indian Tribes" to include ANCs. The Ninth Circuit considered and affirmed the government's interpretation more than 30 years ago, and no case has ever questioned that holding—nor have Plaintiffs cited *any* authority doing so. Congressional actions since then confirm that Congress considers ANCs to be "Indian Tribes" under ISDEAA. And secondary sources, including a leading treatise, confirm that "regional and village corporations are included as 'tribes' under some Indian legislation." *Cohen's Handbook of Federal Indian Law* § 4.07(3)(d)(i) (Newton ed. 2019) (citing ISDEAA).

Indeed, as the Court noted, Plaintiffs effectively conceded these points. *See* SJ Op. (ECF No. 97) at 30 ("All parties, even the Confederated Tribe Plaintiffs, concede that ANCs may enter into ISDEAA contracts. Thus, to enjoy such status, ANCs, or some constituent part of them, necessarily must meet at least one of ISDEAA's two definitions of 'Tribal organization,' because only a 'tribal organization' may enter into an ISDEAA contract[.]") (citation omitted). The Court easily concluded that ANCs meet the *first* definition of Tribal organization, that they therefore

---

[2] Whether or not it is later vacated, an opinion at the preliminary-injunction stage "does not constitute law of the case for the purpose of further proceedings and does not limit or preclude the parties from litigating the merits." *Gordon v. Holder*, 721 F.3d 638, 645 (D.C. Cir. 2013) (quoting *Sherley v. Sebelius*, 689 F.3d 776, 781 (D.C. Cir. 2012)). That is because, "given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Thus, "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits. *Id.* (citing *Industrial Bank of Wash. v. Tobriner*, 405 F.2d 1321, 1324 (D.C. Cir. 1968); *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 742 (2d Cir. 1953)).

have a "recognized governing body" under ISDEAA, and that they therefore have a "recognized governing body" under the CARES Act. *Id.* at 31-33.

Nevertheless, Plaintiffs maintain that they have raised a "serious legal question." Mot. at 5. They rely on this Court's opinion in *Cigar Association of America* for the rubric of what it means to raise a "serious legal question," but in that case, the "host of complex, purely legal questions" were all First Amendment challenges to FDA's novel tobacco warning regime. 317 F. Supp. 3d at 561. No other court or agency had ever passed on them. In this case, as noted above, the relevant questions have been settled for decades. Plaintiffs have not raised any legal question serious enough to warrant this Court's enjoining the reasoned decision that it just entered.

### B.    Plaintiffs' Disagreement with this Court's Decision Does Not Warrant an Injunction Pending Appeal

Not only do Plaintiffs suggest "that the Court had it right the first time," but they offer four specific reasons why that is so. As a preliminary matter, three of those four "identified vulnerabilities," Mot. at 5-12, concern the question of whether ANCs are "Indian Tribes" under ISDEAA. As Defendant has emphasized, and as the Court noted in its recent opinion, "there is a split among Plaintiffs" on that question. SJ Op. at 12. The fact that Plaintiffs in two of these three cases *have never even argued this point* is enough to conclude that it is not a "serious legal question." Even on their merits, however, the *Chehalis* Plaintiffs' arguments fail.

### 1.    Interpretation of "Indian Tribe" under ISDEAA.

Defendant will not re-hash the lengthy arguments about how to interpret "Indian Tribe" under ISDEAA. Suffice it to say, the Court ultimately concluded—correctly—that the imperative to give effect to Congress's language trumps, where necessary, adherence to grammatical canons of interpretation. SJ Op. at 14-21.

The *Chehalis* Plaintiffs argue, ironically, that the Court's conclusion was "based on one canon alone." Mot. at 6. It is not a canon, however, but "the 'cardinal principle' of interpretation that courts 'must give effect, if possible, to every clause and word of a statute.'" SJ Op. at 16-17 (quoting *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1890 (2019); *Loughrin v.*

*United States*, 573 U. S. 351, 358 (2014)). Canons of construction, by contrast, "are no more than rules of thumb that help courts determine the meaning of legislation." SJ Op. at 15-16 (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992)). They readily give way when necessary to give effect to statutory terms.[3]

Finally, the fact that Courts will not try to "eliminate all superfluity," and will at times "tolerate a degree of surplusage," does not undermine the Court's conclusion. Mot. at 7. ANCs were specifically added by a last-minute amendment to ISDEAA. SJ Op. at 21-23 ("ISDEAA's drafting history lends support to this conclusion."). Thus, it "would be an odd result indeed for Congress to include ANCs in one breath only to negate their inclusion in the very next breath through the eligibility clause." *Id.* at 22. This is not a stray word, misplaced punctuation mark, or drafting error; Plaintiffs' reading would undeniably frustrate Congress's express intent.

## 2.   The Court's conclusion does not "rest[] on a faulty assumption."

Plaintiffs fault the Court for not citing "evidence" that Congress understood, in 1975, that no ANC satisfied the eligibility clause. That, too, is ironic, given that Plaintiffs can identify no instance of an ANC ever being federally recognized. Mr. Soller recognized in 1976 that no ANC had ever been recognized, and the 1978 recognition regulations expressly excluded them from the process. *See* J.A. 611; 43 Fed. Reg. 39,361, 39,362 (Sept. 5, 1978); *see also* PI Hr'g at 12:7-13:8 (COURT: "Has an ANC ever been qualified under that eligibility clause?" MR. KANJI: "No, I do not believe so, Your Honor. And I'm not aware of an ANC having attempted to go through that entire process."). That is evidence enough that ANCs do not, and never have, satisfied the clause.

Plaintiffs insist that the Court's "assumption" is belied by two statements: one by ANCs and one by Interior. Mot. at 8. As to the ANC statement, the Court noted correctly that it is hardly surprising that the ANCs themselves would claim recognized status—after all, they are still

---

[3] Once again, the *Chehalis* Plaintiffs suggest that Defendant "agree[s]" that the "ordinary grammatical construction of the Indian tribe definition" favors Plaintiffs. Mot. at 6. Defendant expressly addressed and refuted that point at the summary-judgment hearing: "there's nothing extraordinary about giving precedence to the notion that every term should be given effect and that that should trump any grammatical rule of application." Hr'g at 57:10-13.

making that argument 45 years later. SJ Op. at 22.

As to Interior, it did *not* make a "statement to the same effect in 1988." Mot. at 8. *Compare* Def. Mem. (ECF No. 79-1) at 24-25 (recounting administrative history from 1979-1993). In 1982, Interior first addressed the issue of ANCs on its annual list of Indian Tribes. *Id.* at 24 (citing 47 Fed. Reg. 53,130, 53,133 (Nov. 24, 1982)). While the list did not include ANCs, Interior included the following preamble:

> While eligibility for services administered by the Bureau of Indian Affairs is generally limited to historical tribes and communities of Indians residing on reservations, and their members, unique circumstances have made eligible additional entities in Alaska which are not historial [*sic*] tribes. Such circumstances have resulted in multiple, overlapping eligibility of native entities in Alaska. To alleviate any confusion which might arise from publication of a multiple eligibility listing, the following preliminary list shows those entities to which the Bureau of Indian Affairs gives priority for purposes of funding and services.

47 Fed Reg. at 53,133-34. Thus, Interior took specific steps to *avoid* confusing eligibility for ISDEAA contracts with federal recognition of sovereignty.

In 1988, Interior added "Alaska entities which are statutorily eligible for funding and services from the Bureau of Indian Affairs," *i.e.*, the ANCs, to Interior's list. *See* 53 Fed. Reg. 52,829, 52,832 (Dec. 29, 1988). This was "to make it easier for previously unlisted, but statutorily eligible, entities to receive funding and services." *Id.* Plaintiffs previously noted that this "approximately doubled" the number of Alaskan entities on the list, *Chehalis* Reply (ECF No. 77) at 39, but left out the reason: "express Congressional recognition of the types of entities in Alaska eligible to receive funding or services from the Bureau of Indian Affairs." 53 Fed. Reg. at 52,832. These "additional entities [we]re included without the necessity of completing the Federal Acknowledgment Process because of more explicit statutory provisions on groups eligible to receive funding and services on behalf of Alaska Natives." *Id.* Most importantly, "inclusion on a list of entities already receiving and eligible for Bureau funding and services does not constitute a determination that the entity either would or would not qualify for Federal Acknowledgment under

the regulations," nor should it "be construed to be a determination by this Department as to the extent of the powers and authority of that entity." *Id.* Thus, once again, Interior took great steps to *distinguish* inclusion on the list from federal recognition or acknowledgment of sovereignty. Contrary to the *Chehalis* Plaintiffs' suggestion, Interior has *never* made a "statement to the same effect" as the ANC's suggestion that they satisfy the eligibility clause.

Finally, Plaintiffs never address the Court's reasoning that "whether ANC eligibility remained an unsettled question in 1975 is ultimately a distraction," because the question is "whether Congress meant for ANCs to be eligible for CARES Act relief *in 2020*." SJ Op. at 22. Because that is plainly right, stray comments from the 1970s and 1980s—even if they had been made—are hardly grounds for an injunction pending appeal.

### 3.    The government's contemporary interpretation of ISDEAA, consistently held for 40 years, merits *Skidmore* deference.

The *Chehalis* Plaintiffs next argue that Defendant cannot avail itself of *Skidmore* because "the Treasury Department . . . is the administering agency here," and the 40-year-old interpretations of ISDEAA are held by the Departments of the Interior and of Health & Human Services. Mot. at 8-9. Plaintiffs fail, as they did previously, *see Chehalis* Reply (ECF No. 87) at 27, to cite any authority for the proposition that government agencies' interpretations merit no deference under *Skidmore* unless they are the named defendants in the instant litigation. Nor did the Court find that distinction significant. SJ Op. at 23-27.

In any case, Interior need not have been the ultimate decisionmaker, or been named as a defendant in this case, for its longstanding interpretation to merit deference. Courts account for the fact that a defendant agency's interpretation is consistent with another, expert agency's interpretation. *See, e.g.*, *Sec'y of Labor, Mine Safety & Health Admin. v. Excel Mining, LLC*, 334 F.3d 1, 7 (D.C. Cir. 2003) ("[I]n evaluating the reasonableness of the Secretary's interpretation of the statute and the Joint Finding, we take into account the fact that her reading tracks both the Department of the Interior's and the Department of Labor's original interpretation, adopted at a time when the origins of both the statute and the finding were fresh in the minds of their

administrators."); *Am. Mun. Power-Ohio v. EPA*, 98 F.3d 1372, 1375 (D.C. Cir. 1996) ("EPA's interpretation of the thermal energy exception is also consistent with how the Federal Energy Regulatory Commission uses the words 'thermal energy' in its rules implementing the Public Utility Regulatory Policies Act of 1978. . . . Although FERC's views are not controlling, we think it significant that another federal agency with relevant expertise takes essentially the same position as EPA . . . ."). Courts also defer to non-party agencies' interpretations. *See Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 56-57 (2014) (affirming that *Chevron* deference was properly afforded to BIA's interpretation of immigration laws, even though the case had been brought against USCIS); *Olympic Forest Coal. v. Coast Seafoods Co.*, 884 F.3d 901, 907 (9th Cir. 2018) (deferring to "EPA regulations defining CAFOs" even though "[t]he EPA is not a party to this litigation and has taken no position in this litigation."); *Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir. 1993) ("Although DED is not a party to this appeal, we must accord its interpretation of Title IX appreciable deference."). There is no question here that Treasury relied on the expert opinion of the Department of the Interior in arriving at its final decision.  J.A. 614, 615-16, 617. Since Treasury adopted Interior's interpretation, the Court cannot disagree with Treasury without also disagreeing with Interior. And the Court cannot disagree with Interior's interpretation without first affording it the deference due.

Rather than address these interpretations directly, the *Chehalis* Plaintiffs bicker at the margins. They argue, for example, that the Soller memorandum was too short. Mot. at 9. However, the Court addressed and rejected that exact contention: "Although the analysis is brief, Soller recognized the interpretive challenge presented by Congress's drafting of the ISDEAA definition, identified the competing canons of statutory construction, and evaluated those canons in light of contemporaneous understandings of the statutory terms used and Congress's intent." SJ Op. at 25. The *Chehalis* Plaintiffs also point out that Mr. Soller's memorandum contains an error in wording. Mot. at 9. But as the Court rightly held, the fact that Mr. Soller "appears to have misspoken in one

respect" is hardly fatal to the government's argument. SJ Op. at 25 n.10.[4]

Ultimately, *Skidmore* deference attaches to the extent it has the "power to persuade." Courts will "give an agency's interpretations considerable weight where they involve the contemporaneous construction of a statute and where they have been in long use." *Grecian Magnesite Mining v. IRS*, 926 F.3d 819, 823 (D.C. Cir. 2019) (citing *Skidmore*, 323 U.S. at 140) (quoting *Davis v. United States*, 495 U.S. 472, 484 (1990)). Both are true here.

### 4.    ANCs have "recognized governing bodies."

Plaintiffs argue that "ANCs are not 'Tribal governments,' *and* that they do not have 'recognized governing bodies.'" Mot. at 9 (emphasis added). That is misleading, since "Tribal government" in the CARES Act is *defined as* the "recognized governing body of an Indian Tribe." 42 U.S.C. § 801(g)(5). There is no requirement to be a "government" per se; an ANC need only have a "recognized governing body." As this Court concluded, it unquestionably does.[5]

The term "recognized governing body" was taken directly from ISDEAA's definition of "Tribal organization." The Court did not "back[] its way into" its conclusion, Mot. at 10, but rather logically started with the exact same phrase in another, related statute. *See* SJ Op. at 29 ("In evaluating the parties' arguments, ISDEAA once more serves as the starting point."). Plaintiffs acknowledge that the only other option is to attempt to fit the square peg of an ANC into the round

---

[4] The extent of the error in Mr. Soller's memorandum is that he wrote, "before the word 'including,'" instead of "before the words 'or regional.'" From the balance of the memorandum, that was obviously an error—as the Court recognized.

[5] There is not, and never has been, a "wide body of case law holding that the term 'recognized' as used in Indian law statutes is a legal term of art indicating that a government-to-government relationship has been established between a tribal government and the federal government." Mot. at 9. Defendant has addressed this at length. *See* Def. Mem. (ECF No. 79-1) at 30-33; Def. Reply (ECF No. 88) at 18-21. The only authority to the contrary cited by Plaintiffs is the Court's preliminary-injunction opinion, which this Court thoroughly addressed. SJ Op. at 33-34 ("On this question, while the court agreed with Plaintiffs' argument at the preliminary injunction stage, upon further reflection the court now concludes the opposite—'recognized' standing alone, as it is used in the CARES Act's definition of 'Tribal government,' does not convey federal recognition of an Indian tribe.") (citation omitted).

hold of ISDEAA's *second* definition of "Tribal organization."[6]

It was not until the summary-judgment hearing that the *Chehalis* Plaintiffs argued that ANCs were "sanctioned" by other Indian Tribes, and thus met the definition.[7] As the Court easily concluded, however, that "reading cannot be squared with ISDEAA's text," not least because "ANCs are corporate entities established by Congress and chartered under Alaska state law," and because that reading renders superfluous the proviso at the end of ISDEAA's definition. SJ Op. at 31 (citing 25 U.S.C. § 5304(l)).

Plaintiffs also appear to misunderstand the wording of the 1981 guidelines promulgated by the Indian Health Service, *see* 46 Fed. Reg. 27,178 (May 18, 1981). They say that, under those guidelines, an ANC is treated as "the governing body of an *Alaska Native village*," i.e., "of a specific federally recognized tribe." Mot. at 10 (emphasis in original), 11. Not so. First, the 1981 guidelines prescribe when IHS will recognize an ANC "*as the village governing body*." 46 Fed. Reg. 27,179 (emphasis added). Alaska "Native village" is a defined term under ANCSA; it was *not* used in the cited portion of the 1981 guidelines. Moreover, the ANCs are only recognized under the guidelines "if there is no [Indian Reorganization Act] Council, and no traditional village council." *Id.* Thus, by definition, the ANC would not be recognized as "the governing body of a specific federally recognized tribe." *Contra* Mot. at 11.

The Court did not unduly elevate the phrase "Tribal organization" over "Tribal government." Mot. at 11-12. Recall the statutory scheme here: "Tribal governments" are eligible for payments from the Coronavirus Relief Fund. 42 U.S.C. § 801(a)(2)(B). "Tribal government" is defined under the CARES Act to mean "the recognized governing body of an Indian Tribe." *Id.*

---

[6] *See* 25 U.S.C. § 5304(l) ("any legally established organization of Indians which is controlled, sanctioned, or chartered by such governing body or which is democratically elected by the adult members of the Indian community to be served by such organization and which includes the maximum participation of Indians in all phases of its activities").

[7] The *Chehalis* Plaintiffs had argued that ANCs fell under the second definition of "Tribal organization," *Chehalis* Mem. (ECF No. 77) at 35, but never on what textual basis. Instead, they simply relied on *Ukpeagvik Inupiat Corporation*, which reliance Defendant has debunked, *see* Def. Reply (ECF No. 88) at 10-11.

§ 801(g)(5). "Indian Tribe" is defined under the CARES Act as it is under ISDEAA. *Id.* § 801(g)(1). And finally, the words "recognized governing body" in the CARES Act were copied verbatim from ISDEAA. "The ISDEAA definition of 'tribal organization' is therefore instructive in understanding the term 'Tribal government' under the CARES Act." SJ Op. at 30.

The fact that the CARES Act used "Tribal government" instead of "Tribal organization" is irrelevant for several reasons. First, the obvious reason for not using "Tribal organization" is the *second* definition of "Tribal organization" under ISDEAA, which would have opened the doors to associations, consortia, etc., which are not themselves "Indian Tribes" under ISDEAA. *See* 25 U.S.C. § 5304(l). Congress logically wanted only the *first* form of "Tribal organization," the "recognized governing bod[ies] of [the] Indian Tribe[s]," to get payments from the relief fund. Second, Congress did not leave it at "government." This is a red herring that Plaintiffs have employed throughout in this litigation, and that has been rebutted at length by Defendant. *See* Def. Mem. (ECF No. 79-1) at 33-34; Def. Reply (ECF No. 88) at 21-22. *An entity need not be a government to receive payments under Title V of the CARES Act.* If it did, there would have been no reason for Congress to define "government" as "governing body," and indeed it would have been counterproductive to do so.

"If ANCs have a 'recognized governing body' for purposes of ISDEAA, it stands to reason that Congress brought that same meaning forward in the CARES Act, as the first definition of 'tribal organization' in ISDEAA and the definition of 'Tribal government' in the CARES Act are essentially identical." SJ Op. at 32-33 (citing *Branch v. Smith*, 538 U.S. 254, 281 (2003)).

*      *      *

The "serious legal question" suggested by Plaintiffs was answered long ago. This Court's preliminary-injunction opinion was the first legal authority to dispute that ANCs are "Indian Tribes" under ISDEAA, or that ANCs have "recognized governing bod[ies]" accordingly. The Court has now acknowledged that its prior opinion, issued a mere week after the motion was filed, was in error. This Court's decision on the merits, issued after full consideration of the issues, is correct, and there is no basis to warrant yet another injunction barring Treasury from carrying out

12

its clear statutory command.

## II.   THE BALANCE OF EQUITIES DOES NOT FAVOR PLAINTIFFS.

These cases were all brought on the premise that any reduction in payment from the Coronavirus Relief Fund, or any delay of those payments, would cause irreparable harm to the intended recipients.[8] This Court accepted that premise in its preliminary-injunction opinion: "These are monies that Congress appropriated on an emergency basis to assist Tribal governments in providing core public services to battle a pandemic that is ravaging the nation, including in Indian country." PI Op. (ECF No. 36) at 16. The Court credited Plaintiffs' evidence that "COVID-19 and the public health measures necessary to combat the novel coronavirus have caused their regular streams of revenue to run dry," thereby "creating a crisis in funding needed to deliver health care, procure medical equipment and supplies, and provide meals and expand food banks—just to name a few ways in which the CARES Act funds would be put to use." *Id.*

That is no less true of the ANCs or the Alaska Natives served by them. In their motion for summary judgment, the ANCs documented at length how they have provided services to Alaska Natives, before and during the COVID-19 pandemic. *See* ANC Mem. (ECF No. 78-1) at 9-21 ("The ANCs' missions include a substantial social benefit component, which they further through health care services, elder benefits, language preservation and cultural programs, burial assistance, community infrastructure development, scholarship; programs, job training, educational support, food security and subsistence, land management and protection, and other means."); 43-50 ("Even with the promised CARES Act funding on hold, ANCs have already played a critical role in providing much needed assistance to Alaska Natives in the current crisis.") (cataloguing the provision of housing assistance, energy assistance, social services, and healthcare services). Even if ANCs provide such services to a lesser extent than the Plaintiff Tribes, the funds paid from the Coronavirus Relief Fund must, by law, be used to cover costs that were necessarily incurred due

---

[8] In their original motions for preliminary injunction, Plaintiffs asked, not just that the Court enjoin Defendant from making payments to ANCs, but also that the Court order *all* money to be disbursed by April 26, 2020. *E.g.*, *Chehalis* Mot. (ECF No. 3) at 2.

to COVID-19. *See* 42 U.S.C. § 801(d) (Use of Funds).

Not only did the CARES Act limit the use of funds to those purposes, but it directed Treasury to distribute that funding within 30 days. *Id.* § 801(b)(1). That deadline was April 26, 2020—more than two months ago. The Court recently ordered Treasury to disburse $679 million, which Treasury had proposed to withhold "to resolve any potentially adverse decision in litigation." Mem. Op. at 4, *Agua Caliente*, No. 1:20-cv-1136-APM (D.D.C. June 15, 2020). That opinion recognized that "the Secretary's withholding only invites other dissatisfied Indian tribes to bring their own challenges to the Secretary's allocation decisions." *Id.* at 5. And indeed, that has happened. Three days after that opinion, another Tribe filed suit in the Northern District of Oklahoma, seeking an injunction to withhold millions of dollars from being disbursed, pending a challenge to Treasury's allocation. *See generally Shawnee Tribe v. Mnuchin*, No. 4:20-cv-290-JED-FHM (N.D. Okla. June 18, 2020). The Court was right: further withholding of these funds will only invite further litigation and prolong delay.

Plaintiffs' only argument to the contrary, Mot. at 13-15, is that Defendant's actions would unlawfully "disburse relief funds to unauthorized entities." In other words, Plaintiffs simply insist that they are right on the merits. That is not correct, as this Court—and every court, agency, and secondary source before it—now agrees. Thus, if Plaintiffs are correct that the "public interest" equates to "Congress['s] policy judgments regarding the most appropriate way to allocate the limited relief funding available,"  Mot. at 14, that is all the more reason to *deny* the motion—as Congress plainly intended ANCs to receive payments, and there is no longer any contrary legal authority.

Plaintiffs' only mention of the ANCs is they should avail themselves of "the billions of dollars of corporate funds available to them." Mot. at 15. That ignores both the dire need among Alaska Natives and that Plaintiffs' own Tribally-owned businesses are *also* eligible for those "corporate funds." Plaintiffs want to have it both ways: they invoke the crises of the pandemic without acknowledging its impact on other Alaska Natives, and suggest that ANCs can avail themselves of other CARES Act relief while failing to mention that *Plaintiffs'* businesses are

eligible for that relief, too.

Against the harm that Alaska Natives would suffer by further delay of these disbursements, and the public interest in abiding by Congress's policy choice, the Court must weigh the potential harm to Plaintiffs. Even where demonstrated, irreparable harm alone is not enough to sustain an injunction pending appeal. *Cf. Ind. State Police Pension Tr. v. Chrysler LLC*, 556 U.S. 960, 961 (2009) ("A stay is not a matter of right, even if irreparable injury might otherwise result.") (citation omitted). And under the sliding-scale approach, that prospect of harm would have to outweigh both (1) the minimal chance that the D.C. Circuit will be the first court *ever* to conclude that ANCs are not "Indian Tribes" under ISDEAA, or that they lack the "recognized governing body" necessary to contract thereunder; and (2) the deep inequity of making Alaska Natives wait *even longer* while Plaintiffs try these novel arguments for a third time.

While Defendant does not doubt that Plaintiffs are struggling with the burdens of COVID-19, or that additional funds would provide some benefit, Plaintiffs have, in combination, received more than $1 billion from the Coronavirus Relief Fund. The amount that they could obtain if successful on appeal—by their own calculation, only a small percentage of the Fund, *see* Mot. at 12—is not itself a reason to delay further the distribution of relief funds. To date, the ANCs have received $0. Thus, months after passage of the CARES Act, in which Congress expressly included ANCs, the Alaska Natives served by those ANCs have not benefitted at all—and any further delay only harms them further. Those interests outweigh any assertion of irreparable harm by Plaintiffs.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be denied.

Dated: July 1, 2020

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ERIC WOMACK
Assistant Branch Director

*/s/ Jason C. Lynch*

15

Jason C. Lynch (D.C. Bar No. 1016319)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Rm. 11214
Washington, DC 20005
Tel: (202) 514-1359
Email: Jason.Lynch@usdoj.gov

*Attorneys for Defendants*