## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CONFEDERATED TRIBES OF THE CHEHALIS RESERVATION, et al., | |
| Plaintiffs, | |
| v. | Case No. 1:20-cv-1002-APM |
| STEVEN MNUCHIN, in his official capacity as Secretary of the Treasury, | |
| Defendant. | |
| CHEYENNE RIVER SIOUX TRIBE et al., | |
| Plaintiffs, | |
| v. | Case No. 1:20-cv-1059-APM |
| STEVEN MNUCHIN, in his official capacity as Secretary of the Treasury, | |
| Defendant. | |
| UTE TRIBE OF THE UINTAH AND OURAY RESERVATION, | |
| Plaintiff, | |
| v. | Case No. 1:20-cv-1070-APM |
| STEVEN MNUCHIN, in his official capacity as Secretary of the Treasury, | |
| Defendant. | |

## OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL OF INTERVENOR-DEFENDANTS ALASKA NATIVE VILLAGE CORPORATION ASSOCIATION, INC. AND ASSOCIATION OF ANCSA REGIONAL CORPORATION PRESIDENTS/CEO'S, INC.

## INTRODUCTION

Intervenor-Defendants Alaska Native Village Corporation Association, Inc. and Association of ANCSA Regional Corporation Presidents/CEO's, Inc. (together, "ANC Association Intervenors") respectfully request that this Court deny Confederated Tribes Plaintiffs' Motion for Injunction Pending Appeal ("Motion")[1] of this Court's June 26, 2020, Order granting Defendants summary judgment, Dkt. 97 ("SJ Order"), insofar as the Motion would prohibit the Secretary of the Treasury (the "Secretary") from disbursing much-needed relief funds to Alaska Native Village and Regional Corporations ("ANCs") under Title V of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020) (codified at 42 U.S.C. §801).

Congress appropriated $8 billion for "Tribal governments" to respond to the COVID-19 pandemic almost three months ago. The Secretary has since disbursed more than $7 billion to Indian Tribes in the lower 48 states. By no fault of their own, ANCs, and the Alaska Natives who rely on them for important services, are still waiting for their share of the relief funds.

As the merits briefing in this case illustrated, the devastating consequences of the COVID-19 pandemic have not spared Alaska Natives, and further delaying disbursement of CARES Act funding to ANCs will exacerbate an already dire situation. *E.g.*, ANC MSJ, Dkt. 78-1, 17-21, 43-46 ("ANC MSJ"); *accord* AFN Br., Dkt. 81, 2-4 ("AFN Br."). Many Alaska Native communities are disconnected from any road system, reliant on air carriers that have been forced to scale back or cease operations, and in need of bare essentials. *See* ANC MSJ 18-19. Some communities lack running water and sewage infrastructure, and many have substandard housing conditions and suffer from high unemployment. *See id.* Many of these communities are heavily

---

[1] To the extent necessary, the arguments herein apply equally to Ute Indian Tribe's joinder filed July 1, 2020 (Dkt. 100).

dependent upon tourism and fishing—both of which have been negatively impacted by the pandemic. Because of these unexpected circumstances, CARES Act Title V funds that will pay for critical services to combat the effects of novel coronavirus are desperately needed.

Plaintiffs are not entitled to an injunction pending appeal under the traditional four-factor test. To begin, Plaintiffs are unlikely to succeed on the merits of their appeal for the reasons explained in the decision on summary judgment. This Court's interpretation of CARES Act Title V is supported by the text, relevant history and administrative practice, and case law.

The irreparable harm factor also does not militate in favor of an injunction. To be sure, this litigation represents something of a zero sum game—as this Court noted in its Preliminary Injunction Decision, "dollars improperly paid to ANCs will reduce the funds to Plaintiffs." Dkt. 36 ("PI Decision") at 15. But when this Court made its original finding of irreparable harm, the Secretary had not yet "publicly confirmed how he will divide up the $8 billion that Congress allocated for 'Tribal governments.'" *Id.* at 17. By now, though, he has, and Plaintiffs and other non-ANC tribes have already received over 90% of the funds. Further, Plaintiffs make no showing that *they specifically* stand to receive additional funds but for the ANC allocation. For that reason alone, Plaintiffs fail to carry their burden of showing irreparable harm. In any event, to date, ANCs—village and regional alike—have devoted considerable resources to help their communities while they await CARES Act Title V funds. Plaintiffs have *already* received the funds to which they are entitled; ANCs should not have to wait longer for the funds to which they are entitled.

Finally, the public interest and balance-of-the-equities prongs, which merge for purposes of Plaintiffs' Motion, also weigh against issuing an injunction. At this point, the relative harm to Alaska Natives from continuing to withhold CARES Act relief funding from ANCs during the

midst of this pandemic is severe. In contrast, any harm to Plaintiffs arising from this Court's refusal to grant the injunction is mitigated by the fact that Plaintiffs have already received the CARES Act funding to which the Secretary determined they are entitled.

This Court should deny the Motion.

## ARGUMENT

An injunction pending appeal is an "extraordinary remedy that may only be awarded upon a clear showing that the movant is entitled to such relief." *John Doe Co. v. CFPB*, 849 F.3d 1129, 1131 (D.C. Cir. 2017) (citation and internal quotation marks omitted). In deciding such a motion, the Court weighs: (1) the likelihood of success on the merits; (2) whether the movant will be irreparably injured absent an injunction; (3) the prospect that others will be harmed if the court grants the stay; and (4) where the public interest lies. *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985). Plaintiffs cannot carry their burden here.

## I.     Plaintiffs Are Unlikely To Succeed On The Merits.

To obtain an injunction pending appeal, Plaintiffs must establish that they are likely to succeed on appeal. *Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, 317 F. Supp. 3d 555, 561 (D.D.C. 2018). Recognizing the tall order this presents in the present case, Plaintiffs do not even contend they are likely to succeed, and instead argue that they raise "serious legal questions going to the merits, so serious, substantial, difficult as to make them a fair ground of litigation and thus for more deliberative investigation." *Id.*; *see also* Motion at 5-6. But here, Plaintiffs fall short, as they cannot identify any "potentially persuasive authority for [their] legal position." *John Doe*, 849 F.3d at 1131. This Court's interpretation of the statute, on the other hand, is bolstered by the statute's text, relevant legislative and administrative history, previous court decisions, and the "longstanding treatment of ANCs under ISDEAA by the federal government." SJ Order at 35. Plaintiffs therefore cannot sustain their burden.

A.   **The Plain Text Of The CARES Act Confirms that ANCs Are Indian Tribes for Purposes of the Statute.**

The plain language of the CARES Act confirms that ANCs are "Indian Tribes" for purposes of the statute. The CARES Act makes "Tribal governments" eligible for funding and defined the term to mean "the recognized governing body of an Indian tribe." 42 U.S.C. §801(g). "Indian tribe" is used as defined in Section 5304(e) of ISDEAA, which, in turn, defines "Indian tribe" to mean:

> any Indian tribe, band, nation, or other organized group or community, *including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act* (85 Stat. 688) [*43 U.S.C. 1601 et seq.*], which is recognized as eligible for the special programs and services provided by the United States.

25 U.S.C. §5304 (emphasis added). The italicized language resolves this dispute. For Title V of the CARES Act, Congress chose a definition of "Indian tribe" that expressly includes ANCs.

Reading the statute to include ANCs avoids the linguistic gymnastics necessary to justify the Plaintiffs' exclusion of ANCs from the CARES Act. Under the Plaintiffs' interpretation of "Indian tribe," the phrase "*recognized* governing body" in the definition of "Tribal government" and the phrase "which is *recognized* as eligible for the special programs and services provided by the United States" in ISDEAA both nullify Congress' inclusion of "Alaska Native . . . regional or village corporation" because ANCs are not "recognized" federal tribes under the List Act. This argument fails for all of the reasons discussed in Intervenor-Defendants' joint summary judgment briefing and this Court's decision on summary judgment.

Plaintiffs' interpretation also runs headlong into the reality that, for more than 40 years, ANCs are and have been eligible to participate in—and have participated and continue to participate in—federal programs under ISDEAA. Interpreting ISDEAA's use of "recognized" as being *in pari materia* with the List Act's use of "recognized" would mean that the List Act

retroactively banned ANCs from participating in federal programs in which they had long participated and that it did so *sub silentio*, without having been discovered until now, 25 years after the List Act's passage. Furthermore, the differences between the text and purpose of ISDEAA and the text and purpose of the List Act should put to rest any contention that the eligibility clause in ISDEAA operates to exclude ANCs in the same manner as the List Act. *See* ANC Reply, Dkt. 86, 5-7 ("ANC Reply").

Plaintiffs argue that the plain text of the statute should yield to their view of various canons of construction, including the series-qualifier canon. But reading "Alaska Native . . . regional or village corporation" out of the statute, as Plaintiffs suggest, would run headlong into the principle that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . . " *Hibbs v. Winn*, 542 U.S. 88, 101 (2004). This Court's ANC-inclusive interpretation of the statute eliminates the superfluity problem. SJ Order at 19.

### B.    ANCs' Governing Bodies Are "Tribal Governments" Under the CARES Act.

ANCs (acting through their governing bodies) are "Tribal government[s]" as defined in Title V of the CARES Act. As previously explained, the sole purpose of the "Indian tribe" definition in the CARES Act is to inform the meaning of "Tribal government." Congress could not possibly have chosen a definition of "Indian tribe" that explicitly includes ANCs only to turn around and exclude all ANCs on the theory that they categorically lack "governing bodies." SJ Order at 34 ("It would be passing strange to exclude ANCs so obliquely, and the court cannot presume that Congress intended such a result.").

The term "recognized governing body," which is borrowed from ISDEAA's definition of "tribal organization," 25 U.S.C. §5304(*l*), comfortably encompasses ANCs' boards of directors. Despite Plaintiffs' insistence to the contrary, nothing in the text of the CARES Act limits the

term "recognized governing body" to sovereigns or governmental entities, and the broader corpus of federal law confirms that Congress did not mean for the term to be so limited. ANC Reply 12-14. Longstanding agency guidelines for ISDEAA contracting, on which Plaintiffs rely heavily, reflect that the federal government has long understood the term "recognized governing body" in ISDEAA to encompass ANCs' boards of directors. *See id.* at 14 (citing guidelines).

As this Court noted, "the question before the court is whether ANCs are 'Tribal governments' for the limited purpose of delivering public services to combat the COVID-19 pandemic." SJ Order at 35. The Court held they are. That decision is correct.

C.     **The Histories of ISDEAA and the List Act Further Rebut Plaintiffs' Atextual Interpretation.**

ISDEAA's legislative history confirms that Congress intended ISDEAA's definition of "Indian tribe" to include ANCs. Initially, there was no reference to ANCs in ISDEAA's definition of "Indian tribe." Instead the term was defined as:

> any Indian tribe, band, nation, or other organized group or community, which is recognized as eligible for the special programs and services provided by the United States.

25 U.S.C. §5304. As the Ninth Circuit explained, "[s]pecific reference to Alaska village and regional corporations was added [later] by amendment." *Cook Inlet Native Ass'n v. Bowen*, 810 F.2d 1471, 1473 (9th Cir. 1987). The only way to give that amendment "real and substantial effect," *Stone v. INS*, 514 U.S. 386, 397 (1995), is to construe ANCs as "Indian tribes." Otherwise, Congress' intentional inclusion of ANCs would serve no purpose.

Furthermore, the legislative history and text of ISDEAA belies the argument that Congress' inclusion of "recognized governing body" in the CARES Act was meant to limit Title V funding to tribes that are federally recognized under the List Act. Again, the phrase "recognized governing body of an Indian tribe" is not unique to the CARES Act; it appeared

6

much earlier in ISDEAA. And although the original phrase in ISDEAA referred to the "*elected* governing body of an Indian tribe" it was later amended by Congress to ensure that tribes without elected governing bodies could still participate in ISDEAA's programs. Ever since, the phrase is simply a means for Congress to clarify which body associated with an Indian tribe (including ANCs) has the authority to represent that tribe for purposes of the relevant program.

### D. The Secretary's Determination That ANCs Are Eligible for Funds Under Title V Is Consistent with Longstanding Federal Practice and Entitled to Respect.

When Congress enacted the CARES Act with ISDEAA's definition of "Indian tribe" it did so with the benefit of more than 40 years of consistent interpretation of that term. *See Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) ("When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well."). It legislated with an understanding that "Indian tribe" under ISDEAA has a settled meaning.

The Ninth Circuit's holding in *Bowen* that the term "Indian tribe" in ISDEAA includes ANCs comports with the longstanding interpretation of "Indian tribe" by the Departments of the Interior and of Health and Human Services, and which has been followed in the ensuing years. *See, e.g.,* AR Tab 12; *Ukpeagvik Inupiat Corp. v. U.S. Dep't of Health & Human Servs.*, No. 13-cv-00073, 2013 WL 12119576, at *2 & n.21 (D. Alaska May 20, 2013) (noting that Alaska village corporation was an "Indian tribe" under ISDEAA). Thus, to the extent there is any lack of clarity as to what Congress intended in enacting Title V of the CARES Act, Treasury's

interpretation readily qualifies for deference under *Skidmore v. Swift*, 323 U.S. 134 (1944). SJ Order at 23-24.[2]

## II.    The Irreparable Harm Factor Does Not Weigh in Plaintiffs' Favor.

"To meet the 'high standard for irreparable injury,' the moving party must demonstrate an injury that is 'both certain and great' and must also 'show [t]he injury complained of is of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm.'" *Cigar Ass'n*, 317 F. Supp. 3d at 562 (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (emphasis and marks in original)). Plaintiffs cannot make this showing.

As an initial matter, this Court should view with skepticism Plaintiffs' plea that without an injunction "no legal obstacle will preclude the Secretary from distributing" the funds allocated to ANCs, thus preventing Plaintiffs from "recoup[ing] them." Motion at 12. Although, back in April, this Court agreed that because any Title V dollar distributed to an ANC is a dollar that "will not be recoverable by judicial decree" by Plaintiffs, PI Decision at 15, it did so in part because, at that point, the Secretary had not yet revealed its allocation formula and this Court surmised the amount ultimately allocated to the ANCs "could be substantial." *Id.* at 18. Relevant here, several months later—after Treasury has already disbursed more than 90% of the Title V funds to non-ANC Indian tribes, including Plaintiffs—Plaintiffs make no reliable showing of how much of the remaining funds *they specifically* would be entitled to but for the allocation to ANCs. All Plaintiffs say, without support, is that "they will forever be denied the opportunity to

---

[2] Plaintiffs' Motion also argues that the government is not entitled to *Skidmore* deference. The weight of an agency's interpretation depends in part on its validity, its consistency with earlier and later decisions, and its persuasiveness. SJ Order at 23-24. The government has reaffirmed that ANCs are Indian tribes under ISDEAA for 45 years and courts have found the government's interpretation to be persuasive. Plaintiffs' disagreement as to the validity of the agency's interpretation does not deprive the agency of deference.

share in hundreds of millions of dollars" that Treasury has allocated to ANCs. Motion at 4; *see also id.* at 12 (arguing they will have no chance to recoup ANC funds). Plaintiffs thus fail to "provide proof that the harm . . . is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *Florida EB5 Invs., LLC v. Wolf*, No. 19-cv-3573, 2020 WL 1079181 (D.D.C. March 6, 2020) (same).

In any event, on a relative scale, the harm to Plaintiffs is diminished by the fact that the non-ANC Indian tribes have already received the funds to which the Secretary deemed they were entitled, the aggregate of which exceeds 90% of the $8 billion Congress made available. Thus, to the extent the specific tribes constituting the moving Plaintiffs might theoretically be harmed if the judgment is not stayed pending appeal, the extent of that potential harm is far less severe than it would have been two months ago. Tribes that have received hundreds of millions of dollars should not be standing in the way of ANCs who have so far received nothing.[3]

As for Plaintiffs' contention that, absent an injunction, they "will have been denied the right to appellate review of the serious and important questions presented," Motion at 12, that, too, must be viewed relative to the current posture of this case. ANC Association Intervenors do not deny the importance of the legal issues posed, but as this Court noted, its decision does not effect a "sea-change in Tribal law" or elevate ANCs to anything more than they are: entities "eligible for CARES Act funds, as Congress intended—no more, no less." SJ Order 35-36.[4] In

---

[3] For example, Plaintiff Navajo Nation reported that it alone received more than $714 million, presumably more than all of the ANCs will receive collectively. *See* https://www.nhonews.com/news/2020/jun/30/navajo-nation-receives-714-million-federal-cares-a/; Motion at 12 (suggesting what ANCs might expect to receive collectively).

[4] Certainly when Plaintiffs moved for a preliminary injunction, and sought disbursement of *all* Title V funds, they were not then of the view that these same "serious and important questions"—in which ANCs have an equal stake—deserved full hearing at even the district

all events, whatever harm Plaintiffs can show is not so substantial as to justify making ANCs wait what is otherwise likely to be several more months for their CARES Act Title V disbursements, especially given the possibility of the appropriation lapsing at the end of September. *See* SJ Order at 10 n.6.

## III.    The Balance of the Equities and Public Interest Favor Denying Plaintiffs' Motion.

When the federal government is the opposing party, the balance of the equities and the public's interest merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court, in applying this factor, considers whether the harm to the public and third parties if there is no injunction, outweighs the harm to the Plaintiffs if an injunction is granted.

There is no dispute here that time is of the essence for the CARES Act Title V funds to be disbursed. As this Court noted in another case, "[e]ach day that passes in which Plaintiffs have not received their full allotment of [CARES Act] funds impairs their capacity to respond to the crisis." *Agua Caliente Band of Cahuilla Indians v. Mnuchin*, No. 20-cv-01136, 2020 WL 3250701, at *3 (D.D.C. June 15, 2020) (Mehta, J.). Plaintiffs, though, continue to press the narrative that they have a monopoly on the harm that flows from the Secretary's withholding of funds. *See* Motion at 15 ("A *delay* in the potential receipt of these funds by ANCs would not result in any irreparable harm. In stark contrast, absent an injunction, the Plaintiff Tribes will *forever* lose the opportunity to receive and spend these funds on the governmental services that Congress intended." (emphasis in original)). But Title V funds intended to help ANCs with the costs associated with combatting the COVID-19 pandemic are no less urgently needed than the funds allocated to the non-ANC tribes. As this Court observed in its *Agua Caliente* order,

---

court, let alone the court of appeals, prior to disbursement. Dkt. 3 at 2 (seeking an order directing the Secretary "to allocate and disburse . . . all" $8 billion to non-ANC tribes).

"Congress made a policy judgment that Tribal governments are in dire need of emergency relief" and "are presumed already to be suffering great harm." *Agua Caliente*, 2020 WL 3250701, at *3.

The declarations attached in support of intervention bear that presumption out. To take just one example (of the many), in Tyonek, Alaska, which is 43 miles southwest of Anchorage, direct road access is (as in so many locations in Alaska) nonexistent; thus, the main ways in and out of the village are by plane or boat. *See* Barlow Decl. ¶ 3, Dkt. 45-15. As part of their subsistence lifestyle, Tyonek Native Corporation ("TNC") Shareholders "rely heavily on the fishing industry which has been negatively impacted by the spread of the pandemic across the State of Alaska." *Id.* ¶ 3. Moreover, housing and medical facilities are limited, the airstrip is in desperate need of new lighting "to support medevacs which are anticipated to respond to the COVID-19 pandemic," and a $4,000,000 bridge and road upgrade is needed to serve as "the only other route that would provide alternative access for medevacs which are not currently able to land at the Tyonek airstrip[.]" *Id.* "Without access to funding under Title V of the CARES Act, TNC will be unable to continue to provide even the minimum levels of support its Shareholders and Native community depend upon each year much less be equipped to provide the necessary responses and additional support that will be necessary to implement the public safety measures necessary to combat the detrimental effects of the COVID-19 pandemic." *Id.* ¶ 6. These additional expenses were not budgeted, and the funds will not be available without access to CARES Act Title V funds. *See id.*; *see also* AFN Br. 2-3 (discussing ANCs' efforts to work with other tribal entities to combat the pandemic).

This is genuine hardship and suffering. Moreover, as described throughout Intervenor-Defendants' motion for summary judgment and the declarations attached in support of intervention, ANCs in Alaska provide a range of vital services to Alaska Natives that look every

bit as "governmental" as the services highlighted in Plaintiffs' briefing. *Compare, e.g.*, Sioux/Ute MSJ 5-7 *with* ANC MSJ 10-13, 46-48. The onset of the pandemic has only served to amplify the need for such services in light of the remoteness and substandard living conditions of many Alaska Native communities. *See* ANC MSJ 18-20; *accord* AFN Br. 3-4.

Non-ANC tribes appear to have received by now over $7 billion in CARES Act funds for the purpose of combatting COVID-19. ANC Intervenors, meanwhile, "through no apparent fault of their own," *Shawnee Tribe v. Mnuchin*, No. 20-cv-290, Dkt. 19 at 3 (N.D. Okla. June 29, 2019), have not received a dime. The ANCs now, no less than all Indian tribes these past few months, are in need of relief funding to assist in providing core public services to their local communities, which continue to suffer as a result of the pandemic. The ANC Association Intervenors are on record that the Title V funds will be put to immediate use,[5] and the Court should allow that to happen without further delay. For ANCs, no less than the other tribes that have already received their funds, "longer delays are less tolerable when public health considerations are at stake." *Agua Caliente*, 2020 WL 3250701, at *2; *cf. id*. at *3 ("More litigation will only lead to more delay—a result that the court cannot countenance in the face of a pandemic.").

Allowing Treasury to proceed with disbursements is consistent with Congress' goal to provide funding to Tribal governments to cover the costs "incurred due to the public health emergency." *See Citizens for Responsibility and Ethics in Wash. v. Office of Admin.*, 565 F. Supp. 2d 23, 31 (D.D.C. 2008) (evaluating the public interest in light of the purpose of the

---

[5] *E.g.*, "Alaska Native Cos. Can Get Part of $8B COVID Fund," Law360 (June 30, 2020), https://www.law360.com/articles/1287328?utm_source=rss&utm_medium=rss&utm_campaign=articles_search (quoting the ANC Associations as saying the funds "will provide immediate support to Alaska's rural communities suffering from COVID-19 and help repair the economic damage caused by the pandemic").

statute). For ANCs, no less than other Indian tribes, every day the disbursement of CARES Act funds allocated for ANCs is delayed is another day that the Alaska Natives they serve are not fully equipped with the tools to combat the public health emergency. To be sure, competing interests must be balanced here, but at this juncture, the scales tip in favor of allowing the Secretary to discharge his remaining Title V obligations and disburse the ANC-allocated funds to the ANCs.

## IV.    Conclusion

ANC Association Intervenors respectfully request this Court deny Plaintiffs' Motion for an injunction pending appeal.

Dated:  July 1, 2020

Respectfully submitted,

/s/ Daniel W. Wolff
_____
Daniel W. Wolff (D.C. Bar #486733)
David Y. Chung (D.C. Bar #500420)
Kirsten L. Nathanson (D.C. Bar #463992)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 624-2500
dwolff@crowell.com
dchung@crowell.com
knathanson@crowell.com

Christine V. Williams
J. Harrison Powell, II
Outlook Law, LLC
1016 West 6th Avenue, Suite 306
Anchorage, Alaska 99501
(907) 258-2200
christinewilliams@outlooklaw.com
harrisonpowell@outlooklaw.com

*Counsel for Alaska Native Village Corporation
Association, Inc. and Association of ANCSA
Regional Corporation Presidents/CEO's, Inc.*